UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE PENNSYLVANIA AVENUE FUNDS, Individually and on Behalf of All Others Similarly Situated, | : : : : | Civil Action No. 08-6857 |
| | : | CLASS ACTION |
| Plaintiff, | : : | |
| | : | COMPLAINT FOR VIOLATIONS OF |
| vs. | : : | FEDERAL SECURITIES LAWS |
| INYX INC., JACK KACHKAR, STEVEN HANDLEY, RIMA GOLDSCHMIDT, DAVID ZINN and BERKOVITS, LAGO & COMPANY LLP, | : : : : : : | |
| Defendants. | : x | |

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Inyx Inc. ("Inyx" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of purchasers of the securities of Inyx between March 31, 2005 and July 2, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b), as and many of the acts and practices complained of herein occurred in substantial part in this District.

5.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.    Plaintiff The Pennsylvania Avenue Funds, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Inyx during the Class Period and has been damaged thereby.

7.    Defendant Inyx is a pharmaceutical company that develops and manufactures prescription and over-the-counter ("OTC") aerosol pharmaceutical products and drug delivery applications for the treatment of respiratory, allergy, dermatological, and topical and cardiovascular disease conditions and provides pharmaceutical development and manufacturing consulting services to the international healthcare market.

8.    (a)    Defendant Jack Kachkar ("Kachkar") was, at all relevant times, Chairman and Chief Executive Officer of Inyx and also served as Inyx's Chief Financial Officer.  During the Class Period, Kachkar signed and verified the Company's false and misleading reports filed with the SEC.

(b)    Defendant Steven Handley ("Handley") was, at all relevant times, Inyx's President.  During the Class Period, Handley signed and verified the Company's false and misleading reports filed with the SEC.

(c)    Defendant Rima Goldschmidt ("Goldschmidt") was, at all relevant times, Inyx's Treasurer and also served as Inyx's Chief Financial Officer and Chief Accounting Officer. During the Class Period, Goldschmidt signed and verified the Company's false and misleading reports filed with the SEC.

(d)    Defendant David Zinn ("Zinn") was at certain times, Inyx's Vice President of Finance and Principal Accounting Officer.  During the Class Period Zinn signed and verified the Company's false and misleading reports filed with the SEC.

(e)    Defendants Kachkar, Handley, Goldschmidt and Zinn are collectively referred to herein as the "Individual Defendants."

- 2 -

9.     Defendant Berkovits, Lago & Company LLP, ("Berkovits") is a firm of Certified Public Accountants and consultants.  Through its Ft. Lauderdale office, Berkovits served as Inyx's auditor during the Class Period.  The term "Defendant" does not refer to Berkovits unless Berkovits is specifically referenced.

10.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

11.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above.  Each of the above officers of Inyx, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

12.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded in the over-the-counter market on the NASDAQ OTC Bulletin Board under the symbol IYXI, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Inyx, each of the Individual Defendants had access to the adverse undisclosed information about Inyx's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Inyx and its business issued or adopted by the Company materially false and misleading.

14.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class

- 4 -

Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

15.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Inyx common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Inyx's business, operations, management and the intrinsic value of Inyx common stock; and (ii) caused Plaintiff and other members of the Class to purchase Inyx common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Inyx during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Inyx common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Inyx or its transfer agent and may be notified of the

- 5 -

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Inyx; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

22.    Defendant Inyx is a pharmaceutical company that develops and manufactures prescription and OTC pharmaceutical products.  The Company has operating subsidiaries in the US and the UK.

23.    The Class Period commences on March 31, 2005.  On that date, Inyx issued a press release announcing that it had obtained asset-based credit facilities totaling up to $46 million from Westernbank Business Credit Division of Westernbank Puerto Rico ("Westernbank") to fund the acquisition of a drug manufacturing plant in Puerto Rico.  The press release stated, in pertinent part:

> Inyx has received from Westernbank ten-year and five-year asset-based term loans, secured by land, buildings and equipment owned by Inyx, bearing an interest rate of 2% above the prime rate.  From these credit facilities, approximately $19.7 million in funding has been utilized by Inyx to close today its acquisition of certain assets and business of Aventis Pharmaceuticals Puerto Rico Inc. from Aventis Pharmaceuticals, Inc., a member of the sanofi-aventis Group. . . .

> \*       \*       \*

> Westernbank has also provided Inyx with an asset-secured capital expenditure line of $5 million at an interest rate of prime plus 2% and a $5 million mezzanine line with 15% annual interest as well as a revolving credit facility, secured against accounts receivable and inventory, at prime plus 1%.

> Jack Kachkar, M.D., Chairman and CEO of Inyx, said, "The new credit facilities from Westernbank provides Inyx with the funding flexibility to prudently operate and grow our new base in the United States from Puerto Rico as well as our base in Europe from the United Kingdom.  We are very gratified in the faith that Westernbank has in Inyx."

24.    On or about April 15, 2005, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2004 and issued guidance for 2005.  The press release stated, in pertinent part:

> For 2004, revenues totaled $15.7 million versus $13.1 million the prior year, which covered less than a full-year period of March 7 2003 to December 31, 2003.  There was a net loss in 2004 of $16.9 million, or $.52 per share, compared with a net loss in 2003 of $13.4 million, or $0.59 a share.

\*     \*     \*

For the 2004 fourth quarter, revenues were $4.2 million versus $5.0 million in the 2003 period. The 2004 fourth-quarter net loss was $7.0 million, or $0.18 per share, as opposed to a 2003 last period loss of $6.2 million, or $0.27 per share.

Jack Kachkar, M.D., Chairman & CEO of Inyx, Inc., said, "Our revenues in 2004 were approximately $10 million less than originally anticipated because of the delay in two contracts that were initially scheduled to start last year but didn't because the required government and regulatory approvals were not secured and not in Inyx's control." One of the delayed contracts is now scheduled to start production in the fourth quarter of this year with full ramp-up in 2006. It is anticipated that the other delayed contract also will commence later this year.

"Furthermore, we have very significant contractual relationships commencing this second quarter with two new clients, which will have a materially positive impact on 2005 results," added Dr. Kachkar. One new relationship is with Kos Pharmaceuticals, Inc. (NASDAQ:KOSP), with which Inyx signed a 10-year agreement for Inyx to produce Kos' Azmacort(R) Inhalation Aerosol product line. This contract is expected to generate about $10 million in annual revenues to Inyx.

25.     On or about April 15, 2005, Inyx filed its Form 10-K for the year ended December 31, 2004 with the SEC, which was signed by Defendants Kachkar and Handley (the "2004 Form 10-K"). The 2004 Form 10-K included Inyx's financial statements for the year ended December 31, 2004, which were represented to have been presented in conformity with U.S. Generally Accepted Accounting Principles ("GAAP"). In addition, the 2004 10-K represented that:

The Company recognizes revenue when (1) persuasive evidence of an arrangement exists; (2) product delivery has occurred or services rendered; (3) the fee is fixed or determinable; and (4) collectability is reasonably assured. Revenues are recognized FOB (freight-on-board) shipping point, when products are shipped, which is when legal title and risk of loss is transferred to the Company's customers, and is recorded at the net invoiced value of goods supplied to customers after deduction of sales discounts and sales and value added tax, where applicable. In situations where the Company receives payment in advance of the performance of research and development services, such amounts are deferred and recognized as revenue as the related services are performed.

