**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE PENNSYLVANIA AVENUE FUNDS, Individually And On Behalf of All Others Similarly Situated, <br><br>                    Plaintiff, <br><br>         vs. <br><br> INYX INC., JACK KACHKAR, STEVEN HANDLEY, RIMA GOLDSHMIDT, JAY M. GREEN and BERKOVITS & COMPANY, LLP, <br><br>                    Defendants. | Civil Action No. 08-cv-06857-PKC |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**BROWER PIVEN**
  A Professional Corporation
David A.P. Brower
Jessica Sleater
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile:  (212) 501-0300

Charles J. Piven
Yelena Trepetin
World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: (410) 332-0030
Facsimile:  (410) 685-1300

*Lead Counsel for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………...………... iii

PRELIMINARY STATEMENT………………………………………………………... 1

ARGUMENT…………………………………………………………………………… 4

I.    LEGAL STANDARD ON A MOTION TO DISMISS…………………………… 4

II.   PLEADING REQUIREMENTS FOR A SECTION 10(B) CLAIM……………… 5

III.  THE ALLEGATION IN THE COMPLAINT ADEQUATELY PLEAD A CLAIM
      AGAINST THE INYX DEFENDANTS………………………………………….. 6

      A.    Plaintiff Alleges Actionable Material Misstatements and Omissions …………… 6

            1.    Materially False and Misleading Statement About the Company's
                  Financial Condition……………………….............................................. 7

            2.    Materially False and Misleading Statements About the Company's
                  Internal Controls and GAAP Violations …………………………......... 10

            3.    The False and Misleading Statements About Taking Inyx Private and
                  Repaying the Westernbank Loan are Actionable …………………….... 12

            4.    The Statements Regarding the Aventis Acquisition and Westernbank
                  Loans are False and/or Misleading and Actionable………….……....... 13

            5.    The Statements Regarding the Financial Guidance are Actionable............. 15

            6.    The Individual Defendants are Liable for the Class Period Statements…… 18

      B.    Plaintiff Has Alleged Facts Giving Rise to a Strong Inference of *Scienter* …...… 22

            1.    The Inyx Defendants Were Aware of Facts and/or Had Access to
                  Information Contrary to Their Public Statements……………………….24

            2.    The Inyx Defendants' Misstatements and Omissions Concerned the
                  Company's Ability to Continue its Operations………………………… 28

            3.    Defendants' GAAP Violations Provide Evidence of *Scienter*……………. 29

            4.    The Resignations Provide Evidence of *Scienter*…………………………. 31

5.    The Refusal of Zinn to Sign Off on the 10-Q and 10-K Provides
      Evidence of *Scienter*................................................................ 31

6.    The SOX Certifications Provide Evidence of *Scienter*........................ 32

7.    Motive Has Been Adequately Pleaded............................................ 32

8.    Opportunity Has Been Adequately Pleaded..................................... 35

IV.    PLAINTIFF STATES A CLAIM FOR CONTROL PERSON LIABILITY...................36

V.     THE ALLEGATIONS IN THE COMPLAINT ADEQUATELY PLEAD A CLAIM
       AGAINST BERKOVITS................................................................ 36

A.    The Complaint Adequately Alleges That Inyx's Financial Statements Were
      Materially False and/or Misleading ............................................... 37

B.    Plaintiff Has Properly Pled *Scienter* Against Berkovits .......................... 45

1.    Berkovits' Deliberate Ignorance of Red Flags Supports a Strong
      Inference of *Scienter*................................................................ 46

2.    The Quick Discovery by the CFO of Significant Problems Supports
      a Strong Inference of *Scienter*.................................................... 52

3.    The Magnitude of the Fraud Suggests a Strong Inference of *Scienter*....... 53

4.    The Lack of Independence and Berkovits' Resignation Support
      *Scienter*.............................................................................. 54

VI.    PLAINTIFF HAS ADEQUATELY PLED LOSS CAUSATION ............................. 56

A.    Plaintiff Sufficiently Alleged Loss Causation With Respect to the
      July 2 Bankruptcy Announcement.................................................. 60

B.    Defendants' Reliance Argument Fails.............................................. 62

C.    Defendants' Truth on the Market Defense is Premature ...........................  63

CONCLUSION.................................................................................. 65

# TABLE OF AUTHORITIES

## CASES

*380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199 (S.D.N.Y. 2008) ...........16

*In re Accelr8 Tech. Corp. Sec. Litig.*, 147 F. Supp. 2d 1049 (D. Colo. 2001)...................42

*Adam v. Silicon Valley Bancshares*, 884 F. Supp. 1398 (N.D. Cal. 1995).................39, 45

*Adams v. Crystal City Mariott Hotel*, No. 02-10258, 2004 U.S. Dist. LEXIS 5819
   (S.D.N.Y. 2004).............................................................................................................5

*In re Adelphia Comm'ns Corp. Sec. & Deriv. Litig.*, 398 F. Supp. 2d 244
   (S.D.N.Y. 2005)...........................................................................................................36

*Adelphia Recovery Trust v. Bank of Am., N.A.*, No. 05-9050, 2009 U.S. Dist.
   LEXIS 38834 (S.D.N.Y. May 4, 2009) .......................................................................22

*Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372 (E.D.N.Y. 2009) .................................27

*Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002)..............................................40

*In re Alliance Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171 (S.D.N.Y. 2003) .........16, 17

*In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424 (S.D.N.Y.
   2000) ......................................................................................................................33, 35

*Am. Bus. Fin. Servs. Noteholders Litig. v. Seidman*, No. 05-0232, 2008 U.S. Dist.
   LEXIS 61450 (E.D. Pa. Aug. 11, 2008) ......................................................................50

*In re Anicom Inc. Sec. Litig.*, No. 00-4391, 2001 U.S. Dist. LEXIS 6607 (N.D. Ill.
   May 15, 2001)............................................................................................8, 9, 25, 30, 42

*In re Apollo Group Inc. Sec. Litig.*, 395 F. Supp. 2d 906 (D. Ariz. 2005) .......................33

*Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461 (E.D. Va. 2002).....................46

*Ashcroft v. Iqbal*, No. 07-1015, __ U.S. __, 129 S. Ct. 1937 (2009).................................5

*Asher v. Baxter Int'l, Inc.*, No. 02-5608, 2006 U.S. Dist. LEXIS 4821 (N.D. Ill.
   Feb. 7, 2006) ...............................................................................................................61

*In re Aspeon Sec. Litig.*, No. 04-55651, 2006 U.S. App. LEXIS 4673 (9th Cir.
   Feb. 23, 2006) ..............................................................................................................45

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...................................................................................29, 44

*Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008) ........................................................................................................40

*In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005)........................................21

*In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1 (D.D.C. 2000) ............................................30

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)..................................................................7, 62

*Batwin v. Occam Networks Inc.*, No. 07-3750, 2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008) ................................................................................45

*In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323 (W.D.N.Y. 2008) .........22, 35

*In re BearingPoint Inc., Sec. Litig.*, 525 F. Supp. 2d 759 (D. Va. 2007) .......................60

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..............................................................4

*Berry v. Valence Tech, Inc.*, 175 F.3d 699 (9th Cir. 1999)........................................60, 64

*In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148 (S.D.N.Y. 2008) ...........56

*In re Bristol Myers Squibb*, No. 00-1990, 2005 U.S. Dist. LEXIS 18448 (D.N.J. Aug. 17, 2005) ............................................................................................57

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) .......................29

*CMNY Capital, L.P. V.Deloitte &  Touche*, 821 F. Supp. 152 (S.D.N.Y. 1993)..............50

*Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F. Supp. 2d 1324 (N.D. Ga. 1998)..................................................................................................53

*Carter v. Safety-Kleen Corp.*, No. 06-12947, 2007 U.S. Dist. LEXIS 29484 (S.D.N.Y. Mar. 14, 2007) .............................................................................5

*Cashman v. Coopers & Lybrand*, 877 F. Supp. 425 (N.D. Ill. 1995)...............................45

*In re Centocor, Inc. Sec. Litig. III*, No. 98-260, 1998 U.S. Dist. LEXIS 18909 (E.D. Pa. Dec. 1, 1998) ...............................................................................33

*In re Cephalon Sec. Litig.*, No. 96-0633, 1997 U.S. Dist. LEXIS 13840 (E.D. Pa. Aug. 29, 1997) ............................................................................................42

*Chalverus v. Pegasys., Inc.*, 59 F. Supp. 2d 226 (D. Mass. 1999)...............................30, 46

*In re Chambers Dev. Sec. Litig.*, 848 F. Supp. 602 (W.D. Pa. 1994) ...............................43

*City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F. Supp. 2d 464 (S.D.N.Y. 2008) .........................................................................................................................23

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348 (S.D.N.Y. 2006) ...............................................................................16, 62

*In re Columbia Sec. Litig.*, 155 F.R.D. 466 (S.D.N.Y. 1994)..........................................64

*In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D.N.Y. 2001) .......24, 28, 34, 35

*CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807 (S.D.N.Y. 2006)................................36

*In re Comshare Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999) .........................................30

*In re CornerStone Propane Partners., L.P. Sec. Litig.*, 416 F. Supp. 2d 779 (N.D. Cal. 2005)..........................................................................................................................24

*Coronel v. Quanta Cap. Holdings Ltd.*, No. 07-1405, 2009 U.S. Dist. LEXIS 6633 (S.D.N.Y. Jan. 23, 2009)....................................................................................31

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989) ................................................................29

*In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34 (D. Mass. 2006) .......................65

*In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077 (N.D. Cal. 2001)......................................44

*Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923 (N.D. Ill. 1999) ....................30, 38, 52

*In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005) ....................29, 30, 45, 62

*In re Datatec Sys. Sec. Litig.*, No. 04-525, 2006 U.S. Dist. LEXIS 78843 (D.N.J. Oct. 30, 2006) ...............................................................................................................24, 40

*DeMarco v. Lehman Bros., Inc.*, 309 F. Supp. 2d 631 (S.D.N.Y. 2004).........................65

*DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242 (2d Cir. 1987)................22

*Dileo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990)....................................................20

*In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461 (S.D.N.Y. 2008) .......................38

*Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307 (S.D. Fla. 2004) ...........................55

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ........................56, 57, 58, 60

*In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88 (S.D.N.Y. 2006) .........32

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)........................................................63

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) ....................................................................................................................57, 58

*Employment Ins. Of Wausau v. Musick, Peeler & Garrett*, 871 F. Supp. 381 (S.D. Cal. 1994)....................................................................................................................45

*In re Enron Corp. Sec.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002)........................................54

*In re Entropin,  Inc., Sec. Litig.*, 487 F. Supp. 2d 1141 (C.D. Cal. 2007) ........................34

*Feiner v. SS&C Techs., Inc.*, 11 F. Supp. 2d 204 (D. Conn. 1998) ..................................40

*In re First Merchs. Acceptance Corp. Sec. Litig.*, No. 97-2715, 1998 U.S. Dist. LEXIS 17760 (N.D. Ill. Nov. 2, 1998) ..............................................38, 42, 52, 53, 54

*Frank v. Dana Corp.*, 547 F.3d 564 (6th Cir. 2008)..........................................................6

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2nd Cir. 2000) .......................................7, 63

*Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10 (D. Mass. 2000)......................................46

*Gerber v. Bowditch*, No. No. 05-10782, 2006 U.S. Dist. LEXIS 27552 (D. Mass. May 8, 2006)..........................................................................................................19

*In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319 (S.D.N.Y. 2004)................44

*In re Globalstar Sec. Litig.*, No. 01-1748, 2003 U.S. Dist. LEXIS 22496 (S.D.N.Y. Dec. 15, 2003)....................................................................................16, 64

*Great Neck Capital Appreciation Inv. P'ship, L.L.P. v. PricewaterhouseCoopers, L.L.P.*, 137 F. Supp. 2d 1114 (E.D. Wis. 2001)...........................................................51

*Gross v. Medaphis Corp.*, 977 F. Supp. 1463 (N.D. Ga. 1997)........................................33

*Hall v. Children's Place Retail Stores, Inc.*, No. 07-8252, 2008 U.S. Dist. LEXIS 54790 (S.D.N.Y. July 18, 2008) ...................................................................30, 31, 55

*Hanon v. Dataprods. Corp.*, 976 F.2d 497 (9th Cir. 1992) ..............................................34

*In re Health Mgmt. Inc. Sec. Litig.*, 970 F. Supp. 192 (E.D. N.Y. 1997) ........................42

*Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 603
(S.D.N.Y. 2008) ..............................................................................5, 22, 24, 56

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) ........................................6

*Howard v. Everex Sys., Inc.*, 228 F.3d 1057 (9th Cir. 2000) ......................20, 45

*Hubbard v. BankAtlantic Bancorp, Inc.*, No. 07-61543, Order
(S.D. Fla. May 11, 2009) ....................................................................25

*In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968 (S.D. Ohio 2008) ..............44

*In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471 (S.D.N.Y. 2008) ........................45

*In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294 (D. Mass. 2006)....................33

*In re Immucor Inc. Sec. Litig.*, No. 1:05-2276, 2006 U.S. Dist. LEXIS 72335
(N.D. Ga. Oct. 4, 2006)....................................................................11

*In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996).....................16

*Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97-3374, 1999 U.S. Dist. LEXIS 2102
(S.D.N.Y. Mar. 1, 1999) ....................................................................51

*Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269 (S.D.N.Y. 2008)...........25

*Katz*, 542 F. Supp. 2d at 275 ....................................................................47

*Keeney v. Larkin*, 306 F. Supp. 2d 522 (D. Md. 2003)....................................42

*Klein v. PDG Remediation*, 937 F. Supp. 323 (S.D.N.Y. 1996)........................7

*In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230 (N.D. Cal. 2008)..........34, 40

*Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221 (S.D.N.Y. 2006).................65

*In re Lattice Semiconductor Corp. Sec. Litig.*, No. 04-1255, 2006 U.S. Dist.
LEXIS 262 (D. Or. Jan. 3, 2006) ....................................................11, 32, 34

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) ..........56, 57

*In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152 (D. Mass. 2002) ....................20

*In re Leslie Fay Cos. Sec. Litig*, 835 F. Supp. 167 (S.D.N.Y. 1993)................................54

*In re Leslie Fay Cos. Sec. Litig.*, 871 F. Supp. 686 (S.D.N.Y. 1995)...............................51

*Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129 (D. Wash. 2006)......................................12

*In re Livent Sec. Litig.*, 148 F. Supp. 2d 331 (S.D.N.Y. 2001)........................................49

*In re Loewen Group, Inc. Sec. Litig.*, 395 F. Supp. 2d 211 (E.D. Pa. 2005) ...................57

*Makor Issues and Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702 (7th Cir. 2008)..................28

*Maldonado v. Dominguez*, 137 F.3d 1 (1st Cir. 1998) ...............................................19, 20

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006) ..............................................................................................................................6

*Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*, No. 08-1035, 2009 U.S. App. LEXIS 16990 (4th Cir. July 31, 2009)...............................................................23

*In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000).......33, 55

*McNamara v. Bre-X Minerals Ltd.*, 57 F. Supp. 2d 396 (E.D. Tex. 1999).................20, 45

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*, 543 F.3d 150 (3d Cir. 2008)..........64

*In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000)....................................................................30, 33, 35, 45, 46, 47, 54

*Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164 (C.D. Cal. 2007)...................................................................................................31, 55

*In re Miller Indus. Sec. Litig.*, 12 F. Supp. 2d 1323 (N.D. Ga. 1998) ............................10

*Miller v. Material Scis. Corp.*, 9 F. Supp. 2d 925 (N.D. Ill. 1998)...................................28

*In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493 (S.D.N.Y. 2009).....................27, 65

*In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501 (N.D. Ill. 2007) ....................................57

*In re New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008)................................45, 53, 61

*Newman v. Warnaco Group, Inc.*, 335 F.3d 187 (2d Cir. 2003).......................................64

*In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613 (S.D.N.Y. 2003) .........10, 15

*Novak v. Kasaks*, 216 F.3d 311 (2d Cir. 2000) ...........................................................17, 24

*In re Nuko Info. Sys., Inc. Sec. Litig.*, 199 F.R.D. 338 (N.D. Cal. 2000)..........................34

*Number 84 Employer-Teamster Joint Council Pension Trust Fund v. America W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) ...............................................................34

*Nursing Home Pension Fund v. Oracle Corp.*, No. 01-00988, 2006 U.S. Dist. LEXIS 94470 (N.D. Cal. Dec. 20, 2006)...................................................................57

*In re Omnivision Techs.*, No. 04-2297, 2005 U.S. Dist. LEXIS 16009 (N.D. Cal. July 29, 2005)..........................................................................................................44

*In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236 (S.D.N.Y. 2007)...........................55

*Overton v. Todman & Co.*, 478 F.3d 479 (2d Cir. 2007).....................................................51

*In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290 (S.D.N.Y. 1999) ......50, 54

*In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133 (S.D.N.Y. 1999).................21

*In re PE Corp. Sec. Litig.*, No. 00-705; 2005 U.S. Dist. LEXIS 5083 (D. Conn. Mar. 31, 2005)....................................................................................................63

*In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 U.S. Dist. LEXIS 15696 (E.D. Pa. July 27, 2005)..................................................................................11, 20

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589 (D.N.J. 2001) .................................................................................................................................50

*P. Stoltz Family P'ship L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004).............................16, 17

*In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009) ........................6

*In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668 (S.D.N.Y. 1990)...........................6, 7

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005).........................56, 61, 62

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608 (S.D.N.Y. 2009)........................................................................62

*In re Petco Animal Supplies Inc. Sec. Litig.*, No. 05-0823, 2006 U.S. Dist. LEXIS 97927 (S.D. Cal. July 31, 2006).................................................................20, 26

*In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621 (S.D.N.Y. 2008) ..................................21

*In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463 (S.D.N.Y. 2004) ..............38, 49

*Pirraglia v. Novell, Inc.*, 339 F.3d 1182 (10th Cir. 2003) .................................................34

*In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728 (E.D. Mich. 2007) .................................32

*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1993)............................................................64

*In re Qwest Commc'n Int'l, Inc. Sec. Litig.*, 396 F. Supp. 2d 1178 (D. Colo. 2004) ........53

*In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..................................21

*Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246 (N.D. Ill. 1997)........................................29

*In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493 (W.D. Pa. 2002) ...................................50

*In re Retek, Inc. Sec.*, No. 02-4209, 2005 U.S. Dist. LEXIS 35734
    (D. Minn. Mar. 7, 2005)............................................................................................57

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ..............................................................6

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)........................................................24, 29

*SEC v. Baxter*, No. 05-03843, 2007 U.S. Dist. LEXIS 52829
    (N.D. Cal. July 11, 2007) ..........................................................................................17

*SEC v. DCI Telecomms.*, 122 F. Supp. 2d 495 (S.D.N.Y. 2000)......................................29

*SEC v. Delphi Corp.*, No. 06-14891, 2008 U.S. Dist. LEXIS 78671 (E.D. Mich.
    Oct. 8, 2008) .............................................................................................................25

*SEC v. Feminella*, 947 F. Supp. 722 (S.D.N.Y. 1996) ....................................................42

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996)..........................................21

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ......................................................20, 44

*Saddle Rock Partners, Ltd. v. Hiatt*, No. 95-2326, 1996 U.S. Dist. LEXIS 20649
    (W.D. Tenn. Mar. 26, 1996) ......................................................................................64

*Schleicher v. Wendt*, 529 F. Supp. 2d 959 (S.D. Ind. 2007) ......................................49, 50

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ......................21, 29, 45, 46

*Schuster v. Anderson*, 413 F. Supp. 2d 983 (D. Iowa 2005)............................................57

*In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315 (N.D. Ga. 2007) ..............63

*In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370 (S.D.N.Y. 2007) ..........31, 49, 55

*In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693 (S.D. Tex. 2006) ................................59

*Simons v. Dynacq Healthcare, Inc.*, No. 03-05825, 2006 U.S. Dist. LEXIS 46503
(S.D. Tex. July 10, 2006) ...................................................................................10, 11

*Simpson v. Specialty Retail Concepts*, 149 F.R.D. 94 (M.D.N.C. 1993)........................63

*Skydell v. Ares-Serono S.A.*, 892 F. Supp. 498 (S.D.N.Y. 1995)........................................6

*In re SmarTalk Teleservs., Inc. Sec. Litig.*, 124 F. Supp. 2d 527 (S.D. Ohio 2000)....12, 14

*In re Solucorp Indus., Ltd., Sec. Litig.*, No. 98-3248, 2000 U.S. Dist. LEXIS
16521 (S.D.N.Y. Nov. 15, 2000) ...................................................................................36

*In re Sonus Networks Sec. Litig.*, No. 04-10294-DPW, 2006 U.S. Dist. LEXIS
28272 (D. Mass. May 10, 2006) ...................................................................................53

*In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350 (S.D. Fla. 2005) ......................30

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148,
128 S. Ct. 761 (2008) ......................................................................................................5

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87
(2d Cir. 2001)..........................................................................................................57, 58

*In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326 (S.D. Fla. 1999)...............................46, 51

*In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308 (M.D. Fla. 2002).......................42

*In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008) ................21

*In re Tarragon Corp. Sec. Litig.*, No. 07-7972, 2009 U.S. Dist. LEXIS 60160
(S.D.N.Y. Mar. 27, 2009) .............................................................................................52

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d
190 (2d Cir. 2008)..........................................................................................................24

*Tellabs v. Makor Issues & Rights, Ltd*, 551 U.S. 308 (2007) .................................6, 23, 32

*In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010 (N.D. Ohio 2000)..........................44

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) .........................................33

*In re Tommy Hilfiger Sec. Litig.*, No. 04-7678, 2007 U.S. Dist. LEXIS 55088 (S.D.N.Y. July 20, 2007) ......................................................................4, 48

*In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. 02-1335, 2004 U.S. Dist. LEXIS 20733 (D.N.H. Oct. 14, 2004) ............................................................43

*In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005) ..........................................................................................65

*In re Veeco Instruments Inc. Sec. Litig.*, 235 F.R.D. 220 (S.D.N.Y. 2006).......................15

*Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991)................................6, 7

*In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-5571, 2004 U.S. Dist. LEXIS 7015 (S.D.N.Y. April 22, 2004)..........................................................33, 64

*In re Warnaco Group Inc. Opinion Sec. Litig.*, 388 F. Supp. 2d 307 (S.D.N.Y. 2005) ............................................................................................7

*In re Wells Fargo Sec. Litig.*, 12 F.3d 922 (9th Cir. 1993)..............................40

*West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, No. 05-01265, 2008 U.S. Dist. LEXIS 47748 (D. Colo. Mar. 28, 2008) ....................................34

*In re Westinghouse Sec. Litig.*, 90 F.3d 696 (3rd Cir. 1996) ...........................29

*In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206 (N.D. Okla. 2003) ............................................................26, 33, 40, 46, 47, 48, 54, 55

*In re Winstar Commc'ns*, No. 01-3014, 2006 U.S. Dist. LEXIS 7618 (S.D.N.Y. Feb. 24, 2006) ..............................................................29, 60, 61, 62

*In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392-415 (S.D.N.Y. 2003)..................36

*In re WorldCom, Inc. Sec. Litig.*, No. 02-3288, 2003 U.S. Dist. LEXIS 10863 (S.D.N.Y. June 24, 2003)................................................................43

*In re Worldcom, Inc. Sec. Litig.,* No. 02-3288, 2003 U.S. Dist. LEXIS 10863 (S.D.N.Y. June 25, 2003)............................................................47, 53

*In re Worldcom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472 (S.D.N.Y. 2005)..............45, 47, 54

*In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208 (D. Conn. 2001) .........................17, 29

*In re Xethanol Corp. Sec. Litig.*, No. 06-10234, 2007 U.S. Dist. LEXIS 65935
   (S.D.N.Y. Sept. 7, 2007) ............................................................................24

*Yak v. Bank Brussels Lambert, BBL Holdings, Inc.*, 252 F.3d 127 (2d Cir. 2001) .............5

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ...................31, 55

## STATUTES

15 U.S.C. §78u-5(c)(1) .................................................................................15, 16

15 U.S.C. §78j(b) ...............................................................................................5

17 C.F.R. §229.303(a) .........................................................................................7

17 C.F.R. §240.10b-5 .......................................................................................5, 6

Fed. R. Civ. P. 8(a) ............................................................................................6

Fed. R. Civ. P. 8(a)(2) .......................................................................................56

Fed. R. Civ. P. 9(b) ............................................................................................5

Plaintiff David S. Lenington respectfully submits this memorandum in opposition to the motions to dismiss the Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws (the "Complaint")[1] filed by Inyx, Inc. ("Inyx" or the "Company"), the Chairman and Chief Executive Officer, Jack Kachkar ("Kachkar"), the Vice President of Finance, Treasurer, Corporate Secretary, and Inyx's Chief Financial Officer and Chief Accounting Officer, Rima Goldschmidt ("Goldschmidt"), and the Company's Executive Vice President and Director of Corporate Development, Jay M. Green ("Green") (collectively the "Individual Defendants," and with the Company, "Inyx Defendants"), and by Berkovits & Company, LLP, f/k/a Berkovits, Lago & Company, LLP ("Berkovits"), Inyx's auditor during the Class Period (with the Inyx Defendants, collectively the "Defendants").[2]

## <u>PRELIMINARY STATEMENT</u>

Inyx is a pharmaceutical company that develops and manufactures prescription and over-the-counter aerosol pharmaceutical products and drug delivery applications and provides pharmaceutical development and manufacturing consulting services. ¶9. Inyx's operations are conducted through several wholly owned subsidiaries. ¶¶9, 31.

