UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
THE PENNSYLVANIA AVENUE FUNDS,
individually and on behalf of all others similarly
situated,

                        Plaintiff,                    08 Civ. 6857 (PKC)

          -against-                   MEMORANDUM
                                                  <u>AND ORDER</u>

INYX INC., JACK KACHKAR, STEVEN
HANDLEY, RIMA GOLDSCHMIDT, JAY M.
GREEN and BERKOVITS & COMPANY LLP,

                       Defendants.
------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

          David Lennington, lead plaintiff, brings this action under sections 10(b) and 20(a)

of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a),

and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, on behalf of himself and all others who purchased

the securities of Inyx, Inc. ("Inyx"), between April 1, 2005 and July 2, 2007 (the "Class Period").

Inyx filed a motion to dismiss, as did three of its current or former officers, Jack Kachkar, Rima

Goldschmidt and Jay M. Green (the "Individual Moving Defendants").  Inyx's auditor, Berkovits

& Company LLP, formerly known as Berkovits, Lago & Company LLP ("Berkovits") filed a

separate motion to dismiss.  Defendant Steven Handley has not answered or otherwise appeared.

For the reasons stated below, Berkovits's motion to dismiss is granted and Inyx and the

Individual Moving Defendants' motion to dismiss is granted in part and denied in part.

BACKGROUND

I.  <u>Factual History</u>

The following allegations are taken from plaintiff's Consolidated Amended Class Action Complaint (the "Amended Complaint") and an Inyx public filing.  Inyx develops and manufactures pharmaceutical products.  (Am. Compl. ¶ 9.)  It conducts business through several wholly-owned subsidiaries in North America, Puerto Rico and the United Kingdom.  (<u>Id.</u> ¶¶ 31-32.)  These subsidiaries include Inyx USA, Ltd. ("Inyx USA"), Inyx Pharma Limited ("Inyx Pharma") and Inyx Europe Limited ("Inyx Europe") (<u>Id.</u> ¶ 9.)  Inyx Europe, in turn, owns Ashton Pharmaceuticals Limited ("Ashton") and Exaeris, Inc. ("Exaeris").  (<u>Id.</u>)

At all relevant times, defendant Jack Kachkar was the Chairman and Chief Executive Officer of Inyx.  (<u>Id.</u> ¶ 10.)  Defendant Steven Handley served as Inyx's President and a director from May 1, 2003, through the end of the Class Period.  (<u>Id.</u> ¶ 11.)  During the Class Period, defendant Rima Goldschmidt held various positions with Inyx, including Vice President of Finance, Treasurer, Corporate Secretary, Chief Financial Officer and Chief Accounting Officer.  (<u>Id.</u> ¶ 12.)  From December 1, 2003, through the end of the Class Period, defendant Jay M. Green was Inyx's Executive Vice President and its Director of Corporate Development.  (<u>Id.</u> ¶ 13.)

David Zinn joined Inyx on May 15, 2006, as its Principal Accounting Officer and Vice President of Finance.  (<u>Id.</u> ¶ 2.)  Zinn was named as a defendant in the original complaint filed in this action, but he is not named as a defendant in the Amended Complaint.  (Docket Nos. 1, 32.)

In early 2005, Inyx acquired a business located in Puerto Rico known as Manati. (Am. Compl. ¶ 32.)  To finance this purchase, Inyx entered into an asset-based loan agreement

with Westernbank Puerto Rico ("Westernbank") under which "Westernbank committed to making a $46 million asset-based loan to Inyx." (Id.) Subsequently, Inyx and Westernbank entered into additional loan agreements under which Westernbank ultimately loaned Inyx over $142 million (the "Loan Agreements"). (Id. ¶ 33.)

According to the terms of the Loan Agreements, "Westernbank agreed to provide lines of credit to Inyx that [it] could draw upon based on the percentage of its accounts receivable, evidenced by invoices, reports, and credit notes provided by Inyx to Westernbank." (Id.) The Loan Agreements also required "that Inyx direct its customers to make payments for accounts receivable to Westernbank controlled lock boxes, the proceeds of which would be partially used to pay down" Inyx's loan obligations.[1] (Id.) Finally, to withdraw funds under the Loan Agreements' lines of credit, "Inyx was required to submit information derived from and copies of accounts receivable invoices for each Inyx operating subsidiary to Westernbank on a daily basis." (Id. ¶ 36.) "Inyx was also required to provide Westernbank with monthly reports of the accounts receivable." (Id.) Based upon these documents, Inyx would be able to draw funds equal to "a certain percentage of eligible accounts receivable." (Id.) As discussed below, plaintiff alleges that during the Class Period, Inyx and certain individuals at Inyx, including the Individual Moving Defendants, engaged in a series of fraudulent schemes that were designed to allow Inyx to draw on the Loan Agreements' lines of credit.

David Zinn took over as Inyx's Vice President of Finance and Principal Accounting Officer on May 15, 2006. (Id. ¶ 2.) He replaced defendant Goldschmidt, who,

---

[1] According to the Amended Complaint, the Loan Agreements established a set of "lock box" accounts into which Inyx and its subsidiaries "were required to promptly deposit and direct their account debtors to directly remit all payments on receivables, including accounts and all payments constituting proceeds of inventory, equipment or other collateral in the identical form in which such payments [were] made." (Id. ¶ 56.) According to the terms of the Loan Agreements, all funds that were required to be deposited into a lock box account were the property of Westernbank. (Id.)

according to Zinn, defendant Berkovits had characterized as "incompetent." (Id. ¶ 154.) According to plaintiff, the first period for which "Zinn took active responsibility for the preparation and the filing of the Form 10-Q" was the third quarter of 2006. (Id. ¶ 156.) In familiarizing himself with Inyx's financial statements, "he became quickly concerned about numerous accounting issues" which were pre-existing, and of which Berkovits knew or should have known. (Id.)

