# Exhibit 11

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

WESTERNBANK PUERTO RICO,

        Plaintiff,

vs.

JACK KACHKAR, STEVEN HANDLEY,
COLIN HUNTER, JAY M. GREEN,
RIMA GOLDSHMIDT, VIKTORIA
BENKOVITCH, and INYX, INC.,

        Defendants.

CASE NO. 07-Civ 1606 (ADC)

_____/

## DECLARATION OF JACK KACHKAR
### (28 U.S.C. § 1746)

    1.    I am over the age of 18 years old and a defendant in the above-captioned action. Since April 2003, I have held the position of Chairman and Chief Executive Officer of Defendant Inyx, Inc. ("Inyx").

    2.    I submit this declaration in further support of my opposition to Westernbank Puerto Rico's ("Westernbank") motion to freeze the assets of Inyx, my assets and my spouse's assets (the "Freeze Motion"). This declaration is submitted at this time to supplement my prior submissions based on information and documents that recently have become available to me, including documents disclosed by Westernbank within the past thirty (30) days.

    3.    This declaration details facts and attaches documents that confirm that Westernbank during the ordinary course of its business with Inyx was aware of the financial issues of which it now complains. I do not deny that there were issues with the Inyx loans; rather, I assert that these issues were raised and openly discussed with Westernbank, and resolved between the parties in the ordinary course of business. That is, during Inyx's borrowing relationship with

Westernbank, the loan covenant violations about which the bank now complains were discussed by the parties and waived by Westernbank as described below.

4.     Inyx is a publicly-owned company which, until the actions of Westernbank beginning in June 2007, was a multi-national pharmaceutical development and manufacturing company with operating subsidiaries in the United Kingdom, Canada and the United States.

5.     Except as alleged upon information and belief, the statements I make through this declaration are based upon personal knowledge and supported by the documents referenced herein.

6.     Inyx first became an asset-based borrower of Westernbank on March 31, 2005. From that point forward, the bank received significant interest and fees on its ever-increasing loans to Inyx.  Inyx was current on its principal and interest payments through July 3, 2007, the date on which Westernbank declared Inyx in default of the loan agreements.

7.     I was informed by Westernbank officials and believe that by the first quarter of 2007, the Inyx loans had grown to account for approximately 20% of the loan portfolio of Westernbank's Business Credit Division ("WBC") (the asset-based loan division of the bank) and generated significant income for the bank.

8.     Inyx's relationship with Westernbank changed dramatically in May 2007 when Westernbank breached the confidentiality of an agreement I had reached with a foreign businessman to provide financing to repay Westernbank and take Inyx private. Westernbank's breach of confidentiality caused the financier to refuse to proceed with the financing I had arranged to satisfy the Westernbank loans.   As a result of Westernbank's breach, Inyx was unable to consummate a financing deal for $335 million which would have enabled it to pay off

2

the amounts owed to Westernbank. Westernbank issued a formal written apology to Inyx on May 14, 2007. [*See* Exhibit "1" attached hereto].

9.   Westernbank relies on the affidavit of Jonathan Middup, a witness paid by Westernbank to offer evidence in support of the Freeze Motion. Mr. Middup has submitted to this Court a collection of random accounting records, invoices and e-mails he claims are indicative of wrongful accounting conduct by Inyx. My review of those documents made clear that Mr. Middup's documentation is incomplete. Furthermore, his conclusions are contradicted by public information and documentary evidence he either has overlooked or that Westernbank did not provide to him. Notably, Mr. Middup's affidavit acknowledges that he only looked at selected documents [*see* Middup Affidavit, par. 6]. In addition, Mr. Middup and Ernst & Young (through their counsel) have admitted that they took direction from Westernbank in conducting their investigation as administrators - - "[Westernbank] was advised of the Administrators' findings and *consulted as to the way forward*." [see December 31, 2007 letter from Ernst & Young's UK counsel to Inyx's counsel, attached hereto as Exhibit "2"].[1]

10.   To my knowledge, Mr. Middup never sought to interview me or obtain my assistance in discovering the facts and circumstances relating to the Inyx loans from Westernbank. As a result, Mr. Middup also misinterprets and misconstrues my correspondence with colleagues and others.

---

[1]   Indeed, in order to make the bank's case, Mr. Middup seems to have relied on speculation by those he (and Attorney Rachel Anthony) interrogated, *see* Mr. Middup/Ms. Anthony's July 5, 2007 interrogation of Joseph Rose (a former employee of Inyx's UK operations [*see* limited excerpts of Rose interrogation, as transmitted by Ernst & Young's UK counsel, attached hereto as Exhibit "3"], or on the impressions offered by his colleagues from other interrogations [*see* limited excerpts of 'meeting extracts' transmitted by Ernst & Young's UK counsel, attached hereto as Exhibit "4"]..

