# Exhibit 12

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

WESTERNBANK PUERTO RICO

　　　Plaintiff,

　　　　　v.

JACK KACHKAR; STEVEN HANDLEY;
COLIN HUNTER; JAY M. GREEN;
RIMA GOLDSHMIDT; VIKTORIA
BENKOVITCH, and INYX, INC.

　　　Defendants.

Civil No.: 07-1606 (ADC)

## DECLARATION OF RIMA GOLDSHMIDT

　　　1.　　　From April 1, 2003 to June 29, 2007, I was an officer of defendant Inyx, Inc. ("Inyx") where I held the positions of Vice President, Treasurer and Corporate Secretary prior to my resignation as an Officer of Inyx. I continued to serve as Director and Secretary of various wholly-owned subsidiaries of Inyx. These include: Inyx Pharma Ltd. ("Inyx Pharma"), Inyx Canada Inc. ("Inyx Canada"), Inyx USA Ltd. ("Inyx USA"), and Ashton Pharmaceuticals Limited ("Ashton Pharmaceuticals"), Inyx Europe Limited ("Inyx Europe"), Exaeris Inc. ("Exaeris") and its wholly owned subsidiary, Exaeris Holdings Ltd., ("Exaeris Holdings") and Inyx Germany, GmbH ("Inyx Germany"), collectively referred to as the "Inyx Group."

　　　2.　　　Inyx is a publicly-owned company which, until the actions of Westernbank beginning in June 2007, was a multi-national pharmaceutical development and manufacturing company with operating subsidiaries in the Europe, Canada and the United States.

　　　3.　　　Inyx was current on its principal and interest payments through July 3, 2007, the date on which Westernbank declared Inyx in default of the loan agreements.

4.     Many of the documents used in this declaration have only become available to me recently, including certain documents disclosed by Westernbank within the past thirty (30) days.

5.     Westernbank's decision to place Inyx's UK businesses into Administration has interfered with Inyx's ability to recover Inyx's own documents.

6.     Inyx first became an asset-based borrower of Westernbank on March 31, 2005. From that point forward, the bank received significant interest and fees on its ever-increasing loans to Inyx.  At the time, Inyx was current on all of its loan payments with Westernbank and enjoyed a good performance rating from the bank.  *See* Ex. 1, WHI Conference Call, Jan. 31, 2007 and Ex 2, March 7, 2007 Audit Confirmation Letters issued by Westernbank.

7.     Inyx was not notified of any default or breaches of the loan agreements until after the administration process was commenced, apart from conditions of performance that were previously waived by Westernbank per letters to Inyx (Ex. 3, Westernbank Waiver Letters, dated March 31, 2006, August 11, 2006, and November 20, 2006) or were otherwise waived by Westernbank.  *See* Ex. 4, Excerpts of Westernbank's Responses to Requests for Admission (Kachkar), ¶ 69 and ¶ 71.

8.     Westernbank's forced Administration, without proper notice to Inyx and with no event of default having occurred which would have legitimately triggered such action, enabled Westernbank to take control of Inyx's corporate computer server, housed in the UK, thereby preventing the defendants from gaining access to vital documents and records.  These documents would refute the bank's allegations of fraudulent or improper conduct, and show the bank's acceptance of Inyx's business, commercial and accounting activities under the loan agreements. These documents would also provide Inyx with evidence of Westernbank's improper Administration process against Inyx, and possible breaches of federal banking and securities

2

regulations that Westernbank and its parent company, W Holding Company, Inc ("WHI") committed. Further, the Administration process prevented Inyx from accessing documents and commercial agreements that were maintained to a significant extent on Ashton Pharmaceutical's computer servers in the United Kingdom. *See* Ex. 5, Denton Wilde Sapte letter re Inyx UK entities in Administration.

9.     Westernbank's forced Administration process also impaired Inyx's ability to complete a number of important commercial negotiations and discussions with key customers which would have secured payment on outstanding invoices for legitimate work and legitimate work in progress. These are the same invoices that Westernbank and its agents now claim are uncollectible and/or fraudulent.

