BROWER PIVEN
 A Professional Corporation
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel.: (212) 501-9000
Fax: (212) 501-0300

*Lead Counsel for Class Representatives
and the Class*


**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE PENNSYLVANIA AVENUE FUNDS, Individually And On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br> vs. <br><br> INYX INC., JACK KACHKAR, STEVEN HANDLEY, RIMA GOLDSHMIDT, JAY M. GREEN and BERKOVITS & COMPANY, LLP, <br><br> Defendants. | Civil Action No. 08-cv-06857-PKC |


**DECLARATION OF PLAINTIFF'S LEAD COUNSEL DAVID A.P. BROWER IN
SUPPORT OF FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION
AND LEAD COUNSEL'S APPLICATION FOR AN AWARD OF
<u>ATTORNEYS'FEES AND REIMBURSEMENT OF EXPENSES</u>**

**DAVID A.P. BROWER,** declares, under penalty of perjury, as follows:

1.      I, David A.P. Brower of Brower Piven, A Professional Corporation ("Brower Piven or "Lead Counsel"), am the attorney primarily responsible for the prosecution of the above-captioned action (the "Action").  My firm serves as Court-appointed Lead Counsel for plaintiff David S. Lenington's ("Lead Plaintiff" or "Class Representative") and the Class[1] in the Action.[2]  I have participated in, or overseen and monitored virtually every aspect of the Action, and have otherwise been kept currently informed of developments in the Action by attorneys and para-professionals working with me and under my supervision.  Thus, if called upon, I can testify to the matters set forth herein.

2.      I respectfully submit this declaration (the "Brower Declaration" or "Brower Decl."), in support of: (i) the Court's final approval, pursuant to Fed. R. Civ. P. 23(e), of the proposed settlement (the "Settlement") on the terms and conditions reflected in the Stipulation, which the Court preliminarily approved by its Preliminary Approval Order dated February 9, 2012 (the "Preliminary Approval Order"); (ii) the Court's final approval of the plan of allocation set forth in the Notice of Proposed Settlement of Class Action (the "Notice") disseminated to the Class (the "Plan of Allocation"), and (iii) the Court's grant of Lead Counsel's application for an award of attorneys' fees and reimbursement of expenses.

3.      This Declaration is intended to provide the Court with a summary of the proceedings in this Action and the basis upon which Lead Plaintiff and Lead Counsel highly recommend approval of the Settlement, the Plan of Allocation and the requested award of

---

[1] Unless otherwise noted, capitalized terms used herein shall have those meanings contained in the Stipulation and Agreement of Settlement dated February 9, 2012 (the "Stipulation") previously submitted to the Court.

[2] Pursuant to Order dated July 5, 2011, the Court appointed the law firm Brower Piven, A Professional Corporation as counsel for the Class.  *See* Dkt. No. 248.

attorneys' fees and reimbursement of expenses.  This Declaration does not, however, seek to comprehensively detail nearly four years of hard-fought litigation but rather provide the Court with highlights of the events leading to the resulting Settlement.

## I.   TERMS OF THE SETTLEMENT AND NOTICE

4.   The Settlement provides for the payment of between $600,000 and $1,100,000 in cash (the "Settlement Amount"), on behalf of Inyx, Inc. ("Inyx" or the "Company") and three of its executive officers during the Class Period, Dr. Jack Kachkar, Jay M. Green and Rima Goldshmidt (the "Individual Defendants" and together with Inyx, the "Defendants"), in monthly installments of $10,000 and annual balloon payments of $50,000 commencing in the third year.  The exact amount of the Settlement Amount is, under the terms of the Stipulation, dependent both on the timing of Defendants' payments in satisfaction of the Settlement and on whether or not Defendants realize any financial return in connection with certain intellectual property described in the Stipulation. Further, the Stipulation provides for the acceleration of certain payments and other security, including an agreed-upon self executing judgment as against defendant Kachkar, in the event of a default in payment by the Defendants.  Pursuant to the Stipulation, Inyx has so far transferred the sum of $20,170 into an interest-bearing account (the "Escrow Account").  Upon the Court's final approval of the Settlement, Defendants will continue to transfer funds to the Escrow Account on a regular basis until the terms of the Stipulation have been satisfied.

5.   The terms of the Settlement are set forth in the Stipulation.  As of April 27, 2012, a total of 6,038 copies of the Notice and Proof of Claim and Release form (the "Proof of Claim" and together with the Notice, the "Claim Packet") have been mailed to potential Class Members pursuant to the Court's Preliminary Approval Order.  *See* Dkt. No. 284; *see also* ¶6 of the Affidavit of Jose C. Fraga Senior Director of the Garden City Group, Inc. ("GCG") Regarding (A)

Mailing of the Notice; (B) Publication of the Summary Notice; (C) Website; and (D) Requests for Exclusion Received to Date, the Court-appointed claims administrator for the Settlement, dated April 27, 2012 (the "GCG Affidavit" or "GCG Aff."), attached hereto as Exhibit 1.  As set forth in the GCG Affidavit 6,038 total Claim Packets were mailed.  As in most securities class actions, since the large majority of Class Members are beneficial purchasers whose securities are held in "street name" (*i.e.*, the securities are purchased by brokerage firms, banks, institutions and other third-party nominees ("Nominees") on behalf of the beneficial purchasers), GCG mailed 2,159 Claim Packets to the names and addresses contained in GCG's proprietary database of Nominees. GCG Aff. ¶¶3-5.  The remaining 3,825 Claim Packets were either (i) mailed to names and addresses of potential Class Members provided to GCG by Nominees or (ii) mailed to Nominees who requested additional Claim Packets to forward on to their clients directly.  GCG Aff. ¶¶5-6.

6.     In addition, the Summary Notice of Proposed Settlement of Class Action was published over *PR Newswire*, on three separate days -- February 27, 2012, March 5, 2012, and March 9, 2012.  *See* GCG Aff. ¶7.  GCG also posted information regarding the Settlement on a website, www.gcginc.com/cases/inyx, as well as downloadable copies of the Notice and Proof of Claim, the Stipulation, Preliminary Approval Order and instructions for filing Proofs of Claim electronically.  GCG Aff. ¶8.

7.     Along with providing information about the Settlement, the Notice advised recipients that Class Members who do not wish to participate in the Settlement may exclude themselves from the Class.  The Notice also advised recipients that Class Members who do not believe that all aspects of the Settlement, including the Plan of Allocation and Lead Counsel's request for an award of attorneys' fees and reimbursement of expenses are fair, reasonable and adequate, have the right to object to any or all of the foregoing.  The deadline for Class Members

to either file an objection or request exclusion from the Class expired on April 9, 2012.  *See* Exhibit 1(A).  As of the filing of the Brower Declaration, not one Class Member has objected to the Settlement, the Plan of Allocation, or the request for an award of attorneys' fees and expenses, and only two requests for exclusion have been received.  *See* GCG Aff. ¶9.

