BROWER PIVEN
  A Professional Corporation
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel.: (212) 501-9000
Fax: (212) 501-0300

*Lead Counsel for Class Representatives*
*and the Class*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PENNSYLVANIA AVENUE FUNDS, Individually And On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> INYX INC., JACK KACHKAR, STEVEN HANDLEY, RIMA GOLDSHMIDT, JAY M. GREEN and BERKOVITS & COMPANY, LLP, <br><br> Defendants. | Civil Action No. 08-cv-06857-PKC |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF FINAL APPROVAL OF
CLASS ACTION SETTLEMENT AND
PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS**

Pursuant to Fed. R. Civ. P. 23(e), lead plaintiff David S. Lenington ("Lead Plaintiff" or "Class Representative"), by and through his counsel, Brower Piven, A Professional Corporation ("Brower Piven" or "Lead Counsel"), respectfully submits this memorandum in support of final approval of: (i) the settlement of the above-captioned action (the "Action"), as set forth in the Stipulation and Agreement of Settlement dated February 9, 2012 (the "Stipulation"),[1] which this Court preliminarily approved by its Preliminary Approval Order dated February 9, 2012 (the "Preliminary Approval Order"); and (ii) the proposed plan for allocating the settlement proceeds to the Class[2] (the "Plan of Allocation").

## I.    PRELIMINARY STATEMENT

As set forth in detail in the accompanying Declaration of Plaintiffs' Lead Counsel David A.P. Brower in Support of Final Approval of Settlement, Plan of Allocation and Lead Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Expenses (the "Brower Declaration"), the Settlement obtained for the Class in this Action -- between $600,000 and $1,100,000 in cash (under the terms of the Stipulation the exact amount of will depend both on the timing of Defendants' payments in satisfaction of the Stipulation and on whether or not Defendants realize any financial return in connection with certain intellectual property rights

---

[1] Capitalized terms not defined herein shall have those meanings ascribed to them in the Stipulation and Brower Declaration.

[2] The Class was previously certified by Order dated July 5, 2011 and is defined as follows: "[A]ll purchasers of Inyx . . . securities on the [NASDAQ] between April 1, 2005 and July 2, 2007, inclusive, and who were damaged thereby."  (Alterations in original).  Excluded from the class are defendants Inyx, Jack Kachkar, Rima Goldschmidt, Jay M. Green, and Steven Handley; members of the immediate family of each of the individual defendants; any person who was an officer or director of Inyx during the Class Period, and his or her legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest. Pursuant to the Settlement, the Class shall also exclude Persons who timely and validly request exclusion from the Class in accordance with the requirements set forth in the Notice of Proposed Settlement of Class Action (the "Notice").

described in the Stipulation) -- is the product of nearly four years of investigation, hard-fought litigation and complicated settlement negotiations that required great creativity and ingenuity on the part of Lead Counsel.

Since this Action was commenced in July 2008, Plaintiffs have diligently and vigorously pursued their claims against the Defendants[3] and were prepared to take the Action to trial the next business day had the Settlement not been reached.  To that end, Lead Counsel, *inter alia*: (i) reviewed and analyzed information and financial data obtained from numerous public and private sources (*e.g.*, Inyx's filings with the Securities and Exchange Commission ("SEC"), publicly available annual reports, press releases, published interviews, news articles and other media reports, and securities analysts reports); (ii) sought out and obtained information from former Inyx employees; (iii) retained and consulted with an expert in the area of damages and financial markets; (iv) fully briefed and successfully opposed, in large part, Defendants' motion to dismiss; (v) prevailed on a motion for class certification and the appeal of that determination to the Second Circuit Court of Appeals; (vi) engaged in difficult and contentious discovery, which included exchanging innumerable letters, emails and telephone calls relating to various disputes over the sufficiency and timing of Defendants' document productions and filing several successful motions to compel Defendants' document production; (vii) reviewed tens-of-thousands of pages of documents produced by Defendants and numerous third parties, including, *inter alia*, the voluminous documents produced in *Federal Deposit Insurance Corporation v. Kachkar, et. al.*, 3:07-cv-1606-ADC (D.P.R.) (the "Westernbank Action"), the depositions conducted in the Westernbank Action, the voluminous pleading and exhibits filed in the