Non-refundable fees are recognized as revenue over the term of the arrangement, based on the percentage of costs incurred to date, estimated costs to complete and total expected contract revenue. Product returns are not accepted.

\*     \*     \*

Accounts receivable are stated at realizable value, net of an allowance for doubtful accounts. Periodically, management reviews all accounts receivable and based on an assessment of whether they are collectible, estimates the portion, if any, of the balance that will not be collected in order to establish an allowance for doubtful accounts. Such allowance was based on the specific identification of accounts deemed uncollectible as of each period end. The provision for the allowance for doubtful accounts is included in general and administrative expenses in the accompanying consolidated statements of operations.

*       *       *

The consolidated financial statements are prepared in conformity with accounting principles generally accepted in the United States of America. The preparation of consolidated financial statements, in conformity with generally accepted accounting principles, requires management to make estimates and assumptions. Those estimates and assumptions affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. The more significant estimates are those used by management to measure the recoverability of intangible assets, the value of its deferred tax asset, the allowances for doubtful accounts and inventory reserves. Actual results could differ from those estimates.

26.     On or about May 23, 2005, Inyx issued a press release announcing its financial results for the first quarter of 2005, the period ended March 31, 2005. For the quarter, revenues were $2.7 million versus $4.5 million for the year-ago period. Defendant Kachkar commented on the results and reaffirmed the Company's 2005 guidance, stating, in pertinent part, as follows:

Our operating results in this year's first quarter were impacted by revenues deferred until the second half of 2005 and one-time refinancing costs related to our recent Puerto Rico acquisition.

*       *       *

In addition, there were delays in two client contracts that were originally expected to start earlier but didn't because the required regulatory approvals and other client issues were not resolved on schedule. These delayed contracts are now scheduled to start production in the third and fourth quarters of 2005, which we expect will add approximately $4 million to revenues in the second half of this year. Moreover, as a result of our recent acquisition of assets and business of Aventis Pharmaceuticals from sanofi-aventis Group (NYSE:SNY), we have gained significant contractual relationships with two new clients that will have a materially positive impact on 2005 results.

- 9 -

\*     \*     \*

Based on these new business relationships, as well as the commencement and ramp-up this year of several existing contracts, Inyx reaffirms the financial guidance given last month.

27.     On or about May 23, 2005, Inyx filed its March 31, 2005 Form 10-Q with the SEC, which repeated Inyx's previously announced financial results for the quarter. The Form 10-Q included Inyx's financial statements for the quarter ended March 31, 2005, which were represented to have been presented in conformity with U.S. GAAP, stating, in pertinent part, as follows:

The accompanying consolidated financial statements for the three months ended March 31, 2005 and 2004 are unaudited but, in the opinion of management, include all necessary adjustments (consisting of normal, recurring in nature) for a fair presentation of the financial position, results of operations and cash flow for the interim periods presented.

28.     On or about August 19, 2005, Inyx issued a press release announcing its financial results for the second quarter of 2005, the period ending July 31, 2005. For the quarter, the Company reported revenues of $8.5 million. Defendant Kachkar commented on the results and reaffirmed the Company's 2005 financial guidance, stating, in pertinent part, as follows:

The strong increase in second-quarter revenues is due to increased business from our Puerto Rico acquisition on March 31, 2005. We also had higher operating expenses and financing costs as a result of the acquisition. Contributing to the increased loss in this year's first half was a reduction in our core revenues during the period due to regulatory delays experienced by two customers and a vendor qualification delay on a third customer at our United Kingdom site. These delays, which have since been resolved, have resulted in approximately $8.0 million in committed contract revenues being deferred from the first half to the second half of 2005.

Based on new business relationships that we have been cultivating, as well as the commencement and ramp-up of several existing contracts in this second half, Inyx reaffirms the 2005 financial guidance given earlier in the year.

29.     On or about August 19, 2005, Inyx filed its June 30, 2005 Form 10-Q with the SEC, which repeated Inyx's previously announced financial results for the quarter. The Form 10-Q

- 10 -

included Inyx's financial statements for the quarter ended June 30, 2005, which were represented to

have been presented in conformity with U.S. GAAP, stating, in pertinent part, as follows:

> The accompanying consolidated financial statements for the three and six months ended June 30, 2005 and 2004 are unaudited but, in the opinion of management, include all necessary adjustments (consisting of normal, recurring in nature) for a fair presentation of the financial position, results of operations and cash flow for the interim periods presented.

30.    On or about August 26, 2005, Inyx issued a press release announcing that it and UCB,

a Belgian pharmaceutical company, signed a definitive agreement whereby Inyx would acquire from

UCB all the outstanding shares of Celltech Manufacturing Services Limited (CMSL), a UCB

subsidiary based in Ashton, England.   The purchase price was 27.5 million Euros and would be

financed through an asset-based funding facility.   The press release stated that the acquisition,

expected to close on August 31, 2006, would add "in excess of $50 million with high profit margins

to Inyx over the first 12 months, which are expected to build in the future."  Defendant Kuchkar

commented on the acquisition, stating, in pertinent part, as follows:

> This strategic acquisition will make a material contribution to Inyx's revenue base and profitability immediately and going forward.  Moreover, CMSL greatly enhances Inyx's operations and capabilities in Europe, augmenting our existing base in the U.K., and complements our recently established operating base in the United States.

> CMSL provides Inyx with both a base of new customers and new development and production capabilities, which include expertise in dry powder inhalers that complements Inyx's expertise in metered dose inhalers and aerosol sprays, giving Inyx a comprehensive inhalation-therapy platform.

31.    On or about September 13, 2005, Inyx issued a press release increasing its revenue

and earnings guidance for 2005 and 2006.  The press release stated, in pertinent part, as follows:

> "As a result of our company's strategic United Kingdom acquisition of the Celltech manufacturing operation two weeks ago and our strategic alliance with King Pharmaceuticals announced last week, Inyx's industry positioning has changed and been enhanced significantly.   Inyx's mid-term financial outlook also has been increased materially," said Jack Kachkar, M.D., Chairman and Chief Executive Officer of Inyx, Inc.

- 11 -

Inyx now expects consolidated revenues in 2006 to exceed $125 million with earnings before interest and taxes approaching 20% and net after-tax earnings of better than 10%, Dr. Kachkar reported.  Previously, the company's guidance expected 2006 revenues to be in the range of $75 million with net earnings of about $7 million.

Inyx now expects 2005 revenues to well exceed $50 million, up from earlier guidance of approximately $50 million.  The company now expects to have earnings before interest and taxes approaching $3 million for full year 2005.  Inyx expects to have a net loss in the range of $7 million for 2005, primarily because of increased interest expenses and one-time costs related to both the U.K. acquisition and a U.S. acquisition this past March.  In 2004, Inyx had revenues of $15.7 million and a $16.9 million net loss.