In early 2005, Inyx was attempting to acquire the Manati, Puerto Rico-based business of Sanofi-Aventis and sought an asset-based loan as financing from Westernbank Puerto Rico ("Westernbank"). ¶32. Under the terms of the loan agreements ("Loan Agreements"),[3] Westernbank agreed to provide lines of credit to Inyx that they could draw upon based on the percentage of its accounts receivable, evidenced by invoices, reports, and credit notes provided by Inyx to Westernbank. ¶33. The Loan Agreements also required that Inyx

---

[1] Paragraph references (¶) shall be to those in the Complaint.

[2] The Memorandum in Support of the Inyx Defendants' Motion to Dismiss (Dkt. No. 46) will be referred to as "Def. Br." The Motion did not include a response by President and Director, Steven Handley ("Handley") and he has not entered his appearance in this case. The Memorandum in Support of the Motion to Dismiss filed by Berkovits (Dkt. No. 42) will be referred to as "Berk. Br." Exhibits submitted by Berkovits will be referred to as "Berk. Ex. __ ."

[3] On March 16, 2005, Westernbank committed to making a $46 million asset-based loan to Inyx. Westernbank ultimately loaned over $142 million to Inyx over the Class Period. The Loan Agreements refer to those issued during the Class Period. ¶¶32-33.

direct its customers to make payments for accounts receivable to Westernbank controlled lock boxes, which would be used to pay down the loan obligations. *Id.* After learning the terms of the Loan Agreements, the Inyx Defendants began to plot their fraudulent scheme to withdraw funds from Westernbank without the necessary collateral.  ¶34. To that extent, beginning in or about April or May 2005, the Inyx Defendants began submitting fictitious invoices, created by Goldschmidt, at the direction of Kachkar, Handley, and Green, to obtain additional funds from Westernbank. ¶¶34, 36. To make the scheme succeed, the amounts in these invoices were also reflected as sales on Inyx's publicly issued financial reports and statements, which, in turn, fraudulently inflated the Company's financial results and condition. ¶34. At the same time, Inyx maintained internal books showing that the invoices were uncollectible and fraudulent, and the purported sales non-existent. *Id.*

Additionally, the Inyx Defendants re-directed customer payments, which should have been made to lock boxes, into other accounts, while providing Westernbank with records showing that the sums, which had been paid, were still collectable receivables. ¶35. The Inyx Defendants also, without properly recording the transactions, offset accounts receivable owed to Inyx from its customers against debts Inyx owed to customers, resulting in the overstatement of Inyx's net income and understatement of the Company's liabilities. *Id.* Based on evidence presented to the Delaware Bankruptcy Court,[4] it is estimated that Inyx overstated its assets and revenues by more than $100 million during the Class Period. ¶195.

Further, starting in September 2006 and continuing through at least May 2007, the Inyx Defendants repeatedly misled Westernbank and investors by representing to them that they were finalizing arrangements with other sources of funding to buy out or significantly pay down Inyx's debt to Westernbank. However, no such sources of funds ever actually existed. ¶86. Thus, as alleged in the Complaint, all the statements made during the Class Period related to the Company's financial condition, its compliance with Generally Accepted

---

[4] *In re Exaeris, Inc.*, No. 07-10888 (KG) (Bankr. D. Del.); *In re Inyx USA, Ltd.*, No. 07-10888 (KG) (Bankr. D. Del.).

Accounting Principles ("GAAP") and its internal controls, repayment of the Company's debt, and taking the Company private were completely and materially false and misleading when made. Further, as the Complaint alleges, all of the Inyx Defendants were active and knowing participants in the fraud throughout the Class Period. Moreover, almost £493,496 (approximately $1 million) from the diversion of funds from Westernbank was delivered directly to Kachkar and portions of the additional million of dollars diverted were used to pay the Individual Defendants' personal compensation. ¶269.

Throughout the Class Period, with knowledge of Inyx's true financial condition, or in reckless disregard thereof, Berkovits -- the last line of defense for investors -- intentionally blinded itself to the obvious red flags, described in more detail below, approved the issuance of these materially false and misleading financial statements and provided unqualified Auditors' Reports which were included in Inyx's 10Ks, certifying their accuracy. ¶¶250-58. Finally, in February 2007, due to David Zinn ("Zinn"), Inyx's Vice President of Finance and Principal Accounting Officer, forcing Berkovits and the Chairman of the Audit Committee, Joe Rotmil, to take the serious accounting issues up with the full board of directors of Inyx, Berkovits, to feign an appearance of independence and protect itself, began expressing concerns over issues Zinn had previously brought to its attention. ¶¶161-62. On July 5, 2007, Berkovits resigned from its position. As alleged in the Complaint, the resignation of Berkovits as Inyx's auditor and the reorganization of the firm, including the departure of Jesus Lago ("Lago") from Berkovits, was a direct and consequent result of the conduct of the Inyx Defendants. ¶15.

Defendants' arguments on their motion to dismiss are not only completely baseless, but verge on the absurd. There can be no question that the statements during the Class Period were materially false and misleading and part of an overarching fraudulent scheme that the Inyx Defendants perpetrated during the Class Period, as confirmed by the Delaware Bankruptcy Court proceedings, and the Affidavit of Jonathan Middup, dated September 19, 2007 (the "Middup Affidavit"), which is based on his investigation of certain aspects of the subsidiaries' business and affairs, particularly cash flows and accounts receivable, and

examination of materials provided by Westernbank, Inyx's records and books, and interviews with current and former employees, officers, and/or directors of Inyx. Further, Plaintiff more than sufficiently pleads a strong inference of *scienter*, supported by Inyx's Vice President of Finance and Principal Accounting Officer, Zinn, who has first hand knowledge of what occurred at Inyx based on his position as the person in charge of, *inter alia*, preparation of the Company's filings with the United States Securities and Exchange Commission ("SEC").

Additionally, Plaintiff adequately pleads loss causation by alleging that the news on July 2, 2007 of the bankruptcy reflected the materialization of previously concealed risks. The July 2, 2007 news was immediately followed by the price of Inyx shares dropping 86% on unusually heavy trading volume. Defendants' reliance defense is not only inappropriate on a motion to dismiss, as the presumption of reliance applies, but also fails based on the facts, as alleged below. Finally, the Section 20(a) claim should also be sustained because Plaintiff adequately pleads a primary violation of Section 10(b) and the Inyx Defendants do not challenge that the Individual Defendants were control persons. Therefore, it is respectfully submitted that Defendants' motions to dismiss should be denied in their entirety.

## **ARGUMENT**

## I.     **LEGAL STANDARD ON A MOTION TO DISMISS**

"When considering a motion to dismiss, the complaint is liberally construed, 'accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor.'"  *In re Tommy Hilfiger Sec. Litig.*, No. 04-7678, 2007 U.S. Dist. LEXIS 55088, at *5 (S.D.N.Y. July 20, 2007) (citations omitted). A complaint need only allege "enough factual matter (***taken as true***)" to suggest that a violation occurred, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (emphasis added; citation omitted). The pleading need only contain "[f]actual allegations. . . [sufficient] to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 556.  As here, "[w]hen there are well-pleaded

factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* No. 07-1015, __ U.S. __, 129 S. Ct. 1937, 1940-41 (2009).[5]

Further, the Court must limit itself to facts stated in the Complaint, documents attached to the complaint as exhibits and documents incorporated by reference. *See, e.g., Yak v. Bank Brussels Lambert, BBL Holdings, Inc*., 252 F.3d 127, 130 (2d Cir. 2001) (finding that the court is limited to the four corners of the pleading and may not consider information outside the pleading, unless such information is attached to the complaint or incorporated by reference). Even those narrow categories of documents extraneous to a complaint that a court may consider in addition to the complaint itself may only be considered for the fact that they say what they say – not for the truth of the statements made in them. *See Carter v. Safety-Kleen Corp.*, No. 06-12947, 2007 U.S. Dist. LEXIS 29484, at *10 (S.D.N.Y. Mar. 14, 2007). "When a party submits additional evidence to the Court in connection with a motion to dismiss, the Court must convert the motion to dismiss into a motion for summary judgment or exclude the extraneous documents from consideration." *Adams v. Crystal City Marriott Hotel*, No. 02-10258, 2004 U.S. Dist. LEXIS 5819, at *8-9 (S.D.N.Y. 2004) (citations omitted).

## II.    PLEADING REQUIREMENTS FOR A SECTION 10(b) CLAIM

Under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5(b), a plaintiff must plead six elements: (1) a material misrepresentation or omission; (2) *scienter*; (3) a connection between the misrepresentation or omission and purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 128 S. Ct. 761, 768 (2008); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 613 (S.D.N.Y. 2008) (citations omitted). The heightened pleading standard under the Private Securities Litigation Reform Act of

---

[5] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 129 S. Ct. at 1949. Thus, *Ashcroft* makes clear that, for elements of claims subject to Rule 8(a), *Twombly* requires more than pleading the "bare elements of [the] cause of action," but far less than the particularity of pleading required under Fed. R. Civ. P. 9(b). *See id.* at 1954.

1995 ("PSLRA"), as interpreted by the United States Supreme Court in *Tellabs v. Makor Issues & Rights, Ltd,* 551 U.S. 308 (2007) applies only to the element of *scienter*; all other elements of a §10(b) claim are governed by traditional pleading standards under Fed. R. Civ. P. 8(a) or 9(b). *See In re PXRE Group, Ltd. Sec. Litig.,* 600 F. Supp. 2d 510, 528-29 (S.D.N.Y. 2009). Rule 9(b) merely requires that the complaint "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). A plaintiff is not required to plead evidence. *See Skydell v. Ares-Serono S.A.,* 892 F. Supp. 498, 501 (S.D.N.Y. 1995).[6]

## III.    THE ALLEGATIONS IN THE COMPLAINT ADEQUATELY PLEAD A CLAIM AGAINST THE INYX DEFENDANTS

### A.    Plaintiff Alleges Actionable Material Misstatements and Omissions

Rule 10b-5(b) prohibits "mak[ing] any untrue statement of material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."    17 C.F.R. §240.10b-5. "[O]nce corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading." *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990). *See also Virginia Bankshares v. Sandberg,* 501 U.S. 1083, 1098 n.7 (1991) (when a company chooses to speak, "there can be no question that the statement [it] do[es] make carrie[s] with it no option to deceive"); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) ("corporations have a duty to disclose all facts necessary to ensure the completeness and accuracy of

---

[6] The Inyx Defendants' reliance on *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001), Def. Br. at 4, is misplaced because the reasoning of the case has been impliedly overruled by *Tellabs* and has been, accordingly, since repudiated by the Sixth Circuit itself  The Sixth Circuit has recently stated, "[t]he district court's 'most plausible' standard is derived from this Court's decision in *Helwig*, where the *en banc* Court held that 'the 'strong inference' requirement means that plaintiffs are entitled only to the most plausible of competing inferences.'  After *Tellabs*, however, the standard adopted in *Helwig* is no longer good law." *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008) (citations omitted).

their public statements"). A statement is misleading if a reasonable investor would have received a false impression from the statement. *Par Pharm.*, 733 F. Supp. at 677. The purpose of the disclosure requirements is "to inform, not to challenge the reader's critical wits." *Va. Bankshares*, 501 U.S. at 1097. Further, Regulation S-K, Item 303, requires Inyx to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii).

A misrepresentation or omission is material when a reasonable investor would attach importance to it in making an investment decision. *See Va. Bankshares,* 501 U.S. at 1090 (citation omitted); *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988) ("there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"). The materiality requirement poses a very low burden;  "[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2nd Cir. 2000). Thus, the trier of fact usually decides the issue of materiality.[7]  Material facts include information disclosing financial results, "but also facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *Klein v. PDG Remediation*, 937 F. Supp. 323, 327 (S.D.N.Y. 1996) (citation omitted). The misrepresentations and omissions here are accordingly material.

1. **Materially False and Misleading Statements About the Company's Financial Condition**

Plaintiff properly pleads particularized facts to support his claims that the Inyx Defendants made

---

[7] *See Basic*, 485 U.S. at 240 (materiality is inherently an intensely "fact-specific inquiry" that "depends on the significance the reasonable investor would place on the withheld or misrepresented information"); *In re Warnaco Group Inc. Opinion Sec. Litig.*, 388 F. Supp. 2d 307, 313 (S.D.N.Y. 2005) (materiality "may be characterized as a mixed question of law and fact, and is generally inappropriate for determination at the pleading stage").

materially false and misleading statements about the Company's financial condition.[8]  On August 19, 2005, in

a press release, Kachkar claimed that the "sharp increase" in revenues for that quarter was due to the Aventis

acquisition. ¶115. On August 26, 2005, in a press release announcing the Celltech acquisition, the Company

stated that the acquisition would provide Inyx with an "excess of $50 million with high profit margins" in the

next twelve months, and a "material contribution to Inyx's revenue base." ¶¶119-20. On November 21, 2005,

Inyx announced its financial results for the third quarter of 2005, stating that the increase in revenues was due

to two acquisitions, Aventis and Celltech, that have "contributed significantly to" revenues. ¶126. On April 3,

2006, the Company issued a press release announcing its financial results for the fourth quarter of 2005,

claiming the increase in revenue was due to the two previously mentioned acquisitions. ¶132. On May 17,

2006, the Company reported its financial results for the first quarter and stated that the improved profitability

was due to the "achievement of development milestones in the quarter in several new customer contracts,"

"commercial production on two material contracts," and a new "marketing arm, Exaeris, Inc." ¶135. On

August 21, 2006, Inyx issued a press release reporting its second quarter results of $20.1 million revenues,

versus $8.5 million for the same quarter in 2005. ¶140. On December 4, 2006, Inyx issued a press release

announcing the third quarter results, with a reported revenue of $18 million versus $12.9 million in a

comparable quarter in 2005. ¶147.

All of the statements previously described were false and misleading at the time made because the

Inyx Defendants failed to disclose that the real source of the resulting increases in revenue were due to

improper acceleration of development revenue and creation of fictitious and fraudulent invoices, for the

purpose of inflating Inyx's financial position and operating results. ¶¶37-55.[9]  The Inyx Defendants also

---

[8] *See In re Anicom Inc. Sec. Litig.*, No. 00-4391, 2001 U.S. Dist. LEXIS 6607, at *11-13 (N.D. Ill. May 15, 2001) ("plaintiffs allege that the statements were misleading because they reported increased sales and increased profits when defendants knew that the company was actually in financial trouble and that the reported numbers were false because they were generated through prebilling and fictitious orders . . . Such pleading is sufficient to meet the requirements of Rule 9(b) and the PSLRA").

[9] The Inyx Defendants claim that the "Scheme Allegations allege that unidentified persons at an Inyx subsidiary in Europe decided at an unidentified time to submit allegedly fraudulent invoices to Westernbank in order to get

improperly overstated accounts receivable and understated bad debt expense, as a result of the improper recognition of revenues and recording of fraudulent invoices as sales. ¶207. Further, the Company's cash position was artificially inflated due to the improper diversion of funds and the failure to record offsets throughout the Class Period. ¶¶56-85.

The Inyx Defendants' fraud continued with the Company's filing of its Form 10-Q on December 4, 2006, which stated that "[a]s of September 30, 2006, the Company had approximately $119.4 million in loan obligations, including approximately $108.2 million relating to the credit facilities with Westernbank, with the balance of the obligations, amounting to approximately $11.2 million, relating to the balance due to UCB Pharma Limited ("UCB Pharma") as a result of the purchase of the Ashton business from UCB." ¶148. This statement was false and misleading because Defendants did not disclose that in May 2006, the Inyx Defendants submitted fraudulently inflated invoices and accounts receivable reports to Westernbank for invoices related to the UCB Agreement.[10]   ¶149. The total amount of these invoices submitted was approximately £1.037 million, when the actual amount owed under the UCB Agreement for May 2006 was only £437,564. *Id.* Further, the Inyx Defendants did not disclose that by June 2006, "the full amount for the year ending August 31, 2006 that UCB had to pay under the UCB Agreement (£4.2 million) had already been invoiced to UCB," yet "the Inyx Defendants caused an invoice for £658,000.00, represented to be for payment due under the UCB Agreement, to be submitted to Westernbank in July 2006 for the purpose of fraudulently obtaining additional funding." *Id.*

---

additional draws on the loan facility." Def. Br. at 20. This ignores the actual allegations in the Complaint, which not only provide specific instances of the fraud, but also provide the dates. Further, the Individual Defendants are linked to the fraud and each of their roles is explained in detail. *See* ¶¶37-55. Further, the allegations do not "relate almost entirely to part of the operations of Inyx Pharma," as the Inyx Defendants allege. Def. Br. at 21. *See, e.g.,* ¶¶43, 52, 55.

[10] The Complaint alleges that "UCB owed Ashton a receivable per month based upon the level of sales of specific products sold by Ashton to UCB. The UCB Agreement fixed the annual amount for the year ending August 31, 2006 at £4.2 million. The accounts receivable reports the Inyx Defendants submitted or caused to be submitted to Westernbank identified three different invoices owed in May 2006 by UCB to Ashton pursuant to the UCB Agreement." ¶149.

The materiality of the false and misleading statements is evidenced by the restatement, which is used only in cases of "material" mistakes. ¶215.[11]   On April 6, 2007, Inyx filed an amended Form 8-K, stating that the Company would restate its financial results for the first three quarters of 2006. ¶178.[12]   A later disclosure revealed that the restatement would reduce revenue by at least $4 million due to the improper recognition of development revenue. ¶182.   Further, as alleged in the Complaint, based on the evidence presented in bankruptcy court, Inyx overstated its assets and revenues by more than $100 million during the Class Period. ¶195.[13]

### 2.    Materially False and Misleading Statements About the Company's Internal Controls and GAAP Violations

Defendants' own admissions that they discovered material weaknesses in the Company's internal controls show that Defendants' statements regarding the internal controls were materially false and misleading when made. ¶178. The Form 10-K filed on April 15, 2005, as well as the quarterly filings during

---

[11] *See In re Miller Indus. Sec. Litig.*, 12 F. Supp. 2d 1323, 1330 (N.D. Ga. 1998) ("When viewing the allegations in the Amended Complaint as true, the alleged accounting fraud misrepresentations in connection with the overstatement of revenues and masking of growth, as disclosed in the various public statements, are clearly not so unimportant that reasonable minds could not differ as to their materiality. Accordingly, the Plaintiff has sufficiently pled the element of materiality as to each Defendant"); *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 627 (S.D.N.Y. 2003) ("Looking at all of the alleged accounting improprieties in the Nortel Complaint, the Court cannot conclude, as a matter of law, that they are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance'") (citations omitted).

[12] The Inyx Defendants' argument that the allegations "do not plead any specific facts regarding fraudulent acts before mid-2006," Def. Br. at 22, is not only incorrect, but is contradicted by Inyx Defendants' own admission that a restatement was needed for the first three quarters of 2006. Further, the fact that the allegations relate to Inyx's subsidiaries is irrelevant because the impact on Inyx's financial statements is alleged, and additionally, all accounting had to involve the subsidiaries because Inyx was "a mere holding company that does not have ongoing manufacturing operations." ¶93.

[13] Thus, the Inyx Defendants' statement that the Complaint "never explains why Inyx shareholders should be concerned," Def. Br. at 21, is completely meritless. Further, the Inyx Defendants' statement that the financial irregularities are not quantified and their materiality is not alleged ignores the well-pled allegations in the Complaint. Although Plaintiff does quantify the financial improprieties here, courts do not require it. *See, e.g., In re Miller*, 12 F. Supp. 2d at 1328 (a plaintiffs "need not specify the exact dollar amount of each accounting error"); *Simons v. Dynacq Healthcare, Inc.*, No. 03-05825, 2006 U.S. Dist. LEXIS 46503, at *17-18 (S.D. Tex. July 10, 2006).

the Class Period, and each certification[14] stated that "under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer," the Company had carried out an evaluation of the disclosure controls and found them effective. ¶¶108, 113, 117, 137, 142, 150.[15]

The Company's statements about its internal controls and GAAP[16] compliance were also materially[17] false and misleading when made because, *inter alia*, Defendants concealed that "Inyx suffered from a serious lack of legitimate controls over its financial reporting which rendered the Company's financial reporting inherently corrupt, subject to manipulation and unreliable, further making each of statements that Inyx's financial results complied with GAAP materially false and misleading." ¶240. Bolstering this allegation is that when Zinn joined Inyx, he became "quickly concerned about the numerous accounting issues that made him question the Company's accounting and financial controls." ¶156. He also learned from numerous conversations with Berkovits' partners and the audit committee that the inadequate controls had been in place as far back as 2005, as evidenced by Goldschmidt not being able or willing to provide sufficient or timely

---

[14] Defendant Kachkar further certified that Inyx disclosed "[a]ll significant deficiencies in the design or operation of internal controls which could adversely affect the [Company's] ability to record, process, summarize and report financial data and have identified for the [Company's] auditors any material weaknesses in internal controls" and that Inyx's auditor and audit committee had been apprised of "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting." ¶242. The Inyx Defendants made further certifications as to their responsibility for internal controls. ¶243. Further, the Company's March 2006 Code of Ethics for the Company filed as an exhibit to the 2005 10-K stated that "[t]he Officers are responsible for full, fair, accurate, timely and understandable disclosure in all periodic reports and financial disclosures required to be filed by the Company with the Securities and Exchange Commission or disclosed to the public." ¶244.