Shortly thereafter, Inyx began disclosing that there were problems with some of its previously released financial information. On December 4, 2006, Inyx filed a Form 10-Q which addressed its financial performance for the quarter ended September 30, 2006. In that Form 10-Q, Inyx reported a total "stockholder's deficiency" (calculated by subtracting Inyx's total liabilities from its total assets), also known as a negative shareholder equity, of $38.9 million and a net loss $22.18 million for the first nine months of 2006. (Exhibit F to the Declaration of John H. Eickemeyer ("Eickemeyer Decl.") at F-2 – F-3.) In note 2 to the financial statements in that Form 10-Q – the "going concern" note – Inyx stated:

> As of September 30, 2006, the Company was in violation of certain financial covenants in connection with its Westernbank loan and security agreements. As it has previously done when requested so by the Company, Westernbank has waived, through December 15, 2006, certain requirements such that the Company's non-compliance with its covenants under such agreements has not resulted in an event of default by the Company. There can be no assurance the Company will meet such covenants in the future or that Westernbank will continue to grant such waivers.

(Id. at F-5.)

On February 19, 2007, Berkovits sent a letter to Joe Rotmil, the chairman of Inyx's audit committee. (Id. ¶ 161.) The letter "discussed pertinent, unresolved issues material to completion of Inyx's 2006 audit and its ability to file its Form 10-K by April 2, 2007." (Id.)

On March 16, 2007, Inyx filed a Form 12b-25 with the SEC, stating that it was unable to timely file its Form 10-K for the year ended December 31, 2006.  (Id. ¶ 170.)  On March 27, 2007, Inyx filed a Form 8-K with the SEC, stating that "management ha[d] identified internal control weaknesses," and that the company may be required "to restate its financial results for prior periods in 2006."  (Id. ¶ 175.)  Inyx also stated that "[a] restatement may result in lower revenues, a greater loss or an impairment of assets in 2006."  (Id.)

On April 6, 2007, Inyx filed a Form 8-K/A, stating that financial results for the first three quarters of 2006 would need to be restated, and further stating that the need for the restatement arose from "previously issued financial statements with respect to the Company's internal control over financial reporting, including, at a minimum, the revenue recognition policy for development revenue earned during 2006."  (Id. ¶ 178.)  On April 27, 2007, Inyx filed a second Form 8-K/A stating that it expected "revisions to its previously reported financial results to reflect a reduction in revenue and an increase in net loss of a minimum of approximately $1.8 million, $347,000 and $1.9 million for the first, second and third quarters of 2006, respectively, or an aggregate increase in net loss of a minimum of approximately $4.0 million of the nine month period ended September 30, 2006."  (Id. ¶ 182.)

Berkovits sent a second letter to Joe Rotmil on May 10, 2007, which stated that most of the open items mentioned in the February 19 letter had not been resolved, and noting that Inyx would be "delisted" if it were not able to file its Form 10-K by the May 18, 2007 deadline. (Id. ¶ 184.)  On Monday, July 2, 2007, two of Inyx's operating subsidiaries filed Chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware.  (Id. ¶ 188.)  That day, Inyx's stock price closed at $0.35 per share, down from its previous close of $2.44 per share on Friday, June 29, 2007.  (Id. ¶ 189.)  The next day, Inyx disclosed that on June 28, 2007,

Westernbank had caused a court-appointed administrator to take over three of its United

Kingdom operating subsidiaries.  (Id. ¶ 190.)  Berkovits resigned as Inyx's auditor on July 5,

2007, having never issued an audit opinion for Inyx's 2006 financial statements.  (Id. ¶ 192.)

    A.   The Scheme Allegations

          According to plaintiff, the bankruptcy of Inyx's two United States subsidiaries

was the result of several fraudulent schemes engaged in by defendants Kachkar, Goldschmidt,

Green and Handley (the "Individual Defendants"), along with Inyx itself, that were designed to

artificially inflate Inyx's revenues and accounts receivable, allowing it to draw additional funds

under the Loan Agreements.

        i.   Fraudulent Invoices

          According to the Amended Complaint, beginning as early as April 2005, Inyx and

the Individual Defendants would submit "duplicate, inaccurate, altered, and/or false invoices to

Westernbank" to increase the amount of money Inyx could draw under the Loan Agreements.

(Id. ¶ 37.)  For example, "certain of the sales invoices" that Inyx submitted to Westernbank in

support of the initial $46 million loan were "pre-billing" or "development" invoices.  (Id. ¶ 39.)

          In another example, during 2006, Inyx submitted to Westernbank a series of

invoices that bore the prefix number 7.  (Id. ¶¶ 41-43.)  These invoices, which totaled more than

£7 million, did not appear on Inyx's internal accounts receivable ledgers, and they were later

cancelled by Inyx.  (Id.)

          Inyx and the Individual Defendants also double billed for certain projects.

"[T]hey would cause Inyx to issue a single invoice for the total amount a customer would owe

once work on the project was completed," and they would send that invoice to Westernbank to

obtain additional financing under the Loan Agreements.  (Id. ¶ 44.)  "Subsequently," Inyx and

the Individual Defendants "issued additional invoices on the same account receivable that would

subdivide the amount owed under the original invoice." (Id. ¶ 45.)  These too, would be

submitted to Westernbank to increase the available financing.  (Id. ¶¶ 47-48.)  Later, Inyx would

issue a credit note to the customer cancelling the initial invoice.  (Id.)  Westernbank would not be

informed of the cancellation.  Although plaintiff alleges that the practice took place "throughout

2005 until June 2007," the only specific examples plaintiff has pled occurred in 2006 and 2007.

(Id. ¶¶ 46-48.)

      The Amended Complaint also alleges that Inyx and the Individual Defendants

"engaged in a practice involving the creation of invoices for so-called 'developmental work.'"

(Id. ¶ 49.)  Unlike Inyx's normal invoicing practice, which is to send invoices directly to

customers, these invoices were sent to defendant Handley.  (Id.)  According to plaintiff, most of

these invoices "were never submitted to customers," and the Individual Defendants "instructed

Inyx employees, including their credit department employees, not to pursue payment from the

customers named" on these invoices.  (Id.)  The invoices, however, were submitted to

Westernbank, allowing Inyx to receive additional financing under the Loan Agreements.  (Id. ¶

50.)

      Plaintiff alleges two specific examples of this conduct.  First, in or around

December 2005, "Inyx Pharma generated developmental invoices totaling £8 million for its

customer King Pharmaceuticals."  (Id. ¶ 51.)  These invoices were later cancelled by Inyx and

the Individual Defendants.  (Id.)  Plaintiff also alleges that similar conduct was used to inflate

revenue for a developmental project for a company called MEDA.  According to plaintiff, in a

"scheme" that "began around October 2005 and continued until June 2006," approximately £2.5

million in invoices were issued (plaintiff does not state by which entity) and were later cancelled on December 31, 2006.  (Id. ¶ 52.)