11.    Westernbank also relies on the affidavit of Mr. Juan Carlos Pavia Vidal, Auxiliary Vice President of WBC.  The statements in Mr. Pavia's affidavit also are contradicted by documentary evidence.

12.    Westernbank's history of familiarity with the "prebilling" development-invoicing and other asset-based lending issues related to the Inyx loans is confirmed by the reports of its independent UK field auditors in 2006. Charles Banister of P&A Lender Services (in the UK) was retained by Westernbank to conduct field audits of Inyx's United Kingdom operations starting in 2005.  As early as the first quarter of 2006, the Banister reports specifically identified customer invoicing issues and other asset-based lending collateral matters, including the timely payment of customer receipts into the Westernbank lockbox and customer payment set-offs against accounts receivable reports submitted to Westernbank.  [*See* March 2006 Banister audit report shared with me by Westernbank, and attached hereto as Exhibit "5"].   The October 19, 2006 Banister report , expressly stated:  "It is worth noting that all the key points (escalating AR ledger, concerns over fundability of the Development Invoices, Irregularities with cash allocation, Irregularities with VAT payment, Reporting Issues) have been mentioned at *previous audits*." [*see* Exhibit "6", page 4 of 5 (emphasis added)].

13.    The issue of "prebilling" on development projects became a topic of protracted discussion with Westernbank starting on or about March 13, 2006 -- *see* Exhibit "7" attached hereto -- fourteen (14) months *before* the date Westernbank now tells this Court and the public that it first became aware of these matters. [2]   This email and the annexed memorandum

---

[2] Exhibit 7 includes an e-mail from Gabriel Montanez to Jay Green which recently was produced by Westernbank (WBPR00024595). I was unable to locate the attached internal memorandum from Juan Pavia to Gabriel Montanez dated March 13, 2006 in Westernbank's recent production.

4

questioned Inyx's development invoicing to a major customer. Inyx provided a detailed response to the bank's questions the next day. [*See* Exhibit "8" attached hereto].[3]

14.    Discussions regarding Inyx's development invoicing became more frequent in August 2006 due to the increasing amount of ineligible receivables resulting from Inyx's growing pharmaceutical development business. Such ineligible receivables caused a collateral shortfall under the loan agreements and limited the availability of funds under the loan agreements' working capital lines. At or about that time, Westernbank representatives discussed altering the loan arrangements to extend the time period for which  the development invoices submitted by Inyx would be considered eligible [*See* Exhibit "9" attached hereto].

15.    On or about August 7, 2006, Inyx was provided with copies of internal Westernbank loan reports highlighting that, even after the release of a ten percent (10%) currency reserve, $10 million of the accounts receivable submitted by Inyx's UK operations' was ineligible collateral as of August 4, 2006. According to Westernbank, the collateral was ineligible because the attendant Inyx's development invoices were still outstanding more than 120 days old after issuance.   The bank provided copies of internal status reports and screen prints showing these amounts on or about August 7, 2006. Attached hereto as Exhibit "10" are the screen prints. Such documents also were *not* included in Westernbank's recent production of documents.

16.    In  or  about  August,  2006  and  continuing  thereafter,  Inyx  had  several communications,  including  in-person  meetings  and  telephone  conference  calls,  with

---

[3]    These documents were recently produced by Westernbank as WBPR00069504, WBPR00059117-120, WBPR00068846-47, WBPR00068855-56, WBPR00022390,WBPR00024596.

Westernbank officials regarding the development invoicing, "pre-billing" and collateral shortfall. [*See* Exhibit "11" attached hereto].[4]

17.     During such meetings and telephone conference calls, Inyx again informed Westernbank that many of its billings to customers were progress and milestone invoices that documented stages of completion of longer term product commercialization contracts that were not immediately collectible. . Inyx also informed Westernbank of existing funding requirements and the deficient collateral position under its asset-based loans. [*See* Exhibit "12" attached hereto].[5] Notwithstanding the disclosure Inyx made to Westernbank, I believe that the Boards of Directors of Westernbank and its parent company, W Holding Company Inc. ("WHI"), continued to approve funding to Inyx. [*See* Exhibit "12" attached hereto (WBPR00023902) regarding the upcoming September 5, 2006 Board meeting for approval of increased funding to Inyx, and Exhibit "13" attached hereto reflecting payments to Inyx under an increased line of credit, after Westernbank board approval].[6] On September 11, 2006, without regard to the collateral deficiency, Westernbank reported to Inyx that it intended to showcase Inyx in a local Puerto Rican newspaper as the type of financing offered by WBC. [*See* Exhibit "14" attached hereto]. These Westernbank e-mails were *not* found in Westernbank's recent production to us.