10.     Notwithstanding Westernbank's efforts to prevent or delay Inyx access to these documents, Inyx has recently gained access to evidence which was presented in Dr. Kachkar's two Declarations issued on May 20, 2008 and May 30, 2008, respectively (Doc. Nos. 164 and 168).

11.     Mr. Middup has made a number of allegations against me and my co-defendants including purported "irregular" invoicing, financial records and cash flow practices. I submit this declaration to counter these allegations and also to highlight herein, those documents which are well known to Westernbank, and which Mr. Middup has either failed to consider, further investigate or disclose in his affidavits.

12.     Contrary to Mr. Middup's allegations of purported irregular development invoices, the issue of pre-billing of development invoices was discussed and approved as early as 2005 at the onset of the relationship with Westernbank when Inyx USA entered into a development contract with a major client. Such Westernbank approvals continued into 2006 and

3

2007 with Inyx's UK Entities, including the same invoices that Mr. Middup now alleges to be irregular.

13.     Westernbank was well aware of the contractual negotiations and contracts in progress of being completed, and the relationships and the invoicing processes we had with such customers. *See* Ex. 6, Westernbank's knowledge of Development Invoices.   Westernbank accepted and funded these client's invoices based on the supporting commercial transactions with these customers.

14.     On or about August 30, 2005, Inyx closed the Inyx Europe loan with Westernbank.  At that time, Westernbank engaged P&A Lender Services ("P&A") and its field auditor, Charles Banister, to undertake a "Closing Audit" on behalf of Westernbank.  P&A's Report addresses Inyx's practice of using manual invoices and eleven such invoices are included in the first assignment of accounts receivable to Westernbank as collateral on August 30, 2005. The Report also identifies that Inyx was about to acquire a different type of accounting system, which is not capable of producing the types of reports Westernbank requires.  For example, see Exhibit 7, Closing Audit (WBPR 00048180, 00048166).

15.     Westernbank, therefore, knew that the manual invoicing system at Ashton Pharmaceuticals was inherited from Ashton's predecessor company upon Inyx's acquisition of that company on August 30, 2005.  Consequently, the manual invoicing system, referred to by Westernbank as "Prefix 7" invoices, was part of Ashton's standard operating procedures.

16.     As a result, Westernbank approved the practice of funding manually generated invoices from the early stages of the lending relationship.  Contrary to Mr. Middup's conclusion that such invoices are "irregular," such invoicing was in the ordinary course as demanded by Inyx's business, and accepted by Westernbank.

4

17.     Westernbank accepted and funded against manually-generated invoices from the early stages of the lending relationship.   All such invoices were supported by underlying contracts that Westernbank knew about or learned about through the ordinary course of Inyx's relationship with the bank.  Such invoices included sales uplift invoicing, allowed under Inyx's supply agreement with Inyx Europe's major client, and the development and product commercialization and industrialization invoicing related to existing and new customer contracts, including at times when contract terms were still being negotiated and/or discussed. *See* Ex. 8, Westernbank's knowledge of underlying contracts or open contracts for manual and development invoices.  Westernbank also acknowledged in its own internal reports that such customer billings were supported by contracts and associated documentation. *See* Ex. 9, Westernbank Executive Summary Report on Inyx.

18.     Westernbank's history and familiarity with "pre-billing" development-invoicing and other asset-based lending issues related to the Inyx loans is also confirmed by the reports of its independent UK field auditors back in 2006.  The P&A (Banister) reports specifically raised customer invoicing issues.  *See* Ex. 10, Banister Report, Oct. 2006 and Ex. 11 Aug. 2006 Banister Report.

19.     Mr. Middup also fails to identify that a number of development invoices he treats as "irregular" were related to concurrent commercial transactions involving the purchase of such customer's respective businesses. *See* Ex. 12, Inyx Credit Report, WBPR 00224622.