8.      If the Court approves the Settlement and it becomes Final as that term is defined in the Stipulation, the claims asserted in the Action against the Defendants shall be dismissed with prejudice, subject to the terms of the Stipulation and the Final Order and Judgment entered by the Court.  For the reasons set forth below and in the accompanying Memoranda,[3] I respectfully submit that (1) the terms of the Settlement are fair, reasonable and adequate in all respects and, pursuant to Fed. R. Civ. P. 23(e), worthy of this Court's final approval, (2) the proposed Plan of Allocation is equitable and just, and should be approved, and (3) Lead Counsel's request for attorneys' fees, which is significantly less than the amount of fees they incurred, and their expenses, should be awarded.

## II.      <u>OVERVIEW OF THE SETTLEMENT</u>

9.      The Settlement now before the Court is the culmination of nearly four years of extremely hard-fought litigation, and as the Court is aware, was reached, in principle, by the parties one business day before jury selection and commencement of the trial.  As discussed more fully below, the proposed Settlement was only reached after, *inter alia*, the following:

- •      A factual investigation into the Class' claims that included a review and analysis of financial information obtained from various public sources;

---

[3] In conjunction with the Brower Declaration, Lead Counsel are also submitting (i) Plaintiffs' Memorandum of Law in Support of Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds (the "Settlement Memorandum") and (ii) the Memorandum of Law in Support of Lead Counsel's Application for an Award for Attorneys' Fees and Reimbursement of Expenses (the "Fee Memorandum").

- Briefing a motion to dismiss the consolidated amended complaint filed in this Action;

- Wide-ranging documentary discovery and extensive briefing and argument relating to Plaintiffs' successful motion for class certification, which was followed by Defendants unsuccessful petition to the Second Circuit for review of this Court's class certification decision under Fed. R. Civ. P. 23(f);

- Successfully opposing a motion to transfer the Action to the District of Puerto Rico and a subsequent request for reconsideration of the Court's denial of that motion;

- Extensive document discovery that involved the organization and review of tens-of-thousands of pages of hard-copy and electronic documents;

- Propounding requests for production of documents, responding to Defendants' requests for production of documents and interrogatories, briefing and winning motions to compel the production of documents from Defendants, serving a subpoena on third parties in order to obtain such documents and trial attendance;

- Correspondence between the parties, including the exchange of numerous letters, telephone calls and emails, to resolve the various disputes between the parties related to, *inter alia*, the timing and sufficiency of Defendants' production of documents;

- Developing an in-depth understanding of Inyx's operation, including Inyx's loan covenants with Westernbank Puerto Rico ("Westernbank") and Defendants' schemes regarding false customer invoices, fictitious accounts receivable, and the diversion of funds from the designated lock boxes;

- Working with an expert on market efficiency, materiality, loss causation and damages throughout the litigation;

- Securing default judgments prior to trial against Inyx and Steven Handley and conducting an inquest on damages before the Court; and

- Substantially completing Plaintiffs' pre-trial and trial preparation, including preparing witness lists and researching and drafting jury instructions and motions *in limine*.

10.     Furthermore, the negotiations leading up to finalizing the Stipulation and accompanying exhibits were extensive, protracted, and required great ingenuity on the part of Lead Counsel to forge a solution that provided a benefit for the Class in spite of Defendants' financial

limitations.  I respectfully submit that the ultimate resolution of the Action in February 2012 was achieved only through great diligence and Lead Counsel's persistence notwithstanding the great risks of non-recovery or non-collectability of a judgment as detailed herein.

11.     Another factor heavily militating in favor of the Settlement is that it represents between 1.95% and 3.57% of Class Members' damages (depending on the ultimate amount of the Settlement Amount) based on Lead Plaintiff's damages expert's estimate of recoverable damages (assuming Plaintiffs were completely successful in the Action through trial and the inevitable appeals on all issues on the merits and damages).  Given Defendants' financial condition, such an amount is an excellent result for the Class.

12.     Further recommending the Settlement is the fact that, although over 6,000 copies of the Notice in the form approved by the Court were mailed to potential Class Members by first class mail and three separate publications of the Summary Notice were disseminated over the *PR Newswire*, not a single Class Member has objected to the Settlement and only two requests for exclusion from the Class have been received.  This overwhelmingly positive reaction of the Class further illustrates the excellence of the recovery here.

13.     The Settlement represents a realistic assessment by the knowledgeable and experienced attorneys representing the Class of both the strengths and weaknesses of their claims and defenses thereto, as well as the risks of further proceedings and their ability to actually recover a greater amount from Defendants.  By any objective measure, given the circumstances and history of this Action, the Settlement is fair, reasonable, and adequate.

14.     The Plan of Allocation proposed mirrors precisely the formula Lead Plaintiff would most likely have presented to the trier of fact at trial, and conforms to the legal requirements for loss causation under Supreme Court precedent.  Additionally, the Plan of Allocation is set forth in

full and complete detail in the Notice and, to date, no Class Member has objected to any aspect of the Plan of Allocation.  Accordingly, Lead Counsel believes the Plan of Allocation is both fair and equitable to Class Members.

15.     After battling for nearly four years, Lead Counsel also request an award of attorneys' fees in the amount of one third (33 1/3%) of the recovery, or between $200,000.00 and $366,666.67,  which represent between 10% and 19% of Lead Counsel's time charges devoted to this Action, and reimbursement of their out-of-pocket expenses incurred in the prosecution of the Action of $105,594.24.  This Action was hard fought and required the dedication of significant resources of both time and money over an extended period of time.  To achieve the result here, Lead Counsel expended a total of 3,827.35 hours prosecuting the claims of the Class.  Based on that time expended, Lead Counsel have accrued, on a fully contingent basis and without any compensation for nearly four years, a lodestar of $1,889,404.75, which is five to nine times more than the amount of attorneys' fees requested.  In effect, Lead Counsel are asking for a negative multiplier of their time charges rather than a premium for their efforts.  Given that higher percentages and multipliers of class counsel's time are routinely granted by courts in litigation of this type that end much earlier than on the eve of trial, I submit the requested fee award is both reasonable and fair.

16.     In addition, although the Notice stated that Lead Counsel might seek attorneys' fees equal to thirty-five percent of the Settlement Fund, and the requested fee is, in fact, less, not a single Class Member, to date, has objected to even that higher potential request for attorneys' fees and reimbursement of expenses.  I respectfully submit that the effort expended by Lead Counsel to resolve this contentious litigation justifies awarding the requested attorneys' fees and expenses.

### III.   THE PARTIES AND THE CLASS

17.    On November 10, 2008 the Court appointed David S. Lenington as Lead Plaintiff to prosecute the Action on behalf of the Class.