_____

[3] "Defendants" are Inyx, Inc. ("Inyx"), and three of its executive officers during the Class Period, Dr. Jack Kachkar, Jay M. Green and Rima Goldshmidt (the "Individual Defendants").  This Settlement resolves all claims against the Defendants in this Action.

Westernbank Action, and documents produced by Ernst & Young LLP; (viii) opposed Defendant's motion to transfer the action to Puerto Rico and ensuing motion for reconsideration; (ix) obtained default judgments prior to trial against Inyx and defendant Steven Handley and conducted a subsequent inquest on damages; (x) briefed motions for summary judgment; (xi) completed all trial preparation, including filing plaintiff's portions of the final pretrial order, which included Lead Plaintiff's proposed trial exhibits and deposition excerpts, proposed jury instructions, a final expert report on market efficiency, loss causation, and damages, issuing trial subpoenas to various persons and entities to testify at trial, and arranging for various witnesses to testify at trial including certain former senior Inyx officers; and (xii) conducting due diligence into the financial condition of the Individual Defendants.   Through these efforts, Lead Counsel developed an in-depth understanding the business subjects at the heart of the Action, including Inyx's business operations, Inyx's loan covenants with Westernbank Puerto Rico ("Westernbank"), and Inyx's procedures and controls regarding customer invoices, accounts receivable, and lock boxes.  As such, Lead Plaintiff and his counsel were well positioned to evaluate the strengths and weaknesses of the Class' claims, the value of those claims, and the ability to recover in the event Lead Plaintiff succeeded on the merits.

The Settlement was achieved only after intensive and protracted adversarial negotiations that were ultimately advanced with the assistance of the Court.  At the time the parameters of the Settlement were reached, Lead Plaintiff was ready to proceed with trial on the next business day. Although confident of success on the merits, Plaintiffs were aware that, as in any jury trial, the risk of a loss still exits.  Moreover, Lead Plaintiff was cognizant of the expense and delay associated with a lengthy trial, and, as the history of this litigation amply demonstrates, inevitable post-trial motions and appeals.  Further, Lead Plaintiff was well aware of the

Defendants' ability (or, more to the point, inability) to respond to a significant judgment and that any ultimate victory in the action would, most probably, have been a pyrrhic one. As discussed in detail below, the Settlement for between $600,000 and $1,100,000 in cash, which provides a certain and substantial benefit to the Class, without the attendant risks, costs and delays of further litigation, is a fair, reasonable and adequate result for the Class.

The positive reaction of the Class to the Settlement, so far, also counsels in support of the Settlement.  Pursuant to the Court's Preliminary Approval Order, more than 6,000 copies of the Notice were mailed to potential Class Members or their nominees as of April 27, 2012.[4] Additionally, a summary notice was published over *PR Newswire* on three (3) separate, staggered days.  GCG Aff. ¶7.  GCG also posted information regarding the Settlement on a website, www.gcginc.com/cases/inyx, as well as downloadable copies of the settlement documents, including both the Notice and Proof of Claim and Release form ("Proof of Claim"). *Id*. at ¶8.  The deadline for objections to any aspect of the Settlement or Plan of Allocation or requests for exclusion from the Class expired on April 9, 2012.  To date, ***not a single*** Class Member has filed an objection to the Settlement, and only two (2) potential Class Members have requested exclusion from the Class.  *Id*. ¶9.  See § III (B) (5) below.

For the reasons stated herein and in the Brower Declaration, Lead Plaintiff respectfully requests that the Court grant final approval to the Settlement and Plan of Allocation.