"Because our new U.K. acquisition will only contribute four months of earnings and revenues to Inyx in 2005, and because our strategic alliance with King Pharmaceuticals will not start to make a material contribution to Inyx's operating results until 2006, our increased interest expenses will not be offset until next year," the Inyx CEO explained.  "We will also benefit from the expected introduction of Inyx's first two proprietary products in 2006."

32.     On or about November 21, 2005, Inyx issued a press release announcing its financial results for the third quarter of 2005, the period ended September 30, 2005.  For the quarter the Company reported revenue of $12.9 million.  Defendant Kachkar commented on the results, reaffirming 2005 revenue guidance of $50 million and increasing the Company's 2006 revenue outlook to $135 million, stating, in pertinent part, as follows:

The strong increase in third-quarter revenues is due largely to our two acquisitions this year.  These acquisitions have contributed significantly to our revenues, diversified and grown our client base, expanded our development and manufacturing capabilities, and enlarged our overall scope of business.

*       *       *

Even though our two United Kingdom-based operations are presently impacted by a lower currency exchange, as the U.S. Dollar has been stronger against the Great Britain Pound in the second half, we still expect revenues for 2005 to total around $50 million and to achieve profitability at the plant operating level by year-end.

Moreover, because of increasing business at our new Puerto Rico site as well as our greatly expanded U.K. base, plus our new strategic collaboration with King Pharmaceuticals, Inc.(NYSE:KG), our outlook for 2006 has increased.

33.     On or about November 23, 2005,  Inyx filed its September 30, 2005 Form 10-Q with

the SEC, which repeated Inyx's previously announced financial results for the quarter.  The Form

10-Q included Inyx's financial statements for the quarter ended September 30, 2005 which were

represented to have been presented in conformity with U.S. GAAP, stating, in pertinent part, as

follows:

> The accompanying consolidated financial statements for the nine and three months
> ended September 30, 2005 and 2004 are unaudited but, in the opinion of
> management, include all necessary adjustments (consisting of normal, recurring in
> nature) for a fair presentation of the financial position, results of operations and cash
> flow for the interim periods presented.  Interim results are not necessarily indicative
> of results for a full year.

34.     On or about April 3, 2006, Inyx issued a press release announcing its financial results

for the fourth quarter of 2005, the period ended December 31, 2005.  For the quarter the Company

reported revenue of $25.5 million.  For the year Inyx reported $49.6 million in revenue.  The

Company also increased 2006 revenue guidance to $150 million and increased 2007 revenue outlook

to $250 million.  Defendant Kackar commented on the results, stating, in pertinent part, as follows:

> The strong increase in 2005 fourth- quarter and full-year revenues is due largely to
> additional business as a result of two, strategic acquisitions made last year.  The
> increased net loss in 2005 is due primarily to higher operating expenses created by
> those acquisitions that won't start to be offset until the second half of 2006, as well
> as $3.0 million in one-time, non-recurring charges related to the acquisitions and
> $3.9 million in non-cash charges.

> *          *          *

> In 2006, Inyx is making additional investments to both produce and manage
> accelerating future growth.  We are very excited about the future because, as a result
> of Inyx's niche drug delivery expertise and expanding relationships in the
> pharmaceutical industry, we expect to have a breakout year in 2007.

35.     On or about March 31, 2006, Inyx filed its Form 10-K for the year ended December

31, 2005 with the SEC, which was signed by Defendants Kachkar Handley and Goldschmidt (the

"2005 Form 10-K").  The 2005 Form 10-K included Inyx's financial statements for the year ended

December 31, 2005, which were represented to have been presented in conformity with U.S. GAAP.

In addition, the 2005 10-K represented that:

> The Company recognizes revenue when (1) persuasive evidence of an arrangement exists; (2) product delivery has occurred or services have been rendered; (3) the fee is fixed or determinable; and (4) collectability is reasonably assured. Revenues are recognized FOB shipping point, when products are shipped, which is when legal title and risk of loss is transferred to the Company's customers, and is recorded at the net invoiced value of goods supplied to customers after deduction of sales discounts and sales and value added tax, where applicable. In situations where the Company receives payment in advance of the performance of research and development services, such amounts are deferred and recognized as revenue as the related services are performed.

*    *    *

> Non-refundable fees are recognized as revenue over the term of the arrangement, based on the percentage of costs incurred to date, estimated costs to complete and total expected contract revenue. Product returns are not accepted.

*    *    *

> Accounts receivable are stated at realizable value, net of an allowance for doubtful accounts. Periodically, management reviews all accounts receivable and, based on an assessment of whether they are collectible, estimates the portion, if any, of the balance that will not be collected in order to establish an allowance for doubtful accounts. Such allowance was based on the specific identification of accounts deemed uncollectible as of each period end. The provision for the allowance for doubtful accounts is included in general and administrative expenses in the accompanying consolidated statements of operations.

*    *    *

> The consolidated financial statements are prepared in conformity with accounting principles generally accepted in the United States of America. The preparation of consolidated financial statements, in conformity with generally accepted accounting principles, requires management to make estimates and assumptions. Those estimates and assumptions affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. The more significant estimates are those used by management to measure the recoverability of intangible assets, the allowances for doubtful accounts and inventory reserves. Actual results could differ from those estimates.

36.    On or about May 17, 2006, Inyx issued a press release announcing its financial results for the first quarter of 2006, the period ended March 31, 2006.  For the quarter, revenues were $21.4 million versus $2.7 million for the year-ago period.  The Company also reaffirmed revenue guidance for 2006 and 2007 of $150 million and $250 million, respectively.  Defendant Kachkar commented on the results, stating, in pertinent part, as follows:

> The gross profit for the first quarter was $8.3 million, equal to a gross margin of 39%.  The improved gross profitability is the result of several factors, including the achievement of development milestones in the quarter on several new customer contracts related to high-margin, technical transfer work required prior to the commencement of commercial manufacturing.  In addition, we commenced commercial production on two material contracts in the quarter.  This resulted in increased utilization of capacity at our manufacturing facilities.  Furthermore, Inyx's new marketing arm, Exaeris, Inc., also commenced formal operations in this year's first quarter and, in turn, has started to contribute to our company's overall gross margin.
>
> As a result of the improved gross profitability, earnings before income taxes, deprecation and amortization in this year's first quarter amounted to approximately $1.6 million, which is the first time Inyx has achieved positive EBITDA in our company's three-year history.

37.    On or about May 17, 2006, Inyx filed its March 31, 2006 Form 10-Q with the SEC, which was signed by Defendant Goldschmidt.  The March 31, 2006 Form 10-Q repeated Inyx's previously announced financial results for the quarter.  The Form 10-Q included Inyx's financial statements for the quarter ended March 31, 2008 which were represented to have been presented in conformity with U.S. GAAP, stating, in pertinent part, as follows:

> The accompanying consolidated financial statements for the three months ended March 31, 2006 and 2005 are unaudited but, in the opinion of management, include all necessary adjustments (consisting of normal, recurring in nature) for a fair presentation of the financial position, results of operations and cash flows for the interim periods presented.