[15] Several courts have found that SOX certifications provide evidence of both the false and misleading nature of the statements and *scienter*. *See, e.g.*, *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 U.S. Dist. LEXIS 15696, at *32-33 (E.D. Pa. July 27, 2005); *In re Lattice Semiconductor Corp. Sec. Litig.*, No. 04-1255, 2006 U.S. Dist. LEXIS 262, at *50-51 (D. Or. Jan. 3, 2006).

[16] In both of Inyx's Form 10-Ks, the Company claimed compliance with GAAP and the Company's revenue recognition policy. ¶¶107, 130. Further, in all the 10-Qs during the Class Period, the Company also claimed compliance with GAAP and its own policy. ¶¶112, 127, 136, 141, 148-49.

[17] The statements at issue are material because a shareholder would find important to an investment decision whether the Company has effective controls. *See In re Immucor Inc. Sec. Litig.*, No. 1:05-2276, 2006 U.S. Dist. LEXIS 72335, at *36-37 (N.D. Ga. Oct. 4, 2006) ("A reasonable investor would have been swayed had Immucor identified to the public (as it admits that it identified internally) weaknesses in its internal controls…"). Courts have found internal control statements to be actionable even when Plaintiff has not alleged the financial impact of the internal controls. *See, e.g.*, *Simons*, 2006 U.S. Dist. LEXIS 46503, at *17-18.

information, as well as her inexperience with SEC filings. ¶156. Furthermore, it is important to note that the Inyx Defendants did not provide Zinn with the necessary information to confirm certain open items until he refused to sign off on the Form 10-Q for the third quarter until the information was made available. ¶159.

On March 27, 2007, the Company disclosed in a Form 8-K that it has identified "internal control weaknesses." ¶175. On April 6, 2007, Inyx filed an amended Form 8-K, stating that the Company would restate its financial results for the first three quarters of 2006, and that the restatement arose due to GAAP violations and "the Company's internal control over financial reporting, including, at a minimum, the revenue recognition policy for development revenue earned during 2006." ¶178. On April 27, 2007, the Company in a Form 8-K/A, in response to a demand by SEC, stated that "[w]ith respect to one customer, development revenue was recognized in 2006 before the customer received value for the related development services and management currently believes that it should not have recognized such revenue." ¶182. By Defendants' own admissions, GAAP was violated by at least $4 million for just the first quarters of 2006. Thus, the material falsity of Defendants' statements regarding internal controls has been corroborated by Inyx's own former CFO, *see* ¶¶157, and later confirmed by Defendants' own admissions. *See Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1160 (D. Wash. 2006). Defendants simply "cannot legitimately contend at this stage of the pleading that a restatement is not sufficient to establish that the original statements were not false when made." *In re SmarTalk Teleservs., Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 543 (S.D. Ohio 2000). Therefore, the statements are adequately pleaded to be materially false and misleading when made.[18]

### 3. The False and Misleading Statements About Taking Inyx Private and Repaying the Westernbank Loan are Actionable

On November 24, 2006, the Company issued a press release announcing that the Board of Directors has been approached about taking the Company private, but the Company would "work to secure new debt financing for Inyx before the group tries to finalize financing for any going-private offer." ¶145. The press

---

[18] Thus, notwithstanding the Inyx Defendants' arguments to the contrary, Def. Br. at 23, the effect of the lack of internal controls is material and quantified, as confirmed by the belated admissions.

release further stated that "Inyx reported that the company this week informed Westernbank Puerto Rico it intended to pay off the loan amounts owed to Westernbank by December 31, 2006." ¶145. The Company made an identical statement in its Form 10-Q filed on December 4, 2006. ¶148. On January 25, 2007, the Company issued a press release announcing that Kachkar was finalizing financing to take the Company private, and further stated that Inyx intended to repay the debt to Westernbank by March 31, 2007. ¶152.[19] On March 19, 2007, the Company issued another press release that it "expects to finalize over the next several days the financing to formally make its offer to take the company private," and also stated that the Company expects to "shortly" pay off Westernbank. ¶171. On March 26, 2007, the Company announced an offer by Kachkar and an "outside investor" to take the Company private, which would also provide the funding to pay Westernbank back. ¶172.

The statements about finalizing arrangements with sources of funding either to buy out or significantly pay down Inyx's debt to Westernbank were simply lies. The Inyx Defendants falsely assured Westernbank on numerous occasions that financing agreements had been reached and were in the final stages of negotiation. For example, the Inyx Defendants told Westernbank that Kachkar was negotiating with Al-Saadi Qadhafi of Libya on a deal, "in which Mr. Qadhafi would provide a multi-hundred-million dollar investment which would be used to pay off the Westernbank loans." These fanciful representations were proved false by Westernbank's subsequent investigation. ¶¶86, 146(a), 153(a), 174(a).[20]

### 4.  The Statements Regarding the Aventis Acquisition and Westernbank Loans are False and/or Misleading and Actionable

On March 31, 2005, Inyx issued two false and/or misleading press releases regarding the Aventis acquisition and its loan from Westernbank. ¶¶96-97. On April 6, 2005, Inyx filed two Form 8-Ks, one providing more details on the Aventis acquisition and one providing more details on the Westernbank loan.

---

[19] The Inyx Defendants' argument that Plaintiff misquotes the press release is just plain wrong considering the Complaint block quotes relevant portions of the press release. *See* ¶152.

[20] Thus, the Inyx Defendants' argument that Plaintiff pleaded no facts to demonstrate that these statements were false and misleading, Def. Br. at 24, is just plain wrong.

¶¶100-01. The Complaint alleges that the statements were false and misleading because the Inyx Defendants failed to disclose material information, including that prior to the signing of the Loan Agreements, the Inyx Defendants began planning their schemes to access additional funds from Westernbank, and that as early as April 2005, the Inyx Defendants began their practice of the "submission of duplicate, inaccurate, altered, and/or fictitious invoices" to increase their accounts receivable and inflate the Company's financial position and operating results. ¶102. Further, because of these practices, the Company would violate GAAP[21] and its own stated accounting policies by fraudulently representing the Company's ability to collect cash, "improperly recognizing revenue in the absence of product delivery, the satisfaction of its contractual obligations, and reasonable assurance of collectability." *Id.*[22]  Additionally, the Inyx Defendants did not disclose that the Company suffered from a "serious lack of legitimate controls over its financial reporting which rendered the Company's financial reporting inherently corrupt, subject to manipulation and unreliable." *Id.*[23]

---

[21] The Inyx Defendants' argument that the GAAP violations did not need to be disclosed with these statements, Def. Br. at 20, is erroneous because as the Complaint alleges, the "announcement of the Westernbank line of credit was well received by the investing public as an indication of Inyx's financial health and positive future prospects. However, investors did not know that the Inyx Defendants intended to use the Westernbank credit facility as their personal piggy-bank through the series of deceptive and fraudulent devices, schemes, and practices described above to siphon off funds."  ¶99. Thus, knowing that the Company would be violating GAAP was material to investors and had to be disclosed to make the statements made not false and misleading and so investors could "proper[ly] understand[] and evaluat[e] [] the Company's operating performance." *Id.*  Further, the Complaint does allege when the GAAP violations started; they clearly started when the schemes and practices started in April of 2005, as the schemes caused the Company to violate GAAP.

[22] The Inyx Defendants' statement that "neither allegation [regarding MEDA and King Pharmaceuticals] explains that the developmental invoice was issued with the intention of canceling it," Def. Br. at 20, mischaracterizes both allegations. In regard to MEDA, the allegations clearly state that MEDA was part of the Inyx Defendants' scheme to use developmental invoices to inflate revenues. ¶52. Further, not only were the invoices later canceled, but Zinn questioned whether the balance was ever collectible "because the work was supposed to be off-set against the purchase price of the Tropon acquisition that itself was deferred."  ¶¶52, 164. As to King Pharmaceuticals, the Complaint alleges that the fraudulent invoices of around £8 million had to be cancelled because the work for the invoices never actually existed. ¶51.

[23] As to the internal controls, notwithstanding the Inyx Defendants' arguments to the contrary, Def. Br. at 20, the Complaint does not need to state who was responsible for the internal controls because management has admitted that it is responsible. *See, e.g.*, ¶113. The internal control allegations are also adequately detailed to satisfy the pleading requirements. *See* ¶¶240-49. Further, the Inyx Defendants have admitted to internal control weaknesses with their restatement. *See* ¶¶246-49.

**5.    The Statements Regarding the Financial Guidance are Actionable**

The Inyx Defendants' false and misleading statements related to its financial guidance are not protected by the PSLRA's safe-harbor or any other doctrine known to the federal securities laws. The Complaint alleges that on April 15, 2005, the Company issued a press release providing guidance for 2005 and 2006, in which Kachkar stated that Inyx expected "record sound net earnings" and increasing revenues based on its new contractual partnerships and its own "proprietary products." ¶¶104-05. On May 23, 2005, in a press release, Inyx reaffirmed its guidance, stating that it was based on new business relationships, as well as the "commencement and ramp-up this year of several existing contracts" that would have a "materially positive impact on 2005 results." ¶111. On August 19, 2005, Kachkar once again reaffirmed the 2005 guidance based on same reasons as provided on May 23, 2005. ¶115. On September 13, 2005, the Company updated its guidance for 2005 and 2006, stating that the new acquisition of Celltech and the strategic alliance with King Pharmaceuticals increased Inyx's outlook materially. ¶¶123-24. On November 21, 2005, the Company reaffirmed its 2005 guidance and increased the revenue guidance for 2006 due to the acquisitions. ¶126. On April 3, 2006, the Company increased its revenue guidance for 2006, as well as increasing its 2007 revenue outlook to $250 million, based on its "expanding relationships in the pharmaceutical industry," and stated that it expected to have a "breakout year in 2007." ¶132. On May 17, 2006, the Company reaffirmed its revenue guidance for 2006 and 2007 based on "achievement in development milestones," production on two material contracts, and Exaeris. ¶135.

The PSLRA's safe harbor protects only those forward looking statements that are "identified" as such and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §78u-5(c)(1)(A)(i).[24]   In

---

[24] *See, e.g., In re Veeco Instruments Inc. Sec. Litig.* 235 F.R.D. 220, 236 (S.D.N.Y. 2006) (statements and omissions were not protected because they were not forward-looking, but affirmative representations about current or historical performance, or statements that omitted to disclose material information); *In re Nortel,* 238 F. Supp. 2d at 629 (safe harbor only applies to statements that are forward-looking, not to misstatements of present or historical fact).

addition, even where the safe harbor is triggered, it does not protect statements made with actual knowledge of falsity, as here. *See* 15 U.S.C. §78u-5(c)(1)(B). Defendants cannot be immunized for knowingly false statements even if they include some warnings. *Id.* As Judge Pollack explained, the law provides "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Ltd. P'ships Litig.,* 930 F. Supp. 68, 72 (S.D.N.Y. 1996).[25]

Here, the Inyx Defendants cannot invoke the safe harbor (or the bespeaks caution doctrine) because they failed to accompany the statements with cautionary language "sufficiently specific to render reliance on the false or omitted statement unreasonable." *In re Globalstar Sec. Litig.*, No. 01-1748, 2003 U.S. Dist. LEXIS 22496, at *24 (S.D.N.Y. Dec. 15, 2003). The cautionary language "must precisely address the substance of the specific statement or omission that is challenged." *Prudential,* 930 F. Supp. at 72. Generic or boilerplate statements are not sufficient. *See City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 361 (S.D.N.Y. 2006) ("As the Second Circuit has stated, warnings will not dispel liability where defendants 'gloss over the relevant risk, focus investors' attention elsewhere, and thereby lead them down some primrose path'") (citations omitted). Here, the Inyx Defendants' risk disclosures about the Company's "forward-looking" statements are as general as they get. The risk disclosure only states, "[s]ince these statements involve risks and uncertainties and are subject to change at any time, the Company's actual results could differ materially from expected results." *See, e.g.*, April 15, 2005 press release.[26] The Inyx Defendants do not disclose the risks behind their fraudulent schemes.

---

[25] *See also P. Stoltz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("knowledge within the grasp of the [company]" is not forward-looking and cannot be disclaimed with any amount of cautionary statements); *In re Alliance Pharm. Corp. Sec. Litig.,* 279 F. Supp. 2d 171, 192 (S.D.N.Y. 2003) ("neither the bespeaks caution doctrine nor the Safe Harbor provision . . . protects . . . if a statement was knowingly false when made. Even if defendants had adequately warned … they would not be protected . . . if they knew the statement was false or misleading at the time it was made").

[26] Pl. Ex. A to Declaration of David A.P. Brower submitted herewith. All other exhibits attached to Brower Declaration will be referred to as Pl. Ex. __. The Court can take judicial notice of documents filed with the SEC, like the press release here. *See 380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 214 (S.D.N.Y. 2008).

Moreover, the Complaint alleges -- based on well-supported first hand evidence -- that the Inyx Defendants had actual knowledge that any revenue or earnings guidance that Inyx provided was false when made because the Inyx Defendants knew that the Company's reported revenue increases would be based on their on-going intentional fraudulent scheme to improperly accelerate developmental revenue, record sales based on fictitious invoices and failure to record offsets that would reduce income. Given the fundamental and intentional misstatements of Inyx's reported financial results and condition, any financial guidance was tainted by the intentionally inaccurate and false reporting of the Company's past performance.  As such, the Inyx Defendants cannot shield themselves from the consequences of their overarching fraudulent scheme with the PSLRA's safe harbor.[27]   Such knowingly false statements are *not* protected by the safe harbor. *P. Stoltz*, 355 F.3d at 97 ("[K]nowledge within the grasp of the [company]" is not forward-looking and cannot be disclaimed with any amount of cautionary statements"); *In re Alliance*, 279 F. Supp. 2d at 192 ("But neither the bespeaks caution doctrine nor the Safe Harbor provision of the PSLRA protects a defendant from liability if a statement was knowingly false when made"); *SEC v. Baxter*, No. 05-03843, 2007 U.S. Dist. LEXIS 52829, at *15-16 (N.D. Cal. July 11, 2007) (statement that company's write-off was the result of a sale of one of its business units was actionable where the write-off was necessitated by years of poor record keeping and lack of internal controls and that the information regarding company's lack of internal controls was available to defendants at time they made statements).[28]

---

[27] Further, the statements are not puffery because they misrepresent existing facts. *See Novak v. Kasaks*, 216 F.3d 311, 315 (2d Cir. 2000) (statements that inventory situation was "in good shape" or "under control" when defendants knew the contrary was true were false and misleading) (citation omitted). *See also In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218 (D. Conn. 2001) (plaintiffs' allegations "go beyond claims of mere puffery" because defendants "made specific statements, including . . . those characterized by the defendants as merely reflecting optimism, knowing they were contrary to the company's actual situation").

[28] Interestingly, the only statement that the Inyx Defendants specify and label as not actionable is a statement in paragraph 144 of the Complaint related to Inyx's acquisition of Pharmapac and its expectations of growth from that acquisition. *See* Def. Br. at 23-24. The Complaint, however, does not even allege that anything about that statement was false or misleading.

17

**6.    The Individual Defendants are Liable for the Class Period Statements**

The Complaint also alleges with particularity the Individual Defendants' direct, knowing and volitional participation in the fraudulent schemes during the Class Period. For the fraudulent invoicing, the Complaint alleges the invoices and accounts receivable reports submitted by the Inyx Defendants were fraudulent and created by Goldschmidt at the direction of Kachkar, Handley, and Green. ¶36. [29]   In fact, Kachkar sent an email to Handley stating, "What we say to WB [Westernbank] and what we do are two different things." ¶266. Further, according to Zinn, "Goldschmidt would not do anything without [] Green, who also was directly involved with the dealings with Westernbank, and would approve her actions." ¶268. The Complaint also alleges that in November 2006, Green informed Mike Vasquez, President of the Business Credit Division of Westernbank, that $37.7 million of pre-bills securing Inyx's revolving line of credit were going to be written off, but assured Westernbank that the receivables were good, and that "Inyx was just having a little bit a of a delay in getting them collected." ¶40.[30]

As to the diversion of funds, the Complaint alleges that beginning at least as early as December 2006, and continuing until at least May 2007, the Inyx Defendants caused payments from UCB, one of Ashton's

---

[29]   The Inyx Defendants' attack on the allegations against Goldschmidt, Def. Br. 15, mischaracterizes the Complaint. First, Defendants' statement that there "is nothing sinister about how Inyx drew on its line of credit" is just preposterous. Second, the Complaint alleges the specific fraudulent invoices and accounts receivable information submitted to Westernbank and when it happened. *See* ¶¶41-55. However, even the Inyx Defendants admit that the allegations about the February 2007 check that arrived in Miami that Goldschmidt told Zinn not to send to the bank because "it would mess up everything," ¶57, is fraud. Def. Br. at 15. This allegation is bolstered by the fact that Inyx, Inc. is a mere holding company, yet "large sums of money were routinely retained in Inyx that had been collected from the Westernbank revolving lines of credit and from payments on subsidiaries' accounts receivable, which the Inyx Defendants had fraudulently diverted away from the Lock Box Accounts." ¶93. As to the allegation about the false assurances, ¶87, the Complaint provides the date of the assurances, what the assurances were, and who made them. Further, the Inyx Defendants' statement that "the Complaint does not explain how Zinn's alleged communication with Westernbank in 2007 is probative of a June 2006 conversation" is baseless because the "June 2006" conversation is actually a typographical error and should read "June 2007," which is evidenced by the allegations as to Zinn in May 2007 and the use of "thereafter" before false assurances. *See* ¶87.

[30]   Once again, taking the allegations out of context, the Inyx Defendants claim that informing Westernbank of the pre-bills is not "indicative of fraud." Def. Br. at 16. However, the fraudulent portion is the use of pre-bills in the first place, failing to fully disclose this to investors, and then outright lying about the receivables being good when they were clearly not, as evidenced by the invoices either not being submitted to customers at all, or later cancelled.

largest customers, to be diverted to other bank accounts controlled by the Inyx Defendants, instead of to the Lock Box Account. The signatories for the HSBC Account to which the money was diverted were Kachkar, Goldshmidt, and Joseph Rose ("Rose"), former Vice President of Finance for Inyx EU. ¶66.[31]  Further, Handley and Kachkar directed or caused others to direct UCB to make wire payments to the HSBC account rather than into the Lock Box Account. ¶68. For example, on one occasion, at least, Handley agreed to give UCB a discount on its payment if UCB deposited its payment into the HSBC Account controlled by the Inyx Defendants the same day. *Id.* The total amount diverted into the HSBC account was in excess of £4.4 million, ¶69, of which £4,473,399.00 was distributed to Inyx and Kachkar, including at least £1.64 million that was paid out to Inyx and over £493,000.00 that was paid out to Kachkar personally. ¶72. When told by Ross that this diversion was impermissible, Kachkar, corroborating Handley's previous false statements that there were negotiations with Westernbank permitting this practice, misrepresented to Rose that the diversion of funds "was appropriate and permissible." ¶71.

Additionally, the Inyx Defendants falsely assured Westernbank on numerous occasions that "financing agreements had been reached, were in the final stages of negotiation, they were doing due diligence, and trying to get the best deal for the Company."  ¶86. In May of 2007, Zinn informed Westernbank that at least $82.5 million of the accounts receivable securing the Company's loans to Inyx

---

[31] The Inyx Defendants' attacks on some of the scheme allegations are completely baseless and take the allegations out of context. Def. Br. at 13-17. Notwithstanding the Inyx Defendants' arguments to the contrary, pre-discovery, "plaintiffs need not allege all facts that may be related to their claims. The pleadings may leave some questions unanswered and still survive a motion to dismiss, 'provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA.'" *Gerber v. Bowditch*, No. No. 05-10782, 2006 U.S. Dist. LEXIS 27552, at *17 & n.8 (D. Mass. May 8, 2006). *See also Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir. 1998) ("While Fed. R. Civ. P. 9(b) proscribes the pleading of fraud by hindsight, we also cannot expect plaintiffs to plead fraud with complete insight before discovery is complete") (internal quotations omitted). Further, for example, the Inyx Defendants state that "[t]he Complaint does not explain why it is fraudulent to have the Chairman and Chief Financial Officer of the parent company and the CFO of this European subsidiary as signatories on a corporate bank account." Def. Br. at 13. Defendants completely miss the point. The point of that allegation is to show that as signatories on the bank account, they controlled the account and had to be aware or recklessly disregarded that money was fraudulently diverted into that account from the lock boxes. As another example, the Inyx Defendants state that there is nothing "inherently fraudulent or illegal about a corporate officer being paid funds from a corporate account." Def. Br. at 14. However, the Inyx Defendants were diverting funds that did not belong to them to other accounts and then paying themselves, evidencing their motive, as well as their knowledge.

would "probably" not be collected. ¶87. However, Kachkar, Green and Goldshmidt gave false assurances in June 2007 that the deficiency was substantially less, that the accounts receivable were in fact collectible, and/or that the collateral deficiency would be covered. *Id.* These allegations, which "set forth 'who, what, when, where, and how: the first paragraph of any newspaper story,'" *Dileo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990), are more than adequate to plead the primarily liability of each of the Inyx Defendants under the Exchange Act and Rule 10b-5.

Additionally, the Complaint specifically alleges the time, place and content of each of the Inyx Defendant's material misrepresentations and omissions. To start with, Inyx is liable as the issuer for the false and misleading statements issued in the name of the Company. Kachkar, Green and Goldschmidt are also all liable for each of the false and misleading statements made during the Class Period. Kachkar was quoted in press releases. ¶¶96, 98, 105, 111, 115, 120, 124, 126, 132, 135, 140, 144, 152, 173. Kachkar and Goldschmidt both signed[32] and certified[33] Inyx's 10-Ks and 10-Qs which contained false and misleading statements. ¶¶107, 112-13, 116-17, 127, 130, 136, 141, 148. Further, besides Green's active participation in the fraudulent schemes, Zinn relied on Green, Kachkar, Handley, and Goldschmidt's representations as to the accuracy of the financial statements when signing off on the Form 10-Q for the second quarter of 2006. ¶155.[34]

---

[32] "[T]hose who sign the documents (even if there are no facts showing they were involved in the preparation) can be held liable as a primary violator of §10(b) for making a false statement." *In re Petco Animal Supplies Inc. Sec. Litig.*, No. 05-0823, 2006 U.S. Dist. LEXIS 97927, at *44 (S.D. Cal. July 31, 2006) (citation omitted). *See also In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 163 (D. Mass. 2002) ("It is well established . . . that each defendant may be held responsible for the false and misleading statements contained in the financial statements he signed [under §10(b)]").

[33] Based on then existing facts, the certifications were knowingly or recklessly false and provide evidence of both falsity and *scienter*. ¶¶135-40, 151-57, 162-65, 207-08, 191-93, 195-96. *See, e.g., In re PMA*, 2005 U.S. Dist. LEXIS 15696, at *32-33.