The final fraudulent "scheme" relating to invoices was alleged to have occurred in 2006.  According to plaintiff, the amounts due under certain invoices owed to Ashton, an indirect Inyx subsidiary, simply were inflated.  (Id. ¶¶ 53-55.)

　　　　ii.   Diversion of Accounts Receivable Payments

Plaintiff also alleges that Inyx and the Individual Defendants caused funds payable on accounts receivable that should have been deposited into lock box accounts at Westernbank to be deposited into bank accounts that were controlled by the Individual Defendants.  (Id. ¶¶ 57-72.)  According to the Amended Complaint, Inyx and the Individual Defendants "caused the diversions . . . to take place with the full knowledge that Inyx had previously submitted invoices to Westernbank for these accounts receivables [sic] to obtain financing under the Loan Agreements."  (Id. ¶ 57.)

For example, in or around February 2007, a customer sent a check to Inyx's offices and Zinn told defendant Goldschmidt that he was going to send the check to Westernbank.  Goldschmidt "told him not to send it because that would mess up everything." (Id.)  Plaintiff also alleges that defendants Handley and Kachkar directed that certain customers make payments to bank accounts controlled by Inyx or an Inyx subsidiary, instead of making those payments to the lock box accounts at Westernbank.  (Id. ¶¶ 63, 67-68.)  At one point, Inyx Europe's Vice President of Finance, Joseph Rose, told defendant Handley that "money being paid by UCB 'belongs to Westernbank and unless they have agreed to the money going to the Inyx bank account in writing you cannot do this.'"  (Id. ¶ 71.)  Handley and Kachkar both misrepresented to Rose that, in fact, these diversions were permissible.  (Id.)

iii.  Offsets

Finally, plaintiff has alleged that Inyx and the Individual Defendants engaged in an "offset scheme" in which they caused customers to offset obligations owed by Inyx against accounts receivable that had been assigned to Westernbank and that should have been paid into the Westernbank lock box accounts.  (Id. ¶¶ 73-81.)  According to the Amended Complaint, this practice began in or around August 2005.  (Id. ¶ 81.)

B.  The Public Statements Allegations

i.  Inyx and the Individual Defendants

Plaintiff alleges that from March 31, 2005 through April 6, 2007, while these fraudulent schemes were taking place, Inyx and the Individual Defendants, made approximately 30 separate statements that were false or misleading.  Two of the statements relate to Inyx's acquisition of Manati.  (Id. ¶¶ 96, 100.)  Two are about the Westernbank financing used to fund that purchase.  (Id. ¶¶ 97, 101.)  Most of the allegedly false statements consist of financial reporting in Inyx's annual and quarterly statements and their accompanying press releases.  (Id. ¶¶ 104-105, 107-108, 111-113, 115-117, 123-124, 126-128, 130-132, 135-137, 140-142, 147-150, 175, 178, 181-182, 232-233, 242-244.)  Finally, four of the statements are press releases regarding a potential "going private" transaction.  (Id. ¶¶ 145, 152, 171-173.)

Each category of misstatements is discussed below.  Although the majority of the misstatements are alleged to be materially false and misleading because they omitted material information, plaintiff alleges that some were misleading because they misrepresented certain facts.  Generally, however, plaintiff alleges that the statements did not disclose that Inyx's revenues and accounts receivable were artificially inflated because certain individuals were submitting duplicate, inaccurate or fictitious invoices, Inyx was violating generally accepted

accounting practices ("GAAP") and its internal accounting policies by improperly recognizing certain items as revenue, and that Inyx's lack of legitimate internal controls rendered its financial reporting inaccurate and misleading.

ii.  Berkovits

On April 15, 2005, Inyx filed its Form 10-K for the year ending December 31, 2004.  (Id. ¶ 107.)  On March 31, 2006, Inyx filed its Form 10-K for the year ending December 31, 2005.  (Id. ¶ 130.)  Both of those documents contained audit opinions from Inyx's auditor, defendant Berkovits.  (Id. ¶¶ 254-255.)  In both of those opinions Berkovits stated that it conducted its audits in accordance with the standards set forth by the Public Company Accounting Oversight Board (the "PCAOB")[2] and stated that "the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Inyx, Inc . . . in conformity with accounting principles generally accepted in the United States."  (Id.)  Those opinions also stated that Berkovits was not engaged to perform an audit of Inyx's internal control over financial reporting and that Berkovits did not express an opinion on Inyx's internal controls.  (Id.)

II.  Procedural History

The Pennsylvania Avenue Funds filed its original class action complaint on July 31, 2008.  (Docket No. 1.)  Subsequently, three individuals and the Pennsylvania Avenue Funds filed motions seeking to have themselves named as lead plaintiff.  (Docket Nos. 10, 15, 18.)  On November 10, 2008, I issued an order appointing David S. Lennington as lead plaintiff and

---

[2] The PCAOB is a nonprofit corporation, established by the United States Congress "to oversee the audit of public companies that are subject to the securities laws, and related matters, in order to protect the interests of investors and further the public interest in the preparation of informative, accurate, and independent audit reports for companies the securities of which are sold to, and held by and for, public investors."  15 U.S.C. 7211(a).  One of its functions is to "establish or adopt, or both, by rule, auditing, quality control, ethics, independence, and other standards relating to the preparation of audit reports for issuers. . . ."  15 U.S.C. § 7211(c)(2).

appointing the law firm of Brower Piven as lead counsel for Mr. Lennington and the class.

(Docket No. 25.)

On March 10, 2009, plaintiff filed the Amended Complaint.  (Docket No. 32.)  On

June 19, 2009, Berkovits, Inyx and the Individual Moving Defendants moved to dismiss the

Amended Complaint.  (Docket Nos. 38, 45.)  The motions were fully briefed on September 25,

2009.  (Docket Nos. 54, 57, 60.)  I have since granted the motion of Butzel Long, P.C. to

withdraw as counsel for Inyx and the Individual Moving Defendants.  (Docket No. 75.)  Both

motions to dismiss were <u>sub judice</u> before Butzel Long withdrew and I will address them.