18.     Westernbank did not "call" the Inyx loans in response to the Banister audit concerns or after learning that Inyx's development invoicing had caused Inyx to be "out-of-formula" on its loans from Westernbank. Rather, Westernbank knowingly approved and advanced additional funds against ineligible receivables under the working capital line. To this end, it acknowledged

---

[4]  Many of the e-mails included in Exhibit 11 to and from Westernbank officials, were *not* found in Westernbank's recent production.
[5]   These documents recently were produced by Westernbank as WBPR00071056, WBPR00024938, WBPR00024228,-229, WBPR00023902-04, WBPR00023912, WBPR00060584-85.
[6]  These documents recently were produced by Westernbank as WBPR00022262-64, WBPR00032227, WBPR00015804-05, WBPR00015798-800, WBPR00038995-96.

the loan covenant breaches in writing and waived the resulting breaches in three (3) separate letters, dated March 31, 2006, August 11, 2006 and November 20, 2006 [*see* Exhibits "15","16" and "17" attached hereto]. These Westernbank-signed waiver letters were *not* found in Westernbank's recent production. Mr. Middup claims he was unable to discover a *signed* version of the November 2006 waiver letter despite his "full investigation", but I have attached it hereto as Exhibit 17. As noted above, Westernbank continued to loan additional money to Inyx after such waivers. To the best of my knowledge, the existence of these waiver letters and their effect on the viability of the Inyx loans never was disclosed in Westernbank's and WHI's regulatory filings.

19. On or about November 14, 2006, Mr. Miguel (Mike") Vazquez, the President of WBC, advised me by e-mail that the Inyx loan was chosen for review. [*See* Exhibit "26" attached hereto]. This Westernbank e-mail was *not* found in Westernbank's recent production.

20. On or about November 20, 2006, the bank issued a letter to Inyx acknowledging that $37.7 million in development invoices which had been included in the Inyx's borrowing base, were no longer eligible to borrow against [*see* Exhibit "18" attached hereto]. Mr. Middup's and Mr. Pavia's unsupported statements that Inyx's development invoices were being concealed from Westernbank are contradicted by, among other things, the documentary evidence noted herein.

21. As a publicly traded company, Inyx made regular disclosures in public filings with the Securities and Exchange Commission ("SEC") and related press releases between 2003 and 2007. Unlike Westernbank (and its holding company, WHI), *Inyx* in *its* public filings and reports disclosed the financial matters Westernbank now claims Inyx concealed from the bank. These Inyx public disclosures were provided directly to the bank and were publicly available on the

7

SEC website and Inyx's website. By way of example, on December 4, 2006, Mr. Jay Green emailed Inyx's publicly filed 2006 Third Quarter 10-Q report to Mr. Vazquez and Mr. Montanez (both Westernbank senior officers at the time) and requested that they also share it with their board of directors. [*See* Exhibit "19" attached hereto].[7]

22. Inyx's 2006 Third Quarter 10-Q disclosed that the $37.7 million in pre-billings on development projects (*i.e.*, current accounts receivable) were being written off Inyx's balance sheet and income statement to comply with U.S. GAAP ("Generally Accepted Accounting Principles"). [*See* Exhibit "20" attached hereto, p. F-10].[8] However, based on my review of their regulatory filings for the same reporting periods, Westernbank and WHI did not disclose this $37.7 million reduction in eligible collateral by Inyx or the effects of the reduction . [*See* excerpts from WHI's 10-Q filing for quarter ended September 30, 2006 attached as Exhibit "21" ,pages 46-67, WHI's 10-K filing for the year ended December 31, 2006 attached as Exhibit "22" pages 57 -66, and WHI's 10-Q filing for quarter ended March 31, 2007 attached as Exhibit "23" pages 51-57].[9] On or about June 26, 2007, WHI issued an 8-K Report with the SEC claiming that the bank's management recently discovered a large collateral shortfall in "one of its larger asset-based loans originated by its asset-based lending division". [*See* WHI's 8-K Report issued June 26, 2007, attached as Exhibit "24"]. As described above, if WHI was referring to the Inyx loans in its 8-K Report, this claim is incredible.[10]

---

[7] These documents recently were produced by Westernbank as WBPR00060459-531.

[8] These documents recently were produced by Westernbank as WBPR00060460,462,475.

[9] These filings acknowledge that in the case of Westernbank Business Credit Division loans, Westernbank's Senior Credit Committee's approval was required for all loans in excess of $15.0 million (*e.g.*, Inyx's loan), and that Westernbank's Board of Directors (many of whom also sat on Westernbank's Senior Credit Committee) also had to approve such loans.

[10] Similarly, in correspondence with NASDAQ, WHI has claimed that its management learned of problems with the Inyx loans in the spring of 2007 because of concealment by Inyx. [*See* WHI's letters to NASDAQ dated , attached hereto as Composite Exhibit "25" (produced by NASDAQ as "NASDAQ 0016-17, and 19-22)].