20.     Mr. Middup failed to investigate and identify a $5 million SOFA line approved and issued by Westernbank to Inyx (*see* Doc. No 164, Kachkar Declaration, ¶ 24).

21.     Inyx UK personnel would not have known the specific details of the commercial transactions noted above nor about Westernbank's Secured Over Formula Advance ("SOFA")

line, and the customer invoices resulting thereof, yet Mr. Middup does not further investigate these matters, despite Inyx's public records of such disclosures.   Westernbank knowingly approved advances of additional funding on such development-related invoices although they became ineligible under the loan terms. *See* Ex. 13, Westernbank's Ineligible Reports and SOFA line correspondences.

22.     On or about November 20, 2006, the bank issued a letter to Inyx acknowledging that $37.7 million in development invoices, which had been included in the Inyx's borrowing base, were no longer eligible to borrow against. *See* Doc. No. 164, Kachkar Declaration ¶ 20, ¶ 22, Ex. 18.

23.     On December 4, 2006, Inyx filed its Form 10-Q for the third quarter of 2006 with the Securities and Exchange Commission ("SEC"), which reported that Inyx had written off the $37.7 million in pre-billings on development projects from its balance sheet and income statement in compliance with Generally Accepted Accounting Principles ("GAAP"). *See* Ex. 14, Inyx's 2006 Third Quarter 10-Q.

24.     Therefore, Westernbank was aware of these collateral deficiencies much earlier than June 19, 2007 and/or May 9, 2007, as it and WHI have stated in filings related to the Inyx litigations, and in both federal banking and securities filings.   In an internal Westernbank management memorandum dated January 16, 2007, Westernbank referred to the $37.7 million in ineligible pre-billings publicly disclosed by Inyx.  Westernbank reversed the pre-billings that had accumulated up through September 30, 2006.   *See* Ex. 15, Memorandum, Eduoaro Vivoni, Jan. 16, 2007 WBPR 0002021-27.

25.     Mr. Juan Carlos Pavia (a Westernbank officer)'s collateral reports of April 2007 also highlight the bank's knowledge of the $37.7 million in development invoices which had

been included in the Inyx's borrowing base. *See* Ex. 16, April 2007 Pavia Collateral Shortfall Reports. Based on information and belief, Westernbank did not notify its own auditors of such analyses.

26.     Westernbank was also aware that some of the invoices to customers were based on unsigned agreements with certain customers. Negotiations were still in process at the time. Due to the sensitive nature of such negotiations, the invoices were held back and not sent immediately to customers. *See* Ex. 6.

27.     Mr. Middup made no attempt to contact me regarding Inyx's accounting systems.

28.     Mr. Middup's allegations about "Inflated/Multiple Invoices" are similarly misleading. Inyx routinely submitted billings based on estimates, which were later adjusted to actual billings incurred as part of its year-end audits, and accounting for US GAAP reporting purposes. This would include, for example, contractually based sales uplift invoices, final shipment adjustments, additional work-related service charges charged to a number of clients, all based on contractual terms and conditions that Westernbank was familiar with as they had access to such contracts. As I have highlighted, all such matters were discussed openly with Westernbank and Westernbank accepted Inyx's invoicing systems.

29.     Contrary to Mr. Middup's allegation that Inyx maintained "irregular financial records," Inyx's UK subsidiaries had issued credit notes for amounts already considered ineligible by Westernbank's lending formulas; i.e., those receivables past 120 days due. Due to Westernbank's ex parte, forced Administration process, Inyx did not have a chance to complete analyzing and reconciling its U.K. subsidiaries' accounts and complete its 2006 financial audit in accordance to GAPP. Mr. Middup also fails to report that Westernbank was well aware and kept regular records of the amount of ineligibles or uncollateralized loan amounts under the lending

formulas throughout the tenure of Inyx's loan. *See* Ex. 17, Westernbank's Records of Ineligibles or Uncollateralized Loans.