18.    Defendant Inyx was, during the Class Period, a corporation incorporated in Nevada, and then reincorporated in Delaware on August 31, 2006.  Its principal executive offices are located at 825 3rd Ave., 40th Floor, New York, New York 10022.  Inyx is a pharmaceutical company that develops and manufactures prescription and over-the-counter aerosol pharmaceutical products and drug delivery applications for the treatment of respiratory, allergy, dermatological, and topical and cardiovascular disease conditions and provides pharmaceutical development and manufacturing consulting services to the international healthcare market.  Inyx has numerous wholly-owned subsidiaries.  Inyx common stock traded on the over-the-counter market on the NASDAQ OTC Bulletin Board under the symbol "IYXI."

19.    Certain of Inyx's executive officers during the Class Period also were named as defendants in this Action: (i) Jack Kachkar, Inyx's Chairman and Chief Executive Officer of Inyx; (ii) Steven Handley, Inyx's President and Director; (iii) Rima Goldschmidt, who held officer positions at the Company throughout the Class Period, including Vice President-Finance, Treasurer, and Corporate Secretary, as well as serving as Inyx's Chief Financial Officer and Chief Accounting Officer; and (iv) Jay M. Green, Inyx's Executive Vice President and Director of Corporate Development.

20.    By Order of the Court dated July 5, 2011 (the "Class Order"), *see* Dkt. No. 248, the Court certified a class consisting of all purchasers between April 1, 2005 and July 2, 2007, inclusive (the "Class Period") of Inyx securities on the NASDAQ (the "Class").  Excluded from

the Class are defendants Inyx, Jack Kachkar, Rima Goldschmidt, Jay M. Green, and Steven Handley; members of the immediate family of each of the individual defendants; any person who was an officer or director of Inyx during the Class Period, and his or her legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest. Pursuant to the Settlement, the Class shall also exclude Persons who timely and validly request exclusion from the Class in accordance with the requirements set forth in the Notice.  Additionally, pursuant to the Class Order, Lead Plaintiff Lenington was appointed as the class representative and Lead Counsel, Brower Piven, was appointed class counsel.

## IV.   HISTORY OF THE ACTION

### The Pleadings Phase of the Litigation

21.   Following the revelation that Inyx had fraudulently inflated the Company's reported revenues and made false statements about the Company's operations and internal controls, a securities class actions was filed on July 31, 2008 against Inyx and certain of the Individual Defendants in the United States District Court for the Southern District of New York.   On November 10, 2008, the Court appointed the Lead Plaintiff and appointed Brower Piven as Lead Counsel in this Action.  *See* Dkt. No. 25.

22.   On March 10, 2009, following a far-reaching investigation that included the review and analysis of information and financial data obtained from numerous public and proprietary sources, Lead Plaintiff filed the Consolidated Amended Class Action Complaint (the "CAC"), asserting violations against Defendants of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC").  *See* Dkt. No. 32.

23.   The CAC alleged, among other things, that Defendants engaged in a fraudulent scheme to deceive Class Members through misrepresentations and nondisclosures of material fact

concerning Inyx's reported revenues, operations, and internal controls that artificially inflated the market price of Inyx securities.  In sum, Lead Plaintiffs allege that, in order to fraudulently obtain over $142 million in loans from Inyx's primary lender, Westernbank, Inyx and the Individual Defendants produced false customer invoices, created fictitious accounts receivable, and diverted funds to themselves from a lock box that was supposed to be maintained by the Company for the benefit of Westernbank, and made false statements regarding these activities.

24.     After Westernbank discovered the fraud, it declared certain Inyx subsidiaries in default, forcing those subsidiaries into bankruptcy, and effectively wiping out the value of Inyx's publicly traded shares, thus removing the artificial inflation in the price of Inyx shares and causing damage to those who purchased Inyx securities during the Class Period.

25.     Defendants moved to dismiss the CAC on June 19, 2009, contending, *inter alia*, that (i) Lead Plaintiff's allegations failed to state a claim, (ii) Lead Plaintiffs failed to plead misrepresentations or omissions with the requisite particularity, and (iii) Lead Plaintiff failed to adequately allege *scienter* and loss causation.  *See* Dkt. Nos. 45-46.  On August 21, 2009, Lead Plaintiff filed a memorandum of law opposing Defendants' motion to dismiss, and Defendants filed a reply in further support of their motion on September 25, 2009.  *See* Dkt. Nos. 54 and 57.

26.     On March 1, 2010, the Court issued its Order granting, in part, and denying, in part, Defendants' motion to dismiss the CAC.  *See* Dkt. No. 78.  In that Order, the Court denied in large part Defendants' motion, granting the motion only in regard to a limited number of the approximately thirty false statements the CAC alleged Defendants had made, and denying the motion regarding the majority of Defendants' alleged misstatements.

### Class Certification

27.     On April 22, 2011, Lead Plaintiff filed their Class Certification Motion.  Dkt. No. 227.  On June 30, 2011, Defendants sent a letter to the Court detailing their opposition to

Plaintiffs' Class Certification Motion.  Dkt. No. 245.

28.    To support their Class Certification Motion, Plaintiffs retained John C. Hammerslough, to provide an expert opinion with respect to the efficiency of Inyx shares on the NASDAQ.  Mr. Hammerslough educated himself about the case through the review of public documents, such as Inyx's SEC filings, securities analyst reports, news reports concerning Inyx during the Class Period, and historical stock indices.  Thereafter Mr. Hammerslough issued a detailed expert report.[4]

29.    On July 5, 2011, the Court issued its opinion granting Plaintiffs' Class Certification Motion and appointing Lead Plaintiff as class representative and Brower Piven as class counsel. Dkt. No. 248.

30.    Shortly thereafter, on July 18, 2011, Defendants filed with the Second Circuit their Application for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f), or, in the Alternative, Petition for a Write of Mandamus (the "Rule 23(f) Petition").  On July 29, 2011, Lead Plaintiff filed their opposition to the Rule 23(f) Petition.  On October 28, 2011 the Second Circuit denied Defendants' Rule 23(f) Petition.

**Lead Plaintiff's Discovery**

31.    Lead Counsel have devoted substantial time and effort to discovery.  As set forth below, since discovery began in earnest in March 2010, Lead Counsel have (i) conducted extensive written discovery and document review; (ii) obtained and thoroughly reviewed tens-of-thousands of pages of documents produced by Defendants and third parties in order to understand Inyx's business and operations; (iii) reviewed deposition testimony given in other actions

---

[4] Ultimately, Lead Plaintiff utilized the services of Mr. Hammerslough to provide expert testimony on damages, materiality, market efficiency, and loss causation.  *See infra.*

regarding Inyx, namely *Federal Deposit Insurance Corporation v. Kachkar, et. al.*, 3:07-cv-1606-ADC (D.P.R.) (the "Westernbank Action"); and (iv) litigated multiple disputes over the scope of Defendants' production of documents.

32.     On March 11, 2010, following the Court's denial in large part of Defendants' motion to dismiss, the Court held a conference attended by Lead Plaintiff and Defendants to address the timing of discovery, and then entered an Order setting deadlines for Rule 26 initial disclosures (April 8, 2010), completion of fact discovery (September 30, 2010), and completion of expert discovery (December 30, 2010).  *See* Dkt. 80.