_____

[4] *See* Affidavit of Jose C. Fraga Senior Director of the Garden City Group, Inc. ("GCG") Regarding (A) Mailing of the Notice; (B) Publication of the Summary Notice; (C) Website; and (D) Requests for Exclusion Received to Date, attached as Exhibit 1 to the Brower Declaration, at ¶6.  The Notice, a copy of which is attached to the GCG Affidavit, contains a detailed description of the nature and procedural history of the Action; the material terms of the Settlement and the claims that will be released; the estimated recovery information required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"); the Plan of Allocation; the parameters of Lead Counsel's request for an award of attorneys' fees and reimbursement of expenses; the right and mechanism for Class Members to exclude themselves from the Class; and the right and mechanism for Class Members to object to the Settlement.

## II.    HISTORY OF THE ACTION

The accompanying Brower Declaration (¶¶21-50) contains a detailed discussion of Plaintiffs' claims, the factual background and procedural history of the Action, the investigation and discovery undertaken, the motion practice, and the negotiations leading to this Settlement. Plaintiffs will, therefore, not repeat that information herein, but rather respectfully refer the Court to the Brower Declaration.  Instead, this memorandum will focus on the factual and legal matters relevant to Court approval of the proposed Settlement and Plan of Allocation under Fed. R. Civ. P. 23(e).

## III.   THE SETTLEMENT MEETS THE REQUIREMENTS FOR FINAL APPROVAL

The Settlement is fair, reasonable, and adequate and meets the judicial standard for final approval of a class action settlement under Fed. R. Civ. P. 23(e).

### A.    The Standard of Review for Approval of Class Action Settlements

The settlement of complex class action litigation is clearly favored by the courts in the Second Circuit. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *see also In re Ashanti Goldfields Sec. Litig.*, No. CV-00-717 (DGT), 2005 U.S. Dist. LEXIS 28431, at *3-*4 (E.D.N.Y. Nov. 15, 2005).  Moreover, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."  *In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006); *see also Weinberger*, 698 F.2d at 73 ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation.").

In deciding whether or not to approve a class action settlement, courts have recognized that a settlement represents an exercise of judgment by the negotiating parties and that, while a court should not give "rubber stamp approval" to a proposed settlement, it must "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the

case." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974). As the Second

Circuit explained in *Newman v. Stein,* 464 F.2d 689, 691-92 (2d Cir. 1972):

> [T]he role of a court in passing upon the propriety of the settlement of a derivative
> or other class action is a delicate one . . . we recognized that since "'the very
> purpose of a compromise is to avoid the trial of sharply disputed issues and to
> dispense with wasteful litigation,' the court must not turn the settlement hearing
> 'into a trial or a rehearsal of the trial.'" (citation omitted.)

Rather, a strong initial presumption of fairness attaches to a proposed settlement where plaintiff's

counsel obtains a settlement that is "the product of arm's-length negotiations conducted by a

capable counsel, well-experienced in class action litigation arising under the federal securities

laws." *In re Veeco Instrum. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 U.S. Dist. LEXIS

85629, at *17 (S.D.N.Y. Nov. 7, 2007) (internal citations omitted). *See also In re EVCI Career*

*Colleges Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 U.S. Dist. LEXIS 57918, at

*12 (S.D.N.Y. July 27, 2007) ("Absent fraud or collusion, the Court should be hesitant to

substitute its judgment for that of the parties who negotiated the settlement."); *In re Michael*

*Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 68 (S.D.N.Y. 1993) (in class action settlements

"[t]here is a strong initial presumption that the compromise is fair and reasonable" so long as

"[c]ounsel for plaintiff is able and experienced, particularly in the specific area with which these

actions are concerned," in which case "[h]is judgment is entitled to great weight.") (quotations

and citations omitted).