38.    On or about August 21, 2006, Inyx issued a press release announcing its financial results for the second quarter of 2006, the period ending June 30, 2006.  For the quarter, the

Company reported revenues of $20.1 million versus $8.5 million for the same quarter in 2005. Defendant Kachkar commented on the results, stating in pertinent part, as follows:

> The gross profit in the second quarter was $7.6 million, equal to a gross margin of 38%. The increased net loss was due mostly to the increased non-cash charges and the cash expenses related to the pending acquisitions. We will incur additional one-time, non-recurring expenses and related restructuring charges in the third quarter, however, both acquisitions should be accretive to Inyx once they are completed.

39.    On or about August 21, 2006, Inyx filed its June 30, 2006 Form 10-Q with the SEC, signed by Defendant Zinn, which repeated Inyx's previously announced financial results for the quarter. The Form 10-Q included Inyx's financial statements for the quarter ended June 30, 2006 which were represented to have been presented in conformity with U.S. GAAP, stating, in pertinent part, as follows:

> The accompanying unaudited consolidated financial statements of Inyx have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions for Form 10-Q and Rule 10-01 of Regulation S-X. They do not include all information and notes required by generally accepted accounting principles for complete financial statements and should be read together with the audited financial statements and notes thereto included in our annual report on Form 10-K for the year ended December 31, 2005. The balance sheet data as of December 31, 2005 was derived from audited financial statements but does not include all disclosures required by generally accepted accounting principles. Certain reclassifications have been made to conform to the 2006 presentation. The financial information furnished reflects all adjustments, consisting only of normal recurring accruals, which are, in the opinion of management, necessary for a fair presentation of the financial position, results of operations and cash flows for the quarterly periods presented.

40.    On or about September 28, 2006, Inyx issued a press release announcing that it had entered an agreement to acquire Pharmapac UK Ltd., for £9 million (approximately $17 million) in cash financed by debt "based on European interest rates that are significantly lower than U.S. rates." The acquisition expected to be completed by November 14, 2006. In 2006, Pharmapac expected revenues to reach about £7.3 million with EBITDA of approximately £1.5 million. Inyx expected to

grow Pharmapac's 2007 revenues to around £10 million and EBITDA to near £2.3 million.

Defendant Kachkar commented on the acquisition. stating, in pertinent part, as follows:

> This is another strategic acquisition for Inyx. Pharmapac is highly profitable and a strong cash generator, and it has a network of complementary distribution and packaging customers. The addition of Pharmapac's dedicated 'state-of-the-art' packaging facility will enable Inyx to provide a dynamic secondary-packaging resource for a wide range of dosage forms needed to serve high-demand respiratory, allergy, dermatology and topical product sectors. Pharmapac increases Inyx's capabilities to provide innovative packaging designs for new formulations and drug delivery systems being utilized today by our clients as well as by Inyx.
>
> *       *       *
>
> We expect growth to be derived from the cross-selling of our respective client bases. The combining of our two companies will make Inyx an even stronger presence in the U.K., the second largest healthcare market in Europe. Moreover, Pharmapac's secondary-packaging capabilities enhance Inyx's abilities to serve the pan-European pharmaceutical industry.

41.      On or about November 24, 2006, the Company issued a press release announcing that

its Board of Directors had been approached by a group comprised of Inyx senior management and

others about taking Inyx private. The press release stated, in pertinent part:

> . . . . a group comprised of Inyx senior management and strategic outside investors this week approached the company's board of directors about taking the company private. The Inyx board has formed a special committee comprised of three independent directors, which will evaluate any specific proposal. The committee will retain an independent investment-banking firm to review the fairness of any proposed offer made by the group. The group, which includes Jack Kachkar, M.D., Chairman & CEO of Inyx, and Steve Handley, President of Inyx, said that it intends to make an offer that "it believes will be in the best interests of all Inyx shareholders." Yesterday, Dr. Kachkar informed the special committee that he will work to secure new debt financing for Inyx before the group tries to finalize financing for any going-private offer.
>
> ***Inyx reported that the company this week informed Westernbank Puerto Rico it intended to pay off the loan amounts owed to Westernbank by December 31, 2006; this debt now totals approximately $120 million and Dr. Kachkar has pledged a personal guarantee against a portion of that amount.***
>
> *       *       *

- 17 -

Inyx also reported revised guidance for 2006. The company now expects revenues for the year to total approximately $85 million, up from $49.6 million in 2005, with net losses for 2006, based on two pending acquisitions now not being completed this year. [Emphasis added.]

42.    On or about December 4, 2006, Inyx issued a press release announcing its financial results for the third quarter of 2006, the period ended September 30, 2006. For the quarter the Company reported revenue of $18.0 million, versus $12.9 million reported for the comparable quarter in 2005 million. The Company reaffirmed 2006 revenue guidance of $85 million. The press release stated, in pertinent part:

The growth in revenues during the first nine months was not as strong as the company had expected because certain business has been delayed due to additional regulatory documentation and testing procedures that several of its clients have to complete before commercialization or transfer of their products to Inyx's sites can commence; this business is now expected to start up in the fourth quarter and early 2007. Moreover, two pending acquisitions, which the company originally expected to complete in the 2006 second half, have been delayed.

43.    On or about December 4, 2006, Inyx filed its September 30, 2006 Form 10-Q with the SEC, signed by Defendant Zinn, which repeated Inyx's previously announced financial results for the quarter. The Form 10-Q included Inyx's financial statements for the quarter ended September 30, 2005, which were represented to have been presented in conformity with U.S. GAAP. In addition, the Form 10-Q reported that as of September 30, 2006, Inyx was in violation of certain covenants in connection with its Westernbank loan and security agreements, casting doubt on the Company's ability to continue as a "going concern." The Form 10-Q stated, in pertinent part:

The accompanying consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America, which contemplates continuation of the Company as a going concern. The Company has experienced recurring operating losses, and has an accumulated deficit and negative working capital.

The Company has been financing operations primarily through (i) credit facilities with its primary lender, Westernbank of Puerto Rico, a wholly-owned subsidiary of W Holding Company, Inc. ("Westernbank"); (ii) revenues from multi-year and short-term contract manufacturing, product development contracts and purchase orders;

- 18 -

(iii) the sale of equity securities including proceeds from option and warrant exercises; (iv) stockholder advances, loans and financial guarantees.

The Westernbank credit facilities, consisting of both short-term and long-term debt, are due through 2008 and are automatically renewable on maturity in March 2008, on a year-to-year basis, unless terminated by Westernbank or the Company.    On November 21, 2006, the Company informed Westernbank that it intends to pay off the loan amounts by December 31, 2006.  As a result, on its September 30, 2006 balance sheet, the Company has classified as current liabilities, the amounts due under its credit facilities with the bank.  As of November 21, 2006, the Company owed Westernbank approximately $120.0 million.

As of September 30, 2006, the Company had approximately $119.4 million in loan obligations, including approximately $108.2 million relating to the credit facilities with Westernbank, with the balance of the obligations, amounting to approximately Source: INYX INC, 10-Q, December 04, 2006 $11.2 million, relating to the balance due to UCB Pharma Limited ("UCB Pharma") as a result of the purchase of the Ashton business from UCB.  The Company's annual debt service requirements are approximately $14.4 million (which includes approximately $4.9 million of interest).  Such debt is collateralized by all the existing and future assets of the Company and its subsidiaries.