[34] *See SEC v. Wolfson*, 539 F.3d 1249, 1261 (10th Cir. 2008) ("That the filings were issued in F10's name, and that [defendant] himself did not sign, certify, or physically file the documents, is not dispositive. The relevant question is only whether he can fairly be said to have caused F10 to make the relevant statements, and whether he knew or should have known that the statements would reach investors"); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000) ("participation or intricate involvement in the preparation of fraudulent statements is grounds

Senior officers may also be held liable for statements made by others. *See, e.g., In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75-76 (2d Cir. 2001) (vice president for finance and investor relations responsible for company's communications with investors who had access to internal data may be liable for false and misleading statements even though they were not publicly attributable to him); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471 (2d Cir. 1996) ("Primary liability may be imposed 'not only on persons who made fraudulent representations but also on those who had knowledge of the fraud and assisted in its perpetration.'") (citation omitted). All of the Individual Defendants were senior officers.[35]

The Complaint also satisfies the applicable pleading standard in this Circuit with respect to the Individual Defendants under the "group-pleading doctrine."[36]  That doctrine permits a plaintiff, "for pleading purposes only, to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (internal quotations and citations omitted). *See also In re Refco, Inc. Sec. Litig.*, 503 F.

---

for primary liability even though that participation might not lead to the actor's actual making of the statements"); *McNamara v. Bre-X Minerals Ltd.*, 57 F. Supp. 2d 396, 426 (E.D. Tex. 1999) ("if a defendant played a 'significant role' in preparing a false statement actually uttered by another, primary liability will lie").

[35] Kachkar was the Chairman and Chief Executive Officer. ¶10. Goldschmidt served as Vice-President of Finance, Treasurer, and Corporate Secretary, as well as Chief Financial Officer and Chief Accounting Officer. ¶12. Green served as the Company's Executive Vice-President and Director of Corporate Development. ¶13. The Inyx Defendants' argument that Green was not a senior officer is contrary to even the case they cite. In *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008), a high level position was defined as being an insider with direct involvement in day-to-day affairs, which is what the Complaint here alleges for Green. *See id.* at 266-67. Further, *Take-Two* is distinguishable because the person found not to occupy a senior position in *Take-Two* was a "non-executive" who was "barred by consent decree from acting as an officer or director of any public company." *Id.* at 267.

[36] Individual Defendants were each individuals with direct involvement in the everyday business of Inyx. *See, e.g.*, ¶¶16-20, 276-77 (describing the Individual Defendants' particular roles and their involvement with the everyday business of Inyx). *See In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 637-38 (S.D.N.Y. 2008) ("Plaintiffs allege that all of the Individual Defendants . . . were directly involved with the day-to-day operations of the company, and that all participated in drafting, reviewing, approving, ratifying, and/or disseminating the [] financial statements and press releases during the Class Period . . . these allegations are sufficient"). *See also In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999).

Supp. 2d 611, 641 (S.D.N.Y. 2007) (same).[37]

### B.    Plaintiff Has Alleged Facts Giving Rise to a Strong Inference of *Scienter*

"The 'requisite state of mind' in 10b-5 claims is "'intent to deceive, manipulate, or defraud.'"

*Tellabs*, 551 U.S. at 319 (citation omitted). The Second Circuit has provided at least five non-exclusive

examples of how a plaintiff may adequately plead *scienter* – namely, allegations that the defendants: "(1)

benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal

behavior; (3) knew facts or had access to information suggesting that their public statements were not

accurate; or (4) failed to check information they had a duty to monitor," *Novak*, 216 F.3d at 311, or (5)

"ignored obvious signs of fraud." *Id.* at 308. *See also Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir.

1996) ("An egregious refusal to see the obvious, or to investigate the doubtful, may . . . give rise to an

inference of recklessness.") (citations and quotations omitted); *Heller*, 590 F. Supp. 2d at 619 (same).

---

[37] The Inyx Defendants' argument that the group pleading doctrine does not apply because the "scheme allegations" do not involve press releases or SEC filings, *see* Def. Br. at 12, is inaccurate. The misleading and false statements in the press releases and SEC filings during the Class Period were false and misleading due to the scheme allegations. Therefore, because it was not disclosed that the Company's revenue was improperly recognized and overstated and the internal controls were virtually non-existent due the schemes, the statements in the press releases and SEC filings were false and misleading. *See, e.g.*, ¶131. Further, the Inyx Defendants' argument that the group pleading doctrine does not apply because the fraud related to Inyx's subsidiaries and not Inyx, Def. Br. at 12, also fails. *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323 (W.D.N.Y. 2008) is easily distinguishable. In the case, the Complaint did not allege that any of the Individual Defendants made any public statements about the Company's financial results or internal controls, failed to allege that any of these defendants participated in the drafting of any SEC filing or press release mentioned in the Complaint and did not "identify any documents filed during the Class Period that attributes any specific accounting item or disclosure to them." *See id.* at 346. In the instant case, all three of the Individual Defendants are alleged to have participated in the fraud and/or the drafting of the SEC filings or press releases, and the Complaint identifies the specific Class Period filings and explains why they are false and misleading. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1249 (2d Cir. 1987) is also distinguishable in that the complaint in *DiVittorio*, unlike here, did not identify the grouped defendants as being insiders or affiliates or even being involved in the drafting of misleading documents. *See id.* at 1249. "Grouping of defendants will be allowed if the defendants had drafted, prepared or approved collectively a document and the defendants had knowledge and involvement in the everyday business of the company." *Adelphia Recovery Trust v. Bank of Am., N.A.*, No. 05-9050, 2009 U.S. Dist. LEXIS 38834, at *70-71 (S.D.N.Y. May 4, 2009). Further, the group pleading doctrine is even more appropriate here because the Complaint alleges that "the Individual Defendants routinely participated in the operating, financial, and onsite management decisions of Inyx's operating subsidiaries without regard to what positions they held in those subsidiaries (or whether they held any formal position at all with the companies)." ¶94.

The inquiry on scienter "*is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.*" *Tellabs*, 551 U.S. at 323 (underlined emphasis omitted; bold added). This requisite "holistic" approach, *see id.* at 326, no longer permits courts to ignore any factual allegations that could support *scienter* simply because, standing alone, that fact would not suffice to meet the requisite standard for a strong inference of *scienter*; rather each such fact must be given some weight, and all facts are weighed together to determine whether the totality of the facts alleged give rise to a strong inference of *scienter*. *See also Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*, No. 08-1035, 2009 U.S. App. LEXIS 16990, at *37 (4th Cir. July 31, 2009) ("the[] allegations [are to be evaluated] holistically, recognizing that allegations of scienter that would not independently create a strong inference of scienter might compliment each other to create an inference of sufficient strength to satisfy the PSLRA") (citing *Tellabs*).[38]

"The inference that the defendant acted with *scienter* need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (citations omitted). An inference "at least as likely as competing inferences" warrants recovery. *Id.* at n.5. *See also City of Brockton Ret. Sys. v. Shaw Group. Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) ("the 'tie . . . goes to the plaintiff'").

---

[38] *Tellabs* altered the manner in which courts are to conduct the *scienter* analysis. Under pre-*Tellabs* decisions, courts often reviewed allegations of varying types of *scienter* in separate seriatim, determining whether each such allegation, standing alone, satisfied the *scienter* pleading requirement. If the court found one form of *scienter* allegation was insufficient, it would move on to the next type of *scienter* alleged without giving further consideration or weight to the other types of *scienter* alleged. *Tellabs*, however, makes clear that **all** allegations of *scienter* are to be considered together whether *vel non* individually those allegations would suffice to meet the *scienter* pleading requirement. *See* 551 U.S. at 323. Therefore, unlike prior practice, under *Tellabs,* the court is to review each type of *scienter* allegation, give the allegation the weight the court concludes it merits, and then, at the end of this process, amalgamate all of those separate allegations and determine whether, taken together, it is at least as likely as not that the defendants acted with the requisite state of mind. Under this analytical structure no possible basis for finding *scienter* is discarded; rather, all are assigned a weight and considered *in toto* with all other such allegations.

### 1.   The Inyx Defendants Were Aware of Facts and/or Had Access to Information Contrary to Their Public Statements

Plaintiff has far exceeded the requisite standard for pleading *scienter* here by adequately pleading that

the Inyx Defendants "knew facts or had access to information suggesting that their public statements were not

accurate." *Novak*, 216 F.3d at 311.  Such "allegations alone are enough to satisfy the pleading requirement

for scienter." *Heller*, 590 F. Supp. 2d at 622 (defendants' knowledge of undercapitalization that contradicted

their public statements alone satisfied scienter).[39]  In an almost identical case, the court found that *scienter* has

been adequately alleged, stating:

> Plaintiffs allege that the Individual Defendants created phantom invoices to overstate
> Datatec's accounts receivables. They claim that these phantom invoices were issued for work
> not yet completed, or not yet billable, at the time they were issued. Plaintiffs allege that such
> pre-invoicing was a frequent occurrence during the Class Period . . . Plaintiffs allege that these
> invoices were issued to allow Datatec to continue receiving financing from a $25 million
> credit facility with IBM Credit. According to the Complaint, Datatec needed the financing
> that it received to pay for payroll and supply expenses that it otherwise would have been
> unable to pay. Plaintiffs satisfy the scienter requirement by alleging that Mr. Gaon instructed
> his employees to issue such invoices, and that the Individual Defendants arranged for
> Datatec's customers to falsely confirm the accuracy of those invoices when its auditors
> inquired about the phantom invoices.

*In re Datatec Sys. Sec. Litig.*, No. 04-525, 2006 U.S. Dist. LEXIS 78843, at *44-45 (D.N.J. Oct. 30, 2006).

The Complaint alleges that each Individual Defendant was an active participant in the fraud and had

full knowledge that the statements made during the Class Period were false and misleading. *See In re

CornerStone Propane Partners., L.P. Sec. Litig.*, 416 F. Supp. 2d 779, 791 (N.D. Cal. 2005) (finding *scienter*

because defendant was "implicated as an author of CornerStone financials as well as a primary perpetrator of

a fraudulent scheme").[40]  Goldschmidt, in her roles as CFO and Chief Accounting Officer and later Vice-

---

[39] Furthermore, the Second Circuit has recently held that, at the pleading stage, a plaintiff need not identify a specific culpable officer or director to establish corporate scienter. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).

[40] The Inyx Defendants' argument that the Complaint never pleads when any of the schemes began and when Defendants became aware of them, Def. Br. 32, is incorrect. The Complaint alleges that the schemes began in April 2005, ¶37, and clearly the Inyx Defendants had knowledge of the schemes as soon as they began because they were the ones perpetrating the schemes. Further, the Inyx Defendants claim that no examples are provided

24

President of Finance and Treasurer, created the fraudulent invoices and account receivable reports submitted to Westernbank, at the direction of Kachkar, Green, and Handley.[41]  ¶36. *See Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (finding scienter allegations adequate when the complaint "alleged that [defendant] . . . supplied the information used to generate invoices for the fictitious sales, and reviewed such invoices before they were faxed to the person responsible for maintaining ISE's general ledger"). "Goldschmidt was named on all of Inyx's accounts, and was involved in managing Inyx's affairs, including being directly involved in the financing obtained from Westernbank and the allocation and use of the Westernbank financing and the payments Inyx received from their customers." ¶268.[42]  Moreover, in February 2007, when a customer check arrived in Miami even though there were no operations there, Goldschmidt told Zinn not to send the check to Westernbank because it would "mess up everything."  ¶57.

---

prior to June 2006. That is completely false. *See, e.g.*, ¶¶37, 52. Further, the Complaint does not need to "fix the exact date and time that [Defendants] became aware" of information that rendered their accounting practices misleading, "they must supply some factual basis for the allegation" that defendants had knowledge of the alleged fraud. *See Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000);  *In re Xethanol Corp. Sec. Litig.*, No. 06-10234, 2007 U.S. Dist. LEXIS 65935, at *6-7 (S.D.N.Y. Sept. 7, 2007) ("To plead with particularity does not require at this stage that Plaintiff spell out the very moment PwC should have known about the alleged fraud or that PwC had actual knowledge of the scope or particulars of the scheme"); *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 335 (S.D.N.Y. 2001) ("Andersen also argues that the complaint is lacking because it fails to allege how it is that Andersen would have been aware of the dubious referral and reporting practices of GMMS as CMI's outside auditor. Such specificity is more than Rule 9(b) and the PSLRA demand at this stage in the litigation, and a strong inference of willful blindness is stated on the face of the complaint through the allegations of the various 'red flags'").

[41] *See In re Anicom*, 2001 U.S. Dist. LEXIS 6607, at *15-16 ("the complaint alleges that [defendants] knew of the prebilling and fictitious invoices because they were procured at the defendants' direction. Defendants also took an active part in the dissemination of the press releases and SEC filings that misrepresented Anicom's actual quarterly and yearly finances. Thus, the allegations raise a strong inference that the defendants knew or recklessly disregarded that Anicom was disseminating incorrect information and that Anicom was having financial difficulties").

[42] *See SEC v. Delphi Corp.*, No. 06-14891, 2008 U.S. Dist. LEXIS 78671, at *26 (E.D. Mich. Oct. 8, 2008) (finding scienter because "[s]he is alleged to have been responsible for GAAP accounting in Delphi's IT department, yet she participated in a scheme to mischaracterize the $ 20 million payment as income. In other words, the documents Kudla created are alleged to have been used in the preparation of misstatements and omissions to investors"); *Hubbard v. BankAtlantic Bancorp, Inc.*, No. 07-61543, Order, at 7 n.6 (S.D. Fla. May 11, 2009) (finding scienter based on position as CFO because his job would be to monitor loan loss reserves and therefore he either knew or was reckless in not knowing that the loss reserves were materially understated) (Pl. Ex. B).

Kachkar also assisted Goldschmidt in buying her house. ¶268.

According to Zinn, Goldschmidt, however, would not do anything without Green's approval, and Green also was directly involved with the dealings with Westernbank. ¶268. *See In re Petco*, 2006 U.S. Dist. LEXIS 97927, at *45 (finding the allegation sufficient to state a claim for primary liability; "Though Defendants Brann and Richter are not alleged to have made any statements about the stock value, Plaintiffs allege that they participated in the scheme to defraud investors by causing or permitting Petco to overstate its earnings by recklessly disregarding proper accounting procedures for the distribution centers. The Consolidated Complaint contains sufficient specific facts of their participation"). Green's knowledge is also evidenced by him informing Westernbank in November 2006 that $37.7 million of pre-bills would have to be written off, but claimed that they were research and development receivables and Inyx was "just having a little bit of a delay in getting them collected." ¶37.[43] *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1235 (N.D. Okla. 2003) (finding *scienter* because "Defendant Kalika was involved in negotiations and discussions with WCG's financial lenders, and was aware that, at all relevant times, WCG was on the verge of violating, and in fact did violate, financial covenants with WCG's lenders").

The Complaint also alleges that Kachkar made most of the decisions involving Inyx. ¶266. Handley and Kachkar also directed or caused others to direct UCB to wire payments to the account where the funds were being diverted (HSBC account), instead of the Lock Box Account. ¶68. When warned by Ross that they had no right to do this, Kachkar misrepresented that the diversion was "appropriate and permissible." ¶71. Close to £500,000 of the diverted funds was paid out to Kachkar personally. ¶72. Additionally, a portion of the additional million of dollars diverted by the Individual Defendants from Westernbank to Inyx was used to pay the Individual Defendants' personal compensation. ¶¶269. Further, the signatories on the bank accounts where certain funds were diverted were Kachkar, Goldschmidt and Rose, the former Vice President of

---

[43] Moreover, starting in September 2006 and continuing through May 2007, the Inyx Defendants represented that they were finalizing arrangements to pay back the debt. None of the arrangements could ever be confirmed. ¶86.

Finance for Inyx EU, ¶66, and thus, it is extremely plausible that they would have full knowledge of the diversion scheme.

The Complaint also alleges that while Zinn was working in preparing the Form 10-Q for the second quarter, he made the Inyx Defendants fully aware of many of the accounting issue affecting Inyx. On November 16, 2006, Zinn sent an email to Kachkar, with a copy to Goldschmidt and Green, stating his concern over certain Open Items. ¶158. The same day, Zinn also insisted on a conference call to deal with the matters in the email, which was attended by all the Individual Defendants. ¶159. Letters and memorandums were also exchanged, and sent to all the Individual Defendants, related to Open Items for the Form 10-K. ¶¶165-66, 184. A meeting was held on March 29, 2007, attended by Kachkar, Handley, and Zinn related to the Open Items. ¶177. These emails and direct meetings, where the problems at issue were discussed with Defendants, evidence *scienter*. *See, e.g., Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 387 (E.D.N.Y. 2009) (finding scienter based on allegations regarding meetings with defendants "to discuss the difficulties"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515 (S.D.N.Y. 2009) (finding scienter when defendant made statements revealing that he knew the company's ratings were compromised).

Further evidence of *scienter* is provided by the emails exchanged by the Individual Defendants and Zinn. On June 4, 2007, Kachkar sent an email to Zinn, with a copy to Green and Handley, telling Zinn not to communicate with Westernbank. ¶186. Zinn then sent an email to Kachkar, with a copy to Green and Handley, on June 5, 2007, telling them that he would not be relying on any information provided by Goldschmidt. ¶187. Further, after insistence by Zinn over an extended period of time, Goldschmidt was removed as the authorized signatory on the bank accounts of the corporation. ¶181.[44]  Finally, the Company

---

[44] In their desperate attempt to overcome the overwhelming indicia of *scienter* alleged in the Complaint, the Inyx Defendants attack the allegations provided by Zinn, who was the Vice President of Finance and the Principal Accounting Officer. *See* Def. Br. at 36. First, the Inyx Defendants attack what they characterize as "statements that are nothing more than mere speculation and supposition." *Id.* However, the statements provided by Zinn are not opinions, but first-hand accounts of what he witnessed, conversations he had with the Inyx Defendants, Berkovits and the Audit Committee, and his review of the financials, while he was employed at the Company during the Class Period. For instance, as to his "belief" that the Inyx Defendants were worried he would not sign off on the

27

keeping two set of books to perpetrate its fraud also evidences *scienter. See Miller v. Material Scis. Corp.*, 9 F. Supp. 2d 925, 928 (N.D. Ill. 1998) ("Because Sutton's manipulation of the books was obvious, plaintiff claims that even the most cursory review of the books would have led to the discovery of the fraud. Plaintiff alleges that defendants intentionally or recklessly disregarded this evidence of financial irregularities").

> **2.    The Inyx Defendants' Misstatements and Omissions Concerned the Company's Ability to Continue its Operations**

The inference that the Individual Defendants knew about the fraudulent schemes is simply common sense.[45]   Because the false statements at issue concerned the Company's very survival through its ability to continue receiving funding from Westernbank, there is a strong inference of *scienter* that top management knew. *See, e.g., In re Complete Mgmt.*, 153 F. Supp. 2d at 325-326 (courts reasonably assume "that principal managers [] are aware of matters central to that business's operation") (citing cases); *Makor Issues and Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) ("it is exceedingly unlikely" that CEO "was unaware of the problems of his company's two major products and merely repeating lies fed to him by other

---

Form 10-Q, *see* Def. Br. at 36, the allegation actually states that "He [Zinn] stated that he would not sign off on the third quarter Form 10-Q."   ¶159. As to the allegations regarding the obvious red flags he encountered while examining the books were allegations related to what Berkovits should have noticed at the time of the audit. ¶160. These allegations do not apply to the Inyx Defendants because they were the ones "cooking the books," so they did not need to be put on notice of the red flags since they were the ones committing the fraud. The Inyx Defendants' allegation that Zinn did not bring up the accounting issues to the Audit Committee until February 19, 2007 is completely false. The Complaint stated that Zinn insisted on a conference call to deal with the issues on November 16, 2006 (which included Joe Rotmil, the Chairman of Inyx's Audit Committee). ¶159. Further, the argument that Zinn had no personal knowledge of any of the "pre-existing" issues is baseless because they were issues that remained on the books and that he had to deal with as he became employed at Inyx, including issues dating back to 2005. *See, e.g.*, ¶162. Finally, the Inyx Defendants' statement that prior to Zinn's employment he had "very limited experience with SEC filings" is just blatantly incorrect. That allegation refers to Goldschmidt, not Zinn. The allegation actually states that Zinn took over for Goldschmidt who although was acting as the CFO before Zinn had "very limited experience with SEC filings." ¶154.

[45]   Defendants again reiterate their argument that because the subsidiaries were involved, the Individual Defendants, as officers of the parent corporation, did not have knowledge. *See* Def. Br. at 30. Once again, the argument fails. The allegations in the Complaint are clear. The Individual Defendants perpetrated the fraud. The invoices were created by Goldschmidt, at the directions of the other Individual Defendants. Further, the Complaint alleges that the Individual Defendants were actively involved in and participated in the operating, financial, and onsite management decisions at the subsidiaries without regard for what positions they actually had there. *See* ¶94.

executives").[46]    Furthermore, as revealed in the bankruptcy proceedings in Delaware, "it is estimated that

Inyx overstated its assets and revenues by more than $100 million during the Class Period."  ¶195. Courts have

recognized that the sheer magnitude of the fraud supports a strong inference of *scienter*. *See Scholastic*, 252

F.3d at 77 (2d Cir. 2001); *see also Rothman*, 220 F.3d at 92 (agreeing that the magnitude of write-offs

involved "renders less credible" defendants' argument that they acted without scienter).[47]

### 3.    Defendants' GAAP Violations Provide Evidence of *Scienter*

"GAAP violations, when coupled with evidence of fraudulent intent" provide evidence of *scienter*.

*SEC v. DCI Telecomms.*, 122 F. Supp. 2d 495, 500 (S.D.N.Y. 2000).[48]  As set forth in the Complaint, the

Inyx Defendants violated numerous GAAP[49] provisions and the Company's own stated revenue recognition

policy by improperly accelerating development revenues, improperly recording revenues as a result of

fraudulent invoicing, and improperly overstating accounts receivable and understanding bad debt. ¶¶206-14,

---

[46] *See also Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir. 1989) (strong inference was raised that directors had knowledge of import restrictions that eliminated a "potentially significant source of income for the company"); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488 (S.D.N.Y. 2004) (*scienter* found where "defendants ignored red flags relating to the core operations . . . that should have alerted them to the fact that the . . . financial statements were false"); *Xerox*, 165 F. Supp. 2d at 223 (*scienter* adequately alleged because "[t]he problems Xerox was having . . . affected the company's 'core operations' and jeopardized the success of the company's most significant initiative at that time").

[47] *See also Atlas Air*, 324 F. Supp. 2d at 488-89 ("the mere fact that the company had to make a large correction is some evidence of scienter"); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("the more serious the error, the less believable are defendants' protests that they were completely unaware of [the Company's] true financial status and the stronger the inference that defendants must have known about the discrepancy); *In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636-37 (E.D. Va. 2000) (understatement of losses by $54.9 million and overstated revenues by $66 million supported inference of *scienter*).

[48] *See also Scholastic*, 252 F.3d at 77 (actions contrary to expressed accounting policy "can form the basis of proof of recklessness"; *scienter* evidenced by a delay before taking special charge for returns despite statements that management gave considerable attention to monitoring returns); *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1016 (9th Cir. 2005); *In re Winstar Commc'ns*, No. 01-3014, 2006 U.S. Dist. LEXIS 7618, at *27-28 (S.D.N.Y. Feb. 24, 2006) ("the proposed complaint sets forth comprehensive allegations detailing on-going and extensive fraudulent activities conducted by the Winstar defendants in order to improperly recognize revenue in violation of both GAAP and Winstar's own accounting practices. Such allegations constitute strong circumstantial evidence of the Winstar defendant's conscious misbehavior").