DISCUSSION

I.  <u>Legal Standard</u>

To survive a motion under Rule 12(b)(6), Fed. R. Civ. P., a complaint must

"contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"

<u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S.

544, 570 (2007)).  Plausibility is present "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

<u>Id.</u>  In analyzing a motion to dismiss a securities class action complaint, a court may consider

"any written instrument attached to the complaint, statements or documents incorporated into the

complaint by reference, legally required public disclosure documents filed with the SEC, and

documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."

<u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007).

A.  <u>Section 10(b) and Rule 10b-5 Claims</u>

"To state a claim under § 10(b) and Rule 10b-5, plaintiffs must allege that [a

defendant] '(1) made misstatements or omissions of material fact; (2) with scienter; (3) in

- 11 -

connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that

plaintiffs' reliance was the proximate cause of their injury.'" Lattanzio v. Deloitte & Touche

LLP, 476 F.3d 147, 153 (2d Cir. 2007) (quoting In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir.

1998)).  An omission or misstatement is material if a reasonable investor would view its

disclosure as "significantly alter[ing] the 'total mix' of information . . . available."  TSC Indust.

v. Northway, Inc., 426 U.S. 438, 449 (1976).

    Rule 9(b), Fed. R. Civ. P., requires that allegations of fraud be pled with

particularity.  To satisfy this requirement, the complaint must "(1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent."  Novak v. Kasaks,

216 F.3d 300, 306 (2d Cir. 2000) (quotation marks omitted).  In addition, the Private Securities

Litigation Reform Act of 1995 (the "PSLRA") requires a private litigant to "specify each

statement alleged to have been misleading, the reason or reasons why the statement is

misleading, and, if an allegation regarding the statement or omission is made on information and

belief, the complaint shall state with particularity all facts on which that belief is formed."  15

U.S.C. § 78u-4(b)(1).  The PSLRA also imposes a heightened scienter requirement that requires

plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant

acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

    The defendants argue that plaintiff has failed adequately to plead an actionable

misstatement or omission.  They also assert that the Amended Complaint fails to adequately

allege scienter or loss causation.

i.  <u>Misstatements</u>

1.  <u>Inyx and the Individual Moving Defendants</u>

Plaintiff has alleged that approximately 30 separate statements by Inyx or the Individual Moving Defendants were false or misleading.  There are several statements for which plaintiff has not pled the alleged fraud with the requisite particularity.  Plaintiff quotes from a November 24, 2006 Inyx press release which states that a group of Inyx's "senior management and strategic outside investors" approached the board of directors about taking Inyx private.  (<u>Id.</u> ¶ 145)  The press release also stated that defendant Kachkar had "informed the special committee that he [would] work to secure new debt financing for Inyx before the group tries to finalize financing for any going-private offer."  (<u>Id.</u>)  Plaintiff alleges that this statement was "proven false after due diligence by Westernbank."  (<u>Id.</u> ¶ 146(a).)  Likewise, plaintiff claims that the statements contained in Inyx press releases dated January 25, 2007, March 19, 2007, and March 26, 2007, all of which relate to the going-private transaction, were "proven false" by Westernbank.  (<u>Id.</u> ¶¶ 152-153, 171-172, 174.)  These conclusory allegations of falsity do not satisfy Rule 9(b)'s particularity requirement because they do not set forth any facts showing why or how the statements were false, beyond the fact that no "going-private" transaction materialized.  Therefore, these allegations cannot form the basis of a claim under section 10(b) or Rule 10b-5.

The remainder of the statements contained in the January 25, 2007 press release relate to Inyx's potential acquisition of a United Kingdom company, and Inyx's intention to repay the Westernbank Loan Agreements.  (<u>Id.</u> ¶ 152.)  Likewise, the remainder of the March 19, 2007 press release addresses Inyx's intention to repay the Westernbank loan.  (<u>Id.</u> ¶ 171.)  The remainder of the March 26, 2007 press release contains statements about the Inyx senior

management group's intention to provide funding for Inyx to repay Westernbank.  (Id. ¶ 172.)
Plaintiff alleges that these statements were false because the statements did not disclose that
Inyx's revenues and accounts receivable were artificially inflated due to certain individuals
submitting duplicate, inaccurate or fictitious invoices, they did not disclose that Inyx was
violating GAAP and its internal accounting policies by misrepresenting its ability to collect cash
and by improperly recognizing certain items as revenue, and the statements did not disclose that
Inyx's lack of legitimate internal controls rendered its financial reporting inaccurate and
misleading.  (Id. ¶¶ 153, 174.)  None of the quoted statements in these press releases, however,
relate to Inyx's financial results, its accounting practices or its internal controls.  Therefore, the
claims against the Individual Moving Defendants are also dismissed with respect to claims
arising out of the statements contained in the press releases dated January 25, 2007, March 19,
2007, and March 26, 2007.  For the same reason, the claims against the Individual Moving
Defendants arising out of the statements regarding the going-private transaction that are
contained in the press release dated November 24, 2006, are dismissed as well.

Another category of statements consists of press releases and SEC filings
announcing Inyx's financial results and containing statements regarding Inyx's internal controls,
revenue recognition policies and opinions by management that Inyx's financial statements fairly
presented its financial position.  (Id. ¶¶ 104-105, 107-108, 111-113, 115-117, 123-124, 126-128,
130-132, 135-137, 140-142, 147-150, 175, 178, 181-182, 232-233, 242-244.)  As with the
statements just discussed, plaintiff alleges these statements are false because they did not
disclose that Inyx's revenues were, in part, products of false or fraudulent invoices, that Inyx was
violating GAAP and its own accounting standards and that Inyx did not have legitimate internal
controls over its financial reporting, which rendered the financial reporting inaccurate.  (Id. ¶¶

114, 118, 125, 129, 131, 135, 138, 143, 151, 232-233, 242-244.)  Plaintiff has sufficiently

alleged particular facts to show that, beginning in August 2005, certain individuals at Inyx

created false invoices that artificially inflated Inyx's revenue, that Inyx's financial statements

violated GAAP and that it had internal control deficiencies.  Therefore, plaintiff has sufficiently

pled that these were material misstatements or that the statements contained material omissions.