23.     Inyx's 2006 Third Quarter 10-Q also disclosed that on November 17, 2006, Westernbank had required my wife and me to give a $10 million personal guarantee to the bank regarding Inyx's loans on November 17, 2006. [*see* Exhibit "27" attached hereto]. That guarantee was required by the bank because of Inyx's disclosed collateral shortfall and continuing funding requirements, again confirming the bank's knowledge of the collateral shortfall back in 2006. However, Westernbank and WHI now have sought to cover-up their keen awareness of these publicly disclosed facts, by making false and defamatory statements in regulatory filings and through the media, and before this Court through the Middup and Pavia affidavits.

24.     Inyx's 2006 Third Quarter10-Q filing also disclosed that Inyx was in violation of certain financial covenants governing its loans, but that such breaches had been waived by Westernbank. In the same note, Inyx publicly disclosed that (Westernbank had approved and funded a $5 million line of credit which would permit Inyx to draw funds without the support of accounts receivable as collateral (the "SOFA" (Secured Over Formula Advance) line of credit). [*See* Exhibit "28" attached hereto, Note 1 at page F-14, 2nd ¶]. *Westernbank* urged Inyx to utilize funding under the SOFA line of credit to substitute for additional borrowing under the bank's main loan agreements with Inyx which was not available because of the collateral shortfall. [*See* Exhibit "29" attached hereto]. The March 31, 2006 letter from Westernbank's Senior Vice President Julia Fuentes to Inyx [included in Exhibit "29"], which confirmed the bank's approval of the $5 million SOFA line of credit, was *not* found in Westernbank's recent production.

25.     Westernbank loaned Inyx approximately $37.4 million in additional funds between November 2006 and June 2007, despite the fact that Inyx's availability under its approved loan was described by Westernbank's Gabriel Montanez as "$0". [*See* Exhibit "30" attached hereto].

9

During this period, Inyx was current with all of its interest and fee payments to the bank. In 2007, Westernbank rated the Inyx loans as well-performing.   In an investor conference call on January 31, 2007, Frank Stipes as the Chairman and CEO of WHI informed investors that Inyx is "a current, well-performing loan in our books" [*See* relevant excerpts attached as Exhibit "31"].

26.   The waiver and pre-billing write-down acknowledgement letters were sent to co-Defendants Steve Handley and Colin Hunter as well as Inyx's independent auditors, on November 22, 2006 [*see* Exhibit "32" attached hereto].  Since these letters likely resided on the computer systems used at Inyx's UK operations, I believe they were within the material to which Mr. Middup had access.

27.   In its 2006 Third Quarter 10-Q report, Inyx also publicly reported that the current liabilities on its balance sheet were increased from $92 million to more than $153 million by Inyx's decision to recognize all of the Westernbank debt as a current liability rather than a long term liability.  Inyx made this accounting change to be GAAP compliant because Inyx intended to satisfy the Westernbank debt in the short term.  This accounting change adversely affected Inyx's balance sheet ratios, causing Inyx's independent auditors to add a 'going concern' note in the 10-Q [*see* Exhibit "33" attached hereto, Note 2, page F-4].  In late May 2007, Mr. Frank Stipes confirmed to me that Westernbank had failed to take any reserves or provisions (accrual or impairment) on the Inyx loans at any time through the quarter ending March 31, 2007.

28.   On February 29, 2008, WHI reported that it had appointed a new financial expert to its Board of Directors and Audit Committee.  It also announced that the bank had reached an agreement with regulatory authorities consenting to various corrective actions related to the bank's operations, including addressing timely charge-offs of classified loans and the reduction

10

and collection of classified loans. The bank also reported that it had formed a new Special Regulatory Compliance Committee. [*See* Exhibit "34" attached hereto].

29. In a public filing dated March 17, 2008, WHI stated that it could not file its 2007 year-end audited financial statements due to the need to restate Westernbank's financial statements for the periods ended September 30, 2006, December 31, 2006 and March 31, 2007 to correct an "error to recognize the adjustments to their financials due to the Inyx loan impairment". [*See* Exhibit "35" attached hereto]. Assuming that such an "error" occurred, it had nothing to do with any purported deception by Inyx, since Inyx had timely disclosed its accounting information to Westernbank and to the public. Mr. Middup's affidavit does not address any of the public disclosures made by Inyx with respect to its accounting.

30. Based on the public information I have reviewed, Westernbank has not announced an intention to restate its financial reporting for 2005, when the Inyx loan initiated. If, as Westernbank has alleged, Inyx was defrauding the bank from the initiation of the Inyx loans in 2005 [*see* Westernbank's first amended complaint [DE 3], at ¶ 43], the bank and its auditors would have to restate its financial reporting for 2005 as well.