30.     Mr. Middup's report does not take into account that Inyx had grown rapidly through new acquisitions, and consequently had inherited various different accounting systems from its predecessors. Inyx addressed the need to automate a central reporting system with Westernbank. In February 2007, Inyx changed its corporate accounting software to an online edition of Quickbooks and was in the process of adding the Hyperion system to it in late June 2007, but Westernbank put Inyx's UK entities into Administration in late June. *See* Ex. 18, INYX_WB 00063694, 00089927-28, 00071600-07, 00069754.

31.     Despite extensive documentation of Westernbank's knowledge of collateral shortfalls under the Inyx's loans, Westernbank's parent company, WHI, continues to misrepresent and falsely report to the public that its management team had no knowledge of any problems with Inyx's loans until May 9, 2007 at the earliest. *See* Ex. 19, WHI letter to NASDAQ, dated Dec. 10, 2007. NASDAQ 0019-22 and WHI letter to NYSE, dated Jan. 16, 2008.

32.     Defendants have recently discovered a report prepared by Westernbank officer Juan Carlos Pavia, which was requested by Frank Stipes, the Chairman, CEO and President of both Westernbank and parent WHI, and included two sets of excel spreadsheet files, both marked "confidential;" one set dated as prepared on April 12, 2007 and the other dated as prepared on April 19, 2007.    The April 12th set consisted of three pages, each page entitled "WESTERNBANK BUSINESS CREDIT, INYX, INC. et al., Collateral Breakdown." The April 19th set consisted of four pages, the first two pages entitled as the April 12th set but, after "Collateral Breakdown" is: "- W/O Inelligibles."    Both sets contain on their respective page 1 a

footnote: "(d) Agings do not have adjustment of $37MM made September 06 10-Q."  Both sets each have three pages with the identical captioned lines, columns and numbers.  The only difference is that the April 19th set contains a second page 2  (the additional sheet) with the column entitled "Inelligible" marked with an additional  "(f)" footnote that states:  "No Inelligibles were taken into consideration for this analysis ($93MM)," whereby the entire column is presented as blank so that this Collateral Breakdown does not report any Inyx collateral as inelligible.  *See* Ex. 16, April 2007 Juan Pavia Collateral Breakdown Report.

33.     Emails from Westernbank's Gabriel Montanez, Senior Vice President, to Inyx, copied to Mike Vazquez, President, and Julia Fuentes, senior Vice President, WB Business Credit and Juan Pavia, confirm that Westernbank's senior management had knowledge of the two sets of Mr. Pavia's collateral deficiencies analyses during April 2007.  *See* Ex. 20, Westernbank email to Inyx, WPBR 00127678.

34.     Westernbank's allegation in paragraph 94 of the First Amended Complaint that Westernbank first learned of an $80 million collateral deficiency under the loan agreements in May 9, 2007 is incorrect because Westernbank was aware of the deficiency at least as early as April 2007.

35.     Mr. Middup also failed to describe Westernbank's knowledge and tracking of the amount of ineligibles in his affidavits.  Westernbank knowingly continued to fund Inyx's development invoices.  Julia Fuentes of Westernbank stated: "Furthermore, we continue to accept for financing invoices for development work."  *See* Ex. 21, Email from Julia Fuentes to Mike Vazquez, Dec. 19, 2006.

36.     Westernbank and Inyx discussed an audit of Inyx by Charles Banister of P&A Lending Services back in early March 2006.  *See* Exs. 7, 10-11.  P&A conducted audits of Inyx's

United Kingdom operations in 2005 and 2006. P&A identified the very problems cited in Westernbank's complaint, addressing issues of alleged failure to make payments into lock boxes and customer payment setoffs. Importantly, P&A repeatedly informed Westernbank of key points including escalating accounts-receivable ledger, concerns about fundability of the Development Invoices, irregularities with cash allocation, VAT payments and reporting issues. *See id.* The October 19, 2006 P&A audit report to Westernbank stated: "It is worth noting that all the key points have been mentioned at previous audits." *See* Ex. 10.