33.     On March 22, 2010 Lead Plaintiff served on Defendants Plaintiff's First Request for Production of Documents ("Plaintiff's Document Request").  Plaintiff's Document Request sought the production of documents concerning the various claims in the CAC including, *inter alia*: (i) loans Inyx received from Westernbank, (ii) Inyx's internal controls and compliance with financial and accounting regulations, (iii) Inyx's policies concerning and the Defendants' actions concerning the Company's invoices, accounts receivable, and lock boxes, and (iv) preparation of Inyx's public filings, all documents Lead Plaintiff believed were highly relevant this Action.  Defendants, however, failed to respond timely to Plaintiff's Document Request, and also failed to timely provide their Fed. R. Civ. P. 26 initial disclosures.

34.     In light of Defendants failure to respond to Plaintiff's Document Request, on June 11, 2010 Lead Plaintiff filed a motion to compel, *see* Dkt. No. 92, seeking to compel Defendants to produce all documents responsive to Plaintiff's Document Request.  Only after Lead Plaintiff filed their motion to compel did Defendants provide responses to Plaintiff's Document Request, which they supplied on June 22, 2010, three months after Plaintiff's Document Request was served.

35.     On June 23, 2010 the Court entered the confidentiality agreement that had been

negotiated between Lead Plaintiff and Defendants. *See* Dkt. No. 97.

36.     On June 24, 2010 Defendants produced a limited number of documents to Lead Plaintiff, consisting mostly of Inyx's SEC filings and pleadings from the Westernbank Action, but made no further production.   On July 13, 2010, having reviewed Lead Plaintiff's motion to compel, the Court ordered Defendants to produce all documents responsive to Plaintiff's Document Request over which Defendants had possession or control by no later than July 27, 2010.

37.     In spite of the Court's order of July 13, 2010 that Defendants produce all documents responsive to Plaintiff's Document Request over which Defendants had possession or control by no later than July 27, 2010, Defendants did not produce such documents to Plaintiffs.   Instead, Defendants claimed they did not have possession or control over such documents, asserting that these documents were in the possession of the Federal Deposit Insurance Corporation ("FDIC"), which was by that time serving as the receiver for Westernbank.

38.     Thus, in order to obtain these documents, Lead Plaintiff served a subpoena on the FDIC on April 8, 2011.   On June 16, 2011, following extensive discussions with the FDIC regarding the subpoena and any responsive documents, Lead Plaintiff obtained access to the document database in the Westernbank Actions that contained hundreds of thousands of pages of documents generated in the course of that litigation.   Lead Plaintiff also received and reviewed extensive deposition transcripts and exhibits generated in the Westernbank Action.

39.     Had Lead Counsel not pursued the discovery disputes, as well as all alternatives to production from the Defendants to obtain the relevant documents, Lead Plaintiff would not have obtained the evidence they needed to properly prepare their case for trial.

### Lead Plaintiff's Expert

40.     As noted above, Lead Plaintiff designated Mr. Hammerslough as their expert on damages, materiality, market efficiency and loss causation.  Given the complex nature of these issues, Mr. Hammerslough spent significant time consulting with Lead Counsel and examining Inyx's SEC filings, securities analyst reports, news reports concerning Inyx during the Class Period, and historical stock prices for Inyx and comparable companies and market indices to articulate an easily understandable theory with respect to: (i) the amount of damages suffered by the Class, (ii) whether the statements alleged by Plaintiffs to be false and misleading were material to the Class, (iii) whether Inyx's common stock traded on an efficient market, and (iv) what portion of Inyx's stock price drop was caused by the revelation of the fraud as opposed to market and industry factors.

41.     Following his analysis, Mr. Hammerslough prepared a 44 page final expert report in advance of the trial that was timely provided to Defendants as required by Fed. R. Civ. P. 26.  Mr. Hammerslough also testified before the Court at a damages inquest regarding the liability of Inyx and Steven Handley on April 6, 2011.  In his report, Plaintiffs' expert Mr. Hammerslough opined that damages totaled $30.8 million for the Class Period.  Thus, based on Plaintiffs' damages expert's analysis, the proposed Settlement constitutes between a 1.95 to 3.57 percent recovery to the Class if every Class Member submits a claim.

42.     In any class action, however, all class members who can file a claim do not.  At the time of the final fairness hearing scheduled for May 4, 2012, Lead Counsel will be able to provide the Court with preliminary calculations of the total value of claims actually filed by putative Class Members and the percentage the Settlement Amount represents to the amount of claims actually filed.

### Defendants' Motion To Transfer

43.     Lead Plaintiff was forced to expend considerable time and energy opposing Defendants' extended, albeit tardy, attempts to transfer the Action.  On July 12, 2010, after two years of litigation in the Southern District of New York, Defendants moved to transfer the Action to the District of Puerto Rico, pursuant to 28 U.S.C. §1404.  *See* Dkt. 114.[5]  On July 27, 2010, Lead Plaintiff filed a memorandum in opposition to Defendants' motion to transfer.  *See* Dkt. 115. On August 20, 2010, Defendants filed a reply in support of their motion to transfer.  *See* Dkt. 122. On September 8, 2010, Lead Plaintiff filed a surreply in opposition to the transfer motion.  *See* Dkt. 128.  On September 17, 2010, Defendants filed a sur-surreply in support of their transfer motion.  *See* Dkt. 144.  Finally, on September 27, 2010, Lead Plaintiff filed a sur-sur-surreply in opposition to the motion to transfer.  *See* Dkt. 150.  Following a conference with the Court on December 16, 2010, where the Court heard the parties regarding the transfer motion, the Court denied Defendants' motion to transfer the Action to Puerto Rico.

44.     On January 6, 2011, Defendants filed a motion, pursuant to Local Rule 6.3 and Fed. R. Civ. P. 59(e) and 60(b), requesting that the Court reconsider the denial of Defendants' motion to transfer.  *See* Dkt. 182.   On January 14, 2011 the Court denied Defendants' motion for reconsideration.  *See* Dkt. 186.

### Judgment Against Inyx and Steven Handley

45.     In addition to preparing for a trial against the Individual Defendants, Lead Plaintiff successfully obtained default judgments against Inyx and defendant Handley prior to trial.  On December 22, 2010 Lead Plaintiff applied for a default judgment against Inyx and Handley, *see* Dkt. 168, pursuant to the Court's order on November 17, 2010, *see* Dkt. 157, and on January 14,

---

[5] Defendants' transfer motion was re-filed on July 27, 2010 due to the initial filing being deficient.

2011 the Court entered judgment against Inyx and Handley as to liability.  *See* Dkt. 184.  On April 6, 2011 the Court conducted an inquest as to damages regarding Inyx and Handley.