Here, this presumption of fairness readily attaches. Lead Counsel and Defendants' last

counsel of record attempted to reach a settlement in the fall of 2010. After these settlement

negotiations, which were conducted in Florida and New York, failed, the parties proceeded head-

long towards trial. At the end of the final pretrial conference before the Court on February 3,

2012, at the Court's suggestion, the parties met and began to develop a possible structure of an

unconventional settlement of this Action. From February 3, 2012 to February 9, 2012, the

parties engaged in extended and complicated arms-length settlement discussions.   Due to Defendants' limited financial resources, *see* Brower Decl. ¶¶54, and Lead Counsel's insistence that any amount that Defendants agreed to pay be, to the extent possible, secured, reaching a settlement that would ensure a benefit to the Class required significant ingenuity on behalf of all parties.   On February 9, 2012, after extended arms-length negotiations, the parties submitted to the Court the Stipulation.   *See* Brower Decl. ¶¶47-50.

### B.     The Settlement is Fair, Reasonable and Adequate

The standard for reviewing the proposed settlement of a class action in the Second Circuit, as in other circuits, is whether the proposed settlement is "fair, reasonable and adequate." *Luxottica Group*, 233 F.R.D. at 310; *In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689(SAS), 2003 U.S. Dist. LEXIS 17090, at *9 (S.D.N.Y. Sept. 29, 2003).   Furthermore, "in any case there is a range of reasonableness with respect to a settlement."   *Newman*, 464 F.2d at 693.

The Second Circuit has identified nine factors that courts should consider in deciding whether to approve a proposed settlement of a class action:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463.

Importantly, all nine factors need not be satisfied; rather, a court should look at "the totality of these factors in light of the particular circumstances."   *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 U.S. Dist. LEXIS 93423, at *26

(S.D.N.Y. Dec. 19, 2007) (internal citations omitted).  As demonstrated below and in the Brower Declaration, application of the *Grinnell* factors here overwhelmingly demonstrates that the Settlement is fair, reasonable and adequate.

> **1.     The Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation**

The adequacy of the amount offered in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case."  *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984).  The fact that a class could have theoretically received more if the action was completely successful for plaintiffs and the judgment was actually recoverable is not a reason to deny approval of a settlement.  The Court need only determine whether the settlement falls within a "range of reasonableness."  *In re PaineWebber Ltd. P'ships. Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997) (citation omitted); *see also Luxottica Group*, 233 F.R.D. at 316 ("The present settlement, achieved after years of active litigation, must be balanced against the expense and delay necessary to achieve a potentially larger result after trial and appeals."); *Indep. Energy*, 2003 U.S. Dist. LEXIS 17090, at *13 (noting few cases tried before a jury result in the full amount of damages claimed).

The range of reasonableness of the Settlement Amount in light of the best possible recovery and the attendant risks of litigation both support approval of the Settlement.  *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 461 (S.D.N.Y. 2004) ("Due to the complexities inherent in this case, the certainty of this settlement amount has to be judged in this context of the legal and practical obstacles to obtaining a large recovery.").  Here, the Class will receive between $600,000 and $1,100,000 in cash over a maximum period of five years in exchange for the release of all claims against Defendants -- a meaningful result for the Class both

in absolute terms and when viewed in light of the risks of litigation and ultimate recoverability Indeed, the proposed Settlement provides for the recovery of between 1.95% to 3.57% of the Class' damages as estimated by Plaintiffs' damages expert.  *See Grinnell*, 495 F.2d at 455 n.2 (no reason "why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery"); *Davis v. J.P. Morgan Chase & Co.*, No. 01-CV-6492L, 2011 U.S. Dist. LEXIS 117082, at *14-15 (W.D.N.Y. Oct. 11, 2011) (a "[c]ourt should not impose some arbitrary cutoff, and refuse to approve a settlement that falls below a certain percentage of that purely theoretical recovery."); *Global Crossing*, 225 F.R.D. at 460-61 (holding that "the settlement  amount's ratio to the maximum potential recovery need not be the sole, or even the dominant, consideration when assessing the settlement's fairness" and approving a settlement that was "[u]nquestionably . . . not rich in comparison to the vast damages Plaintiffs claim to have suffered."); *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at *19 (S.D.N.Y. Oct. 24, 2005) (finding settlement representing 3.8% of plaintiffs' estimated damages to be within the range of reasonableness). These foregoing percentages assume, of course, that Plaintiffs would have prevailed on all issues of liability and damages for the entire certified Class Period, prevailed on all appellate proceedings without significant modification of the final judgment, and that Defendants had the ability to pay the entire final judgment – all assumptions that are far from certain.  Without exposing the Class to the risks of further litigation described below, Lead Counsel have obtained a recovery representing a significant recovery of the Class Members' theoretical damages.