***As of September 30, 2006, the Company was in violation of certain financial covenants in connection with its Westernbank loan and security agreements.  As it has previously done when requested so by the Company, Westernbank has waived, through December 15, 2006, certain requirements such that the Company's non-compliance with its covenants under such agreements has not resulted in an event of default by the Company.  There can be no assurances the Company will meet such covenants in the future or that Westernbank will continue to grant such waivers.***  [Emphasis added.]

44.    In addition, the notes to the consolidated financial statements included in the Form 10-Q represented the following concerning the Company's revenue recognition policies and practices:

Revenue Recognition

The Company recognizes revenue in accordance with the SEC's Staff Accounting Bulletin Topic 13, "Revenue Recognition".  Revenue is recognized when all of the following criteria are met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed and determinable; and (4) collection is reasonably assured.  Revenue is recognized when products are shipped and are recorded at the invoiced value of goods supplied to customers net of discounts, sales tax and value-added tax. Development revenue in the form of products and services is recognized using the

- 19 -

proportional-performance model, whereby revenue is recognized as performance occurs based on the relative value of the performance that has occurred to that point in time. The Company fulfills obligations for development revenue over a period of time as its customers receive value throughout the performance period.

The Company allocates revenue to separate elements in multiple element arrangements based on the guidance in Emerging Issues Task Force No. 00-21 ("EITF 00-21"), "*Accounting for Revenue Arrangements with Multiple Deliverables.*" Revenue is allocated to a delivered product or service when all of the following criteria are met: (1) the delivered item has value to the customer on a stand alone basis; (2) there is objective and reliable evidence of the fair value of the undelivered item; and (3) if the arrangement includes a general right of return relative to the delivered item, delivery, or performance of the undelivered item is considered probable and substantially in our control. The Company uses the relative fair values of the separate deliverables to allocate revenue.

The Company obtains detailed credit evaluations of customers and establishes credit limits as required, generally without requiring collateral. Exposure to losses on receivables is principally dependent on each customer's financial condition. The Company monitors its exposure for credit risk losses and maintains an allowance for anticipated losses.

<u>Multiple Deliverables</u>

The Company has revenue arrangements whereby it delivers to the customer multiple products and services. Such arrangements have generally included some combination of the following: product commercialization services; licensed rights to technology, patented products, compounds, data and other intellectual property; and development services. In accordance with EITF 00-21, the Company analyzes our multiple element arrangements to determine whether the elements can be separated. The Company performs its analysis at the inception of the arrangement and as each product or service is delivered. If a product or service is not separable when it is delivered, no revenue is allocated. When a delivered product or service (or group of delivered products or services) meets the criteria in EITF 00-21, the Company allocates revenue. The Company determines the fair value of a separate deliverable using the price it charges other customers when it sells that product or service separately; however, if the Company does not sell the product or service separately, it uses third-party evidence of fair value. The Company considers licensed rights or technology to have stand-alone value to its customers if the Company or others have sold such rights or technology separately or the Company's customers can sell such rights or technology separately without the need for our continuing involvement.

<u>License Arrangements</u>

License arrangements may consist of non-refundable up-front license fees, data transfer fees, various performance or sales milestones and future product royalty payments. Some of these arrangements are multiple element arrangements.

Non-refundable, up-front fees that are not contingent on any future performance by the Company, and require no consequential continuing involvement on its part, are recognized as revenue when the license term commences and the licensed data, technology and/or compound is delivered. Such deliverables may include physical quantities of compounds, design of the compounds and structure-activity relationships, the conceptual framework and mechanism of action, and rights to the patents or patents pending for such compounds. The Company defers recognition of non-refundable up-front fees if it has continuing performance obligations without which the technology, right, product or service conveyed in conjunction with the non-refundable fee has no utility to the licensee that is separate and independent of the Company's performance under the other elements of the arrangement. In addition, if the Company has continuing involvement through development services that are required because its know-how and expertise related to the technology is proprietary to the Company, or can only be performed by the Company, then such up-front fees are deferred and recognized over the period of continuing involvement.

Development Services

Payments related to substantive, performance-based milestones in a development arrangement are recognized as revenue upon the achievement of the milestones as specified in the underlying agreements when they represent the culmination of the earnings process. Revenue from development services is recognized during the period in which the services are performed and is based upon the number of full-time-equivalent personnel working on the specific project at the agreed-upon rate. Payments received in advance are recorded as deferred revenue until the development services are performed, costs including labor, materials and overhead are incurred, or a milestone has been achieved.

45.     On or about January 25, 2007, Inyx issued a press release announcing that Defendant Kachkar was "finalizing" financing to take the Company private and would present an offer to Inyx's Board in February. The press release further stated that Inyx retained a "leading consulting firm" to examine recapitalization of the Company's debt and represented that its $120 million outstanding debt to Westernbank would be repaid by March 31, 2007. Inyx also stated that financing for the acquisition of Pharmapac, originally expected to close in November 2006, was now in place and would go forward in February 2007. The press release stated, in pertinent part:

The company said its senior management group, led by Inyx Chairman and CEO Jack Kachkar, M.D., and Inyx President Steve Handley, interested in taking the company private is finalizing its financing, arranged through Dr. Kachkar and several strategic outside investors. Dr. Kachkar said the buyout group is completing its valuation of Inyx, which will take about three to four weeks to complete, and the

- 21 -

group now intends to present "an attractive cash buyout offer" in February. The Inyx board of directors has a special committee comprised of three independent directors that will evaluate the fairness of any buyout-offer made.

Inyx also reported that financing has been arranged for Inyx's pending acquisition of Pharmapac UK Ltd., one of the leading contract pharmaceutical packaging providers in the United Kingdom. The acquisition is now expected to be completed also in February, following confirmation of Inyx's integration plans for Pharmapac. The purchase price is 9.0 million pounds Sterling cash at closing, with a non-refundable deposit of 750,000 pounds already paid, plus 1.5 million pounds in cash to be held in escrow to pay out if certain milestones are met in 2007 and 2008. In 2006, Pharmapac had revenues of about 7.3 million pounds with EBITDA of approximately 1.5 million pounds.

Inyx further reported that it is retaining a leading consulting firm to assist in recapitalizing the company's balance sheet and in other strategic initiatives. Related to the recapitalization, Inyx said it now intends to pay off the loan amounts owed Westernbank Puerto Rico by March 31, 2006; this debt totals approximately $120 million and Dr. Kachkar has pledged a personal guaranty against a portion of that amount.

46.    On or about March 16, 2007, Inyx filed its Form 12b-25 with the SEC, notifying the commission that it was unable to complete the filing of its Form 10-K for the year ended December 31, 2006. The Form 12b-25, signed by Defendant Kachkar, and providing for a 15-day extension to file, stated, in pertinent part, as follows:

Management has been focused on a number of transactions that the Company is currently involved in and therefore needs additional time to assemble and complete all financial and audit related matters as of December 31, 2006.