[49] Although Plaintiff believes that GAAP violations have been properly pled, whether the Company violated GAAP is a factual question, requiring expert testimony, which should not be addressed at the motion to dismiss stage. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1421 (3d Cir. 1997); *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 709 n.9 (3rd Cir. 1996) (characterizing GAAP proof as a battle of experts).

217-23, 230.[50]  Due to the GAAP violations, Inyx was able to overstate its assets and revenues by more than

$100 million during the Class Period. ¶195. Thus, the GAAP violations here also add to the strength of the

*scienter* allegations,[51] especially because the rules violated were obvious and simple. *See In re MicroStrategy,*

*Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000) ("if the GAAP rules and MicroStrategy accounting

policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants

were aware of the violations and consciously or intentionally implemented or supported them, or were

reckless in this regard"); *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000) ("Violations

involving the premature or inappropriate recognition of revenue suggest a conscious choice to recognize

revenue in a manner alleged to be improper, and may therefore support a strong inference of scienter").[52]

---

[50] Unlike the Inyx Defendants' assertions to the contrary, Def. Br. at 35, the Complaint does specify the specific GAAP violations and how the financials were affected. *See* ¶¶205-230. In making their argument, it is clear that the Inyx Defendants chose to ignore the specific section in the Complaint dealing with the GAAP violations.

[51] Further, a failure to maintain sufficient internal controls to avoid fraud, like here, supports a strong inference of *scienter*. *See, e.g., In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1362, 1364 (S.D. Fla. 2005) (lack of internal controls is a "red flag" contributing to *scienter*); *Hall v. Children's Place Retail Stores, Inc*., No. 07-8252, 2008 U.S. Dist. LEXIS 54790, at *40 (S.D.N.Y. July 18, 2008) (weaknesses in internal controls probative of *scienter*). The weak controls do not contradict the *scienter* arguments. *See* Def. Br. at 30. On the other hand, the Complaint alleges that each Individual Defendant partook in the scheme to defraud and the internal control weaknesses were used to attempt to hide the fraud. This is evidenced by the Individual Defendants, including Goldschmidt, not providing timely or sufficient information to Zinn, who tried to ensure the accuracy of the financials. Further, this is not a case where Plaintiff is using the later revelations to show that the Inyx Defendants recklessly concealed the internal control and GAAP violations. Def. Br. at 33. Unlike the case cited by the Inyx Defendants where plaintiff alleged "no facts to show that Defendants knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did," *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999), here Plaintiff provides evidence that the Inyx Defendants knew of the fraud and tried to hide it from Westernbank and investors. Additionally, "Plaintiff may rely on the defendant's own disclosures about a revenue restatement to allege that previously-made statements about revenue were materially false or misleading." *Chalverus v. Pegasys., Inc.*, 59 F. Supp. 2d 226, 233 (D. Mass. 1999).

[52] The Inyx Defendants' argument that Plaintiff has to specify all the transactions that were improper and approximate the amount the finances were misstated, *see* Def. Br. at 30, is contrary to the law. Courts do not require specifying all the transactions, *see In re Anicom*, 2001 U.S. Dist. LEXIS 6607, at *13-14 ("Courts have found that a complaint need not describe each specific transaction in detail"), or specifying the amount. *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 935 n.6 (N.D. Ill. 1999) ("Plaintiffs need not state the amount by which USN's financial statements were in error"). Plaintiff must only provide "enough information for a 'court to discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of [the financial statements].'"  *In re Daou*, 411 F.3d at 1020. Plaintiff clearly meets this standard. Plaintiff provides examples of many transactions that were improper, *see* ¶¶37-81, and actually states that the finances were misstated by at least $100 million. ¶195. The Inyx Defendants themselves admitted that the

### 4. The Resignations Provide Evidence of *Scienter*

The suspicious circumstances of resignations of top executives supports an inference of *scienter*. *See, e.g., Hall*, 580 F. Supp. 2d at 233 (CEO's forced resignation "add[ed] to the overall pleading of circumstantial evidence of fraud"); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) (two executives' resignations were "additional highly unusual and suspicious facts," and, "add to the overall pleading of circumstantial evidence of fraud"); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) ("resignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of scienter"); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1186 (C.D. Cal. 2007) (a resignation leaned "heavily towards a finding of scienter"). At the end of the Class Period, many resignations occurred, including Goldschmidt's and Handley's. ¶191. The most plausible explanation is that these resignations related to their involvement in the fraud. The Company also admitted that it "believes the resignations of Messrs. Brown, Harrison, Littman and Rotmil were occasioned by the controversy with the Company's lender and the desire to avoid becoming involved in the litigation that has been commenced by the Company." ¶191.

### 5. The Refusal of Zinn to Sign Off on the 10-Q and 10-K Provides Evidence of *Scienter*

Inyx's CFO's initial refusal to sign the Company's third quarter 2006 10-Q, and later the 10-K for 2006, provides a cogent and compelling inference of *scienter*. *See Coronel v. Quanta Cap. Holdings Ltd.*, No. 07-1405, 2009 U.S. Dist. LEXIS 6633, at *92 n.16 (S.D.N.Y. Jan. 23, 2009) (finding a directors' forgetting to sign registration statement not indicative of *scienter* where the "Complaint alleges no basis to infer that he failed to sign because of any lack of confidence in the accuracy of the statement therein"). Here, CFO Zinn stated that he told the Individual Defendants he would not sign the 10-Q until he received the proper documentation for the Open Items. ¶159. Also, Zinn stated that he would not sign off on the 2006 10-K

finances were misstated by at least $4 million. ¶182.

"without resolving these apparent long-standing accounting and financial control issues." ¶161. As a result, Inyx was forced to delay the filing of its 2006 Form 10-K and was given until May 18, 2007 by the National Association of Securities Dealers to clear its delinquency, which it, of course, did not –and could not -- do. *See* ¶181.

### 6. The SOX Certifications Provide Evidence of *Scienter*

The Complaint alleges false Sarbanes-Oxley certifications by Kachkar and Goldschmidt, which report on management's evaluation of internal controls, among other things. Those certifications were knowingly or recklessly false, based on the facts then existing, as alleged in the Complaint, and provide evidence of *scienter. See In re Lattice, In re Lattice*, 2006 U.S. Dist. LEXIS 262, at \*50-51 ("I conclude that the Sarbanes-Oxley certifications . . . provide evidence . . . that defendants . . . knew that the controls they attested to were inadequate . . . The Sarbanes-Oxley certifications, in combination with plaintiffs' [other] allegations . . . are sufficient to create a strong inference of actual knowledge or of deliberate recklessness"); *In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) ("The SOX certifications give rise to an inference of Roemer's scienter because they provide evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate").[53]

### 7. Motive Has Been Adequately Pleaded

Personal pecuniary motive is not required to plead *scienter. See Tellabs* 551 U.S. at 325; *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 99 (S.D.N.Y. 2006) ("Scienter can be alleged in two ways: by pleading facts that evidence conscious misbehavior or recklessness or by pleading facts that

---

[53] Further, high-level corporate officers who sign SEC filings and SOX certifications, such as the Kachkar and Goldschmidt here, have a duty to familiarize themselves with the operations that would have revealed the improprieties (if unknown). *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 05-1898, 2005 U.S. Dist. LEXIS 19506, at \*63 (S.D.N.Y. Sept. 6, 2005) (signatories to SEC filings have a duty to familiarize themselves with facts relevant to the financial reporting of a company's core operations) (citation omitted); *In re Winstar*, 01-3014, 2006 U.S. Dist. LEXIS 7618, at\*22-23 (S.D.N.Y. Feb. 24, 2006) (same). Thus, the Inyx Defendants' argument that the SOX certifications say "nothing about the Defendants' intent in this case," Def. Br. at 33, is baseless.

evidence defendant's motive and opportunity to commit fraud").[54]  However, here, the Complaint alleges that approximately $1 million from the diversion of funds from Westernbank was delivered directly to Kachkar and portions of the additional million of dollars diverted was used to pay the Individual Defendants' personal compensations. ¶269.

Further, particularized corporate motives can demonstrate *scienter. See, e.g., In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993).  Inyx's ability to maintain Westernbank's financing was absolutely critical to the continuation of its business. By misrepresenting and concealing Inyx's true revenue position, Inyx was able to avoid defaulting on the debt covenants and have continued access to financing necessary to fund Inyx's continuing operations and its acquisitions. This also supports a cogent inference of *scienter. See In re Williams*, 339 F. Supp. 2d at 1234 ("the Complaint alleges that Defendants had a strong motive to misrepresent WCG's financial statements because WCG's continued viability was dependent upon certain measures of WCG's financial performance, including the Company's EBITDA, revenues and asset values, which were directly linked to WCG's debt and bank covenants"); *In re MicroStrategy*, 115 F. Supp. 2d at 648-49 (particularized allegations that company was "further motivated [by a desire] . . . to portray the Company favorably with actual and potential creditors from whom MicroStrategy needed to borrow funds" was sufficient to plead motive); *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-5571, 2004 U.S. Dist. LEXIS 7015, at *28-29 (S.D.N.Y. April 22, 2004) (finding *scienter* where defendants sought to expand their enterprise and were motivated to engage in fraud in order to attain that goal).[55]

---

[54] Thus, the absence of motive allegations is not dispositive of *scienter. See In re Apollo Group Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 922 n.4 (D. Ariz. 2005) (finding that *scienter* was adequately pled despite failure to allege motive); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1269 (N.D. Cal. 2000) ("[A] motive for fraud, such as personal gain, is not a required element of scienter….").

[55] *See also Gross v. Medaphis Corp.*, 977 F. Supp. 1463, 1472 (N.D. Ga. 1997) (finding *scienter* where complaint alleged that defendants knowingly made false statements in order to inflate its share price, which, in turn, allowed it to acquire other companies it would not have otherwise been able acquire); *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 317 (D. Mass. 2006) (strong *scienter* inference raised where defendants allegedly delayed impairment charge to complete stock offering); *In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424, 444-45 (S.D.N.Y. 2000) (motivation to inflate IPO price); *In re Centocor, Inc. Sec. Litig. III*, No. 98-260, 1998 U.S. Dist. LEXIS 18909, at *8-9 (E.D. Pa. Dec. 1, 1998) (allegations that defendants wanted to complete public

Additionally, contrary to the Inyx Defendants' arguments, *see* Def. Br. at 26-27, a motivation to make the company seem more profitable and artificially inflate stock has repeatedly been found, in totality with other allegations, to give rise to a strong inference of *scienter*. *See In re Lattice*, 2006 U.S. Dist. LEXIS 262, at *52-53 ("Defendants argue that many of these alleged motives -- keeping the stock price high, raising capital, increasing the value of stock options and other executive incentives -- are normal goals of every business . . . [however] when viewed in the totality of all the other allegations, [they] add additional weight to the inference of scienter."); *In re Complete Mgmt.*, 153 F. Supp. 2d at 327-28 ("[t]he desire to maintain an inflated stock price may . . . be sufficiently specific support for an allegation of scienter . . . and the analysis is a highly fact-intensive one").

Also, notwithstanding the Inyx Defendants' arguments to the contrary, Def. Br. at 27, a strong inference of *scienter* can be established even if defendants did not engage in insider trading during the Class Period. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period. In other words, the lack of stock sales as to a defendant is not dispositive of scienter.") (citations omitted); *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 507 (9th Cir. 1992) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period."); *In re Nuko Info. Sys., Inc. Sec. Litig.,* 199 F.R.D. 338, 344-45 (N.D. Cal. 2000) (where other allegations show *scienter*, the absence of insider trading has little significance); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1255 (N.D. Cal. 2008) ("the lack of stock sales by defendants did not negate the inference of scienter."); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th Cir. 2003) ("We will not, as defendants request, infer from the fact that they did not sell their Novell stock that they lacked motive to defraud investors."); *West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, No. 05-01265, 2008 U.S. Dist. LEXIS 47748, at *39 (D. Colo. Mar. 28, 2008) ("However, as plaintiffs correctly argue, the

offering adequately pled *scienter*).

lack of stocks sales by these two defendants does not alone negate the inference of scienter."); *In re Entropin, Inc., Sec. Litig.*, 487 F. Supp. 2d 1141, 1154 (C.D. Cal. 2007) (same).

### 8.    Opportunity Has Been Adequately Pleaded

The Complaint adequately pleads opportunity to commit fraud as to the Inyx Defendants. As the court in *In re Complete Mgmt.*, 153 F. Supp. 2d 314, stated, "we begin with opportunity because it is apparent for all the named individual defendants by virtue of the positions they held . . . Each plausibly had the opportunity to report false and misleading information about CMI's accounts receivable and the bona fides of the GMMS referrals and billings."  *Id.* at 327. *See also In re Am. Bank Note*, 93 F. Supp. 2d at 444 (finding that senior officers, including the Chairman and CEO, CFO, and Vice President of Finance are in the position to commit fraud). Further, where senior executives have the opportunity to commit fraud, that opportunity may be imputed to the corporation as well. *See id.*[56]

In the instant case, the Complaint alleges that the Individual Defendants were all senior officers and were all responsible for the false and misleading statements during the Class Period. *See* ¶¶10, 12-13, 16-20.[57] Further, the Individual Defendants were all active participants in the fraud. For example, the fraudulent invoices created during the Class Period were created by Goldschmidt at the direction of the other Individual Defendants. ¶36. Thus, although the Individual Defendants attempt to argue that they had no opportunity to commit the fraud because the schemes involved the subsidiaries, Def. Br. at 28, in actuality, the Individual Defendants were the ones creating the fraudulent invoices and submitting them to Westernbank. ¶36. Further,

---

[56] Even the only case on point cited by the Inyx Defendants, *In re Bausch*, 592 F. Supp. 2d 323, found that as senior management, defendants had an opportunity to commit the fraud. *See id.* 343. The rest of the cases cited for their "opportunity" argument actually deal with Section 20(a) and control person liability and have nothing to do with opportunity. *See* Def. Br. at 28.

[57] *See In re MicroStrategy*, 115 F. Supp. 2d at 642 ("It is doubtless true that key directors and officers have the ability to manipulate their company's stock price . . . Plaintiffs allege in the Complaint that the Individual Defendants were among MicroStrategy's most senior executive officers charged with conducting the day-to-day affairs of the Company . . . and that the positions of the Individual Defendants provided them with direct access to confidential, nonpublic information concerning the Company, including, in particular, the Company's sales and accounting information").

the other schemes, although involving the accounts of the subsidiaries, were perpetrated by the Individual Defendants. ¶¶56-85. Moreover, the Complaint alleges that "despite the fact that Inyx is supposedly a mere holding company that does not have ongoing manufacturing operations, large sums of money were routinely retained in Inyx that had been collected from the Westernbank revolving lines of credit and from payments on subsidiaries' accounts receivable, which Inyx Defendants had fraudulently diverted away from the Lock Box Accounts." ¶93. Finally, the Complaint alleges that the "Individual Defendants routinely participated in the operating, financial, and onsite management decisions of Inyx's operating subsidiaries without regard to what positions they held in those subsidiaries (or whether they held any formal position at all with the companies)." ¶94. These allegations adequately plead opportunity.

## IV.    PLAINTIFF STATES A CLAIM FOR CONTROL PERSON LIABILITY

As set forth above, Plaintiff has alleged primary violations of §10(b) by Inyx.[58]  "To survive a motion to dismiss under Section 20(a) of the Exchange Act, a plaintiff need only 'plead facts which 'support a reasonable inference that [defendants] had the ***potential power*** to influence and direct the activities of the primary violator.'"  *In re Adelphia Comm'ns Corp. Sec. & Deriv. Litig.*, 398 F. Supp. 2d 244, 262 (S.D.N.Y. 2005) (rejecting argument that John Rigas could not be a control person because he was not a company officer) (citations omitted; emphasis added).  *See also CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) ("'control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof'").[59]   The Inyx Defendants do not challenge that the Individual Defendants were "controlling persons."  The Inyx Defendants only challenge the primary violation element. *See* Def. Br. at 40. Because the primary violation has plainly been established, Plaintiff has adequately pled a Section 20(a)

---

[58] Moreover, "there is no required state of mind for a defendant's culpable participation" under §20(a). *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392-415 (S.D.N.Y. 2003). The power and influence to cause the fraudulent conduct suffices for "culpable participation." *In re Solucorp Indus., Ltd., Sec. Litig.*, No. 98-3248, 2000 U.S. Dist. LEXIS 16521, at *26 (S.D.N.Y. Nov. 15, 2000). The Complaint here adequately alleges the Individual Defendant's power and influence. *See, e.g.*, ¶¶16-20, 266, 268-69.

[59] "Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *CompuDyne Corp,* 453 F. Supp. 2d at 829 (citation omitted).

claim.

## V.    THE ALLEGATIONS IN THE COMPLAINT ADEQUATELY PLEAD A CLAIM AGAINST BERKOVITS

### A.    The Complaint Adequately Alleges That Inyx's Financial Statements Were Materially False and/or Misleading

The Complaint alleges that Berkovits provided unqualified Independent Auditors' Reports, which were included in Inyx's Form 10-K filed on April 15, 2006 (the "2004 10-K") and Form 10-K filed on March 31, 2006 (the "2005 10-K"). ¶¶107, 130, 254-55. These audit opinions stated that Inyx's financial statements were presented in conformity with GAAP and Berkovits' audit was performed in according with GAAS. ¶¶254-55. The Complaint alleges that "Berkovits knew or recklessly ignored that it falsely represented that Inyx's annual financial statements for at least the years ended 2004 and 2005 were presented in conformity with GAAP." ¶253. Further, the Complaint alleges that "Berkovits knew or recklessly ignored that it falsely represented that its audits of such financial statements had been performed in accordance with Generally Accepted Auditing Standards ("GAAS") and the standards of the Public Company Accounting Oversight Board ("PCAOB"). *Id.*

Notwithstanding Berkovits' arguments to the contrary, Plaintiff has alleged with particularity facts demonstrating how and why Inyx's financial statements in the Form 10-Ks were materially false and misleading. The financial statements in the Form 10-Ks were in violation of GAAP and the Company's own policies because the Company improperly accelerated development revenues, improperly recorded revenues as a result of fraudulent invoices, and improperly overstated accounts receivable and understated bad debt expense. *See* ¶207. Further, in both the 10-Ks, the Company stated that it "carried out an evaluation, under the supervision and with the participation of our management, including the Chief Executive Officer and acting Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures" and found them to be effective. *See* ¶¶108, Berk. Ex. C. Both of the audit opinions for the Form 10-Ks stated that "[o]ur audit included consideration of internal control over financial reporting as a basis for

designing audit procedures that are appropriate in the circumstances." ¶¶254-55.[60] However, at the time of the statements, the Company "suffered from a serious lack of controls over its financial reporting throughout the Class Period which rendered the Company's financial reporting inherently corrupt, subject to manipulation and unreliable." ¶240. On March 27, 2007, in a Form 8-K, the Company stated that "management has identified internal control weaknesses." ¶246. The issues with the internal controls were reiterated in another Form 8-K filed on April 6, 2007 and in a Form 8-K/A, in response to a SEC demand. *See* ¶¶247, 249.

Berkovits' argument that the "crux of most of those allegations is that Inyx submitted supposedly fraudulent 'pre-bills' to its primary lender, Westernbank," Berk. Br. at 12, is completely incorrect and ignores the other well-pled allegations in the Complaint, regarding the "prefix 7" invoices, re-invoicing, inflated invoices, and offsetting schemes. *See* ¶¶37-81. However, by just focusing on the "pre-bills," Berkovits seeks to disclaim liability based on a note in the 2005 10-K, which discloses that the Company billed certain customers "approximately $7.2 million in advance" and that the "amounts have been offset against deferred revenue for financial statement presentation purposes." Berk. Br. at 12. First, this response ignores the

---

[60] Berkovits argues that it did not provide an opinion on the internal controls, and therefore, cannot be held liable for the deficiencies of the internal controls. Berk. Br. at 11-12. But Berkovits' audit opinions make clear that it was still required to consider the internal controls in its audits. ¶¶254-55. Further, Berkovits' attempt to argue that the Complaint contains no allegations that Berkovits failed to account for the weaknesses in the accounting controls, Berk. Br. at 18, must also fail. "In other words, Deloitte argues that the complaint should be dismissed because Deloitte might have properly considered the warning signs in its audit of the financial statements. The specifics of Deloitte's audit are, however, precisely 'the type of facts which are particularly within defendants' knowledge and therefore, need not be included in the complaint.'" *In re First Merchs. Acceptance Corp. Sec. Litig.,* No. 97-2715, 1998 U.S. Dist. LEXIS 17760, at *33 n.5 (N.D. Ill. Nov. 2, 1998) (citation omitted); *Danis*, 73 F. Supp. 2d at 942 n.11 (same); *In re Philip Servs. Corp. Sec. Litig.,* 383 F. Supp. 2d 463, 476 (S.D.N.Y. 2004) (same). The Complaint here alleges that the internal controls were such that if they had been evaluated by Berkovits at the time of the audits, it would have been clear to Berkovits that they were, in effect, non-existent. Berkovits' reliance on *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461 (S.D.N.Y. 2008) is misplaced. In *Doral*, the allegation was based on a confidential source, contained "no time frame within which the meetings occurred, no indication of where within the PwC hierarchy the 'representatives' fell, and no information regarding how extensively or in what manner the reports were discussed." *See id.* at 466. Here, the Complaint alleges that Zinn was CFO, sets forth specifics of the problems and time frames, and identifies various conversations, including calls, emails, and letters, that had occurred between Berkovits, the Individual Defendants and Zinn.

fraudulent "pre-bills" that were submitted, but not disclosed and not offset,[61] as well as the true nature of these "pre-bills – fictitious invoices recorded as legitimate sales that were created for the sole purpose of defrauding Westernbank into providing Inyx with continued funding.

As alleged in the Complaint, Middup[62] "explained that in the normal course of Inyx's business, 'customer quotes' for sales are obtained and 'signed by the customer.' The signed quotes are then attached to the invoice as evidence of the sale." ¶39. The Complaint alleges that these developmental invoices were delivered to Handley and most were never actually submitted to the customer. ¶49. In fact, the Inyx employees responsible for the development work admitted that "they never heard of the names of some of the customers identified in these largely fictitious developmental invoices." *Id.* Further, employees were told not to pursue payments on these developmental invoices because the work was actually never done and if Inyx sought payment, "the entire fraudulent invoice scheme could have come undone." *Id.* For example, around December 2005, Inyx Pharma generated invoices totaling £8 million for King Pharmaceuticals, which was used to secure additional funding from Westernbank, and then canceled the invoices because the work for the invoices never existed. ¶51. Another example included the fraudulent invoices for a "purported developmental project for MEDA," where the invoicing scheme began around October 2005 and continued until June 2006, totaling about £2.5 million. ¶52. Not only were those invoices later canceled, but Zinn "questioned whether the accounts receivable balance from MEDA was collectible at all." *Id.* Zinn believed and alerted Berkovits to the fact that they would not be collectible because the work was supposed to be off-set against the purchase price of an acquisition that itself was deferred. *See* ¶164.

---

[61] *See Adam v. Silicon Valley Bancshares*, 884 F. Supp. 1398, 1403 (N.D. Cal. 1995) ("Nor is the court persuaded by D & T's claim that no misrepresentation occurred because 'the financial statements disclosed the exact information alleged by plaintiff.' Plaintiffs have alleged, however, that the full extent of the loan portfolios' deterioration and the full dollar amount of non-performing loans were not disclosed").