        Inyx's three SEC filings from March and April 2007, did disclose that

management had identified internal control weaknesses, that there would have to be a

restatement of earnings for the first three quarters of 2006, and that these problems "arose from

previously issued financial statements with respect to [Inyx's] internal control over financial

reporting, including, at a minimum, the revenue recognition policy for development revenue

earned during 2006."  (Id. ¶ 175, 178, 182 (emphasis omitted).)  The statements, however, did

not disclose that Inyx's revenue had been inflated by fraudulent or duplicative invoices.  Plaintiff

has adequately alleged that these were material misstatements or that the statements contained

material omissions.

        Another category of alleged misstatements concerns the acquisition of Manati and

Inyx's financing from Westernbank.  The first of these statements, a press release dated March

31, 2005, states that Inyx had "completed its acquisition of certain assets and business of Aventis

Pharmaceuticals Puerto Rico Inc. from Aventis Pharmaceuticals, Inc.," and that the

"approximate $19.7 million acquisition price was financed through non-dilutive, asset-based

funding provided by" Westernbank.  (Id. ¶ 96.)  Another press release, dated that same day,

announced the terms of the Westernbank financing.  (Id. ¶ 97.)  A Form 8-K, dated April 6,

2005, set forth the terms of the Manati acquisition, and another Form 8-K filed on the same day

set forth the terms of the Westernbank financing.  (Id. ¶¶ 100-101.)  Plaintiff again alleges that

these statements were misleading because they did not disclose that Inyx's revenues were partly a product of false or fraudulent invoices, that Inyx was violating GAAP and its own accounting standard and that Inyx's internal controls over its financial reporting were deficient.  (Id. ¶ 102.) In addition, plaintiff alleges that these statements were false because "even prior to signing the [first Westernbank financing agreement] . . . the Inyx Defendants began planning the fraudulent conduct alleged . . . to access additional funds from Westernbank."  (Id.)  These statements, however, did not mention Inyx's revenues or accounts receivable, its accounting practices or revenue recognition policy, its internal controls or its financial statements.  And, plaintiff has not alleged any facts that support the conclusory allegation that the Inyx Defendants had already begun planning their fraudulent conduct when the statements were made.  Nor does plaintiff allege facts to show how Inyx and the Individual Moving Defendants' plan to defraud Westernbank would have rendered these statements false or misleading.  Therefore, the claims against Inyx and the Individual Moving Defendants that are based on these statements fail to state a claim.

Similarly, plaintiff alleges that an August 26, 2005 press release about Inyx's acquisition of a company based in Ashton, England was misleading for not disclosing the invoicing scheme used to wrongfully obtain funding from Westernbank.  (Id. ¶¶ 119-120.)  The quoted portions of this press release generally state that the acquisition was expected to increase Inyx's revenue, but the press release does not contain any statements about Inyx's current revenues or their sources.  The press release did not address Inyx's accounting or revenue recognition policies, or its internal controls.  Therefore, plaintiff has failed to plead facts showing why this statement was materially misleading or omitted material information.

The quoted statements in paragraphs 104, 107 and 108 of the Amended Complaint are alleged to have been misleading for the same reasons as many of the other statements: they did not disclose that Inyx's revenues were, in part, products of false or fraudulent invoices, that Inyx was violating GAAP and its own accounting standard and that Inyx did not have legitimate internal controls over its financial reporting, which rendered the financial reporting inaccurate. These statements, however, address Inyx's financial performance in 2004. (Id. ¶¶ 104, 107-108.) Plaintiff has not alleged that the fraudulent schemes occurred before 2005. Therefore, the statements in paragraphs 104, 107 and 108 cannot form the basis for plaintiff's section 10(b) and Rule 10b-5 claims. Paragraph 105 does contain a statement about plaintiff's revenue projections for 2005. (Id. ¶ 105.) However, because the statement was made in April 2005, and there are no particularized allegations showing that the various fraudulent schemes had begun at that point, paragraph 105 cannot form the basis of plaintiff's claims.

### 2.  Identity of the Speaker

Plaintiff is required to identify the person who made the statements he claims were misleading. Some of the allegedly misleading statements identify an individual as the speaker. (E.g., id. ¶¶ 115, 126.) Most, however, are more general and attribute the statements to Inyx or the "Inyx Defendants," (e.g., id. ¶¶ 127, 128, 141), which is defined as the aggregate of Inyx and defendants Kachkar, Handley, Goldschmidt and Green. (Id. ¶ 1.) Although plaintiff has not explicitly stated, it appears that he is relying on the "group pleading doctrine" in making these allegations.

The group pleading doctrine allows plaintiffs, "for pleading purposes only, to 'rely on a presumption that . . . press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the

company.  This allows plaintiffs, to a limited extent, to circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent.'"  In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (quoting In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d 15, 22 n.26 (S.D.N.Y. 2004)).  The group pleading doctrine is only available against a defendant if the plaintiff has "alleged facts indicating that the defendant was a corporate insider or affiliate with direct involvement in the daily affairs of the company."  Id. at 440-41.[3]

According to the Amended Complaint, defendant Kachkar was an officer and director of Inyx throughout the Class Period, and served as its Chairman and Chief Executive Officer.  (Am. Compl. ¶ 10.)  Defendant Goldschmidt was an officer of Inyx throughout the Class Period and she held the positions of Chief Financial Officer and Chief Accounting Officer. (Id. ¶ 12.)  Defendant Green was Inyx's Executive Vice President and Director of Corporate Development throughout the Class Period.  (Id. ¶ 13.)  All three defendants, therefore, fall within the purview of the group pleading doctrine because, "[b]y virtue of their high level positions at the Company throughout the Class Period, the Court is bound to infer at this stage that all three had direct involvement in" Inyx's day-to-day affairs.  In re BISYS Sec. Litig., 397 F. Supp. 2d at 441 (applying the group pleading doctrine to a company's former CEO and two executive vice presidents); 380544 Canada, Inc. v. Aspen Tech., Inc., 544 F. Supp. 2d 199, 218-19 (S.D.N.Y. 2008) (applying group pleading doctrine to a company's CEO, its CFO and its Executive Vice

---

[3] I recognize that whether the PSLRA has abrogated the group pleading doctrine is an open question in this Circuit, and that some courts, including the Fifth Circuit, have held that it has.  Southland Sec. Corp. v. INSpire Ins. Solutions Inc., 365 F.3d 353 (5th Cir. 2004).  The majority of judges in this district who have addressed the issue have concluded that the group pleading doctrine has survived the PSLRA.  In re BISYS Sec. Litig., 397 F. Supp. 2d at 439 n. 42 (collecting cases).  While I reserve the ability to revisit the issue at the summary judgment or trial phase, for the purposes of this motion, I accept the conclusion that the group pleading doctrine has some continued viability.  See, e.g., In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 641-42 (S.D.N.Y. 2007) (stating that there is no "apparent contradiction between the idea that each defendant's role must be pled with particularity and the fact that corporate officers may work as a group to produce particular document[s]").