31. Equally disconcerting is Mr. Middup's failure to recognize that Inyx's Third Quarter 2006 10-Q Report publicly reported the set-off of the UCB accounts receivable against what Inyx owed UCB for Inyx's Ashton acquisition. [*see* Exhibit "36" attached hereto, Note 15 ("Seller Financing"), page F-13 and Note 25 ("Subsequent Events", pages F-19 and 20] Not only was this information forwarded to Westernbank, but it also was publicly available. Mr. Middup ignored these public disclosures.

32. Inyx's 2006 Third Quarter 10-Q filing also publicly reported the shareholder loans that I had made to Inyx, and those loans that were repaid to me by Inyx. This information also

was provided to Westernbank on December 4, 2006. [*see* Exhibit "37" attached hereto Note 22, page F-18, and page F-4]. During a meeting in June 2007, Mr. Vasquez admitted to me that that he and other Westernbank officials had reviewed the disclosures regarding shareholder loans and repayment in December 2006. Nevertheless, Mr. Middup ignored these disclosures.

33.    Westernbank also knew that there were problems with the lockbox account(s) in London, and that a number of Inyx customer payments could not be made directly into the Westernbank lockbox at Citibank UK.   Mr. Middup inaccurately states that these lockbox payment issues were concealed from Westernbank or were not resolved between me and Westernbank. At the time Inyx Pharma Limited ("Pharma"), Ashton Pharmaceuticals Ltd. ("Ashton") and Inyx Europe Limited ("Inyx Europe") were added to the Inyx loans with Westernbank, a Westernbank-based lockbox had been used to collect customer revenues. This arrangement became unwieldy because many of Inyx's UK customers either paid their invoices in British Pound Sterling or Euro currencies, or could not effectively make international payments. As a result, Westernbank requested that Inyx open a new lockbox account in London at Citibank, but Citibank rejected Inyx as too small a customer to warrant a lockbox arrangement. Westernbank subsequently opened its own lockbox account at Citibank, but when customers presented payments payable to Ashton, Pharma or Inyx Europe, Citibank could not trace the payments or rejected the payments.   Consequently, many customers were forced to make their payments directly into Inyx's UK's operating bank accounts ("cash-in-transit"). This issue was identified by Westernbank's external auditors and was the subject of many discussions between Westernbank officials and Inyx. [See Exhibit "38" attached hereto].    Inyx and Westernbank openly discussed these problems and agreed that if Pharma or Ashton would receive customer payments into their operating accounts, Inyx would account for them.  As part

of this arrangement, Westernbank requested that my spouse and I provide a second personal guarantee of $8 million to protect the bank with respect to payments that had been pledged as collateral but were received in Inyx's operating account. The guarantee would also cover a VAT (Value Added Tax) payment made by Westernbank on behalf of Ashton.

34. My spouse and I signed the second guarantee on March 7, 2007. [*See* Exhibit "39" attached hereto, at ¶15].[11] The next day, March 8, 2007, Westernbank paid the Ashton VAT obligation directly to the "HM Customs and Excise Tax Account". [*See* Exhibit "40" attached hereto].[12] None of these facts were reported by Mr. Middup in his affidavit.

35. On the same day that we signed the second guarantee (March 7, 2007), Westernbank issued three letters to Inyx's independent auditors confirming a combined balance on the Inyx loans of $120.4 million as of December 31, 2006. The letters did not mention any claim by Westernbank that there was an event of default. I believe there was no mention of a default because Westernbank had waived any violations. In fact, the three Westernbank letters confirmed to the auditors that the bank viewed the loans as being collateralized. [*See* Exhibit "41" attached hereto].

36. Similarly, Westernbank omits any reference to the "cash-in-transit" guarantee in its amended complaint. I believe the second guarantee was omitted because acknowledging the existence of the March 7, 2007 "cash-in-transit" guarantee given by my spouse and me would confirm Westernbank's actual knowledge that several Inyx customers were paying into Inyx's operating accounts. It also would be an admission that my spouse and I always acted openly with Westernbank's management and personally guaranteed that we would account to Westernbank for those customer payments.

---

[11] Some of these documents recently were produced by Westernbank to us as WBPR00015837-38, 00015858, 862-63.

[12] These documents recently were produced by Westernbank as WBPR00015869-70.

37.  Mr. Middup also failed to inform the Court that close to $9.4 million of shareholder equity funding – amounts not provided by Westernbank – were used for Inyx's business development and corporate development purposes.  Inyx received the funding from shareholder warrant exercises in 2006.  These shareholder capital infusions were disclosed in Inyx's 2006 Third Quarter 10-Q report [*see* Exhibit "42" attached hereto, Note 21, page F-18 and page F-4].  Inyx provided this public filing to Westernbank. [*See* Exhibit 19 attached hereto].