37.     Westernbank has still not produced a March 2006 P&A audit report, but an excerpt of that report reveals that Inyx dis*closed* the lockbox is*sue* to Westernbank's auditor: "There are ongoing problems with the Citibank [lockbox] account receiving funds." *See* Ex. 11. Inyx disclosed these problems to P&A. "As per the client, they have several customers who were unable to use the IBAN number provided. Also, as the client has no paying in book, they suggested that their only option was to bank cheques into their own current account." *See id.*

38.     Westernbank has also denied in the Kachkar Request for Admission that "as early as May 2005 Inyx representatives reported to Westernbank that its European customers were not able to successfully pay into the Lockbox accounts." *See* Ex. 4, Westernbank Admissions (Kachkar) ¶ 140. Inyx reported to Westernbank, as early as July 2005, the lockbox issues Inyx's customers were encountering. *See* Ex. 22, WBPR 00071365-66, 0000991, 00009918-20, 00009998-00010000, 00047514, 00144733-34.

39.     The original arrangement to make lockbox payments became unwieldy for many of Inyx's UK customers who paid invoices in British Pound Sterling or Euros. Westernbank and Inyx worked together to try to set up a lockbox account with Citibank in London. When customers presented payments payable to Ashton, Inyx Pharma or Inyx Europe, however,

Citibank often could not trace payments directly to Inyx UK's operating bank accounts ("cash-in-transit"). During 2007, Inyx notified Westernbank of continuing customer payment issues regarding Westernbank's European lockbox at Citibank. Westernbank was long aware of the Lockbox issue, which were addressed directly and transparently between Westernbank and Inyx from 2005 to 2007. *See* Ex. 22, WBPR 00144733-34. Mr. Middup did not disclose any of these circumstances in his affidavits filed with this Court.

40.     On March 7, 2007, Dr. Kachkar and his spouse, Viktoria Benkovitch, provided Westernbank a personal, limited guaranty for $8 million to account for customer invoice amounts being paid into Inyx's operating accounts including Inyx Europe's HSBC account. *See* Doc. No. 160, Kachkar Decl, Ex. 39. Such amounts were being paid to Inyx's U.K. operating accounts to overcome lockbox payment issues that were continuously being encountered, and the Kachkar guaranty for $8 million was specifically designed to protect Westernbank against such amounts, hence, the "cash in transit" reference in such guaranty. *See* Doc. No. 164, Kachkar Decl., ¶¶ 33-36, 42. Westernbank admits that it did not provide Mr. Middup with a copy of the $8 million limited guaranty. Mr. Middup, in his affidavits filed with this Court, ignores the existence and purpose of such guaranty.

41.     Jack Kachkar and his spouse issued a personal, limited guaranty to address any issues and cure any breaches arising from the lockbox issue. Westernbank considered the personal, limited guaranty to have satisfied the lockbox issues and cured any purported breaches, including any customer payments to Inyx's operating accounts. Westernbank issued letters to Inyx's independent auditors on March 7, 2007, which confirmed that the loans were collateralized. There was no reference to any breach or default by Inyx in any of these letters. *See* Ex. 2, Westernbank Letters to Berkovits, Lago and Co., March 7, 2007.

42.    Westernbank has denied that "Westernbank continued to loan funds to Inyx pursuant to the Loan Agreements, even after P&A Lender Services had advised Westernbank that customer payments had been diverted away from the Lockbox Accounts." *See* Exhibit 4, ¶ 142. These exhibits show a pattern of continuous communication by Inyx to Westernbank, disclosing the very issues raised in the Middup Report, now alleged as "irregular." Inyx maintained a relationship of candor and transparency with Westernbank, which Mr. Middup does not acknowledge in his report.

43.    For example, Inyx routinely disclosed agreements between Inyx and its subsidiaries and third parties where appropriate. *See* Ex. 23, WBPR 00138774, 00138800, 00087046, 00085855, 00125001, 00086813, 00249182-83. Inyx notified Westernbank and Westernbank accepted transactions where Inyx offset receivables against payables with its customers. *See* Ex. 24, WBPR 00140953.