### Lead Plaintiff's Trial Preparation

46.     As the original February 6, 2012 trial date approached, Lead Counsel began the arduous task of (i) researching and drafting various pleadings for use in conjunction with trial, such as jury instructions and motions *in limine*, (ii) developing a witness list, exhibit list and trial outline to ascertain the most succinct way to present the evidence to the jury, and (iii) planning for compelling live testimony at trial and preparing deposition excerpts where live testimony would be unavailable.  As a result, Lead Plaintiff timely filed his final pretrial order, proposed trial exhibits, proposed trial deposition excerpts, motions *in limine*, and jury instructions.  On February 3, 2012, the court held a lengthy Final Pretrial Conference to resolve outstanding disputes and many of the motions *in limine*.  Because a settlement in principle was not reached until after that pretrial conference, Lead Counsel's preparations for what was anticipated to be a highly complex trial were completed prior to the Settlement being reached in this Action.

### Settlement Negotiations

47.     This Settlement is the product of negotiations spanning much of the length of the Action.   Settlement discussions were conducted at various points following the denial of Defendants' motion to dismiss and finally concluded on February 9, 2012.

48.     Prior to February 2012 Lead Plaintiff and Defendants had, at various times throughout the course of the Action, engaged in settlement discussions.  While these talks seemed at various junctures as if they might yield a resolution to the Action, a final compromise that would benefit the Class was never achieved during these prior discussions.   In the course of these discussions, as well as Lead Plaintiff's discovery efforts, Lead Counsel had attempted to keep abreast of the Defendants' financial and litigation situations.   That due diligence served Lead

Counsel well in the expedited settlement discussions that commenced following the Final Pretrial Conference.

49.     At the conclusion of the Final Pretrial Conference on February 3, 2012, the Court suggested that the parties might wish to engage in a final attempt at settling the Action.  Beginning immediately following the Final Pretrial Conference, and eventually extending throughout most of the next week, the parties discussed possible terms for a settlement, in an attempt to reach an agreement prior to the February 6, 2012 deadline set by the Court.  Because of the limited financial resources of the Defendants, settlement negotiations and the terms of any potential settlement were unusually complicated.  When the parties appeared before the Court on February 6, 2012, Lead Plaintiff and Defendants informed the Court that the parties had reached an agreement in principle. However, due to the complexities involved in preparing for such a unique settlement, the parties informed the Court that settlement had not yet been finalized.  The Court ordered a subsequent conference on February 9, 2012, indicating that if the settlement had not been finalized, the parties would proceed to trial on February 14, 2012.

50.     The parties continued negotiations, and on February 9, 2012, the parties executed the Stipulation and provided the Court with a motion for preliminary approval of the Settlement. Later that day, the parties appeared again before the Court, at which time Lead Counsel and Defendants made presentations to the Court and, thereafter, the Court granted preliminary approval of the Settlement.

## V.     THE FACTORS AFFECTING SETTLEMENT

51.     The proposed Settlement is the result of nearly four years of contentious litigation and protracted settlement negotiations by Lead Counsel, highly experienced counsel who concluded that the Settlement is in the best interests of the Class.

52.     The proposed Settlement is an excellent result for the Class, providing for, based on Plaintiff's expert's damages estimate, a recovery of between 1.95% (assuming Defendants satisfy the terms of the Settlement in its entirety prior to February 27, 2013) to 3.57% (assuming circumstances lead the Defendants to pay the maximum settlement amount) of the Class' total damages of $30.8 million, which would be the best possible Class recovery assuming complete victory on every issue of liability and damage, prevailing on all post-trial and appellate proceedings, a 100% claim rate by eligible Class members and collectability of the judgment. Further, the Settlement at this time avoids a complex trial, and the hurdles Plaintiffs would have to clear to establish the elements of his Section 10(b) and 20(a) claims, including falsity, *scienter*, loss causation and the full amount of the Class' damages, and avoids the significant costs associated with the trial and appellate processes.  Indeed, the significant risks involved in taking this Action to trial, coupled with the additional time and expense, when measured against the benefit of the Settlement Amount, alone justify the Settlement.

53.     The following factors have been cited by the Second Circuit as the pertinent criteria for evaluating the fairness of a proposed Settlement: (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).  Based on an analysis of each of these factors, the Settlement before the Court is, without doubt, fair, reasonable and adequate and should be

approved.

### The Ability of the Defendants to Withstand a Greater Judgment

54.     Lead Counsel believes that, given the circumstances surrounding this action and the financial constraints on the Defendants, the seventh *Grinnell* factor, the ability of Defendants to withstand a greater judgment, is the most important factor here, and counsels heavily in favor of settlement, as Defendants are unlikely to be able to withstand a greater judgment that than provided for by the Settlement, even if Lead Plaintiff successfully litigated this case through to a final judgment against Defendants.  As the Court has previously been informed, based on Lead Counsel's pre-settlement due diligence, Inyx currently has no business operations and essentially no assets, the Company's D&O liability coverage was exhausted by expenses related to the Westernbank Action, Dr. Kachkar and Mr. Green both have limited personal assets, Dr. Kachkar is subject to a nine figure judgment pending in the Westernbank Action, and Ms. Goldschmidt also has limited personal assets and additionally resides in Canada, where enforcing such a judgment under the federal securities laws would likely prove difficult.  Additionally, the Defendants' inability to fulfill their monetary obligations to three successive law firms is further evidence of their collective lack of financial resources.

### The Complexity, Expense and Likely Duration of the Litigation

55.     An analysis of the first *Grinnell* factor, the complexity, expense and likely duration of the litigation, supports the Settlement.  Virtually all securities actions are inherently complex, and this Action was no different.  In addition to the typical complications involved in establishing Defendants' liability and in proving damages in a Section 10(b) action, Plaintiffs' claims involved, *inter alia* explaining Inyx's loan covenants with Westernbank and dissecting Defendants various schemes to inflate revenue, including the false customer invoices, fictitious accounts receivable, and diversions of funds from the appropriate lock box.

56.     Although the parties were literally on the eve of trial when the Settlement was reached, the actual trial would have required hundreds of hours of additional work by Lead Counsel (and the Court) and the expenditure of enormous amounts of money that are required to try a complex commercial action of this type using the requisite modern trial techniques.  Indeed, several witnesses who reside outside the subpoena range of the Court agreed to testify if their travel expenses were paid, including witnesses residing in Florida and England.  Additionally, a trial was unlikely to be the end of the litigation.  There would certainly have been post-trial motions, as well as appeals to the Second Circuit regardless of the victor.  All of the foregoing would have added significantly to the time and expense of this Action and, even if Lead Plaintiff were ultimately successful, delayed, potentially for years, any recovery to the Class.