### 2.    Ability of the Defendants to Withstand a Greater Judgment

In assessing a proposed settlement, the Court should consider the Defendants' ability to withstand a judgment greater than that secured by settlement.  *Grinnell*, 495 F.2d at 463.  Here, given the circumstances surrounding this action and the financial constraints on the Defendants,

this factor -- which may be the most important in considering the proposed Settlement before the Court -- counsels heavily in favor of approval of the Settlement. Based on Lead Counsel's investigation, including documents file in the Westernbank Action, Lead Counsel has concluded that, at this time and in the foreseeable future, Defendants are unlikely to be able to withstand a greater judgment than is provided for by the Settlement. *See* Brower Decl. ¶54. As the Court has been previously informed, Inyx currently has no business operations and essentially no assets; the Company's D&O liability coverage was exhausted by expenses in the Westernbank Action years ago; Dr. Kachkar and Mr. Green both have limited personal assets, much of which has significantly diminished in value during the pendency of this Action; Dr. Kachkar is already subject to a pending nine figure judgment in the Westernbank Action; Ms. Goldschmidt also has limited personal assets and additionally resides in Canada, where enforcing such a judgment under the federal securities laws would likely prove difficult. The Defendants' inability to fulfill their monetary obligations to three successive law firms in this Action is further evidence of their collective lack of financial resources. Given these facts, this factor weighs heavily in favor of the Settlement. *See McBean v. City of New York*, 233 F.R.D. 377, 388 (S.D.N.Y. 2006) ("Where there is a risk that an insolvent defendant could not withstand a greater judgment, this factor will strongly favor settlement."); *Carnegie v. Mut. Sav. Life Ins. Co.*, No. CV-99-S-3292-NE, 2004 U.S. Dist. LEXIS 29404, at *80-81 (N.D. Ala. Nov. 23, 2004) (finding that defendant "has adduced evidence that it could not withstand a judgment exceeding the amount contemplated in the proposed settlement" and therefore approving settlement because "a greater award of damages following trial would be meaningless if Mutual Savings was forced into insolvency").

### 3. The Risk of Establishing Liability and Damages

In assessing the Settlement, the Court should balance the benefits afforded the Class, including the certainty of a recovery, against the continuing risks of litigation. *See Grinnell*, 495

F.2d at 463.  While the Court sustained certain of Plaintiffs' claims against Defendants, Plaintiffs recognized that they faced substantial risks at trial with respect to proving liability, loss causation and damages.  Brower Decl. ¶¶61-62.  *See In re Michael Milken*, 150 F.R.D. at 53 (when evaluating securities class action settlements, courts have long recognized such litigation to be "'notably difficult and notoriously uncertain'") (quoting *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y. 1973)); *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971) ("Stockholder litigation is notably difficult and unpredictable.").