47.    On or about March 26, 2007, after the market close, Inyx issued a press release announcing that on Sunday, March 25, 2007, its Board received a $3.01 per share cash offer from Defendant Kachkar and "a strategic outside investor" to take the Company private. The press release stated, in pertinent part, as follows:

The proposal, which has the support of Inyx President Steve Handley and the company's other senior executives, is an all-cash offer priced at $3.01 per share.

Dr. Kachkar said, "The $3.01 buyout price matches the all-time-high closing price for Inyx's common stock recorded on March 23, 2006. The $3.01 represents a 24% premium over the $2.42 average closing price during the year period since then, a

- 22 -

31% premium over the $2.30 average closing price for Inyx's shares during this first quarter of 2007 and 15% above the $2.61 closing price on Friday."

\*     \*     \*

The capital for this offer will be provided by a partnership being formed by an outside investor and members of Inyx senior management and their family holdings.

Inyx reported that this partnership is also providing the funding for Inyx to pay back the loans, totaling currently approximately $130 million, owed Westernbank Puerto Rico, and the liens held by the bank on Inyx assets will be simultaneously transferred to the partnership.

Additional financing from the partnership is also available to Inyx for certain other strategic business initiatives currently being pursued by the company.

48.     On or about March 27, 2007, Inyx filed its Form 8-K with the SEC stating that

Company had identified "internal control weaknesses" during its year-end audit of 2006 financial

statements and would be unable to complete the audit and file its Form 10-K with the SEC by April

2, 2007.  The Form 8-K, signed by Defendant Zinn, stated, in pertinent part, as follows::

Management has not yet been able to properly collect and complete all the information required by its auditors in order to file its Form 10-K annual report on a timely basis.  During the course of its audit process and its efforts to comply with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"), management has identified internal control weaknesses that it has to fully assess in the process of completing its audit under PCAOB standards.  The Company has informed its independent audit committee and current independent auditors, Berkovits, Lago & Company LLP, that at this time, it is not in a position to complete its financial statements for the year ended December 31, 2006 and provide the supporting documents requested by the independent auditors in time for the Company to file its Form 10-K for such reporting period by April 2, 2007.

The Company has commenced an internal review to ascertain the full extent of the internal control weaknesses and whether management will be able to conclude as to the effect on the audit of the Company's financial statements as of December 31, 2006.  *At this time, the Company does not know if it will be required to restate its financial results for prior periods in 2006, and therefore any estimated losses that may impact such previous periods reported on during 2006 cannot be determined at this time.  A restatement may result in lower revenues, a greater loss or an impairment of assets in 2006.*

In 2006, as an accelerated filer, the Company commenced a comprehensive effort to comply with Section 404.  The Company's Section 404 compliance efforts include

- 23 -

documentation, evaluation, and the design and testing of the operating effectiveness of its internal control over financial reporting.

The Company continues to assess its findings and has not reached a conclusion as to whether there are likely to be any other internal control weaknesses to report under Section 404 for the year ending December 31, 2006. Since management has not completed its testing and evaluation of the Company's internal control over financial reporting, and with respect to any control deficiencies identified to date, the Company's management may ultimately identify additional control deficiencies. The Company will conclude its analyses and report its findings prior to filing its Annual Report on Form 10-K for the year ending December 31, 2006. [Emphasis added.]

49. On or about April 6, 2007, Inyx filed an amended Form 8-K, stating that the Company would restate its financial results for the first, second and third quarters of 2006. The Form 8-K/A, signed by Defendant Zinn, stated that the restatement arose from **"previously issued financial statements with respect to the Company's internal control over financial reporting, including, at a minimum, the revenue recognition policy for development revenue earned during 2006."** [Emphasis added.] To date, the Company's investigation has not been completed and restated financial statements have not been filed with the SEC.

50. On April 25, 2007, the Company received notification from the National Association of Securities Dealers that it was delinquent with respect to filing the Annual Report on Form 10-K for 2006. The Company had until May 18, 2007 to clear the delinquency but has not done so. Accordingly, the securities of the Company are not eligible for quotation on the OTC Bulletin Board. The Company's common stock currently trades on the "pink sheets" under the symbol "IYXIE."

51. On or about April 27, 2007, in response to SEC staff comments regarding the adequacy of the Company's description of the revenue misstatement giving rise to the restatement included in Inyx's April 6, 2007 Form 8-K/A, the Company filed an additional amended Form 8-K/A with the SEC, signed by Defendant Zinn, which stated, in pertinent part:

The Company's development revenue for products and services is recognized using the proportional-performance model that recognizes revenue as performance occurs based on relative value of the products delivered or services rendered. With respect

to one customer, development revenue was recognized in 2006 before the customer received value for the related development services and management currently believes that it should not have recognized such revenue. This matter was identified through review and testing for management's assessment of internal control over financial reporting and in consultation with the audit committee and independent auditors as part of the year-end audit of the Company's 2006 financial results.

The Company currently expects revisions to its previously reported financial results to reflect a reduction in revenue and an increase in net loss of a minimum of approximately $1.8 million, $347,000 and $1.9 million for the first, second and third quarters of 2006, respectively, or an aggregate increase in net loss of a minimum of approximately $4.0 million for the nine month period ended September 30, 2006.

*     *     *

The foregoing are estimates and subject to change until management completes its review of internal control over financial reporting and the audit of its financial statements for the year ended December 31, 2006. The Company will complete its analyses and report its findings prior to filing its Annual Report on Form 10-K for 2006.

Management has been in communication with the audit committee of the board of directors and has discussed with its independent auditors the matters disclosed in the Initial Form 8-K and this Form 8-K/A. However, the Company has not yet completed its analyses and, accordingly, the Company has not determined whether any additional restatements may be required.

52.    On or about May 11, 2007, Inyx filed Form 12b-25 with the SEC, notifying the

Commission that Inyx was unable to complete the filing of its Form 10-Q for the period ended

March 31, 2007. The Form 12b-25, signed by Defendant Zinn, stated, in pertinent part, as follows:

The Company was unable to file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 by the prescribed date of May 10, 2007 without unreasonable effort or expense because additional time was required in order for the Company to assure that adequate internal controls were in place to complete its assessment of the results of operations for the quarter, and for the Company's independent registered public accounting firm to complete its review of the results thereof. The Company intends to file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 as soon as practicable.

53.    The statements referenced above in ¶¶23-52 were each materially false and

misleading when issued because they misrepresented and failed to disclose the following material

adverse facts:

- 25 -

(a)     that the Company was materially overstating its assets and revenues by creating false sales invoices as they were created before the items were billable and had not actually been issued to customers;

(b)     that the Company was not following its publicly stated accounting policies;

(c)     as a result of the foregoing, the Company's financial statements were not prepared in accordance with GAAP and therefore were materially false and misleading.

54.     Then on July 2, 2007, after the market's open, news services carried a report that Inyx USA Ltd. had filed for Chapter 11 protection in the US Bankruptcy Court in Delaware.

55.     In response to this announcement, the price of Inyx common stock plummeted, falling from $2.44 per share on June 29, 2007 to a low as $0.30 per share in intra-day trading on July 2, 2007, on extremely heavy trading volume of more than 7.7 million shares.