[62] Middup was asked by the Administrators of Inyx's subsidiaries "to conduct a forensic investigation of certain aspects of [Inyx's] subsidiaries' business and affairs, particularly cash flows and accounts receivable" for the bankruptcy proceedings. *See* ¶ p.13 n.1.

Additionally, even if the full extent of the "pre-bills" was disclosed for that financial period, which they were not, the Company failed to disclose the true nature of the "pre-bills," as discussed above, including that some of the customers and/or the work never existed. Moreover, even if the Company disclosed some of the "pre-bills," does not mean that the financial statements for that period were not false or misleading.[63]  As later admitted for at least the 2006 financials, the Company was improperly recognizing developmental revenue in violation of GAAP and its own policy and had to restate. *See* ¶¶178, 182. However, as Zinn stated, the policy in place for the financials that Berkovits did audit was "inadequate," yet was never questioned by the auditors. ¶163. Therefore, just because the Company disclosed some of the "pre-bills," does not mean that its financial statements for those periods were not false and misleading, especially considering that the policy in place was "inadequate."  *See In re Datatec*, 2006 U.S. Dist. LEXIS 78843, at \*44-45 ("Defendants argue that the Complaint fails to allege any misstatements because Datatec's Form 10-K, filed on July 23, 2003, stated that '[g]enerally, the Company invoices customers and payments are received throughout the deployment process and, in certain cases, in advance of work performed if a substantial amount of up front costs are required.' It remains unclear, however, whether the work for which the alleged phantom invoices were issued required 'a substantial amount of up front costs[.]' For present purposes, the Court must draw all reasonable inferences in Plaintiffs' favor and assume that it did not").

Berkovits' argument that all the allegations concerning Inyx's creation of false or inflated invoices,

---

[63] A restatement is not necessary to show that the statements are false and misleading. *See Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1154-55 (S.D. Cal. 2008) (upholding allegations of accounting violations against defendants without a restatement). Otherwise, auditors could avoid liability for the Company and themselves simply by opting not to force the company to restate. *See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("However, the fact that the financial statements for the year in question were not restated does not end [the plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA. To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements"). *See also In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 926-28 (9th Cir. 1993) (sustaining allegations that reserves were understated without restatement); *In re LDK*, 584 F. Supp. 2d at 1245 ("the lack of a restatement did not mean that LDK only engaged in legitimate conduct"); *Feiner v. SS&C Techs., Inc.*, 11 F. Supp. 2d 204, 209 (D. Conn. 1998) ("the fact that [the Company] has not elected to restate . . . does not indicate, much less prove, the accuracy of those figures"); *In re Williams*, 339 F. Supp. 2d at 1222 n.4 (sustaining claims against company and auditor without restatement).

improper diversions of proceeds from lockbox accounts, and unrecorded offsets of certain obligations occurred after December 31, 2005, and therefore, are not relevant to the audit of the 2005 financials, Berk. Br. at 13, is baseless. The Complaint alleges that throughout 2005 until June 2007, the Inyx Defendants engaged in a scheme at the Inyx Pharma facility in the United Kingdom of issuing multiple invoices for the same projects, which in turn also resulted in the Company's artificial inflation of its financial results and condition, of at least approximately £3 million. ¶¶44-46. Further, the Complaint alleges that starting no later than August 2005, the Inyx Defendants devised and engaged in fraudulent conduct involving Inyx EU and caused the customers to offset other obligations owed by Inyx to such customers against accounts receivables that had been assigned to Westernbank, and which should have been paid into the Lock Box Account. ¶¶73-74. "The net effect of this offset would be that the customer's accounts receivable owed to Inyx was reduced by a certain amount and Inyx's debt or obligation to the customer was reduced by the same amount, all without any money for the relevant account receivable being paid into or passing through the Lock Box Account. Furthermore, as a result of the scheme, the Company's financial results and condition was artificially inflated." ¶74.

Moreover, the Inyx Defendants engaged in a further practice from around November 2005 to around February 2006, causing Inyx to offset approximately £2.6 million in accounts receivable owed by UCB to Ashton against an amount owed by Inyx EU to UCB, as a result of a working capital adjustment under the Celltech Purchase Agreement. However, Inyx had no right to offset these accounts receivable against their debts owed to UCB or any other customer and as a result of this conduct, the Company's financial results and condition were already artificially inflated. ¶78. Also, starting August 2005 and ending around June 2006, the Inyx Defendants' offset (at least £213,000.00) of accounts receivable owed by Innovata PLC, both a customer and supplier of Ashton, to Ashton against accounts payable due to Innovata from Ashton, resulted in the Company's artificial inflation of its reported revenue and assets. ¶81. These allegations are more than adequate to show that the financial statements during the relevant period of the audits was false and

misleading. Courts have held that every single transaction does not have to be described in detail. *See In re First Merchs.*, 1998 U.S. Dist. LEXIS 17760, at *25-26 ("Moreover, several courts have held that a complaint need not describe each single specific transaction in detail nor allege the precise amount of overstatement on a period by period basis.") (collecting cases);[64] *In re Anicom*, 2001 U.S. Dist. LEXIS 6607, at *13-14 ("Defendants argue that plaintiffs have specifically identified only 14 transactions that may have been the result of fraud; therefore, all claims based on any unidentified transactions must be dismissed. The argument is not persuasive . . . In addition, the general averments and the 14 specific transactions give adequate notice to defendants of the claims asserted them, and the information concerning the other transactions is primarily in the hands of the defendants. Plaintiffs have met their burden at this stage of the litigation"); *SEC v. Feminella*, 947 F. Supp. 722, 733 (S.D.N.Y. 1996) ("Rule 9(b) does not require nor make legitimate the pleading of detailed evidentiary matter").[65]

Plaintiff here has also adequately alleged the GAAS violations, ¶257, which further make the financial statements false and misleading.[66] *See In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1332

---

[64] *In re First Merchants*, 1998 U.S. Dist. LEXIS 17760, at *24-25 ("Similarly, the allegations detail what was materially misstated in the financial statements -- the Company's true earnings and net worth. Deloitte complains that the first amended complaint fails to state the precise amount of the overstatement of earnings in each of the audited financial statements; which loans were not properly written off; and which collateral was not repossessed according to proper procedures, etc. The court agrees that this information is noticeably absent from the complaint and that, in order to prove its allegations, plaintiffs will be required to fill in these details. However, given that most of this information is in the hands of defendants, the court finds that plaintiffs have satisfied their burden at this stage of the litigation . . . Indeed, the true amounts of First Merchant's reserves, income and net worth cannot be determined without a re-audit of the Company's financial records -- records in the hands of defendants and obtainable through discovery").

[65] *See also Keeney v. Larkin*, 306 F. Supp. 2d 522, 528 (D. Md. 2003) ("Despite the heightened pleading standards of Rule 9(b) and the PSLRA, Keeney correctly avers that no rule requires him to plead 'detailed evidentiary matter' in order to survive a motion to dismiss. Moreover neither Rule 9(b) nor the PSLRA requires plaintiff to set forth facts which, because of the lack of discovery, are in the exclusive possession of the Defendants"); *In re Accelr8 Tech. Corp. Sec. Litig.*, 147 F. Supp. 2d 1049, 1053-54 (D. Colo. 2001) ("However, pleading with particularity does not require the plaintiff to include in his complaint detailed evidentiary matter"); *In re Health Mgmt. Inc. Sec. Litig.*, 970 F. Supp. 192, 208 (E.D. N.Y. 1997) (same); *In re Cephalon Sec. Litig.*, No. 96-0633, 1997 U.S. Dist. LEXIS 13840, at *5 (E.D. Pa. Aug. 29, 1997) ("The PSLRA 'does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim'").

[66] Berkovits' argument that GAAS allegation regarding failure to adequately plan and perform an audit to detect financial improprieties must fail because only the pre-bills were in existence and the pre-billing was disclosed, *see*

(M.D. Fla. 2002) ("The Amended Complaint describes the alleged GAAP and GAAS violations and sets forth why the statements in the audit opinion are allegedly false and misleading. In sum, the Amended Complaint is sufficiently detailed regarding Arthur Andersen's making of material misstatements and otherwise satisfies the applicable standards regarding pleading fraud with particularity as to this Defendant"). As in *In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. 02-1335, 2004 U.S. Dist. LEXIS 20733, at *31-32 (D.N.H. Oct. 14, 2004), where the motion to dismiss was denied, Plaintiff here "charge[s] the company's independent accountant with issuing unqualified audit reports certifying the company's financial statements for specific years and claiming that the audits were performed in conformity with GAAS"; "the complaint lists a number of auditing standards and principles allegedly violated by [the accountants] which, taken as a whole, render the certified financial statements materially misleading." *Id.* at *31-32. Further, "plaintiff[] specified each statement [he] alleged to be misleading" and "specified the reasons why the statements were allegedly misleading [(violations of GAAP, violations of GAAS, failure to report inadequate internal controls at Tyco, failure to report looting behavior, etc.)]. . . ." *Id.* (internal citations and quotations omitted). *See also In re Chambers Dev. Sec. Litig.*, 848 F. Supp. 602, 622 (W.D. Pa. 1994) ("Plaintiffs have identified numerous accounting and auditing standards which, they allege, were not followed by Arthur Anderson in preparing the U.S. Healthcare financial statements for the years 1985 and 1986. Plaintiffs have clearly identified the financial statements which they allege were materially false and have particularly identified the allegedly misleading portion of the documents. It is hard to imagine what more particularity defendants could expect without demanding omniscience on the part of plaintiffs") (internal citations omitted).[67]

---

Berk. Br. at 13, ignores the well-pled allegations of the financial improprieties related to the pre-bills that were not disclosed, as well as the other schemes that were put in place by management.

[67] Berkovits' argument that "internal control is management's responsibility, not the auditors," Berk. Br. at 14, is inaccurate. In *In re WorldCom, Inc. Sec. Litig.*, No. 02-3288, 2003 U.S. Dist. LEXIS 10863 (S.D.N.Y. June 24, 2003), the court stated that "Independent auditors are charged with obtaining and evaluating evidence concerning the assertions made in their client's financial statements. Auditors are not entitled to allow representations from a company's management to substitute for the auditing procedures that are necessary to provide a reasonable basis for forming an opinion regarding the financial statements that are the subject of the audit." *Id.*, at *10.

The Complaint further alleges that according to Zinn, Berkovits was "intimately involved with the preparation of the 10-Qs," ¶250, which were false and misleading. Furthermore, the Complaint alleges that although Zinn took responsibility for signing off on the Form 10-Q for the second quarter of 2006, because in the first several months of his employment, he was not involved in the preparation of the SEC filings and concentrated solely on the Company's acquisitions, he relied on Green, Kachkar, Handley, and Goldschmidt's representations as to the accuracy of the financial statements and received approval from Berkovits when signing off on the Form 10-Q. ¶155.[68] Thus, Berkovits' argument that it cannot be liable for the SEC filings during the Class Period that it reviewed or prepared that do not attribute any statements to it, *see* Berk. Br. at 14-15, is contrary to the caselaw. *See Wolfson*, 539 F.3d at 1261 ("That the filings were issued in F10's name, and that [defendant] himself did not sign, certify, or physically file the documents, is not dispositive. The relevant question is only whether he can fairly be said to have caused F10 to make the relevant statements, and whether he knew or should have known that the statements would reach investors"); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 334-35 (S.D.N.Y. 2004) ("Allegations that Andersen 'prepared, directed or controlled,' 'helped create' or 'materially assisted in' preparing false statements issued by Global Crossing place its involvement well beyond the realm of 'aiding and abetting'

---

[68] The Company has admitted that the financial statements in the first three quarters of 2006 were materially false and misleading statements. A retroactive restatement is "reserved for material accounting errors." ¶215. When an a restatement is accompanied by defendants' statements admitting that the restatement is necessary due to accounting errors, at the pleading stage, it is sufficient to show that an earlier statement was materially false when made. *See In re Omnivision Techs.*, No. 04-2297, 2005 U.S. Dist. LEXIS 16009, at *10 (N.D. Cal. July 29, 2005) ("Given that the financial results for these periods were restated, the originally announced results were clearly misleading"); *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1026 (N.D. Ohio 2000) ("Telxon, itself, admitted its prior disclosures were materially misstated when it issued the restatements which gave rise to this litigation"). Even when plaintiffs do not allege that the restatement was due to an earlier accounting error, courts have found that the allegation that the revenues were restated was enough. *See In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) ("the existence of restated financial results is sufficient to support plaintiffs' belief that the statements were misstated"); *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1017-18 (S.D. Ohio 2008) ("Defendants argue that the restatement of financial results is not actionable under the PSLRA. This Court does not agree. Courts have held that the mere fact that financial results are restated is sufficient at the pleading stage to establish that results were false when originally made."); *In re Atlas Air*, 324 F. Supp. 2d at 486 ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made").

liability precluded by *Central Bank*"; "Establishing the actual extent of Andersen's participation in making the statements will, of course, await summary judgment or trial").[69]  Thus, the Complaint alleges material misstatements and/or omissions by Berkovits.

### B.    Plaintiff Has Properly Pled *Scienter* Against Berkovits

"Allegations of GAAS and GAAP violations, coupled with allegations of red flags to which the defendants paid no mind, 'can be sufficient to withstand a motion to dismiss in a securities fraud action.'"  *In re Worldcom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497-98 (S.D.N.Y. 2005) (citation omitted).[70]  Violations of GAAP are themselves indicia of *scienter* that are ultimately analyzed in their totality with all the other allegations in the Complaint to determine whether a strong inference of *scienter* is created.[71]  Here, in

---

[69] *See also Howard*, 228 F.3d at 1061 n.5 ("participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability even though that participation might not lead to the actor's actual making of the statements"); *McNamara*, 57 F. Supp. 2d at 426 ("if a defendant played a 'significant role' in preparing a false statement actually uttered by another, primary liability will lie"); *Adam,* 884 F. Supp. at 1401 (plaintiffs could allege primary liability against accountant based upon various statements and reports issued by company); *Cashman v. Coopers & Lybrand,* 877 F. Supp. 425, 432 (N.D. Ill. 1995) (primary liability may be based on accountant's "central involvement" in preparation of misstatements); *Employment Ins. Of Wausau v. Musick, Peeler & Garrett,* 871 F. Supp. 381, 389-90 (S.D. Cal. 1994) (sufficient that accountants were architects of prospectus and that the prospectus contained misrepresentations attributable to them; "the court does not read that case to create the rigid rule that an accountant must actually be named in a document to be liable as a primary actor").

[70] "A complaint might reach this 'no audit at all' threshold by alleging that the auditor disregarded specific 'red flags' that 'would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.'  Alternatively, allegations of particularly large frauds might go far toward creating a compelling inference of auditor scienter based on recklessness even where actual knowledge of the fraud by the defendant auditor is not alleged."  *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483-84 (S.D.N.Y. 2008).

[71] *See, e.g.*, *In re Daou*, 411 F.3d at 1016 ("Violations of GAAP standards can also provide evidence of scienter"); *In re Aspeon Sec. Litig.*, No. 04-55651, 2006 U.S. App. LEXIS 4673, at *4 (9th Cir. Feb. 23, 2006) ("'violations of GAAP standards can . . . provide evidence of scienter'") (citation omitted; omission in original); *In re Scholastic*, 252 F.3d at 77 (holding that a large write down will support a finding of recklessness); *In re New Century*, 588 F. Supp. 2d 1206, 1230 (C.D. Cal. 2008) (allegations of GAAP violations supported inference of *scienter* where large backlog of repurchase claims made it highly unlikely that senior officers were unaware that reserves were inadequate to cover the growing number claims); *Batwin v. Occam Networks Inc.*, No. 07-3750, 2008 U.S. Dist. LEXIS 52365, at *38 (C.D. Cal. July 1, 2008) ("These significant violations of GAAP, taking place over an extended period of time, give rise to a strong inference of scienter"); *In re MicroStrategy*, 115 F. Supp. 2d at 635 ("But this is not to say that a misapplication of accounting principles or a restatement of financials can never take on significant inferential weight in the scienter calculus; to the contrary, when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to

addition to the numerous violations of GAAP, GAAS,[72] and the Company's own internal inventory policy,[73] the following facts support a strong inference of *scienter*:  (1) Berkovits' deliberate ignorance of red flags; (2) the immediate discovery of significant problems by a new employee; (3) the magnitude of the fraud; and (4) the lack of independence of Berkovits and its resignation. The Complaint specifically alleges the risk factors Berkovits failed to observe, the specific audit and testing procedures Berkovits failed to conduct, red flags Berkovits ignored, as well as steps Berkovits should have taken once the red flags came to its attention, but did not. *See* ¶¶250-58.[74]  Plaintiff, here, provides more than enough particularized facts to allege that the "wrongdoing ran deeper than innocent auditing and accounting slip-ups." *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1344 (S.D. Fla. 1999).

### 1.    Berkovits' Deliberate Ignorance of Red Flags Supports a Strong Inference of *Scienter*

The Complaint alleges that Berkovits' personnel had intimate knowledge of the financial reporting practices based on its access to confidential internal corporate, financial, operating and business information. *See* ¶160.[75]  Further, the Complaint alleges that Berkovits was "intimately involved" with the preparation of

---

be drawn from such allegations may shift significantly in favor of scienter"). The cases cited by Berkovits, Berk. Br. at 16, are inapposite because fraudulent intent is alleged in the Complaint.

[72] For example, the Complaint alleges that Berkovits knew or recklessly ignored that it violated Section 10A of the Exchange Act by failing to determine that an illegal act occurred and to notify the SEC if Inyx's management or Board of Directors failed to take appropriate remedial action. ¶257(a).

[73] "Courts have held that violation of a company's own policy supports an inference of scienter." *Chalverus*, 59 F. Supp. 2d at 235 (citations omitted); *see also In re Scholastic*, 252 F.3d at 77; *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 18 (D. Mass. 2000) ("While Defendants' alleged violations of [their internal policies] are not materially different from the alleged GAAP violations, they are probative of scienter because they suggest that Defendants' accounting practices recklessly disregarded another red flag -- accounting standards the company adopted").

[74] "It is simply a matter of common sense and logic--particularly given the special expertise of accounting firms-- that the less complex the rules violated, the greater the magnitude of the irregularities, and the more frequent the violations, the stronger is the inference that conscious fraud or recklessness is the explanation for the auditor's role in the violations." *In re MicroStrategy*, 115 F. Supp. 2d at 652.

[75] In addition to allegations that Berkovits had intimate knowledge of the Company, Plaintiffs have alleged other contemporaneous facts that Berkovits knew about or recklessly disregarded that when considered collectively and in totality support a strong inference of scienter. *See* ¶¶250-58, 154-69. *See also In re Williams*, 339 F. Supp. 2d at 1241 ("The allegations that E&Y had a deep understanding of the existence and significance of WCG's problems

the 10-Qs. ¶250. The Complaint also alleges that during the course of Berkovits' audits, there appeared

numerous red flags that should have led the auditors to procure additional evidentiary matter. *See* ¶204. An

auditor's disregard of "red flags"[76] suggests that its violation of GAAS "must have resulted from a conscious

decision to do so or from severe recklessness on [its] part." *In re MicroStrategy*, 115 F. Supp. 2d at 654.

In addition to the pre-billing[77] and others schemes that Berkovits either knew about or recklessly

ignored,[78] starting no later than April 2005,[79] red flags existed regarding Project Invar, which was an

---

sufficiently establish an inference of scienter"); *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 477 (E.D. Va. 2002) ("This privileged position is not offered alone as the requisite strong inference of scienter, rather, it simply is posited as part of the context to support the particulars of scienter set forth in the other allegations of the [] Complaint."); *In re Sunbeam*, 89 F. Supp. 2d at 1346 ("'allegations that [the auditor] had knowledge of [the company's] internal workings and had a history with the company, taken together, support a claim that the failures to observe GAAS in this particular audit amount to a level of recklessness high enough to maintain an action under § 10(b)'"); *In re MicroStrategy*, 115 F. Supp. 2d at 653 ("But it is equally apparent that the greater PwC's access to and involvement with MicroStrategy's operations, the more support an inference of scienter takes on").

[76] "As a result of performing auditing procedures or from other sources during the audit, information may come to the auditor's attention that differs significantly from the information on which the audit plan was based. . . . The auditor may need to reevaluate the auditing procedures he or she plans to apply, based on the revised consideration of audit risk and materiality for all or certain of the account balances or classes of transactions and related assertions." *In re WorldCom*, 352 F. Supp. 2d at 498 (quoting AU § 312.33). "Among the types of new information acquired during an audit plan are facts that may indicate wrongdoing by management. Such facts constitute 'red flags' under Section 10(b)." *Id.*

[77] Berkovits' attempt to argue that "[t]he elimination of the 'pre bill' invoices from the financial statement presentation and the disclosures contained in the note undercut both Plaintiff's allegations of inflation of Inyx's financial position by virtue of the 'pre-billing' and his allegations of fraudulent conduct by Berkovits," Berk. Br. at 16, fails. First, the pre-bills are not the only fraudulent invoices alleged in the Complaint during the relevant period. Second, as previously discussed, the Company only disclosed a certain amount of the pre-bills and not the full extent of the pre-bills. Third, even if the Company disclosed the full extent of the pre-bills, the financial statements were still false and misleading because the Company's statement that it pre-billed customers "in advance for raw materials and for services to be provided pursuant to arrangements under contract manufacturing and product support and services agreements that it has in place" did not disclose that for example, as alleged in the Complaint, some of the customers and/or the work for the pre-bills never existed. ¶49. Fourth, the Company belatedly admitted that it improperly recognized developmental revenue for at least certain periods in 2006 and prior to that, Zinn stated that the revenue recognition policy in place was inadequate.

[78] *See Katz*, 542 F. Supp. 2d at 275 ("there are more than sufficient allegations that GGK either knew or was reckless in not knowing that most of the sales allegedly made by Image in 2004 were fictitious . . . GGK was in a position at the time of the original audit to validate sales based on shipping documentation, invoices, and other available information . . . These allegations are sufficient to raise an inference of recklessness"); *In re Worldcom, Inc. Sec. Litig.*, No. 02-3248, 2003 U.S. Dist. LEXIS 10863, at *10-13 (S.D.N.Y. June 25, 2003) (Auditor acted recklessly in conducting audit where complaint alleged that auditor reviewed company's books and records that contained no support for or documentation for certain accounting treatments).

investment in hydrofluoroalkane ("HFA") equipment in 2005 and was on Inyx's balance sheets in 2005, the financial statements that Berkovits audited. ¶168. Zinn stated that when he "went to England to look at the equipment, which was a $1.4 million investment on the balance sheets, he could not figure out where the equipment was, and what he did see did not satisfy him that it was worth $1.4 million." *Id.*[80] Therefore, although the equipment was on the balance sheets and part of the financial statements that were audited by Berkovits, the investment was never questioned before Zinn brought it to Berkovits' attention. *Id.*[81]

Further, Berkovits knew or recklessly disregarded that Inyx literally kept two set of books, a fact that should have been obvious to Berkovits during its audits in the course of reviewing the Company's books and records. As the Complaint alleges, "[s]pecifically, they engaged in a practice of submitting accounts receivable reports to Westernbank that materially differed from the accounts receivable ledgers Inyx kept

---

[79] Berkovits also knew or recklessly disregarded that the Company would be in default of its loan covenants if it did not improperly inflate revenue through the fraudulent schemes, which further evidences *scienter*. *See In re Williams*, 339 F. Supp. 2d at 1241 ("Furthermore, based on the allegations in the Complaint, E&Y knew and/or recklessly disregarded that, but for the improper recognition of revenues and failure to write-down its impaired assets, WCG would be in default of its agreements for its credit and debt facilities").