President of Worldwide Sales).  Therefore, plaintiff has properly pled that Inyx and defendants Kachkar, Goldschmidt and Green made the alleged misstatements.

3.  <u>Berkovits</u>

"[T]o state a § 10(b) claim against an issuer's accountant, a plaintiff must allege a misstatement that is attributed to the accountant 'at the time of its dissemination,' and cannot rely on the accountant's alleged assistance in the drafting or compilation of a filing."  <u>Lattanzio</u>, 163 F.3d at 153.  The only statements made during the Class Period that are attributable to Berkovits are contained in its 2004 and 2005 audit opinions, which were included in the Form 10-Ks for those years.

In those opinions, Berkovits stated that "the consolidated financial statements [of Inyx] present fairly, in all material respects, the consolidated financial position of Inyx, Inc. . . . in conformity with accounting principles generally accepted in the United States," and that Berkovits conducted its audit "in accordance with the standards of the [PCAOB]."  (<u>Id.</u> ¶¶ 254-55.)  According to plaintiff, these statements were false because Inyx's financial statements violated GAAP and its audits violated the PCAOB's standards which incorporate generally accepted auditing standards ("GAAS").  Auditing Standard AU § 150.01 ("An independent auditor plans, conducts, and reports the results of an audit in accordance with generally accepted auditing standards.").

According to plaintiff, Inyx's financial statements violated GAAP in three ways.  First, by "improperly accelerating development revenues by approximately $4 million during the nine months ended September 30, 2006, thus providing a misleading impression of the Company's results of operations for the present period."  (<u>Id.</u> ¶ 207(a)).  This allegation does not state a claim against Berkovits, because Berkovits did not issue an audit opinion for 2006.

The two remaining reasons plaintiff alleges Inyx's financial statements violated GAAP are that Inyx improperly recorded "revenues of approximately $74 million as a result of fraudulent invoicing" (id. ¶ 207(b)), and "improperly overstat[ed] accounts receivable and understate[ed] bad debt expense, as a result of recognizing accelerated developing revenues and recording fraudulent invoices."  (Id. ¶ 207(c).)  In support of these claims, plaintiff alleges that in 2005, Inyx or Inyx subsidiaries generated over £10 million of invoices for two specific developmental projects – King Pharmaceuticals and MEDA – which were recognized as revenue, and that these invoices were later cancelled.  (Id. ¶¶ 51-52.)  A close review of the remainder of the Amended Complaint reveals that even though plaintiff alleges in a conclusory fashion that fraudulent invoice schemes began as early as April 2005 (id. ¶ 37), all of the remaining particularized factual allegations concerning the fraudulent, duplicative or inflated invoices only relate to the period after 2005.  (Id. ¶¶ 43, 47-48, 54-55.)  The fact that most of the particularized allegations occurred during a year for which Berkovits did not issue an opinion is important in the evaluating its scienter.  But, in evaluating whether or not plaintiff has adequately pled that Berkovits's 2005 audit opinion was misleading because Inyx's 2005 financial statements did not comply with GAAP, plaintiff's particularized factual allegations, although few, are sufficient.

In addition, plaintiff also alleges that the 2004 and 2005 audit opinions were not performed in accordance with GAAS.  (Id. ¶ 253.)  Plaintiff identifies ten auditing standards he alleges that Berkovits violated.  (Id. ¶ 257(a)-(j).)  Although most of those allegations are conclusory, two are not.  Plaintiff alleges that Berkovits violated GAAS Standard of Reporting No. 1 when it "falsely represented that Inyx's 2004 and 2005 financial statements were presented in conformity with GAAP."  (Am. Comp. ¶ 257(e).)  As discussed above, plaintiff has alleged

facts showing that the 2005 financial statements did not conform to GAAP.  Plaintiff also alleges

that Inyx violated GAAS General Standard No. 2 because its independence was compromised

due to the fact that Inyx represented 20% to 30% of Berkovits's fees and was a significant

portion of the audit partner, Jesus Lago's, book of business.  (Id. ¶¶ 161, 257(g).)  Taking these

allegations as true, as I must on a motion to dismiss, I conclude that plaintiff has adequately pled

that Berkovits's 2004 and 2005 audit opinions contained misstatements.

      ii.  <u>Scienter</u>

      1.  <u>Inyx and the Individual Defendants</u>

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-

4(b)(2).  "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter,

the court must take into account plausible opposing inferences."  <u>Tellabs, Inc. v. Makor Issues &</u>

<u>Rights, Ltd.</u>, 551 U.S. 308, 323 (2007).  "A complaint will survive . . . only if a reasonable

person would deem the inference of scienter cogent and at least as compelling as any opposing

inference one could draw from the facts alleged."  <u>Id.</u> at 324.  A plaintiff may demonstrate this

by alleging facts "(1) showing that the defendants had both motive and opportunity to commit

the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or

recklessness."  <u>ATSI Commc'ns</u>, 493 F.3d at 99.

The Amended Complaint alleges conscious misbehavior in the form of a series of

fraudulent activities, such as the diversion of money from lock box accounts into other accounts

and the improper offsetting of certain expenses.  However, in most of these allegations plaintiff

alleges that the "Inyx Defendants" were responsible.  "Inyx Defendants" is a defined term in the

Amended Complaint that refers to defendants Kachkar, Handley, Goldschmidt, Green and Inyx,

Inc., collectively.  This type of "group pleading" of scienter – as distinguished from collective authorship of a statement – runs afoul of the PSLRA's requirement that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added).