38.  Despite the Banister reports and the $37.7 million collateral shortfall, Westernbank issued a new financing proposal to Inyx in late December 2006 seeking to provide up to $20 million in additional funding in connection with the proposed acquisition of Pharmapac UK Ltd. [*See* Exhibit 43 attached hereto].[13]

39.  On June 28, 2007, on an *ex-parte* basis, Westernbank initiated Administration proceedings in the United Kingdom against Inyx's three operating U.K. subsidiaries: Inyx Europe, Ashton and Pharma; Westernbank appointed two (2) partners at Ernst & Young as the Administrators.  At the time, Inyx was current on all of its loan payments with Westernbank and enjoyed a good performance rating from the bank.

40.  A few days earlier, I had negotiated a forbearance agreement with Westernbank on Inyx's behalf.   My spouse and I also had agreed to pledge personal assets as additional collateral[14] for Inyx's debt to Westernbank and to increase our personal guarantees on the Inyx loans from $18 million to in excess of $70 million. In exchange for our pledge of personal assets, Westernbank agreed to provide additional financing to Inyx and to allow additional time for Inyx

---

[13] Some of these documents recently were produced by Westernbank as WBPR00039610-611.

[14] This new, personal collateral included at least $13 million in real property located in Miami and additional business assets including mining assets which were believed to be worth as much as $400 million based on commodity prices at that time. In addition, Inyx pledged a valuable parcel of real property located in Miami. Westernbank immediately recorded mortgages against the real property.

to refinance the Westernbank loans. The terms of the forbearance agreement were the subject of much negotiation among the parties. [*See* June 19 and June 20, 2007 documents attached hereto as Exhibit "44"].

41.     Immediately after obtaining this additional collateral, and in breach of the forbearance agreement, Westernbank initiated Administration proceedings against Inyx's operating subsidiaries in the United Kingdom (Inyx Europe, Ashton and Pharma), placing the bank and its appointees in exclusive control of those businesses and their business records.

42.     My spouse and I never would have increased our personal guarantees, or provided some of our personal assets as collateral, had Westernbank not agreed to forbear on the Inyx loans. We would not have agreed to provide this additional collateral if Westernbank had disclosed to us its imminent strategy to instead destroy Inyx by initiating an Administration proceeding in the United Kingdom. I learned after the fact that the bank had not dealt in good faith with my spouse and me. At the time that we entered into the forbearance agreement and provided the personal collateral and increased guarantees (June 20, 2007), Westernbank and its attorneys failed to disclose that a day earlier (June 19, 2007) Westernbank had already classified the Inyx loans as "impaired". The bank's concealment of this information was confirmed by documents we recently received in discovery [*see* Exhibit "45"].

43.     I do not believe that Westernbank properly initiated the Administration process. On June 27, 2007, Westernbank engaged in continuing discussions with my attorneys relating to the mining interests my wife and I had agreed to pledge as additional collateral [*see* Exhibit "46" attached hereto]. There was no mention of an impending administration proceeding. On June 28, 2007 (when the Administrators assumed control over Inyx's UK subsidiaries), Westernbank had not demanded repayment of the collateral shortfall or the loan [*see* Exhibit

15

"47" attached hereto]. Westernbank's first "demand" for any repayment of the collateral deficiency was not issued until late on Friday, June 29, 2007 [*see* Exhibit "48" attached hereto]. And Westernbank did not issue a notice of default and demand under the Inyx loans in total until July 3, 2007, several days after Westernbank's Administrators had taken total and exclusive control over all of the Inyx Europe, Ashton and Pharma businesses and all of the business records for those Inyx operations [*see* Exhibit "49" attached hereto].

44. When Westernbank filed its original complaint with this Court on July 5, 2007, it inaccurately alleged in paragraphs 40 and 41 that it had notified Inyx and its subsidiaries of an event of default on June 27, 2007. That allegation was omitted in Westernbank's First Amended Complaint.

45. Westernbank's commencement of the Administration against Inyx's UK operations and similar receivership proceedings against Inyx's Canadian subsidiary prevented Inyx from gaining access to critical electronic and hard copy operational documents, creating an impediment to the defense of this action and greatly prejudicing the Defendants. That problem persists to this day. The *source* documents reflecting the daily business activities of the Inyx UK companies, such as customer contracts, development invoices and supporting material, related laboratory and technical reports, timesheets and memos, electronic information, and accounting ledgers and bank records concerning ongoing Inyx operations, business development activities and customer development projects, were all located in the UK. The location and condition of these critical Inyx records are not currently known. Neither Westernbank, nor its appointed Administrators, have granted us access to them despite numerous demands and at least one federal Court Order [*see* Exhibit "50" attached hereto].