44.    Mr. Middup's Supplemental Affidavit, ¶ 14 ("UK entities did not receive funding equivalent to the invoices they generated") is also inaccurate. At least as early as April 4, 2005, Westernbank was aware of and approved of funding under the Inyx UK draws, which were being sent to Inyx's corporate bank accounts. For example, Julia Fuentes directly approved such transactions in April 4, 2005, and Gabriel Montanez approved such a transaction on February 16, 2006, which became part of the standard operating practice between Inyx and Westernbank. *See* Ex. 25, Mellon Bank emails between Inyx and Westernbank. Indeed, Westernbank approved such transactions on nearly a daily basis. From the beginning of the banking relationship, Westernbank was aware that advances on the loans were being sent to Inyx's corporate accounts.

45.    The matters above were openly discussed and presented at an in-person meeting with Westernbank officials that I personally attended on August 11, 2006 at Westernbank's

12

offices in Hato Rey. At such meeting, Westernbank officials acknowledged and accepted the very same items that Mr. Middup reports now as being "irregular."

46.     The Middup Affidavit does not allege that any principals of Inyx improperly diverted assets or funds of Inyx for their personal benefit.  The only reference to funds having been paid by Inyx's United Kingdom entities to Dr. Kachkar is approximately $1 million as repayment to Dr. Kachkar for a "series of cash injections" he provided to Inyx's U.K. subsidiaries which amounted to approximately $2.6 million. *See* Doc. No. 7-2, Middup Aff. ¶ 49. Moreover, Inyx's repayment of the funds advanced by Dr. Kachkar to the company and its subsidiaries were openly and regularly disclosed in Inyx's public filings and to Westernbank. *See* Doc. No. 160, Kachkar Decl., ¶ 32, pp. 11-12.

47.     Pursuant to Clause 9.25 of the Loan Agreements between Inyx and Westernbank, Westernbank had the right to request certification by the President and Chief Financial Officer of Inyx that Inyx is in compliance with the provisions of the Loan Agreements and that the "borrowing base" (i.e., asset-based loan collateral value) is sufficient.  Ex. 26, Excerpt Loan Amount Certificate Terms.

48.     This certification, a "Borrowing Base Certificate," also known as a "Loan Amount Certificate" was never presented to me.  I never signed any such document, nor did any other Inyx principal sign such document, to the best of my knowledge.  Westernbank had the right to obtain such certification four times a year, but it chose not to do so.  Mr. Middup also omits any mention of a Borrowing Base Certificate or Loan Amount Certificate in his reports.

49.     Westernbank has objected and refused to produce any documents related to Exaeris in this case. *See* Ex. 27, Westernbank Puerto Rico Objections to Rima Goldshmidt's First Request of Production of Documents, ¶ 50, p. 27.  The production of such documents

would otherwise shed light and help Inyx to disprove the fraud allegations asserted by Westernbank.

50.     On September 5, 2006, Westernbank's Board of Directors announced that it had unanimously approved a loan of $3 million to Exaeris.  *See* Ex. 28, Minutes of Westernbank Senior Credit Committee, Sept. 5, 2006.

51.     Despite approving such $3 million loan to Exaeris, on January 3, 2008, Frank Stipes, Westernbank's Chairman and CEO, filed a proof of claim on behalf of Westernbank, in the Delaware Bankruptcy court in the Exaeris Chapter 11 bankruptcy proceedings stating that Exaeris is not an Inyx Borrower and that the formation of Exaeris itself was a breach of the Inyx USA Loan Agreement.  *See* Ex. 29, Proof of Claim.

52.     I, however, did not sign or approve a $3 million Exaeris "loan" nor did any other principal of Inyx or its subsidiaries sign or approve such loan, to the best of my knowledge. Additionally, neither Inyx nor Exaeris was ever informed of this $3 million loan, nor did Inyx or Exaeris ever execute any such loan agreement.  I did not receive any information about the Exaeris loan in Westernbank's loan status reports regularly provided to Inyx.