### The Reaction of the Class to the Settlement

57.     An analysis of the second *Grinnell* factor, the reaction of the class to the settlement, counsels in favor of the Settlement.  Class Members had until April 9, 2012 to request exclusion from the Class or to submit an objection to the proposed Settlement, or any part thereof.  The reaction of the Class to the Settlement has been overwhelmingly positive.  As set forth above, GCG and Lead Counsel, in accordance with the procedures for mailing and publication established by the Court's Preliminary Approval Order, undertook an extensive program to ensure that notice of the Action and the proposed Settlement was widely disseminated to Inyx's Class Period shareholders.  GCG mailed over 6,000 copies of the Notice to potential Class Members and publication of the summary notice three times over the national business newswires.  However, not one Class Member has objected to the Settlement, and only two potential Class Members have requested exclusion from the Class.

<u>**The Stage of the Proceedings and the Amount of Discovery Completed**</u>

58.    An analysis of the third *Grinnell* factor, the stage of the proceedings and the amount of discovery completed, fully supports the Settlement.   By the time the Parties reached the Settlement, Lead Counsel had sufficient knowledge and understanding of the merits of Lead Plaintiff's claims and Defendants' defenses to determine that the Settlement is fair, reasonable and adequate.

59.    As detailed above, Lead Counsel had completed wide-ranging investigation and discovery into the merits, engaged an expert to analyze and opine on damages, were in the final days of their trial preparation at the time the Settlement was reached, and had fully apprized themselves of the Defendants' financial conditions.

60.    The knowledge and insight gained by Lead Counsel following nearly four years of investigating, litigating and negotiating the Action provided Lead Counsel with more than sufficient information to make an informed evaluation of the strengths and weaknesses of the Class' claims and Defendants' defenses.   This knowledge also guided Lead Counsel to the conclusion that, given that Plaintiffs are highly unlikely to be able to obtain a larger recovery should they engage in a complex trial, and additionally faced a real risk that Plaintiffs would recover nothing following trial, Settlement pursuant to the terms of the Stipulation was the best course of action for the Class.

<u>**The Risks of Establishing Liability and Damages**</u>

61.    An analysis of the fourth and fifth *Grinnell* factors -- the risks of establishing liability and the risks of establishing damages – were not factors that weighed heavily in Lead Plaintiff's decision to resolve the Action.   Nevertheless, while Lead Counsel was confident that Lead Plaintiff would prevail at trial on the merits, any experienced class action attorney understands that success in a securities fraud litigation is never a certainty.   Indeed, the risks at trial

of proving liability, loss causation and damages always exist as these elements are notoriously difficult to prove under the federal securities laws.

62.     Furthermore, irrespective of the factual merits to a plaintiff's claims, the law in the area of securities regulation is very fluid.  Indeed, during the pendency of this Action, no less than four significant Supreme Court cases were decided that significantly altered the law in the area. Thus, Lead Counsel was fully aware that, no matter how successful at the pretrial and trial stage, a change in the law was always possible and could significantly undermine their case or dilute any result at the appellate stages.

<u>**The Risks of Maintaining the Class Action Through the Trial**</u>

63.     An analysis of the sixth *Grinnell* factor, the risk of maintaining the class through the trial, is also a factor that did not weigh heavily in Lead Plaintiff's decision to settle the Action. Again, Lead Counsel was confident under existing law that the Class would remain as certified through trial and the appellate process.  Nevertheless, as with any class decision, the outcome of an appellate review is not pre-ordained.  Here, Defendants contested certification of the Class and while they have not formally sought to decertify the Class, they may at trial attempt to limit the span of the Class Period and/or the number of potential Class Members within the Class. Defendants, who were refused interlocutory review of the class certification decision, would certainly have sought post-trial review of that decision.  Although Lead Plaintiff believes their appellate arguments were without merit, the risk always exists that the Second Circuit could disagree.

**The Range of Reasonableness of the Settlement Fund in Light of the**
<u>**Best Possible Recovery and the Attendant Risks of Litigation**</u>

64.     An analysis of the eighth and ninth *Grinnell* factors, the range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks in litigation, was

critical in Lead Counsel's decision to settle the Action and weighs strongly in support of the Settlement.  Here, the Class will receive between $600,000 and $1,100,000 in cash to settle their claims against Defendants, over a time period ranging between five years or less, a significant result for the Class both in absolute terms and when viewed in light of Defendants' inability to withstand a greater judgment and avoiding the risks of further litigation

65.     Furthermore, if the Action had gone to trial, Defendants would only be liable for payment, assuming Plaintiffs' complete success on the merits and damages, for the amount of claims actually submitted by Class Members to share in the judgment rendered, which would have placed further limitations on any recovery that might have been won at trial.

## VI.     THE PLAN OF ALLOCATION

66.     The proposed Plan of Allocation provides the manner in which the Settlement Amount, together with any interest earned thereon, less all payments from the Settlement Fund allowed by the Court for Notice, administration of the Settlement and Class Counsel's attorneys' fees and expenses (the "Net Settlement Fund") shall be distributed to Authorized Claimants.[6]  *See* Notice attached as Exhibit 1(A) hereto.  Distributions will be made to Authorized Claimants after all Proofs of Claim have been processed and after the Court has approved the final calculations and distributions to be made to the Class.

67.     Lead Counsel prepared the Plan of Allocation after careful consideration and detailed analysis, and after consulting with Lead Plaintiff's damages expert, Mr. Hammerslough. The Plan of Allocation was fully disclosed in the Notice and, as of the filing of the Brower

---

[6] "Authorized Claimant" is defined in the Stipulation as any putative Class Member whose claim for recovery has been allowed pursuant to the terms of the Stipulation.  As set forth in the Notice, Authorized Claimants must submit Proofs of Claim postmarked by no later than May 11, 2012 in order to be eligible to recover under the Settlement, however, the Court may extend this deadline.

Declaration, there has been no objection to the Plan of Allocation.

68.      The Plan of Allocation reflects the proposition that the price of Inyx common stock was artificially inflated during the Class Period (April 1, 2005 through July 2, 2007, inclusive) due to misrepresentations and/or omissions by Defendants.[7]   Thus, as set forth in the Plan of Allocation, the Net Settlement Fund will be allocated to all Authorized Claimants *pro rata* on a per share basis on the number of shares of Inyx common stock held by claiming Authorized Claimants at the close of the market on July 1, 2007, based on the information supplied in their Proof of Claim with respect to each claimant's purchases and sales of Inyx common stock on the NASDAQ.   In order to recover under the Plan of Allocation, a claimant must have purchased Inyx common stock on the NASDAQ between April 1, 2005 and July 2, 2007, inclusive, otherwise their resulting recognized loss would calculate to zero.

69.      The Plan of Allocation reflects the same formula that would have been applied by Lead Counsel to determine per share and aggregate damages at trial and is the same formula that Lead Plaintiff would have proposed to the Court for a post-trial Class claims process if Lead Plaintiff had succeeded on the merits.   As such, the proposed Plain of Allocation reflects the same methodology for calculating Class Members' claims as would have been used if their was no settlement and a recovery to the Class.

70.      Accordingly, Lead Counsel believe that this method of allocation has a reasonable and rationale basis and is fair, reasonable and equitable and therefore, warrants the Court's approval.