Lead Plaintiff believes he would have succeeded on the merits in this Action.  That said, he must acknowledge that he faced the risks of failing to establish one or more of the elements of his claim at trial, such as falsity, *scienter*, loss causation or damages.  Brower Decl. ¶¶61-62.  *See Bussie v. Allmerica Finance Corp*, 50 F. Supp. 2d 59, 76 (D. Mass. 1999) (approving settlement where plaintiffs faced several significant, viable legal defenses "any one of which, if successful, could result in entry of a judgment *with prejudice* against the Class.") (emphasis in original).  For instance, proof of *scienter* is typically a difficult challenge in a securities fraud action.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (To establish liability under Section 10(b) and Rule 10b-5, a plaintiff must prove that a defendant acted with *scienter*, which is "a mental state embracing intent to deceive, manipulate, or defraud."); *see also In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, MDL No. 1500, 2006 U.S. Dist. LEXIS 17588, at *39 (S.D.N.Y. Apr. 6, 2006) (noting that "the difficulty of establishing liability is a common risk of securities litigation"); *Indep. Energy*, 2003 U.S. Dist. LEXIS 17090, at *11 (noting difficulty of proving *scienter*).  Thus, no matter how confident a plaintiff is of victory, prudence and experience counsel that a successful result, particularly one in a complex class action securities case, is never assured, and that consideration should be credited in favor of approval of the

Settlement here.

### 4.     The Complexity, Expense and Likely Duration of the Litigation

"The expense and possible duration of the litigation should be considered in evaluating the reasonableness of [a] settlement." *Milstein v. Huck*, 600 F. Supp. 254, 267 (E.D.N.Y. 1984). *See also In re Gilat Satellite Networks, Ltd.*, CV-02-1510 (CPS), 2007 U.S. Dist. LEXIS 29062, at *36 (E.D.N.Y. Apr. 19, 2007) ("Securities class actions are generally complex and expensive to litigate."). Virtually all securities actions are inherently complex, and this Action was no different. In addition to the typical complications involved in establishing Defendants' liability and in proving damages in a Section 10(b) action, proving Plaintiff's claims required, *inter alia* a detailed understanding of Inyx's loan covenants with Westernbank and the dissection of Defendants' various schemes to inflate revenue, including the false customer invoices, fictitious accounts receivable, and diversions of funds from the appropriate lock boxes.

Although the parties were, literally, on the eve of trial when the Settlement was reached, the actual trial would have required hundreds of hours of additional work by Lead Counsel and the expenditure of enormous amounts of money that are required to try a complex commercial action of this type using the requisite modern trial techniques. Additionally, a trial was unlikely to be the end of the litigation. The Court need only scan the docket in this Action and its related miscellaneous dockets in the Second Circuit relating to Defendants' attempts at reconsideration and interlocutory review of almost every decision issued by this Court to know that post-trial motions and appeals were inevitable. All of the foregoing would have added significantly to the time and expense of this Action and, even if Lead Plaintiff were ultimately successful, delayed by years any recovery to the Class even if Lead Plaintiff was able to execute upon a judgment against the Defendants. *See* Brower Decl. ¶55-56. *See AOL Time Warner*, 2006 U.S. Dist. LEXIS 17588, at *33 ("Each step of the way, expenses would continue to accumulate, further

decreasing the funds available to Class Members."); *Hicks*, 2005 U.S. Dist. LEXIS 24890, at *16 ("Further litigation would necessarily involve further costs [and] justice may be best served with a fair settlement today as opposed to an uncertain future settlement or trial of the action.").