56.     On July 3, 2007, Inyx, in an SEC filing on Form 8-K, confirmed that its primary operating subsidiaries in the US and UK had entered bankruptcy proceedings following notification by the Company's asset-based lender, Westernbank, that the Company was in default on its $130 million debt to the bank.  The Form 8-K stated, in pertinent part, as follows:

> On June 28, 2007, the Company's three United Kingdom (U.K.) subsidiaries, Inyx Pharma Limited, Inyx Europe Limited and Ashton Pharmaceuticals Limited (the "UK Companies") received a letter from the Company's principal lender, Westernbank Puerto Rico ("Westernbank"), alleging that the UK Companies were in default under the loan and security agreements with Westernbank as a result of failing to comply with certain covenants under such agreements.  Westernbank informed the UK Companies that it was accelerating the loans and appointing an Administrator over the business of the UK Companies.  As a result, a U.K. court-appointed Administrator has taken over control of the UK Companies.  The Company does not admit that it is in default and is reviewing with U.K. legal counsel its available options and remedies in this matter.

> On June 29, 2007, the Company and its wholly-owned subsidiary Inyx USA, Ltd. (collectively, the "Inyx Parties"), together with the Company's Chairman and Chief Executive Officer, Dr. Jack Kachkar, and his wife, filed suit against Westernbank in New York State Supreme Court, asserting various causes of action seeking no less than $500 million in compensatory damages, as well as punitive damages.  The

complaint alleges, among other things, that Westernbank acted in bad faith and in a commercially unreasonable manner by blocking the flow of funds from the Inyx Parties' customers to the Company, and preventing the Inyx Parties from paying their debts. The complaint asserts causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing, promissory estoppel, wrongful dishonor of checks, wrongful impairment of collateral, tortious interference or impairment with prospective business relations, and third-party beneficiary of contract and of tortious interference with contracts and prospective business relations.

On June 29, 2007, Westernbank issued a demand for the immediate payment by the Company and its U.K. and U.S. subsidiaries for all outstanding loans and all other obligations claimed under the loan documents with the Bank.

On July 2, 2007, as an additional measure to protect the Company against further potential damaging actions by Westernbank, the Company placed its non-UK subsidiaries, Inyx USA, Ltd. and Exaeris Inc. ("US Companies"), in Chapter 11 bankruptcy protection filings made in the US Bankruptcy Court in the District of Delaware, case numbers Ch-11 07-10888 and Ch-11 07-10887, respectively.

Inyx, Inc., the Registrant, is not itself a party to such Chapter 11 filings.

57.    The Form 8-K also stated that Defendants Handley, Goldschmidt and Zinn, as well as

several of Inyx's directors, resigned from their positions with the Company:

Effective June 29, 2007, Rima Goldshmidt, Vice President - Treasurer and corporate Secretary, resigned from her positions with the Company.

Effective June 30, 2007, Douglas Brown resigned as a director, chairman of the Compensation Committee and member of the Audit Committee.

Effective July 1, 2007, Peter Littmann and Roger Harrison resigned as directors of the Company, and Joseph Rotmil resigned as director, chairman of the Audit Committee and member of the Compensation Committee. The Registrant believes the resignations of Messrs. Brown, Harrison, Littman and Rotmil were occasioned by the controversy with the Company's lender and the desire to avoid becoming involved in the litigation that has been commenced by the Company.

*        *        *

Effective July 2, 2007, David Zinn resigned as the Company's Vice President of Finance and principal accounting officer.

Effective July 2, 2007, Steven Handley and Colin Hunter resigned as Directors of the Company. The Company believes that the resignations of Messrs. Handley and Hunter were due to the possible conflict of interest they may face in serving on the

- 27 -

Board while continuing to manage the UK Companies under the control of the Administrator.

58.     During a Delaware Bankruptcy Court hearing in July 2007, evidence was presented that Inyx forged sales invoices during the Class Period in order to overstate the value of it accounts receivable pledged as collateral for the asset-based credit facilities.  In particular, Inyx engaged in a massive scheme involving "pre-billing," a euphemism for false invoices created by Inyx, and fraudulently represented in the Company's financial statements as being real, while in fact they were created before the items were billable and had not actually been issued to customers.  Based on evidence presented to the Court, it is estimated that Inyx overstated its assets and revenues by more than $100 million during the Class Period.

59.     The market for Inyx's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Inyx's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Inyx common stock relying upon the integrity of the market price of Inyx's common stock and market information relating to Inyx, and have been damaged thereby.

60.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Inyx's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

61.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Inyx's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Inyx and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of Inyx stock was removed and the price of Inyx stock declined dramatically, causing loss to Plaintiff and the other members of the Class.

## Inyx's GAAP Violations

62.    Inyx issued financial statements were presented in violation of GAAP and were materially false and misleading due to improper revenue recognition.

63.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Regulation S-X, 17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.

64.    The Individual Defendants had the responsibility to select GAAP which were appropriate to reflect Inyx's business activities in accordance with Section 13 of the Exchange Act.

Inyx presented its financial statements during the Class Period in a manner which violated at least the following provisions of GAAP:

(a)     The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts ("Concepts Statement") No. 1, ¶34);

(b)     The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶40);

(c)     The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶50);

(d)     The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶42);

(e)     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶79); and

(f)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶95, 97).

65.     In failing to file financial statements with the SEC which conformed to the requirements of GAAP, Inyx disseminated financial statements that were presumptively misleading and inaccurate.  The Company's Class Period Forms 10-K and 10-Q filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties which were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

### Berkovits' False and Misleading Statements

66.     Berkovits knew or recklessly ignored that it falsely represented that Inyx's annual financial statements for at least the years ended 2004 and 2005 were presented in conformity with GAAP.  In addition, Berokovits knew or recklessly ignored that it falsely represented that its audits of such financial statements had been performed in accordance with Generally Accepted Auditing Standards ("GAAS") and the standards of the Public Company Accounting Oversight Board ("PCAOB").

67.     Berkovits issued the following false and misleading unqualified audit report, dated April 12, 2005, on Inyx's financial statements for the year ended December 31, 2004[1]:

To the Board of Directors Inyx, Inc. (formerly known as Doblique, Inc.)

---

[1]     Berkovits' false and misleading audit reports on Inyx's 2004 and 2005 year-end financial statements were included in the Company's filings with the SEC during the Class Period.

We have audited the consolidated balance sheets of Inyx, Inc. (formerly known as Doblique, Inc.) (the "Company") as of December 31, 2004 and 2003, and the related consolidated statements of operations, changes in stockholders' equity (deficit) and cash flows for the year ended December 31, 2004 and for the period from March 7, 2003 through December 31, 2003. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company has determined that it is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we do not express such an opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Inyx, Inc. (formerly known as Doblique, Inc.) as of December 31, 2004 and 2003, and the results of operations and cash flows for the year ended December 31, 2004 and for the period from March 7, 2003 through December 31, 2003, in conformity with accounting principles generally accepted in the United States.

/s/Berkovits, Lago & Company, LLP
Fort Lauderdale, Florida
April 12, 2005

68.     Berkovits issued the following false and misleading unqualified audit report, dated

March 29, 2006, on Inyx's financial statements for the year ended December 31, 2005:

To the Board of Directors Inyx, Inc.