[80] Thus, Berkovits' attempt to disclaim liability by simply stating that "difficulties" are encountered in the course of many audits and "cannot be deemed sufficient to create a 'cogent and compelling' inference of fraudulent intent," Berk. Br. at 19-20, ignores the actual specific allegation in the Complaint that even when Zinn joined the Company, the equipment valued at $1.4 million could not be confirmed, and thus the more plausible inference is that Berkovits knew this or recklessly ignored this clear "red flag" in signing off on the audit.

[81] Berkovits' attempt to discredit the allegations as to the Open Items that were unresolved in February 2007, Berk. Br. at 18, must also fail. First, the Open Items are not irrelevant because some of the Open Items were on the balance sheets in 2005, the financials that Berkovits audited. ¶168. The Open Items also provide evidence that the accounting irregularities should have been obvious to Berkovits and should have raised significant concerns, *see* ¶160, as Zinn discovered them within months of being the CFO with limited access to financial documents. Further, the Open Items provide evidence as to *scienter* as they show how willing Berkovits was to look the other way even when presented with very obvious "red flags." *See* ¶161 ("Following several months of complaints to Berkovits by Zinn regarding the Company's financial controls, the unavailability of supporting documentation, and the lack of apparent finical or accounting controls, and with Inyx's full-year 2006 audit needing to be completed for the Company to file its 2006 Form 10-K, Zinn indicated he would not sign off without resolving these apparent long-standing accounting and financial control issues. Thus, Berkovits was left with no choice but to write to Joe Rotmil, the Audit Committee Chairman, on February 19, 2007. The February 19 letter discussed pertinent, unresolved issues material to completion of Inyx's 2006 audit and its ability to file its Form 10-K by April 2, 2007 ("Open Items"). The February letter, however, simply and belatedly reflected all the issues about which Zinn had alerted Berkovits and the Audit Committee in the past"). Finally, Berkovits' statement that the "Open Items" were not overlooked by Berkovits because they "did not proceed with its audit . . . because, in part, of their existence," is completely contrary to the allegations in the Complaint, which the Court must accept as true. *See In re Tommy*, 2007 U.S. Dist. LEXIS 55088, at *5 (citations omitted).

internally, and as a result, to continue their scheme, the reported revenues and assets were artificially inflated during the Class Period. This practice was confirmed by Zinn." *See* ¶¶82-85. *See also In re Livent Sec. Litig.*, 148 F. Supp. 2d 331, 370-371 (S.D.N.Y. 2001) ("D&T's actions and omissions in connection with Livent's manipulations of its books and records display acquiescence and passivity that, in this Court's reading of the pleadings, cross over the boundary of ordinary breaches of reasonable care into the zone of recklessness. Viewing these circumstances in their totality, the Court finds that D&T could be deemed to have failed to review or check information that it had a duty to monitor, or ignored obvious signs of fraud").

Moreover, aware that considering internal controls is extremely important in conducting audits, Berkovits disregarded that the internal controls were virtually nonexistent. *See* ¶¶240-49.[82] Berkovits ignored the clear red flag alerting it to inadequate internal controls that Goldschmidt, although acted as the CFO during the Class Period before Zinn, had "very limited experience with SEC filings." ¶154. Further, although "Berkovits repeatedly complained that [] Goldschmidt was not competent [at least as far back as 2005]. . . it took no action to remedy the situation and purported to rely upon defendant Goldschmidt notwithstanding Berkovit's lack of confidence in her abilities and her failure to provide timely or complete accurate financial or accounting information when requested by Berkovits." ¶156.[83]     Additionally, Zinn confirmed that

---

[82] The Complaint alleges that "most of the of the issues involved deficiencies and other weaknesses in internal controls that pre-existed Zinn's tenure with the Company and were of significant magnitude and materiality, such that it was apparent to Zinn from even a cursory review of the limited internal financial information provided to him by the Individual Defendants, that Berkovits was or should have been aware of the deficiencies and weaknesses in internal controls in the prior years in which Berkovits provided unqualified audit opinions that were publicly disseminated as part of Inyx's financial reports." ¶161.

[83] Unable to withstand the compelling evidence of scienter, Berkovits resorts to attacking allegations provided by Zinn, the CFO during part of the Class Period (May 15, 2006 through July 2, 2007). However, Zinn's allegations are particularized and support that he would have first hand knowledge of the information alleged, being that he was the CFO of the Company, responsible for the Company's SEC filings. *See In re Scottish*, 524 F. Supp. 2d at 397 ("In this case, there is little question that a senior executive at the Company would be familiar with the interaction between the Company and its auditors"). *See also In re Philip*, 383 F. Supp. 2d at 479 ("the disclosure of sources may strengthen a complaint"); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 972 (S.D. Ind. 2007) ("In this case, plaintiffs have included specific details about identities and bases of knowledge that tend to support inferences of scienter"). For example, his allegation that Berkovits characterized Goldschmidt as incompetent comes directly from a conversation he had with Lago in April and/or May of 2007 where he stated that "he questioned Rima's competence because she is slow with providing information and did not have experience with

Berkovits knew that "defendant Kachkar was aware of the situation and was not planning to take any action." *Id.*[84]

Similar allegations as alleged here have been found to support a strong inference of *scienter*. *See In re In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999) ("Essentially, plaintiffs are alleging that KPMG recklessly disregarded, or outright ignored, blatant evidence of Oxford's extreme accounting irregularities, particularly Oxford's complete lack of internal controls . . . These accounting irregularities obviously indicated that Oxford's financial statements were not and could not have been truthful. In ignoring this evidence, KPMG violated GAAS and other auditing standards and issued a

---

SEC filings," as well as conversations with the audit staff about their problems with Goldschmidt beginning in 2005. ¶253. His other allegations are based on "visits to Berkovits' office," "numerous communications with Berkovits' employee[s]," and "Zinn's own experience as an accountant." ¶251. Thus, his allegations are based on his first hand experiences and conversations when he took over as CFO and his experience as an accountant. For example, the Complaint alleges that as Zinn became more familiar with the Company's financials, he continued to find material problems that he reported to Berkovits, and "based on the nature of the issues and Berkovits' reactions, Zinn believed that many of the problems were already known or should have been known to Berkovits as the Company's auditor. Zinn believed these issues, upon inspection of the Company's internal books and records to which he was able to gain access, were relatively obvious and should have raised significant concerns to any accountant that reviewed the Company's books and records in connection with an audit." ¶160. Further, Berkovits' argument that "[g]iven the allegations that Berkovits complained to Zinn about Goldschmidt's competence, it is hardly plausible that Berkovits simultaneously harbored an intent to aid a fraud of which, Plaintiff alleges, Goldschmidt was one of the major perpetrators," Berk. Br. at 17 n.10, misses that it is in fact extremely plausible that Berkovits complained about Goldschmidt, but took no further action, to "preserve the appearance of independence and protect itself," which is confirmed by actions taken by Berkovits once Zinn started to aggressively push them to address the "financial and accounting deficiencies and weaknesses." ¶161.

[84] Berkovits' statement that internal controls were management's responsibility, and thus, it relied on management's statements does not undermine *scienter*, but actually supports it. *See, e.g., Am. Bus. Fin. Servs. Noteholders Litig. v. Seidman*, No. 05-0232, 2008 U.S. Dist. LEXIS 61450, at *10-12 (E.D. Pa. Aug. 11, 2008) ("Because it acquiesced to and relied excessively on representations of ABFS's management, BDO failed to discover or disclose deficiencies of ABFS's internal auditing controls and financial assumptions despite its access to ABFS's financial records . . . In sum plaintiffs allege that BDO's auditing practices were so accepting and uncritical of ABFS that the audits amounted to no audit at all"); *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 606-08 (D.N.J. 2001) ("The complaint asserts that E & Y failed to obtain sufficient competent evidential matter to form a basis for its unqualified reports . . . Plaintiffs charge that E & Y failed to obtain direct evidence in connection with CUC's and CMS's recording of revenue and elimination or reduction of expenses as a result of write offs of merger reserves. ***Instead, E & Y relied largely on management's representations . . . when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter***") (emphasis added); *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002) ("PwC conducted its audits without obtaining adequate detail and documentation in violation of GAAS and consequently failed to detect non-standard journal entries made by [the] personnel").

fraudulent audit."); *CMNY Capital, L.P. V.Deloitte & Touche*, 821 F. Supp. 152, 165 (S.D.N.Y. 1993) (holding sufficient allegations of GAAS violations and red flags including fictitious sales being included as revenue, unusually high year end revenues, and the existence of large and unusual transactions); *Great Neck Capital Appreciation Inv. P'ship, L.L.P. v. PricewaterhouseCoopers, L.L.P.*, 137 F. Supp. 2d 1114, 1124 (E.D. Wis. 2001) (denying motion to dismiss because "Plaintiffs have alleged facts indicating that PwC knew that Harnischfeger lacked experience in managing such large projects and lacked the internal controls to be able to estimate costs, profits or losses. Plaintiffs have alleged facts suggesting that Harnischfeger's accounting techniques violated GAAP and that PwC failed to make the investigation required of an independent auditor and violated GAAS").[85]

Moreover, further supporting a strong inference of *scienter* is that even when Zinn brought the "red flags" relevant to the 2005 financials to Berkovits' attention, Berkovits still chose to ignore its duty correct its previous statements in its audit.[86]  *See Overton*, 478 F.3d at 488 ("Plaintiffs pled that Todman's certified

---

[85] *See also Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97-3374, 1999 U.S. Dist. LEXIS 2102, at *33-43 (S.D.N.Y. Mar. 1, 1999) (auditors ignored "red flags" that should have raised questions in their mind and led them to obtain additional evidential material to support their audit; did not adequately plan or supervise the audit, which led to the failure to acquire sufficient evidential material; and did not understand its client's internal control structure and therefore did not understand or recklessly disregarded certain weaknesses;  "Plaintiffs' allegations that Coopers had knowledge of [its client's] internal workings and had a history with the company, taken together, support a claim that the failures to observe GAAS in this particular audit amount to a level of recklessness high enough to maintain an action under § 10(b)"); *In re Leslie Fay Cos. Sec. Litig.*, 871 F. Supp. 686, 699 (S.D.N.Y. 1995) ("Because [the auditor] was immersed in Leslie Fay's operations while performing its audit, and because the 'red flags' would be clearly evident to any auditor performing its duties, one could reasonably conclude that BDO must have noticed the 'red flags,' but deliberately chose to disregard them to avoid antagonizing Leslie Fay and incidentally frustrating its fraudulent scheme."); *In re Sunbeam*, 89 F. Supp. 2d at 1344-45 (found that the auditors acted with, at minimum, severe recklessness in issuing its audit opinion because Arthur Andersen knew or was severely reckless for not knowing that Sunbeam's internal controls were virtually non-existent; Arthur Andersen failed to adhere to GAAS by not identifying numerous "fraud risk factors" that suggested that there was a significant risk that Sunbeam had fraudulently misstated its financial statements; and "Arthur Andersen failed to stop Sunbeam from recognizing, in violation of GAAP, revenues from guaranteed sales and consignment sales transactions").

[86] *See Overton v. Todman & Co.*, 478 F.3d 479, 488 (2d Cir. 2007) ("we hold only that the duty to correct arises ... when the accountant (1) makes a statement in its certified opinion that is false or misleading when made; (2) subsequently learns or was reckless in not learning that the earlier statement was false or misleading; and (3) knows or should know that potential investors are relying on its opinion. Under those circumstances, if an

opinion and DBI's 2002 financial statements were misleading at the time they were issued . . . Todman . . . subsequently learned that its certified opinion was false . . . and that despite this knowledge, Todman took no action to correct or withdraw its opinion and/or DBI's financial statements. These allegations adequately state a claim of primary accountant liability"); *In re Tarragon Corp. Sec. Litig.*, No. 07-7972, 2009 U.S. Dist. LEXIS 60160, at *53 n.4 (S.D.N.Y. Mar. 27, 2009) ("Accountants may also be held liable under section 10(b) and Rule 10b-5 where they fail to correct prior certified statements that were false when made").

### 2.    The Quick Discovery by the CFO of Significant Problems Supports a Strong Inference of *Scienter*

Courts have found that an almost immediate discovery of problems with the company can support a strong inference of *scienter*. *See, e.g., In re First Merchs.*, 1998 U.S. Dist. LEXIS 17760, at *32-33 ("the allegation that First Merchants' new Chief Financial Officer almost immediately discovered the discrepancies in the financial statements, suggests a deliberate ignorance on the part of Deloitte."); *In re New Century*, 588 F. Supp. 2d at 1231 ("Further, the fact that the new CEO, Tajvinder Bindra discovered the accounting violations within months of taking the position is a strong indication that these accounting violations were obvious enough"); *Danis*, 73 F. Supp. 2d at 942 ("Finally, plaintiffs' claim that USN's lack of internal controls was readily apparent to outsiders such as AT&T and GTE buttresses a strong inference of Deloitte's recklessness; conditions readily discoverable . . . suggests that an auditor and consultant was likely aware of those conditions"). According to the Complaint, for the third quarter of 2006, Zinn took responsibility for the preparation and filing of the 10-Q, and "[a]s he familiarized himself with the Company's internal financial documents, he became quickly concerned about numerous accounting issues that that made him question the Company's accounting and financial controls, and he immediately alerted Berkovits to his concerns about these issues. Most of Zinn's concerns related to pre-existing issues that Berkovits knew or should have known about, including revenue recognition problems." ¶156. This immediate discovery suggests that Berkovits

accountant fails to take reasonable steps to correct or withdraw its certified opinion and/or the underlying financial statements, it becomes primarily liable for a misleading omission under § 10(b) and Rule 10b-5").

knew of the Company's true financial condition or deliberately ignored it.

### 3.    The Magnitude of the Fraud Suggests a Strong Inference of *Scienter*

As previously argued as to the Inyx Defendants' *scienter*, the magnitude of the fraud here also

supports a strong inference of *scienter* as to Berkovits. *See, e.g.*, *In re Qwest Commc'n Int'l, Inc. Sec. Litig.*,

396 F. Supp. 2d 1178, 1206 (D. Colo. 2004) ("considering the role played by Andersen, the magnitude of the

IRU transactions, and the nature [of the] accounting issues presented, the allegations in the Complaint support

a reasonable inference that Andersen was aware of these transactions and the accounting issues they

presented."); *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F. Supp. 2d 1324, 1339-40 (N.D. Ga.

1998); *In re Sonus Networks Sec. Litig.*, No. 04-10294-DPW, 2006 U.S. Dist. LEXIS 28272, at *60-61 (D.

Mass. May 10, 2006). As one court has stated:

> The allegations identifying the steps Andersen should have taken and failed to take, and the fraud it would have discovered if it had taken those steps, create a strong inference that Andersen acted recklessly in conducting the WorldCom audits . . . Although the size of the fraud alone does not create an inference of scienter, the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of WorldCom's fraudulent accounting and Andersen's failure to conduct a thorough and objective audit create a strong inference that Andersen was reckless in not knowing that its audit opinions materially misrepresented WorldCom's financial state.

*In re WorldCom*, 2003 U.S. Dist. LEXIS 10863, at *22-23. The Complaint alleges that Inyx accelerated

developmental revenues for at least nine months ended September 30, 2006 of $4 million and improperly

recorded revenues of approximately $74 million as a resulted of fraudulent invoicing.  *See* ¶207. The

Complaint also alleges that Berkovits knew that the improper accounting adversely impacted Inyx's reported

revenues and assets, and based on evidence presented during the bankruptcy proceedings, "it is estimated that

Inyx overstated its assets and revenues by more than $100 million during the Class Period."  ¶195. "Thus, the

allegations in the complaint, including the magnitude of the misstatements,  the specific GAAP and GAAS

violations and the 'red flags' together support an inference that Inyx's audits 'amounted to no audit at all or an

egregious refusal to see the obvious or investigate the doubtful.'"  *In re First Merchs.*, 1998 U.S. Dist. LEXIS

17760, at *32-33.

#### 4.    The Lack of Independence and Berkovits' Resignation Support *Scienter*

GAAS General Standard No. 2 requires independence is to be maintained by the auditor in all matters related to the audit. ¶257(g). The Complaint alleges that "Berkovits knew or recklessly disregarded that Inyx was significant to the firm in terms of fees and status, impairing independence." *Id.*   The approximate $500,000 in annual fees related to the Inyx audit was a significant portion of the audit partner, Lago's, business. *Id.* Zinn stated that between 20% and 30% of Berkovits' (and as much as a third of Lago's) business involved work for Inyx. ¶¶161, 251. Furthermore, the Complaint alleges that Berkovits knew or recklessly disregarded other business relationships between the firm, Inyx and Kachkar that impaired its independence. As just one example, Berkovits audited Karver International, Inc., a shell company run by Kachkar and Green, "further increasing the financial significance of the client and impairing Berkovits' ability to stay independent."   ¶257(g). Moreover, "[a]ccording to Zinn, during a conversation with defendant Green in Miami, defendant Green told Zinn 'not to worry about Jesus [Lago].'  Zinn took this to mean that Lago could be manipulated and would look the other way."  ¶251.[87]  Thus, "[b]y violating the GAAS requirement of independence, PwC has weakened its ability to rely on its reputation in countering as 'irrational' allegations that it participated in a client's fraud, for it is that very reputation that an allegation of a lack of independence questions."  *In re MicroStrategy*, 115 F. Supp. 2d at 655.[88]

---

[87] The cases cited by Berkovits for the notion that accounting fees are insufficient as a motive, Berk. Br. at 19, are all distinguishable. Plaintiff's allegations here are particularized and not general, like in those cases, *see, e.g., In re Oxford*, 51 F. Supp. 2d at 294 ("These generalized economic interests are insufficient to establish motive of an accounting firm to commit fraud"). Further, here, Plaintiff alleges other factors that support *scienter*, not just the accounting fees, including lack of independence, based in part on Lago's past relationship with Green and Kachkar. ¶257(g).

[88] *See also In re WorldCom*, 352 F. Supp. 2d at 497 ("The Lead Plaintiff has shown that there are issues of fact as to whether the Andersen audit of WorldCom was so deeply flawed that Andersen acted with reckless disregard of whether WorldCom was engaged in fraudulent accounting practices and materially misstating its financial position in its annual financial statements. It points to an over-reliance on the integrity of management and a failure to maintain its own independence . . ."); *In re Williams*, 339 F. Supp. 2d at 1240 ("The Court finds Plaintiffs have sufficiently pled allegations establishing a strong inference of scienter as required by Fleming. The Complaint sets forth allegations which draw into question E&Y's motive and independence based on its significant consulting fees from WCG. Also, Plaintiffs point out and question how E&Y could not have been aware of alleged misstatements and omissions with regard to WCG's financial statements based on the high level of interaction

Additionally, Berkovits' resignation on July 5, 2007 also supports a strong inference of *scienter*. The Complaint alleges that "the resignation of Berkovits as Inyx's auditor and the reorganization of the [Berkovits, Lago & Company, LLP] firm, including the departure of Jesus Lago [the firm's only other named partner] from Berkovits, was a direct and consequent result of the conduct of Defendants alleged herein." ¶¶15, 192, 250. Resignations and other allegations of corporate reshuffling, including changes in auditors, support a strong inference of *scienter*. *See Zucco Partners, LLC*, 552 F.3d at 1002 (examining the effects of independent accounting firms' resignation on defendant corporation's *scienter*); *In re Scottish*, 524 F. Supp. 2d at 394 (resignations can add to the overall pleading of circumstantial evidence of *scienter*); *Middlesex*, 527 F. Supp. 2d at 1186 (a resignation leaned "heavily towards a finding of scienter"); *In re McKesson*, 126 F. Supp. 2d at 1274 (termination of key personnel supports a finding of *scienter*).[89]

As detailed above, the Complaint identifies numerous factors supporting a strong inference of *scienter* for Berkovits, including: "[its] failure to follow GAAS and disclose GAAP violations"; "its disregard of 'red flags' and failure to investigate [] suspect accounting practices"; "the magnitude of the fraud;" and . . . its intimate knowledge of [the] Company's operations. *In re Williams*, 339 F. Supp. 2d at 1240.[90]   Further,

---

between WCG and E&Y during the Class Period"); *In re Enron Corp. Sec.*, 235 F. Supp. 2d 549, 673-74 (S.D. Tex. 2002) ("The consolidated complaint maintains that Arthur Andersen was not independent of its client. Enron was Arthur Andersen's second largest client . . ."; "Furthermore, Arthur Andersen's close relationship with Enron 's management also impaired the auditor's independence and objectivity in its audits of Enron during the Class Period"); *In re Leslie Fay Cos. Sec. Litig.*, 835 F. Supp. 167, 173-74 (S.D.N.Y. 1993) ("Plaintiffs point to BDO's long and profitable history of providing Leslie Fay with auditing and other accounting services as a possible motive for BDO turning a blind eye to the Company's fraudulent accounting, and the complaint specifies particular accounting laxities at Leslie Fay that BDO either intentionally or recklessly disregarded. These facts, taken together, state a claim . . .").

[89] *See also Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1321 (S.D. Fla. 2004) (finding that auditor resignation is one factor courts consider in finding *scienter*); *Hall*, 2008 U.S. Dist. LEXIS 54790, at * 40 (resignations, including forced resignations, considered to contribute to a strong inference of *scienter*).

[90] *See also In re MicroStrategy*, 115 F. Supp. 2d at 636 ("In this case, however, the Complaint goes well beyond merely alleging that MicroStrategy misapplied accounting principles and that, consequently, the Company had to restate its financials. It does so by alleging in some detail the magnitude of the restated financials and the pervasiveness and repetitiveness of MicroStrategy 's GAAP violations; the simplicity of the accounting principles violated in this case; and the importance of the contracts involved. This contextual background serves to amplify the inference of scienter to be drawn from MicroStrategy's GAAP violations and restatement of financials").

Berkovits has failed to provide any inference of nonculpable conduct, much less a plausible one, which also weighs in favor of a strong inference of *scienter*. *See In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 250 (S.D.N.Y. 2007) ("Defendants have not pointed to any 'competing inferences rationally drawn from the facts alleged,' that could explain their receipt of options bearing dates other than the ones on which they received them"). Thus, taken together, the *scienter* allegations are more than sufficient to survive Berkovits' motion to dismiss.

## VI.    PLAINTIFF HAS ADEQUATELY PLED LOSS CAUSATION

In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court explained that the pleading rules for loss causation were "not meant to impose a great burden upon a plaintiff," and that plaintiffs need only plead "a short and plain statement," pursuant to Fed. R. Civ. P. 8(a)(2), that provides defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 346-47 (citations omitted).[91]   There is no heightened standard for pleading loss causation. *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008). For pleading purposes, loss causation exists "if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).