Only a few allegations mention Kachkar, Goldschmidt or Green.  For example, plaintiff alleges that "invoices and accounts receivable reports submitted by the Inyx Defendants were fraudulent and created by defendant Goldschmidt at the direction of defendants Kachkar, Handley, and Green."  (Am. Compl. ¶ 36.)  This single allegation, if it were taken in isolation, may be insufficient to allege fraud with particularity.  But, courts must "assess all allegations holistically" to determine whether they satisfy the PSLRA's "strong inference" requirement. Tellabs, 551 U.S. at 326.  This general allegation against the defendants is followed by a section in which plaintiff alleges that specific invoices issued in 2006 and early 2007 were fraudulent or duplicative of invoices that had already been submitted to Westernbank, and were submitted to increase the amount of funding available to Inyx under the Loan Agreements.  (Am. Compl. ¶¶ 41-48, 54-55.)  In addition, the plaintiff alleges that defendants Kachkar and Handley directed defendant Goldschmidt "to create and execute the fraudulent invoicing."  (Id. ¶ 266.)  Plaintiff also alleges that defendant Kachkar sent an email to defendant Handley stating: "What we say to WB and what we do are two different things."  (Id.)

The Amended Complaint also alleges that defendants Goldschmidt and Green were involved with the Westernbank financing and that defendant Goldschmidt was "directly involved in . . . the payments Inyx received from [its] customers."  (Id. ¶ 268.)  Finally, according to the Amended Complaint, approximately $1 million of funds were diverted from Westernbank and "delivered directly to defendant Kachkar and portion of the additional million

of dollars [sic] diverted by the Individual Defendants from Westernbank to Inyx was used to pay

the Individual Defendants' personal compensations."   (Id. ¶ 269.)   At this stage, taking these

allegations as true, plaintiff has adequately pled facts that show a strong inference that

defendants Kachkar, Goldschmidt and Green knew of the fraudulent schemes at Inyx, and thus,

knew that the public statements they made regarding Inyx's revenues, accounts receivable,

accounting policies and internal controls were materially false and misleading.   Such conscious

misbehavior satisfies the PSLRA's scienter requirement.

   "To prove liability against a corporation . . . a plaintiff must prove that an agent of

the corporation committed a culpable act with the requisite scienter, and that the act (and

accompanying mental state) are attributable to the corporation."   Teamsters Local 445 Freight

Division Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 195 (2d Cir. 2008).   Plaintiff has

alleged facts showing that Kachkar, Green, Handley and Goldschmidt – all agents of Inyx –

committed acts with the requisite scienter and that these acts are attributable to Inyx.

       2. Berkovits

   Plaintiff does not allege that Berkovits actually knew of any fraud that occurred

during 2004 or 2005, and he does not allege that Berkovits had the motive and opportunity to

commit fraud.   Instead, he alleges that Berkovits was reckless.   "For recklessness on the part of a

non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct

that is highly unreasonable, representing an extreme departure from the standards of ordinary

care.   It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the

audited company."   Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000) (quotation marks

omitted).

Recognizing that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim," Novak, 216 F.3d at 309, plaintiff points to several facts which he claims support a strong inference of highly unreasonable conduct on Berkovits's part.  First, plaintiff alleges that once Zinn, who joined Inyx in May 2006 as its Principal Accounting Officer and Vice President of Finance, began looking into Inyx's internal financial documents, "he became quickly concerned about numerous accounting issues that made him question the Company's accounting and financial controls."  (Am. Compl. ¶ 156.)  According to the Amended Complaint, most of these concerns "related to pre-existing issues that Berkovits knew or should have known about, including revenue recognition problems."  (Id.)  Plaintiff does not specify whether these "pre-existing issues" dated back to 2005, or were limited to 2006.  (Id.)

The Amended Complaint does allege that "Berkovits was or should have been aware of the deficiencies and weaknesses in internal controls in the prior years in which Berkovits provided unqualified audit opinions."  (Id. ¶ 161.)  The Berkovits audit opinions specifically stated that Berkovits was not "engaged to perform[] an audit of [Inyx's] internal control over financial reporting," and that Berkovits's "audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate for the circumstances, but not for the purpose of expressing an opinion on the effectiveness of [Inyx's] internal control over financial reporting.  Accordingly, we do not express such an opinion."  (Id. ¶¶ 254-55.)  By refraining from expressing an opinion in areas in which it did not conduct a full audit, Berkovits did not act in a reckless or highly unreasonable manner.

Plaintiff urges that the size of the alleged fraud – he estimates that Inyx overstated its assets and revenue by more than $100 million during the Class Period – supports an inference

of recklessness on the part of Berkovits.  (Id. ¶ 195.)  Plaintiff also relies on a claimed lack of

independence from Inyx on the part of Berkovits.  (Id. ¶¶ 15 ,161.)  In addition, plaintiff argues

that the fact Jesus Lago, the Berkovits partner in charge of Inyx's audit, left his firm after

Berkovits resigned as auditor, supports an inference of scienter.  (Id. ¶ 15.)

   Finally, plaintiff argues that Berkovits ignored a number of red flags in

performing its audits.  For example, plaintiff alleges that Inyx kept two sets of books.  (Id. ¶¶ 82-

85.)  But, plaintiff does not allege for which years Inyx kept two sets of books and the only

particularized examples alleged in the Amended Complaint post-date 2005.  (Id.)  Plaintiff does

not allege how Berkovits could or should have known about the two sets of books.  In addition,

plaintiff alleges that $1.4 million worth of equipment listed on Inyx's balance sheet did not

appear to be worth that amount and that "Berkovits repeatedly complained that defendant

Goldschmidt was not competent" but, "it took no action to remedy the situation and purported to

rely upon defendant Goldschmidt notwithstanding Berkovit's [sic] lack of confidence in her

abilities and her failure to provide timely or complete accurate financial or accounting

information when requested by Berkovits."  (Id. ¶ 156.)

   These facts are balanced by others alleged in the Amended Complaint that tend to

show Berkovits did not have the requisite level of scienter.  Importantly, most of the alleged

fraudulent activity occurred in 2006 and 2007, years for which Berkovits did not issue an audit

report.  Berkovits sent two letters to the chairman of Inyx's audit committee stating that it was

concerned about several open items and it could not perform the 2006 audit without the

information.  (Id. ¶¶ 161, 184.)  In addition, the only restatements of Inyx's financial statements

that plaintiff has pled were for quarters in 2006, quarters for which Berkovits did not issue an

audit opinion.  (Id. ¶ 178.)  Berkovits resigned from its position as Inyx's auditor, although it did

so after Inyx's subsidiaries had filed for bankruptcy protection.  (Id. ¶ 192.)