16

46. Westernbank, Ernst & Young and Mr. Middup all have had access to Inyx's UK records since last June. We have yet to gain access to a substantial number of these documents through the discovery process, and Ernst & Young is withholding many documents based on its claim of a common-interest privilege with the bank. I have personal knowledge that documents which existed within Inyx's UK files and servers will contradict the statements that Mr. Middup and Mr. Pavia of Westernbank have made in their respective affidavits. Hopefully, there has been no destruction or impairment of this important evidence by Westernbank or its agents in this case.

47. On December 31, 2007, Ernst & Young and Westernbank's common UK counsel (Denton Wilde Sapte) agreed to provide Inyx only with selected documents *they* determined to be 'relevant' to our need for information. The letter acknowledged that the production was not complete. The letter also provided that Ernst & Young and the Administrators were voluntarily producing only those documents *they* deemed "relevant to the claims which the Bank [Westernbank] is now pursuing and the affidavit which Mr. Middup, on behalf of the Administrators, prepared in connection with the Bank's case." It further stated that there are "some irrelevant items (and also some privileged or personal data items) [that] have been removed from the list (of documents the Administrators had earlier volunteered to produce) which originally comprised some 336 items." [*See* Exhibit "51" attached hereto.]

48. On February 6, 2008, the Defendants received a set of documents from Westernbank's counsel which supposedly comprised the universe of source documents which Mr. Middup reviewed when crafting his affidavit. [*See* letters attached hereto as Exhibit "52"]. The source documents which Mr. Middup purportedly reviewed in preparing his affidavit did not include many relevant documents which would have contradicted his conclusions.

17

49. Based on my review of the limited number of e-mails and other documents to which I have gained access, I believe that Westernbank was keeping a second set of records to track over-advances to Inyx in excess of the loan limits of the written loan agreements. Upon information and belief, this second set of records was utilized by Westernbank to avoid reporting and reserve requirements. [*See* Exhibit "53" attached hereto]. Most of the over-advances tracked by Westernbank on this second set of records, mislabeled "Inyx Europe Payroll", were for purposes unrelated to covering Inyx's payroll. For example, the approximately $4.34 million advance Westernbank made on March 8, 2007 is recorded on the ledger as a payment made for the Ashton/Pharma VAT obligation.

50. Between December 2006 and mid-June 2007, Westernbank knowingly gave Inyx in excess of $20 million in over-advances, which were uncollateralized loans. These funds were advanced despite the fact that the total amount loaned to Inyx was well above the lending limits prescribed in Inyx's loan documents. Westernbank kept such information on the second set of records. It is unclear how Westernbank's independent auditors, Deloitte & Touche did not discover and report such advances in WHI's 2007 First Quarter 10-Q report, since the over-advances to Inyx as of the end of the first quarter of 2007 totaled more than $11 million [See Exhibit "54" attached hereto].

51. Throughout this period, Inyx was told that the over-advances were being approved by the Westernbank/WHI Boards of Directors, and sometimes Chairman and CEO Frank Stipes. On June 11, 2007, during a meeting with Messrs. Frank Stipes, William Vidal, Mike Vazquez, Gabriel Montanez and Juan Carlos Pavia, Westernbank provided me with an internal collateral deficiency report, and a loan balance report, showing that Inyx's loan balance then exceeded $141,000,000. The reports reflected that the over-advanced portion (total combined collateral

18

breakdown) exceeded $81,000,000. [See Exhibit "55" attached hereto, page 1]. At the time, Mr. Stipes knew that the Inyx loans were under-collateralized by tens of millions of dollars. That same day, Mr. Stipes personally approved a $2.3 million over-advance to Inyx. [See Exhibit "56" attached hereto].

52.     I respectfully request that the Court deny Westernbank's Freeze Motion in its entirety.  In the event that the Court is inclined to have an evidentiary hearing, I respectfully request that it order Westernbank to produce Mr. Middup and Mr. Pavia for deposition before the hearing.

53.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

Executed this 20th day of May, 2008 in Miami, Florida.

_____
JACK KACHKAR

# CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

CASELLAS ALCOVER & BURGOS, P.S.C.
Popular Center Bldg., Suite 1400
208 Ponce de León Ave.
Hato Rey, PR 00918
P.O. Box 364924
San Juan, PR 00936-4924
Tel:     (787) 756-1400
Fax:     (787) 756-1401

By:   /s/ Heriberto J. Burgos-Perez
Ricardo F. Casellas
PR Bar No. 203114
RCasellas@cabprlaw.com
Heriberto J. Burgos-Perez
PR Bar No. 203114
hburgos@cabprlaw.com

and

BERGER SINGERMAN
200 South Biscayne Boulevard
Suite 1000
Miami, Florida 33131
Tel:     (305) 755-9500
Fax:     (305) 714-4340