53.     In recent discovery, Inyx obtained a Westernbank Excel spreadsheet entitled "Inyx Europe Payroll," (aka "Inyx Recovery Schedule").  *See* Ex. 30, Inyx Europe Payroll. Between the end of December 2006 and through June 20, 2007, Westernbank knowingly advanced to Inyx approximately $22.6 million of uncollateralized over-advances above and beyond Inyx's loan limit of $120 million, under the Loan Agreements, set at the end of December 2006. *See* Ex. 30, Inyx Europe Payroll.

54.     Based upon information and belief, Westernbank never reported such advances in its public filings, as such 2007 loan advances were not recorded on the "Request Summary"

forms normally utilized by the bank to record and post Inyx's loan transactions. *See* Ex. 31, Request Summaries.

55.     In short, I believe that Westernbank was keeping an "off-the-grid" set of books pertaining to the Inyx loans. *See* Ex. 32, Westernbank Recovery Schedule.

56.     Despite the evidence of this second set of books and the evidence of such recovery schedule, Westernbank denies the existence of such records. *See* Ex. 4, Westernbank Admissions (Kachkar), ¶¶ 95-98.

57.     When such uncollateralized advances of approximately $22.6 million are added to the $37.7 million collateral shortfall (of which Inyx had informed Westernbank in November 2006), the $3 million loan advanced to Exaeris, and the $5 million uncollateralized SOFA line the bank also knowingly advanced to Inyx (See Doc. No. 164, Kachkar Declaration, ¶ 24), To the best of my knowledge, Westernbank knowingly provided Inyx approximately $68.3 million of uncollateralized loans, which neither Westernbank nor WHI have ever reported in their regulatory or public filings.  Westernbank now claims it did not ever know of any under-collateralized loan amounts under the loan agreements until May 2007.

58.     Prior to July 3, 2007, Westernbank did not notify Inyx that it was in breach of any loan contracts.  Westernbank did not submit a demand of repayment for a collateral deficiency until late on Friday, June 29, 2007, the day after the bank put Inyx's UK entities into Administration on false pretenses, and despite the workout arrangements it had reached and agreed to with Inyx and the Kachkars. *See* Ex. 33, Westernbank Demand, June 29, 2007.

59.     Westernbank also did not issue a notice of default under the Inyx loans until July 3, 2007, five days after the bank had Inyx's primary revenue-generating operations illegitimately seized. *See* Ex. 34, Westernbank Notice of Default and Demand, July 3, 2007.

60.     On June 20, 2007, at Westernbank's request, Dr. Kachkar, on behalf of Inyx, executed the subsequent securities and guarantees offered by Inyx, himself and his wife to resolve any purported deficiencies under the loan agreements.  Westernbank counter-signed the collateral deficiency letter.  *See* Ex. 35, Barry Woods Email, and Letter from Jack Kachkar to Westernbank and countersigned by Westernbank re: Collateral Deficiency.

61.     Instead after receiving such additional security and guarantees, Westernbank breached its agreements with Inyx and the Kachkars and illegitimately placed Inyx's UK operations, Inyx's major revenue generators, into Administration, and forced Inyx USA, Exaeris and Inyx Canada into receiverships. By such actions, Westernbank destroyed the entire enterprise value of Inyx and wiped out Inyx's shareholder value for Inyx stockholders. Consequently, Inyx, Inc., Dr. Kachkar and his wife originally filed a complaint against Westernbank in New York State court (which was then subsequently moved to Florida), seeking the $300 million-plus in enterprise value that the bank destroyed.  Such original complaint was filed on June 29, 2007 prior to the Complaint filed by Westernbank on July 5, 2007.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury and under the laws of the United States of America that the following is true and correct.


Executed this 10th day of August, in Toronto, Ontario, Canada

_____

Rima Goldshmidt

16