---

[7] On July 2, 2207, the last day of the Class Period, news services carried a report that two of Inyx's United States subsidiaries had filed for Chapter 11 protection.  In reaction to this news, Inyx's stock fell by 87.3%, from a closing price of $2.44 per share on June 29, 2007 to a closing price $0.35 per share on July 2, 2007, on extremely heavy trading volume, and continued to drop to $0.31 on July 3, 2007.

## VII.    REQUEST FOR AN AWARD OF ATTORNEYS' FEES

71.    Lead Counsel respectfully request an award of one third (33 1/3%) of the Settlement Amount, or between $366,666.67 and $200,000.00 (depending, as discussed *supra*, on the final amount of the Settlement Amount), plus interest earned on that amount at the same rate as earned by the Settlement Fund from the time of the award to the time of payment.[8]

72.    Lead Counsel believe that this request is consistent with established precedent in this District and throughout the Second Circuit, as well as in federal courts throughout the country, as fees equal to and greater than the requested percentage have been awarded in securities class actions to Lead Counsel working on a contingent fee basis and obtaining a common fund for the benefit of the class.  *See* Fee Memorandum at p. 13, submitted herewith.

73.    Moreover, a cross-check of the lodestar amply supports the attorneys' fee request. Lead Counsel devoted 3,827.35 hours prosecuting this Action equal to a lodestar of $1,889,404.75 from its inception through April 26, 2012.  Thus, the requested fee award represents a negative multiplier and a ***discount*** of 81% to 89% of Lead Counsel's lodestar.[9]

74.    Although most district courts in the Second Circuit apply the "percentage of the fund" method over the "lodestar" method when determining awards of attorneys' fees in common fund recoveries, Lead Counsel are presenting the information necessary for the Court to use either method for its analysis.  Regardless of which fee calculation method is applied, district courts in the Second Circuit also consider the factors enumerated in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000), when determining an award of attorneys' fees.  The six

---

[8] This amount does not include the continuing costs of claims administration.  Those expenses will be applied for at a later time as the claims administration process progresses further.

[9]  In addition, annexed hereto as Exhibits 2 is a description of the background and experience of the attorneys who worked on this Action and the experience and standing Brower Piven.

*Goldberger* factors are: (1) the time and labor expended by counsel, (2) the magnitude and complexities of the litigation, (3) the risk of the litigation, (4) the quality of representation, (5) the requested fee in relation to the settlement, and (6) public policy considerations.  Lead Counsel respectfully submit that an analysis of these criteria demonstrates that the requested fee is abundantly fair and reasonable.

75.     In addition, although the *Goldberger* factors do not specifically include the reaction of the class to the fee request, courts in the Second Circuit universally consider the class' reaction when deciding whether to award the requested fee.  The Notice disseminated to the Class advised recipients that Lead Counsel would be requesting an award of attorneys' fees from the Settlement Fund in an amount not to exceed 35% of the Settlement Fund and for reimbursement of their expenses in an amount not to exceed $110,000, plus interest.  Both amounts set forth in the Notice were higher than Lead Counsel's actual request here.  Class Members had until April 9, 2012 to submit an objection to Lead Counsel's request for fees and expenses.  To date, not a single objections to Lead Counsel's request for an award of attorneys' fees has been received.

### The Labor and Time Expended by Lead Counsel

76.     An analysis of the first *Goldberger* factor, the labor and time expended by Lead Counsel, weighs heavily in support of the fee request.  As detailed above, Lead Counsel labored over this case for nearly four years, using their best efforts to employ comprehensive, yet cost effective litigation strategies.

77.     Lead Counsel devoted 3827.35 hours to this Action, amounting to $1,889,404.75 in billable time.  As a result, Lead Counsel's request for one third of the Settlement Fund, or between $366,666.67 and $200,000.00, requires the application of a negative multiplier, representing only between 10% and 19% of Lead Counsel's time devoted to this Action.  As Lead Counsel

vigorously litigated this matter for nearly four years -- taking this Action to the eve of trial -- and invested substantial resources on a fully contingent basis and, thus, without a guarantee of payment, Lead Counsel respectfully submit that the resulting negative multiplier from the attendant lodestar cross-check fully supports the requested attorneys' fees not only fair and reasonable, but more than appropriate under the circumstances.[10]

78.     Below is a chart reflecting the names of the attorneys and paraprofessionals at Brower Piven who worked on the Action, the current hourly rates charged by each such attorney and paraprofessional, and the lodestar value of the time expended by those attorneys and paraprofessionals:

**BROWER PIVEN LODESTAR**
**(July 31, 2008 through April 26, 2012)**

| Attorney | Hours | Rate | Lodestar |
|---|---|---|---|
| David A.P. Brower | 487.00 | $850 | $413,950.00 |
| Charles J. Piven | 166.60 | $750 | $124,950.00 |
| Brian C. Kerr | 6.00 | $700 | $4,200.00 |
| Jason Husgen | 415.00 | $550 | $228,250.00 |
| Caitlin Moyna | 772.50 | $550 | $424,875.00 |
| Ananda Chaudhuri | 345.70 | $525 | $181,492.00 |
| Yelena Trepetin | 310.10 | $500 | $155,050.00 |

---

[10] Moreover, Lead Counsel will continue to perform legal work on behalf of the Class should the Court approve the proposed Settlement.  Lead Counsel will expend additional resources assisting Class Members with their Proofs of Claim and related inquiries and working with the Claims Administrator to ensure the smooth progression of claims processing.

| Attorney | Hours | Rate | Lodestar |
|---|---|---|---|
| Melissia Dorsey | 26.90 | $450 | $12,105.00 |
| Daniel I. Wolf | 90.50 | $400 | $36,200.00 |
| Saira Hussain | 21.00 | $300 | $6,300.00 |
| Jessica Sleater | 62.80 | $300 | $18,840.00 |
| Eileen Ryan | 655.95 | $275 | $180,386.25 |
| Eric Love | 174.55 | $220 | $38,401.00 |
| Jeremy Doroski | 123.35 | $220 | $27,137.00 |
| Jason Mustian | 2.80 | $220 | $616.00 |
| Mary Hoffman | 166.60 | $220 | $36,652.00 |
| **Grand Total:** | **3,827.35** | **Grand Total:** | **$1,889,404.75** |

### The Magnitude, Complexities and the Risk of the Litigation

79.     An analysis of the second and third *Goldberger* factors, the magnitude, complexities and risk of the litigation, weighs heavily in support of the fees requested herein. Lead Counsel undertook this Action in July 2008 on an entirely contingent fee basis, assuming the risks of surviving the type of dispositive motions typically filed (and often won) by defendants in federal securities fraud actions, obtaining class certification in a fluid legal terrain, proving falsity, *scienter*, loss causation and damages, and litigating the Action through trial and likely appeals. Lead Counsel understood from the outset that they were embarking on a complex, expensive and lengthy litigation, which would require the investment of thousands of hours of attorney time over a period of years, with no guarantee of ever being compensated for the investment of such time and money.  Lead Counsel also understood that Defendants would (and, in fact, did) mount a

vigorous defense.