### 5.    The Reaction of the Class to the Settlement

The reaction of the Class to the Settlement is a significant factor in assessing its fairness and adequacy, and "'the absence of objectants may itself be taken as evidencing the fairness of a settlement.'" *PaineWebber*, 171 F.R.D. at 126 (citation omitted); *see also Veeco*, 2007 U.S. Dist. LEXIS 85629, at *21-22 (where no objections and one request for exclusion were received, the Court found this fact to show those affected by the settlement had "overwhelmingly endorsed it") (citing *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362-63 (S.D.N.Y. 2002)). GCG and Lead Counsel, in accordance with the procedures for mailing and publication established by the Court's Preliminary Approval Order, undertook an extensive program to ensure that notice of the Action and the proposed Settlement was widely disseminated to Inyx's Class Period shareholders.  The deadline for objections to the Settlement passed on April 9, 2012.  Following the dissemination of over 6,000 copies of the Notice and three staggered summary notices over the major business newswires, not one Class Member has objected to the Settlement, and only two putative Class Members have requested exclusion from the Class, *see* GCG Aff. ¶9, which is plainly *de minimis* for a stock like Inyx with over twenty-seven million shares outstanding during the Class Period.  The absence of negative feed back from Class members and the insignificant number of requests for exclusion from the Class plainly evidences an overall favorable response of the Class Members to the Settlement.  Thus, this factor strongly supports approval of the Settlement.

###### 6.      The Stage of the Proceedings and Amount of Discovery Completed

In evaluating a settlement, "[t]here is no precise formula for what constitutes sufficient evidence to enable the court to analyze intelligently the contested questions of fact.  It is clear that the court need not possess evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation."  Newberg & Conte, NEWBERG ON CLASS ACTIONS §11.45 (4th ed. 2002); *see also In re AOL Time Warner,* 2006 U.S. Dist. LEXIS 17588, at *36-*37 ("The relevant inquiry for this factor is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement.").

As discussed more fully above and in the Brower Declaration, this Action was settled on the eve of trial, after the litigation of dispositive motions and all of the extensive discovery was completed.  Accordingly, Lead Plaintiff and Lead Counsel were as informed as they were likely ever to be regarding the strengths and weaknesses of their claims and Defendants' defenses when the Settlement was reached and that allowed them to balance the benefits of the Settlement with the risk that Plaintiff may not be able to obtain a larger recovery after a complex trial.

Thus, this Action had advanced to a stage -- far more so than in most securities class actions where settlements have received judicial approval -- where the parties certainly "'have a clear view of the strengths and weaknesses of their cases.'"  *Teachers' Ret. Sys.*, 2004 U.S. Dist. LEXIS 8608, at *10 (citation omitted); s*ee also Rolland v. Cellucci*, 191 F.R.D. 3, 10 (D. Mass. 2000) (finding settlement achieved after virtually all discovery was complete and parties had advice and reports of their respective experts "was achieved precisely at the moment when they were most informed and, concomitantly, most at risk given the impending trial.").

### 7.     The Risks of Maintaining the Class Action Through Trial

Although the Class has been certified by the Court, there is no assurance of maintaining it, as certified, through to judgment as a court is expected to re-evaluate the appropriateness of class and its definition throughout the trial.  *See* Fed. R. Civ. P. 23(c)(1)(C).  *See Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005); *Chatelain v. Prudential-Bache Sec.*, 805 F. Supp. 209, 214 (S.D.N.Y. 1992) ("Even if certified, the class [faces] the risk of decertification.").  Here, Defendants vigorously contested certification of the Class, and while they had not formally sought to decertify the Class, they may at trial attempt to limit the span of the Class Period and/or the number of potential Class Members within the Class.  Indeed, several decisions from the Supreme Court issued during the course of this litigation significantly altered the requirements for class certification in securities actions and Lead Counsel were acutely aware that an adverse decision from an appellate court before any judgment in this Action became final was a meaningful risk that militates in favor of approval of the Settlement.

Therefore, Lead Plaintiff respectfully submits that under the applicable factors relevant to determining the fairness, reasonableness, and adequacy of a proposed class action settlement, the Settlement here should be approved.