We have audited the consolidated balance sheets of Inyx, Inc. (the "Company") as of December 31, 2005 and 2004, and the related consolidated statements of operations, changes in stockholders' equity (deficit) and cash flows for the years ended December 31, 2005 and 2004 and for the period from March 7, 2003 through December 31, 2003. We have also audited the statements of operations, changes in stockholders' equity (deficit) and cash flows of Miza Pharmaceuticals (UK) Ltd. (the

- 32 -

predecessor to Inyx, Inc.) (the "Company") for the period from January 1, 2003 through March 6, 2003. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company has determined that it is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we do not express such an opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Inyx, Inc. as of December 31, 2005 and 2004, and the results of operations and cash flows for the years ended December 31, 2005 and 2004 and for the period from March 7, 2003 through December 31, 2003 and the results of operations and cash flows of Miza Pharmaceuticals (UK) Ltd. (the predecessor to Inyx, Inc.) for the period from January 1, 2003 through March 6, 2003, in conformity with accounting principles generally accepted in the United States.

/s/Berkovits, Lago & Company, LLP
Fort Lauderdale, Florida
March 29, 2006

69.     The above-noted Berkovits reports were materially false and misleading because, as alleged in detail herein, Inyx's Class Period financial statements, by its own admission, violated GAAP in numerous respects, including:

- Inyx's accounting revenue violated GAAP;

- Inyx's accounting for accounts receivable and related accounts receivable reserves and bad debt expense violated GAAP; and

- Inyx's recognized revenue when customer payment was not reasonably assured.

70.     In addition to the foregoing violations of GAAS, Berkovits violated at least the following provisions of GAAS in "auditing" Inyx's financial statements during the Class Period:

(a)     Auditing standard AU §316, which required Berkovits to plan and perform its audits in a manner which reasonably assured that Inyx's Class Period financial statements were free from misstatements caused by error or fraud.  Berkovits failed to adequately plan and perform its audit procedures in a manner reasonably designed to identify the numerous financial improprieties alleged herein.  Such failure permitted Inyx to issue materially false and misleading financial statements over a multi-year period.  Moreover, Section 10A of the Exchange Act required Berkovits to "determine" whether, in the course of its audits, an illegal act occurred and to notify the SEC if it became aware of information indicating that an illegal act occurred if Inyx's management or Board of Directors failed to take appropriate remedial action with respect to the illegal acts.  Berkovits knew or recklessly ignored that it violated Section 10A of the Exchange Act in the performance of its audits of Inyx's 2004 and 2005 year end financial statements;

(b)     General Standard No. 3, which requires that due professional care be exercised by the auditor in the performance of the audit and the preparation of the audit report.  Due professional care also requires that the auditor maintain professional skepticism in the course of auditing a client's financial statements.  Berkovits conducted its audits of Inyx's financial statements with such lack of care that it permitted systemic internal control deficiencies to exist over a multi-year period;

(c)     Auditing standard AU §342, which required that Berkovits perform the audit procedures necessary to determine that Inyx's accounting estimates were reasonable during the Class Period.  AU §342 provides that in establishing the reasonableness of an accounting estimate, the

auditor normally concentrates on key factors and assumptions, including the significance of the accounting estimate and its susceptibility to misstatement and bias;

(d)    Auditing standard AU §431, which provides that if management omits from the financial statements, including the accompanying notes, information that is required by GAAP, the auditor should express a qualified or an adverse opinion and should provide the required undisclosed information in its audit report;

(e)    GAAS Standard of Reporting No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP.  Berkovits' opinion falsely represented that Inyx's 2004 and 2005 financial statements were presented in conformity with GAAP when they were not for the myriad reasons herein alleged;

(f)    GAAS Standard of Reporting No. 4, which requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. Berkovits was required to state that no opinion could be issued by it on Inyx's 2004 or 2005 financial statements or issue an adverse opinion stating that such financial statements were not fairly presented in conformity with GAAS.  Berkovits' failure to make such a qualification, correction, modification and/or withdrawal of its audit opinions was a violation of GAAS, including the fourth standard of reporting.  Berkovits also failed to require Inyx to restate its Class Period financial statements to correct the numerous violations of GAAP alleged herein:

(g)    GAAS General Standard No. 2, which requires that independence in mental attitude is to be maintained by the auditor in all matters related to the audit;

(h)    GAAS General Standard No. 1, which requires that audits be performed by persons having adequate technical training and proficiency;

(i)    GAAS Standard of Field Work No. 1, which requires that the audit is to be adequately planned and that assistants should be properly supervised; and

(j)    GAAS Standard of Reporting No. 2, which requires that the audit report identify circumstances in which GAAP has not been consistently observed.

71.    In certifying Inyx's financial statements, Defendant Berkovits falsely represented that it conducted its audits of Inyx's' financial statements in accordance with each of the above-noted auditing standards.

### Additional Scienter Allegations

72.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Inyx, their control over, and/or receipt and/or modification of Inyx's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Inyx, participated in the fraudulent scheme alleged herein.

### Applicability Of Presumption Of Reliance:
### Fraud On The Market Doctrine

73.    At all relevant times, the market for Inyx's common stock was an efficient market for the following reasons, among others:

(a)    Inyx's stock met the requirements for listing, and was listed and actively traded on the NASDAQ OTC Bulletin Board, a highly efficient and automated market;

(b)     As a regulated issuer, Inyx filed periodic public reports with the SEC and the NASD;

(c)     Inyx regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Inyx was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

74.     As a result of the foregoing, the market for Inyx's common stock promptly digested current information regarding Inyx from all publicly-available sources and reflected such information in Inyx's stock price.  Under these circumstances, all purchasers of Inyx's common stock during the Class Period suffered similar injury through their purchase of Inyx's common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

75.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking

statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Inyx who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

76.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

78.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

79.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Inyx common stock. Plaintiff and the Class would not have purchased Inyx common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

80.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Inyx common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

81.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.    The Individual Defendants acted as controlling persons of Inyx within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Inyx, and their ownership of Inyx stock, the Individual Defendants had the power and authority to cause Inyx to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: July 31, 2008                  COUGHLIN STOIA GELLER RUDMAN &
                                        ROBBINS LLP
                                      SAMUEL H. RUDMAN
                                      RUSSELL J. GUNYAN


                                      _____
                                            */S/ Samuel H. Rudman*
                                           SAMUEL H. RUDMAN

                                      58 South Service Road, Suite 200
                                      Melville, New York  11747
                                      Telephone:  631/367-7100
                                      631/367-1173 (fax)

                                      Attorneys for Plaintiff

- 40 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

THE PENNSYLVANIA AVENUE FUNDS ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

6    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery.

INYX

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18ᵗʰ day of JUNE , 2008.

THE PENNSYLVANIA AVENUE FUNDS

By: _____

Its: PRESIDENT & PORTFOLIO MANAGER

- 2 -

INVX

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 04/04/2007 | 5,000 | $2.58 |
| 04/04/2007 | 7,500 | $2.59 |
| 05/29/2007 | 500 | $2.36 |
| 07/02/2007 | 10,000 | $0.39 |
| 07/02/2007 | 10,000 | $0.37 |