A "corrective disclosure" is not required under this Court's post-*Dura* case law. *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-06 (S.D.N.Y. 2005) ("a corrective disclosure is not necessary where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their loss") (citing Second Circuit cases). A risk allegedly concealed by defendants which materialized and arguably caused the decline in shareholder value suffices. *Id.* at 307. *See also Heller*, 590 F. Supp. 2d at 624 (loss causation satisfied by allegations that plaintiff's loss was caused by foreseeable materialization of concealed risk of fund's

---

[91] Berkovits' incorrectly states that a plaintiff must prove transaction causation and loss causation, *see* Berk. Br. at 20. Plaintiff, however, does not have the burden to prove anything at the pleading stage.

undercapitalization). Moreover, neither the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure be a "mirror image" tantamount to a confession of fraud. Because corporate wrongdoers rarely admit that they committed fraud, "it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the ***underlying circumstance that is concealed or misstated.***"  *Lentell*, 396 F.3d at 173 (emphasis added).[92] Thus, the ***"relevant truth"*** required under *Dura* is ***not that a fraud was committed*** *per se*, but that the "truth" about the company's underlying condition, when revealed, causes the "economic loss."

"Plaintiffs 'need only show 'some causal nexus' between [defendants'] improper conduct and plaintiff's losses.'  In a situation where 'the defendant's misrepresentations artificially altered the price of the stock and defrauded the market, causation is presumed.'"  *In re Retek, Inc. Sec.*, No. 02-4209, 2005 U.S. Dist. LEXIS 35734, at *19-20 (D. Minn. Mar. 7, 2005) (internal citations omitted).  Additionally, although the loss must be attributed to the misrepresentation, "it need not be the exclusive or even primary cause."  *See Schuster v. Anderson*, 413 F. Supp. 2d 983, 1014 (D. Iowa 2005).

Defendants' loss causation arguments are premised on the legally inapposite and factually incorrect argument that before the July 2, 2007 bankruptcy announcement, there was "ample basis for the market to conclude that Inyx would not be able to survive and might be forced into bankruptcy protection."  Berk. Br. at 22. Not only is this not relevant to a loss causation analysis, but it cannot be disputed that in response to the news of Inyx's bankruptcy filing on July 2, Inyx stock plummeted by around 86 percent. The materialization of that previously undisclosed risk, coupled with the decline of Inyx's shares, is all that is required for the pleading of loss causation. *See Dura*, 544 U.S. at 342. *See Emergent Cap. Inv. Mgmt., LLC v. Stonepath*

---

[92] *See also Nursing Home Pension Fund v. Oracle Corp.*, No. 01-00988, 2006 U.S. Dist. LEXIS 94470, at *35 (N.D. Cal. Dec. 20, 2006) (*Dura* does not require a corrective disclosure); *In re Loewen Group, Inc. Sec. Litig.*, 395 F. Supp. 2d 211, 218 (E.D. Pa. 2005) ("'loss causation does not . . . require a corrective disclosure followed by a decline in price.'") (citation omitted); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 540 (N.D. Ill. 2007) ("a disclosure . . . can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity"); *In re Bristol Myers Squibb*, No. 00-1990, 2005 U.S. Dist. LEXIS 18448, at *52-57 (D.N.J. Aug. 17, 2005) (case law does ***not*** "stand for the general proposition that an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud").

*Group, Inc.*, 343 F.3d 189, 198-99 (2d Cir. 2003) (cited with approval in *Dura*, 544 U.S. at 344-45).[93]

Therefore, all of Defendants' misguided loss causation arguments, based on the prior partial, inadequate disclosures of information related to the subject matters of the Defendants' alleged Class Period misrepresentations and omissions, have no relevance to whether Plaintiff has sufficiently alleged loss causation.[94]

In the instant case, the true depth and severity of Inyx's dire financial situation was not fully revealed until July 2, 2007. This was the first time that investors realized that the Company would be unable to repay its debt to Westernbank, as it had been pledging to do all along. The previous statements during the Class Period concealed this risk from the market. Defendants concealed this risk in the filings that Defendants claim were "corrective." The September 30, 2006 Form 10-Q stated that that the Company was "in violation of certain financial covenants in connection with its Westernbank loan and security agreements." ¶148. However, the Company, at the same time, assured investors that "Westernbank has waived, through December 15, 2006, certain requirements such that the Company's noncompliance with its covenants under

---

[93] For instance, in *Emergent*, the Second Circuit reviewed the facts of its prior decision in *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F. 3d 87 (2d Cir. 2001). *See* 343 F.3d at 198-99. In *Suez*, defendants, in soliciting plaintiffs' investment, provided plaintiffs with a report on the backgrounds of the company's principal executive that omitted significant negative information about the executive's prior financial and business history. *See* 250 F. 3d at 93-94. Ultimately, the company filed for bankruptcy, and the plaintiffs' investment became worthless. Later the executive's true, poor management experience came to light, and was alleged by plaintiffs to have been a material omission from the initial report. Plaintiffs thus claimed that, *inter alia*, that the executive's concealed inability to manage debt and maintain adequate liquidity were the proximate cause of the company's bankruptcy – the disclosure that signaled the loss. *See id.* The Second Circuit in *Suez* (and *Emergent*) agreed, finding that the executive's concealed lack of experience could have induced the company's failure and, therefore, was a sufficient casual link to the cause of the investors' eventual loss (*i.e.*, the decline in value of the shares upon the bankruptcy filing) to satisfy the loss causation requirement under the Exchange Act. *See Emergent*, 343 F. 3d at 189-99 (quoting *Suez*, 250 F. 3d at 98-99).

[94] Moreover, the Supreme Court recognized in *Dura* that a partial disclosure can satisfy the loss causation requirement, *See* 544 U.S. at 342 (loss causation met where shares sold after "the relevant truth begins to leak out"). Therefore, to the extent Defendants' arguments have any validity, they simply demonstrate that Class members who sold before the end of the Class period will also have compensable damages based on the inadequate, but partially curative intra-Class period disclosures and the resultant declines in the price of Inyx shares in reaction to those partial disclosures.

such agreements has not resulted in an event of default by the Company." *Id.* Inyx also assured investors by stating that Kachkar and his wife provided personal guarantees on the loan to Westernbank. Berk. Ex. F. Further, the Company outright lied to investors by stating that its internal controls were effective. ¶150. The Company also discussed the going private offer that it claimed would allow it to pay back its debt. Berk. Ex. F.[95]  In response to a similar announcement, the court in *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693 (S.D. Tex. 2006) stated:

> In addition, the Complaint directly addresses why the stock price did not immediately decline on the day of the April 1, 2002 press release . . . The Complaint further alleges that the April 1, 2002 press release, itself, was incomplete and deceptive. While the press release stated that "as a result of the restatement" Seitel was not in compliance with its loan covenants, the press release attempted to minimize the impact of this news by explaining that the company had received a waiver and an amendment from senior note holders "that places [Seitel] in compliance with those agreements." "Thus, the press release implies that these debt covenant issues would not significantly impact Seitel." Bolstering this impression, the announcement stated that while Seitel was not in a position "to offer reasonable projections of revenues and earnings for the first quarter, or for the full year," Seitel "expects that year-over-year revenues will be higher and that the Company will be profitable for FY 2002." Thus, the Complaint alleges, that "analysts had no reason to downgrade the stock and Seitel and E&Y were able to continue to keep hidden the severe impact the restatement and the accounting change would have on Seitel going forward."

*See id.* at 712 (internal citations omitted).

Further, the Company stated in its Form 8-Ks on March 27, 2007,[96] April 6, 2007, and April 27, 2007, that the company's internal controls might be deficient, but the statements in the Form 8-Ks were still false and misleading because the Company failed to disclose that the Company's "resulting increases in revenues and accounts receivable were due to improperly accelerating development revenue and creating fictitious and fraudulent invoices, for the purpose of inflating Inyx's financial position and operating results," that the Company was in violation of GAAP and its own publicly stated accounting policies, and that "Inyx

---

[95] Although Berkovits argues that Inyx disclosed that it "had lost $22 million in the first nine months of 2006," Berk. Br. at 21, at the same time, the Company misled investors by its reported revenue of $18 million versus $12.9 million reported for the comparable quarter in 2005, and also the Company reaffirming its 2006 guidance. ¶147.

[96] The March 27, 2007 Form 8-K stated that although the Company identified internal control weaknesses, it did not known if it would be required to restate. ¶175.

suffered from a serious lack of legitimate controls." ¶176; *see also* ¶183. Thus, the statement hardly warned investors of the depth and severity of the Company's internal controls that were concealing these fraudulent practices during the Class Period. *See, e.g., In re BearingPoint Inc., Sec. Litig.,* 525 F. Supp. 2d 759, 780 (D. Va. 2007) (finding that an 8-K that disclosed that financials "should not be relied upon" and that restatements would be "necessary" "may well have been a 'substantial cause' of the stock drop" -- even though an 8-K issued one month prior had already made similar statements – because the earlier 8-K only disclosed "general" concerns about "material weaknesses" and made a "vague warning" that a restatement was "probable").

### A.    Plaintiff Sufficiently Alleged Loss Causation With Respect to the July 2 Bankruptcy Announcement

The Complaint alleges that on July 2, 2007, after the market opened, news services "carried a report that Inyx USA and Exaeris, two of Inyx's U.S. subsidiaries, had filed for Chapter 11 protection." ¶188. As a result of the announcement, the price of Inyx stock fell from $2.44 per share on June 29, 2007 to a close of $0.35 per share on July 2, 2007, on an extremely heavy trading volume of more than 7.7 million shares, and continued to drop to $0.31 per share on July 3, 2007, on a volume of more than 13.74 million shares. ¶189. The market's extreme reaction of around 86 percent to the announcement evidences the concealment of much of the Company's risk up until the end of the Class Period, and Berkovits' argument that by the end of April 2007, there was "ample basis for the market to conclude that Inyx might not be able to survive," Berk. Br. at 22, is thus, negated.[97]  *See In re Winstar*, 2006 U.S. Dist. LEXIS 7618, at *48. Plaintiffs here have clearly pleaded that the "share price fell significantly after the truth became known." *Dura*, 544 U.S. at 346.

Further, Berkovits' argument that the Complaint fails to allege that the false and misleading statements regarding the 2005 financials and the audit concealed the risk of bankruptcy in light of the Form 8-

---

[97] The previous disclosures did not result in significant stock drops, evidencing that the announcement of the bankruptcy was the full revelation of the falsity of the financial statements. *See Berry v. Valence Tech, Inc.*, 175 F.3d 699, 705 (9th Cir. 1999) (concluding that the lack of significant stock movement "bolstered" the conclusion that earlier revelations did not provide evidence of fraud).

Ks and 2006 10-Qs, Berk. Br. at 22, is simply wrong.[98] Here, like in *In re Winstar*, 2006 U.S. Dist. LEXIS

7618, the Audit report contained "unfavorable information as to the net loss suffered by Winstar," but did not

"disclose the true extent of Winstar's dire financial condition." *Id.*, at *50-51. Plaintiffs in *Winstar* alleged

that the Audit Report was false and misleading due to accounting improprieties and "conceal[ed] from

investors the accounting fraud which ultimately led to Winstar's demise." *Id.* The Court found that loss

causation was properly alleged because "once the truth regarding the questionable accounting practices

underlying the Audit Report leaked into the public forum, the price of Winstar stock immediately declined."

*Id.*[99] *See also In re Parmalat*, 375 F. Supp. 2d at 307 ("Among the risks concealed by these reports was that

Parmalat had massive undisclosed debt and was unable to service it. Defendants reasonably could have

foreseen that Parmalat's inability to service its debt would lead to a financial collapse. The concealed risk

materialized when Parmalat suffered a liquidity crisis on December 8, 2003 and was unable to pay bonds as

they came due"); *In re New Century*, 588 F. Supp. 2d at 1237-38 ("The Court finds that Plaintiffs have

sufficiently pled loss causation. The March 2, 2007 disclosure indicates the need to reevaluate at least certain

financial statements in "prior periods." This includes the 2005 financial statements reviewed by KPMG. As a

significant stock decline followed this disclosure, Plaintiffs have properly alleged loss causation . . .

Admittedly, the connection between the March 2, 2007 disclosure and KPMG's allegedly misleading

statements may be found too attenuated, or the existence of intervening causes may be too significant, for

---

[98] *See In re Winstar*, 2006 U.S. Dist. LEXIS 7618, at *47-48 ("The claimed ability of Asensio to arrive at its findings by an examination of the publicly reported financials does not mean that a reasonable investor could have drawn those same conclusions based on the total mix of the available information").

[99] The court further stated:

> Merely because the 1999 Audit Report showed that Winstar suffered a substantial loss does not preclude a reasonable investor from detrimentally relying upon false information in that report in making an investment decision. It should be noted that plaintiffs allege that the reported net loss in the Audit Report was significantly understated. In any event, a reasonable investor would have considered the extent of the loss, in connection with any other false financial information contained in the financial report. A reasonable investor would have assessed whether Winstar's future anticipated earnings could compensate for the reported losses, and result in Winstar becoming a profitable company. [*Id.*, at *51].

Plaintiffs to establish loss causation. Those are factual questions that this Court does not resolve on a 12(b)(6) motion"); *Asher v. Baxter Int'l, Inc.*, No. 02-5608, 2006 U.S. Dist. LEXIS 4821, 23-24 (N.D. Ill. Feb. 7, 2006) ("If Baxter had not lied about its internal state of affairs and its ability for growth, the disappointing second-quarter results would not have had such a negative impact on the share price. Thus, the alleged lies were responsible for the price drop following the July 18, 2002 second-quarter earnings announcement, and plaintiffs have satisfied their burden").[100]

## B.    Defendants' Reliance Argument Fails

Defendants contend that Plaintiff cannot assert reliance on the misrepresentations and omissions. *See* Berk. Br. at 22-24, Def. Br. at 38-39.[101]    However, "the fraud-on-the-market doctrine provides a rebuttable presumption that plaintiffs relied on defendants' misrepresentation or omissions pursuant to the theory that a company's securities prices in an open and efficient market are determined by all available information." *In re Parmalat*, 375 F. Supp. 2d at 303. To obtain the benefit of the presumption, "plaintiffs first must allege that the relevant market was open and developed or, in other words, efficient." *Id.* Although "whether a market is open and developed often is a question of fact," *id.*, Plaintiff has alleged that it is in the Complaint. *See* ¶¶26-29.[102]    Moreover, at the pleading stage – as distinguished from the class certification stage – a plaintiff need

---

[100] *See also In re Daou*, 411 F.3d at 1026 ("Defendants further revealed that the Company's rapidly escalating work in progress account represented over $10 million in unbilled receivables - the direct result of prematurely recognizing revenue" and that prior to this disclosure "defendants failed to disclose the actual figures to analysts to conceal the fact that Daou's operating earnings and margins were deteriorating as a result of prematurely and improperly recognizing revenue"); *Abbey*, 423 F. Supp. 2d at 357 (defendants' announcement that it would have substantially lower profits and massive write-offs and provisioning due to exposure to telecoms and cable sectors, including Tyco's collapse, adequately disclosed prior misrepresentations that there were no problems with its portfolio).

[101] Berkovits' reliance on *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608 (S.D.N.Y. 2009) is misplaced because it was a summary judgment decision. *Id.* at 615.

[102] Furthermore, Berkovits' argument that Plaintiff cannot plead loss causation because too much time passed before its last audit and the final corrective disclosure, Berk. Br. at 22-23, has been previously rejected by courts. *See, e.g.*, *In re Winstar*, 2006 U.S. Dist. LEXIS 7618, at *49-50 ("GT contends that plaintiffs cannot show that the losses allegedly suffered, when Winstar declared bankruptcy in April of 2001, were attributable to the 1999 Audit Report, given the significant time that had elapsed between these events. However, the fact that a significant amount of time has passed between the issuance of the Audit Report and the issuance of the Asensio reports does not, standing alone, establish a break in the casual link as a matter of law").

do no more than invoke this Supreme Court recognized doctrine to satisfy the pleading requirement for reliance. *See Basic*, 485 U.S. at 248 n.27 ("in order to invoke the presumption, a plaintiff must allege and prove: (1) that the defendant made public misrepresentations; (2) that the misrepresentations were material; (3) that the shares were traded on an efficient market; (4) that the misrepresentations would induce a reasonable, relying investor to misjudge the value of the shares; and (5) that the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed"). The Complaint here alleges each and every one of these factors.[103]  Nothing more is required at this stage to plead reliance. At the appropriate stage of the litigation, Plaintiff will prove these allegations on the merits.  Furthermore, as demonstrated above, because the corrective disclosure did not occur until July 2, the element of reliance is met.[104]

### C.    Defendants' Truth on the Market Defense is Premature

Defendants, although not calling it as such, attempt to invoke "the-truth-on-the-market" defense into their loss causation argument by arguing that some of the Class Period statements were "curative," in order to shorten the Class Period.[105]  However, as truth on the market defense implicates a host of factual issues, courts have found it rarely an appropriate basis for dismissing a Section 10(b) complaint. *See Ganino*, 228

---

[103] For allegations related to factors (1) and (2), *see supra* pp. 7-17; for allegations related to factors (3) and (4), *see* ¶¶26-29, 261-64, 278-79; for allegations related to factor (5), *see* ¶8.

[104] Even if reliance was a proper argument at this stage, the Inyx Defendants' argument that Plaintiff could not have relied on the allegations beginning on April 1, 2005 because there is only the speculation that prior to the loan, Defendants began to plot their scheme, *see* Def. Br. at 38, has no merit. The Complaint makes clear that reliance would have been appropriate because "[t]he announcement of the Westernbank line of credit was well received by the investing public as an indication of Inyx's financial health and positive future prospects. However, investors did not know that the Inyx Defendants intended to use the Westernbank credit facility as their personal piggy-bank through the series of deceptive and fraudulent devices, schemes, and practices described above to siphon off funds." ¶99.

[105] Arguments about the "curative" effect of intra-class period statements have been repeatedly rejected as a basis to shorten alleged class period because that determination would require a proscribed preliminary determination of the merits of a plaintiff's claims under *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). *See, e.g., In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1344-45 (N.D. Ga. 2007) (where substantial issues of fact remain as to whether statements "effectively cured" prior misrepresentations required an improper resolution of the facts going to the merits) (citation omitted); *Simpson v. Specialty Retail Concepts*, 149 F.R.D. 94, 104 (M.D.N.C. 1993).

F.3d at 167 ("[T]he truth-on-the-market defense is intensely fact-specific . . ."); *In re PE Corp. Sec. Litig.*, No. 00-705; 2005 U.S. Dist. LEXIS 5083, at *29 (D. Conn. Mar. 31, 2005) ("[Q]questions of whether the information was disseminated and available prior to the secondary offering, and what weight to give to that information, are factual questions that go to the merits of the plaintiffs' claims, and therefore are inappropriate to address at [the motion to dismiss] this stage . . .").[106]  Even on summary judgment, a defendant invoking a "truth on the market defense" bears "a heavy burden of proof." *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1993) ("Summary judgment is proper only if they show that 'no rational jury could find' that the market was misled.") (citation omitted).[107]  Moreover, here, the lack of a meaningful stock market response to the Class Period filings actually demonstrate that they were not "curative." *See, e.g.,  In re Merck & Co., Inc. Sec*., *Deriv. & ERISA Litig*., 543 F.3d 150, 167-68 (3d Cir. 2008) ("In the context of materiality, we have stated that in "an efficient market, 'information important to reasonable investors . . . is immediately incorporated into the stock price.' 'If the disclosure of certain information has no effect on stock prices, it follows that the information disclosed was immaterial as a matter of law.'") (citations omitted); *see also Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 195 (2d Cir. 2003) (the court's "holding is further supported by the fact that [defendant]'s stock price did not have any significant movement following" the identified disclosure revealing evidence of prior misstatements); *Berry*, 175 F.3d at 705 (concluding that the lack of significant stock movement "bolstered" the conclusion that earlier revelations did not provide evidence of

---

[106] *See also In re Globalstar*, 2003 U.S. Dist. LEXIS 22496, at *28-29 (denying defendants' motion to dismiss and holding that even where the stock's price declines precipitously, making it unlikely that a reasonable investor would rely on past representations of the company's expected performance, "[t]he question of whether, and when, the market had received enough information to counteract the allegedly misleading statements is best resolved on a summary motion or at trial," not on a motion to dismiss.); *In re Vivendi*, 2004 U.S. Dist. LEXIS 19431, at *60-62 (Defendants cannot meet the burden of establishing a "truth on the market" defense on a motion to dismiss).

[107] *See also Saddle Rock Partners, Ltd. v. Hiatt*, No. 95-2326, 1996 U.S. Dist. LEXIS 20649, at *52 (W.D. Tenn. Mar. 26, 1996) ("whether defendants have presented sufficient evidence to establish a truth on the market defense – namely, that the market had full knowledge of the omissions and misrepresentations by defendants – is an issue for the factfinder."); *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 483 (S.D.N.Y. 1994) (noting, with respect to truth-on-the-market defense, that "resolving such a fact-intensive inquiry is not appropriate at the summary judgment stage").

fraud).

Further, the Company's misleading Class Period statements contradicted, and thus, nullified any risk disclosures as to the financial position of the Company. *See, e.g., Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (plaintiffs sufficiently pled that defendants' multiple disclosures did not counterbalance defendants' misleading statements); *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 50 n.17 (D. Mass. 2006) (fact that defendants continued to publish optimistic assessments of the company's financial position was "akin to a statement that the reader need not worry much about the generic risk disclosures that appeared from time to time"); *DeMarco v. Lehman Bros., Inc.*, 309 F. Supp. 2d 631, 634 (S.D.N.Y. 2004) ("the very fact that, notwithstanding the skeptical language, the reports gave [the company] the highest possible 'buy' rating is tantamount to a statement that the reader of the reports should discount the skeptical language."). Thus, the 2006 10-Qs and the 8-K's filed in March and April 2007 did not convey the truth to investors or warn them that the Company could be in bankruptcy, but had the intended opposite effect. *See, e.g., In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (the court denied a motion to dismiss a 10b-5 case because, in the context where plaintiffs alleged widespread violation of trading restrictions, the alleged warning about risks of loss could have mislead investors into believing that defendants complied with NYSE restriction and therefore no risk was involved). Thus, Plaintiff has adequately pled loss causation.

## CONCLUSION

For the foregoing reasons, both of the Motions to Dismiss should be denied.[108]

---

[108] In the event either of the motions to dismiss are granted in whole or part, Plaintiff respectfully requests leave to amend. *See In re Moody's*, 599 F. Supp. 2d at 518 ("leave to amend should be granted liberally in cases alleging securities fraud").

Dated: August 21, 2009                    Respectfully submitted,

**BROWER PIVEN**
    A Professional Corporation

*/s/ David A.P. Brower*
David A.P. Brower
Jessica Sleater
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile: (212) 501-0300

**BROWER PIVEN**
  A Professional Corporation
Charles J. Piven
Yelena Trepetin
World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: (410) 332-0030
Facsimile: (410) 685-1300

*Lead Counsel for the Class and for Lead Plaintiff*
*David S. Lenington*

## **CERTIFICATE OF SERVICE**

I hereby certify that this Plaintiff's Memorandum In Opposition To Defendants' Motions To Dismiss The Consolidated Amended Class Action Complaint For Violations Of The Federal Securities Laws and the Declaration of David A.P. Brower In Support Of Plaintiff's Memorandum In Opposition To Defendants' Motions To Dismiss The Consolidated Amended Class Action Complaint For Violations Of The Federal Securities Laws with Exhibits A and B was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and electronically mailed to those indicated as non-registered participants on August 21, 2009.


 */s/  David A.P. Brower*
 David A.P. Brower

67