   Taking plaintiff's allegations as true, he has failed to plead facts that allow a

reasonable person to draw an inference of scienter that is "at least as compelling as any opposing

inference one could draw from the facts alleged."  Tellabs, Inc., 551 U.S. at 324.  Many of the

facts pressed by plaintiff do not bear upon Berkovits's state of mind, and the rest of the

allegations, at most, indicate that Berkovits acted negligently in its 2004 and 2005 audits.

Negligence is not actionable under section 10(b) or Rule 10b-5.  Herman & MacLean v.

Huddleston, 459 U.S. 375, 383 (1983) ("actions under Section 10(b) require proof of scienter and

do not encompass negligent conduct") (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 208-10

(1976)).  Because plaintiff has not adequately plead facts showing that Berkovits's actions

"approximate[d] an actual intent to aid in the fraud being perpetrated by" Inyx, his claims against

Berkovits are dismissed.

   iii. Loss Causation

   A plaintiff alleging a violation of section 10(b) or Rule 10b-5 must allege both

transactional and loss causation.  Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 172 (2d Cir.

2005).  The Individual Moving Defendants challenged plaintiff's allegations of loss causation.

"Loss causation 'is the causal link between the alleged misconduct and the economic harm

ultimately suffered by the plaintiff.'"  Id. (quoting Emergent Capital Investment Management,

LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003).  "[T]o establish loss causation,

a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of

the actual loss suffered, i.e., that the misstatement or omission concealed something from the

market that, when disclosed, negatively affected the value of the security."  Id. at 173 (quotation

marks and internal citation omitted).  Thus, a plaintiff must plead "both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk."  Id. at 173.

      Plaintiff alleges that "on July 2, 2007, after the market opened, news services carried a report that Inyx USA and Exaeris, two of Inyx's U.S. subsidiaries, had filed for Chapter 11 protection in the U.S. Bankruptcy Court for the District of Delaware."  (Am. Compl. ¶ 188.) "In response to this announcement, the price of Inyx common stock plummeted, falling from $2.44 per share on June 29, 2007 to a close of $0.35 per share on July 2, 2007."  (Id. ¶ 189.)

      The Individual Moving Defendants argue that this risk was disclosed in Inyx's Form 10-Q for the quarter ending September 30, 2006, filed with the SEC on December 4, 2006. In that Form 10-Q, Inyx reported a total "stockholder's deficiency" of $38.9 million and a net loss $22.18 million for the first nine months of 2006.  (Eickemeyer Decl. Exh. F at F-2 – F-3.) Note 2 of to the financial statements disclosed that Inyx had violated certain of the Loan Agreements' financial covenants, and that Westernbank had waived noncompliance with the covenants through December 15, 2006, preventing a default.  (Id. at F-5.)  According to the Amended Complaint, this announcement "cast[] doubt on [Inyx's] ability to continue as a 'going concern.'"  (Am. Compl. ¶ 148.)

      On March 16, 2007, Inyx filed a Form 12b-25 with the SEC, stating that it was unable to timely file its Form 10-K for the year ended December 31, 2006.  (Id. ¶ 170.)  On March 27, 2007, Inyx filed a Form 8-K with the SEC, stating that "management ha[d] identified internal control weaknesses," and that Inyx may be required "to restate its financial results for prior periods in 2006."  (Id. ¶ 175.)  Inyx also stated that "[a] restatement may result in lower revenues, a greater loss or an impairment of assets in 2006."  (Id.)

On April 6, 2007, Inyx filed a Form 8-K/A, stating that financial results for the first three quarters of 2006 would need to be restated.  (Id. ¶ 178.)  On April 27, 2007, Inyx filed another Form 8-K/A stating that it expected "revisions to its previously reported financial results to reflect a reduction in revenue and an increase in net loss of a minimum of . . .  approximately $4.0 million of the first nine month period ended September 30, 2006."  (Id. ¶ 182.)

Although these documents depict a worsening financial situation at Inyx, and disclosed that Inyx had in fact violated certain covenants of the Westernbank Loan Agreements, I cannot say, at this stage, that the risk of Inyx's subsidiaries seeking bankruptcy protection because of fraudulent practices at Inyx, was unconcealed.  Therefore, plaintiff has successfully pled loss causation as to Inyx and the Individual Moving Defendants.

B.  Section 20(a) Claim

Count II of the Amended Complaint alleges that the Individual Moving Defendants are separately liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  To establish a prima facie case of control person liability under § 20(a), a plaintiff must show "(1) a primary violation by a controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  ATSI Commc'ns, 493 F.3d at 108.  "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting SEC Rule 12b-2, 17 C.F.R. § 240.12b-2).

As detailed above, a primary violation by Inyx has been properly alleged.  The Individual Moving Defendants do not argue that they are not control persons.  And, because the

Amended Complaint successfully pleads section 10(b) and Rule 10b-5 violations by the Individual Moving Defendants themselves, plaintiff has adequately pled that the Individual Moving Defendants are "in some meaningful sense a culpable participant in the primary violation."

## CONCLUSION

For the reasons stated above, defendant Berkovits's motion to dismiss (Docket No. 38), is GRANTED. Inyx and the Individual Moving Defendants' motion to dismiss (Docket No. 45) is granted in part and denied in part, in accordance with the following:

- the motion is GRANTED with respect to plaintiff's claims arising out of the statements quoted in paragraphs 96, 97, 100-102, 104, 105, 107, 108, 119, 120, 152, 171, 172, 174, and

- the motion is GRANTED with respect to the statement regarding the going-private transaction contained in paragraph 145, but DENIED with respect to the statements alleged in the remainder of that paragraph, and

- the motion is DENIED with respect to plaintiff's claims arising out of the statements alleged in paragraphs ¶¶ 111-113, 115-117, 123-124, 126-128, 130-132, 135-137, 140-142, 147-150, 175, 178, 181-182, 232-233, 242-244.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 1, 2010