By:   /s/ Anthony J. Carriuolo
Anthony J. Carriuolo
Florida Bar No. 434541
acarriuolo@bergersingerman.com
Admitted *pro hac vice*

## SERVICE LIST

James D. Wing, Esq.
Email: james.wing@hklaw.com
Robert T. Watson, Esq.
Email: robert.watson@hklaw.com
HOLLAND & KNIGHT
701 Brickell Avenue, Suite 3000
Miami, FL 33131
Telephone: (305)374-8500
Facsimile: (305) 789-7799
*Attorneys for Inyx, Inc.*

Christopher R.J. Pace, Esq.
Email: christopher.pace@weil.com
James Sanborn, Esq.
Email: james.sanborn@weil.com
Weil, Gotshal & Manges, LLP
1395 Brickell Avenue
Suite 1200
Miami, FL 33131
Telephone: 305-577-3100
Facsimile: 305-374-7159
*Attorneys for Westernbank Puerto Rico*

Matthew T. McLaughlin, Esq.
Email: mtmclaughlin@venable.com
Doreen S. Martin, Esq.
Email: dsmartin@venable.com
Venable LLP
William H. Devaney, Esq.
Email: wdevaney@venable.com
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York 10020
Telephone: 212-307-5500
Facsimile: 212-307-5598
*Attorneys for Steven Handley and Colin Hunter*

Michael J. Higer, Esq.
Email: mhiger@hlglawyers.com
Jeffrey R. Vesel, Esq.
Email: jvesel@hlglawyers.com
Higer, Lichtler & Givner LLP
2999 N.E. 191st Street, Suite 700
Aventura, FL 33180-3123
Telephone: 305-933-9970
Facsimile: 305-933-0998
*Attorneys for Rima Goldshmidt*

Rafael Perez Bachs, Esq.
Email:rp@mcvpr.com
Myrna L. Ruiz-Olmo, Esq.
MCCONNELL VALDES
270 Munoz Rivera Avenue
Hato Rey, Puerto Rico 00918
Telephone: 787-250-5658
Facsimile: 787- 759-2799)
*Attorneys for Inyx, Inc.*

Luis C. Marini Biaggi, Esq.
Email: lmarini@oneillborges.com
Mauricio O. Muñiz-Luciano, Esq.
Email: mauricio.muniz@oneillborges.com
Pedro J. Santa-Sanchez, Esq.
Email: pedro.santa@oneillborges.com
O'NEILL & BORGES
250 Muñoz Rivera Avenue, Suite 800
San Juan, Puerto Rico 00918-1813
Telephone: 787.764.8181
Facsimile: 787.753.8944
*Attorneys for Westernbank Puerto Rico*

Manuel San-Juan-DeMartino, Esq.
Email: sanjuanm@microjuris.com
Manuel San Juan Law Office
PO Box 9023587
San Juan, PR 00902-3587
Telephone: 787-723-6669
Facsimile: 787-725-2932
*Attorneys for Jay Green*

Martin P. Russo, Esq.
Email: russo@butzel.com
Alison Cohen, Esq.
Email: cohen@butzel.com
Butzel Long
380 Madison Avenue, 22nd Floor
New York, NY 10017
Phone: (212) 323-8600
Mobile: (646) 369-6662
Fax: (212) 818-0494
*Attorneys for Jay Green*

Gary H. Montilla-Brogan, Esq.
Email: gmontillabrogan@sprynet.com
Aldarondo & Lopez Bras
ALB Plaza Suite 400
16 Road 199
Guaynabo, PR 00969
Telephone: 787-617-0423
Facsimile: 787-474-5451
*Attorneys for Westernbank*

Yehudah L. Buchweitz, Esq.
Email: yehudah.buchweitz@weil.com
Richard A. Rothman, Esq.
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153
Telephone: 212-310-8000
Facsimile: 212-310-8007

David A. Hickerson, Esq.
Email: david.hickerson@weil.com
Weil, Gotshal & Manges, LLP
1300 Eye Street, N.W.
Suite 900
Washington, DC 20005
Telephone: 202-682-7000
Facsimile: 202-857-0940

Jorge Bermudez-Torregrosa, Esq.
Email: jbtlaw@edupro.net
Cuevas Kuinlam & Bermudez
416 Escorial Ave.
Caparra Heights
San Juan, PR 00920
Telephone: 787-753-6464
Facsimile: 787-759-9556

Ernesto F. Rodriguez-Suris
Email: efrodriguez@prtc.net
Ernesto F. Rodriguez Suris Law Office
27 Gonzalez Giusti Ave.
Tres Rios Bldg. Suite 300
Guaynabo, PR 00968
787-758-8703 x117
Fax: 787-759-6768
*Attorneys for Rima Goldshmidt*