80.     In undertaking this risk, Lead Counsel was obligated to assure that sufficient attorney resources were dedicated to the prosecution of this Action.  Moreover, Lead Counsel have not been compensated for any of their time or expenses during the nearly four years that this Action has been pending while incurring significant out-of-pocket expenses that they were advancing on behalf of their clients.  Nevertheless, despite the risk of receiving no payment if their efforts proved futile, Lead Counsel advanced millions of dollars of time and over one hundred thousand dollars in expenses in litigating the Class' claims.

81.     It would be incorrect to presume that a law firm handling complex contingent litigation always wins.  In fact, the factor labeled by the courts as "the risks of litigation" is not an empty phrase and tens of thousands of hours have been expended in losing efforts.  In numerous cases, plaintiff's counsel working on a contingent basis, such as this, have expended thousands of hours only to receive no compensation.  Moreover, there have been many hard-fought lawsuits where, because of (i) the discovery of facts unknown when the case was commenced, (ii) changes in the law while the case was pending, or (iii) decisions of judges or juries following a trial on the merits, that excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.  Losses such as these are exceedingly expensive and the risks plaintiffs' counsel undertake to litigate cases on a fully contingent basis -- here nearly four years of litigation -- justifies a higher fee where Lead Counsel are successful.

82.     Here, notwithstanding collectability of a judgment (whether Defendants had the resources or not) would prove difficult, Lead Counsel continued to vigorously press the Class claims knowing that it was unlikely, if they took Defendants to the point of trial, they would be able to recover their entire investment of time and expenses in the Action.  Nevertheless, without

regard to their own economic interests, Lead Counsel pursued these Defendants to the eve of trial and obtained, what Lead Counsel believes to be the best recovery possible under the circumstances for the Class.

### The Quality of Representation

83.     An analysis of the fourth *Goldberger* factor, the quality of representation, counsels in favor of the requested fee award.  Lead Counsel, the law firm of Brower Piven, practices extensively in the highly complex field of shareholder securities litigation and has successfully litigated these types of actions in courts throughout the country.  The experience of Brower Piven is set forth in greater detail in Exhibit 2 attached hereto.

84.     Further, Lead Counsel achieved this recovery for the Class through their own skill and effort.  No governmental authority, such as the SEC, instituted any public investigation or proceedings that could have assisted Lead Counsel in this Action; rather, Lead Counsel were on their own to develop the facts necessary to, *inter alia*, successfully defeat a motion to dismiss and prevail on a motion for class certification.

85.     Lead Counsel respectfully submit that their expertise and hard work helped to yield a positive result for the Class in a hotly contested and difficult case.

### The Requested Fee in Relation to the Settlement

86.     An analysis of the fifth *Goldberger* factor, the requested fee in relation to the settlement, favors approval of Lead Counsel's fee request.  While the percentage of fees awarded in securities actions have varied substantially, courts in the Second Circuit and around the country have consistently awarded percentage fees to Lead Counsel that were equal to and, indeed, greater than the fee requested by Lead Counsel herein.  *See* Fee Memorandum at pp. 13.  Given the significant amount of time that Lead Counsel were required to expend to successfully prosecute

this Action, the present request for a fee of one third of the Settlement Fund (or between $366,666.67 and $200,000) representing between only 10% and 19% of their collective time charges is reasonable.

### Public Policy Considerations

87.     An analysis of the sixth *Goldberger* factor, public policy considerations, also supports Lead Counsel's fee request.   During the pendency of this Action, Lead Counsel shouldered all of the risk of committing substantial time and resources to the investigation, prosecution and settlement of the Class' claims, notwithstanding significant uncertainty as to whether the Action would ultimately succeed.   Here, this Settlement is providing the only monetary recovery for Class Members.   Additionally, Lead Counsel's efforts served as a necessary supplement to government enforcement.   The SEC, a vital but understaffed government agency, does not have the budget to ensure complete enforcement of the securities laws.   *See Tellabs*, 551 U.S. at 313 ("meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions. . . ."").   Therefore, if this important work by private counsel for plaintiffs is to be carried out, the courts should award fees that will adequately compensate Lead Counsel, taking into account the risks undertaken with a clear view of the economics of the situation.   Absent Lead Counsel's willingness to assume the risks set forth herein, and vigorously litigate this Action to the eve of trial, the Class would not have recovered anything, let alone the recovery of between $600,000 and $1,100,000 obtained by the Settlement.

## VIII.   LEAD COUNSEL'S REQUEST FOR REIMBURSEMENT OF EXPENSES

88.     Lead Counsel also request reimbursement of their out-of-pocket expenses, in the amount of $105,594.24, incurred in connection with the prosecution of the Action on behalf of the

Class, plus interest earned on that amount at the same rate as earned by the Settlement Fund from the date of the award to the date of payment.  It is well-settled that attorneys who have created a common fund for the benefit of a class are entitled to be reimbursed for their out-of-pocket expenses incurred in creating the fund so long as the submitted expenses are reasonable, necessary and directly related to the prosecution of the Action.

89.     These expenses were incurred in connection with Lead Plaintiff's investigation and discovery efforts, photocopying of documents, on-line research, messenger services, postage, express mail, travel, and other incidental expenses directly related to the prosecution and settlement of this Action.  These expenses are as follows:

### LITIGATION EXPENSE
### (July 31, 2008 through April 26, 2012)

| | | |
|---|---|---|
| Court Reporters | | $1,060.14 |
| Special Supplies | | $69.07 |
| Process Service | | $856.12 |
| Express Mail | | $1,635.98 |
| Postage | | $302.87 |
| Hotels | | $236.75 |
| Meals | | $315.59 |
| Transportation/Airfares | | $1,904.25 |
| Research/Lexis/PACER | | $3,756.87 |
| Experts | | $64,120.00 |
| John C. Hammerslough, LLC (Damages Expert) | $55,545.00 | |
| Axia Advisors (Accounting Expert) | $8,575.00 | |

| | |
|---|---|
| Reproduction/Printing | $12,409.10 |
| Garden City Group (Claims Administrator) | $18,606.19 |
| **TOTAL:** | **$105,594.24** |

90.     As of the date of this filing, although Lead Counsel are seeking less than the amount of the cap set forth in the Notice to Class Members, no objections have been received regarding Lead Counsel's request for reimbursement of expenses.

## IX.     CONCLUSION

91.     Based on the factors discussed above, I respectfully submit that: (i) the proposed Settlement is fair, reasonable and adequate and should be approved; (ii) the proposed Plan of Allocation is fair and equitable, and should be approved; and (iii) Lead Counsel's request for an award of attorneys' fees and reimbursement of expenses incurred in the prosecution of the Action is fair and reasonable, and should be granted.

Dated this 27th day of April, 2012

*David A.P. Brower /s/*
DAVID A.P. BROWER