## IV.    THE PLAN OF ALLOCATION IS FAIR, REASONABLE AND ADEQUATE

The "Settlement Fund," is defined as the amount totaling no less than $600,000.00 in cash and no more than $1,100,000.00 in cash, plus any accrued interest.[5]  The "Net Settlement Fund" consists of the Settlement Fund, less all payments from the Settlement Fund allowed by the Court for Notice, administration of the Settlement and Class Counsel's attorneys' fees and

---

[5] As described above, and in greater detail in the Stipulation, the exact amount of the Settlement Fund will depend both on the timing of Defendants' payments in satisfaction of the Stipulation and on whether or not Defendants realize any financial return in connection with certain intellectual property described in the Stipulation.

expenses.   The Net Settlement Fund will be distributed pursuant to the proposed Plan of Allocation described in the Notice to Class Members who submit timely and valid proofs of claim ("Authorized Claimants").

Under the Plan of Allocation (set forth in the Notice beginning at page 4), the Net Settlement Fund will be allocated to all Authorized Claimants *pro rata* on a per share basis on the number of shares of Inyx common stock held by each such Authorized Claimant at the close of the market on July 1, 2007, based on the information supplied in their Proof of Claim with respect to each claimant's purchases and sales of Inyx common stock on the NASDAQ.  *See Merrill Lynch*, 2007 U.S. Dist. LEXIS 9450, at *39 ("A plan of allocation that calls for the pro rata distribution of settlement proceeds on the basis of investment loss is reasonable."); *Telik, Inc.*, 576 F. Supp. 2d at 581.

The standard for approval of a plan of allocation in the Second Circuit is the same as the standard for approving a settlement: "namely, it must be fair and adequate."  *Maley*, 186 F. Supp. 2d at 367 (citation omitted).  "[T]he adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed allocation is fair and reasonable in light of that information."  *PaineWebber*, 171 F.R.D. at 133.  Moreover, "[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."  *Id.*; *see also Indep. Energy*, 2003 U.S. Dist. LEXIS 17090, at *15 (giving considerable weight to opinion of counsel in making its decision to approve plan of allocation); *In re NASDAQ Market-Makers Antitrust Litig.*, No. 94 Civ. 3996 (RWS), 2000 U.S. Dist. LEXIS 304, at *6 (S.D.N.Y. Jan. 12, 2000) ("An allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' Class Counsel") (citation omitted).

Here, the plan of Allocation divides the Net Settlement among Authorized Claimants on an equal basis regardless of the amount originally paid for such shares; rather, it provides that each Authorized Claimant will share in the Settlement on a *pro rata* basis.  Since the aggregate amount of the drop in the price of Inyx shares at the end of the Class Period will exceed the amount of the Settlement by many times and because the price of Inyx shares never thereafter recovered, this simple method of allocating the Net Settlement Fund is not only facially fair and economical to administrator, but entirely consistent with the Supreme Court's definition of loss causation (and, therefore, recoverable damages) in securities cases under *Dura Pharmaceutical, Inc. v. Broudo,* 544 U.S. 336 (2005).

Further, the Notice disseminated to potential Class Members described the Plan of Allocation in detail, and estimated the impact on individual Class claimants.  Class Members had the opportunity to object or otherwise express their views concerning the Plan of Allocation to the Court by April 9, 2012.  As of the date of this submission, ***not a single objection or negative comment has been submitted regarding the proposed Plan of Allocation***.

Accordingly, Lead Plaintiff submits that the Plan has a reasonable and rationale basis and is fair and equitable to Class Members and should be approved by the Court.

V.    **CONCLUSION**

For the reasons set forth herein and in the accompanying Brower Declaration, Lead Plaintiff respectfully submits that the proposed Settlement and Plan of Allocation are fair, reasonable, and adequate, and respectfully request this Court to grant final approval of the Settlement and Plan of Allocation.


Dated:  April 27, 2012                              Respectfully submitted,

                                                    **BROWER PIVEN**
                                                       A Professional Corporation


                                                    *David A.P. Brower /s/_____*
                                                    David A.P. Brower
                                                    488 Madison Avenue
                                                    Eighth Floor
                                                    New York, NY  10022
                                                    Telephone: (212) 501-9000
                                                    Facsimile:  (212) 501-0300

                                                    *Lead Counsel for Lead Plaintiff and the Class*